# EXHIBIT 6

Dockets.Justia.com

## 2106.02 **>Mathematical Algorithms< [R-5]

**>Claims to processes that do nothing more than solve mathematical problems or manipulate abstract ideas or concepts are complex to analyze and are addressed herein.

If the "acts" of a claimed process manipulate only numbers, abstract concepts or ideas, or signals representing any of the foregoing, the acts are not being applied to appropriate subject matter. *Gottschalk v. Benson*, 409 U.S. 63, 71 - 72, 175 USPQ 673, 676 (1972). Thus, a process consisting solely of mathematical operations, i.e., converting one set of numbers into another set of numbers, does not manipulate appropriate subject matter and thus cannot constitute a statutory process.

In practical terms, claims define nonstatutory processes if they:

– consist solely of mathematical operations without some claimed practical application (i.e., executing a "mathematical algorithm"); or
– simply manipulate abstract ideas, e.g., a bid (*Schrader*, 22 F.3d at 293-94, 30 USPQ2d at 1458-59) or a bubble hierarchy (*Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759), without some claimed practical application.

Cf. *Alappat*, 33 F.3d at 1543 n.19, 31 USPQ2d at 1556 n.19 in which the Federal Circuit recognized the confusion:

> The Supreme Court has not been clear . . . as to whether such subject matter is excluded from the scope of 101 because it represents laws of nature, natural phenomena, or abstract ideas. See *Diehr*, 450 U.S. at 186 (viewed mathematical algorithm as a law of nature); *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972) (treated mathematical algorithm as an "idea"). The Supreme Court also has not been clear as to exactly what kind of mathematical subject matter may not be patented. The Supreme Court has used, among others, the terms "mathematical algorithm," "mathematical formula," and "mathematical equation" to describe types of mathematical subject matter not entitled to patent protection standing alone. The Supreme Court has not set forth, however, any consistent or clear explanation of what it intended by such terms or how these terms are related, if at all.

Certain mathematical algorithms have been held to be nonstatutory because they represent a mathematical definition of a law of nature or a natural phenomenon. For example, a mathematical algorithm representing the formula $E = mc^2$ is a "law of nature" — it defines a "fundamental scientific truth" (i.e., the relationship between energy and mass). To comprehend how the law of nature relates to any object, one invariably has to perform certain steps (e.g., multiplying a number representing the mass of an object by the square of a number representing the speed of light). In such a case, a claimed process which consists solely of the steps that one must follow to solve the mathematical representation of $E = mc^2$ is indistinguishable from the law of nature and would "preempt" the law of nature. A patent cannot be granted on such a process.<

## 2107 Guidelines for Examination of Applications for Compliance with the Utility Requirement

### I. INTRODUCTION

The following Guidelines establish the policies and procedures to be followed by Office personnel in the evaluation of any patent application for compliance with the utility requirements of 35 U.S.C. 101 and 112. These Guidelines have been promulgated to assist Office personnel in their review of applications for compliance with the utility requirement. The Guidelines do not alter the substantive requirements of 35 U.S.C. 101 and 112, nor are they designed to obviate the examiner's review of applications for compliance with all other statutory requirements for patentability. The Guidelines do not constitute substantive rulemaking and hence do not have the force and effect of law. Rejections will be based upon the substantive law, and it is these rejections which are appealable. Consequently, any perceived failure by Office personnel to follow these Guidelines is neither appealable nor petitionable.

### II. EXAMINATION GUIDELINES FOR THE UTILITY REQUIREMENT

Office personnel are to adhere to the following procedures when reviewing patent applications for compliance with the "useful invention" ("utility") requirement of 35 U.S.C. 101 and 112, first paragraph.

(A) Read the claims and the supporting written description.

(1) Determine what the applicant has claimed, noting any specific embodiments of the invention.

(2) Ensure that the claims define statutory subject matter (i.e., a process, machine, manufacture, composition of matter, or improvement thereof).

(3) If at any time during the examination, it becomes readily apparent that the claimed invention has a well-established utility, do not impose a rejection based on lack of utility. An invention has a well-established utility if (i) a person of ordinary skill in the art would immediately appreciate why the invention is useful based on the characteristics of the invention (e.g., properties or applications of a product or process), and (ii) the utility is specific, substantial, and credible.

(B) Review the claims and the supporting written description to determine if the applicant has asserted for the claimed invention any specific and substantial utility that is credible:

(1) If the applicant has asserted that the claimed invention is useful for any particular practical purpose (i.e., it has a "specific and substantial utility") and the assertion would be considered credible by a person of ordinary skill in the art, do not impose a rejection based on lack of utility.

(i) A claimed invention must have a specific and substantial utility. This requirement excludes "throw-away," "insubstantial," or "nonspecific" utilities, such as the use of a complex invention as landfill, as a way of satisfying the utility requirement of 35 U.S.C. 101.

(ii) Credibility is assessed from the perspective of one of ordinary skill in the art in view of the disclosure and any other evidence of record (e.g., test data, affidavits or declarations from experts in the art, patents or printed publications) that is probative of the applicant's assertions. An applicant need only provide one credible assertion of specific and substantial utility for each claimed invention to satisfy the utility requirement.

(2) If no assertion of specific and substantial utility for the claimed invention made by the applicant is credible, and the claimed invention does not have a readily apparent well-established utility, reject the claim(s) under 35 U.S.C. 101 on the grounds that the invention as claimed lacks utility. Also reject the claims under 35 U.S.C. 112, first paragraph, on the basis that the disclosure fails to teach how to use the invention as claimed. The 35 U.S.C. 112, first paragraph, rejection imposed in conjunction with a 35 U.S.C. 101 rejection should incorporate by reference the grounds of the corresponding 35 U.S.C. 101 rejection.

(3) If the applicant has not asserted any specific and substantial utility for the claimed invention and it does not have a readily apparent well-established utility, impose a rejection under 35 U.S.C. 101, emphasizing that the applicant has not disclosed a specific and substantial utility for the invention. Also impose a separate rejection under 35 U.S.C. 112, first paragraph, on the basis that the applicant has not disclosed how to use the invention due to the lack of a specific and substantial utility. The 35 U.S.C. 101 and 112 rejections shift the burden of coming forward with evidence to the applicant to:

(i) Explicitly identify a specific and substantial utility for the claimed invention; and

(ii) Provide evidence that one of ordinary skill in the art would have recognized that the identified specific and substantial utility was well-established at the time of filing. The examiner should review any subsequently submitted evidence of utility using the criteria outlined above. The examiner should also ensure that there is an adequate nexus between the evidence and the properties of the now claimed subject matter as disclosed in the application as filed. That is, the applicant has the burden to establish a probative relation between the submitted evidence and the originally disclosed properties of the claimed invention.

(C) Any rejection based on lack of utility should include a detailed explanation why the claimed invention has no specific and substantial credible utility. Whenever possible, the examiner should provide documentary evidence regardless of publication date (e.g., scientific or technical journals, excerpts from treatises or books, or U.S. or foreign patents) to support the factual basis for the *prima facie* showing of no specific and substantial credible utility. If documentary evidence is not available, the examiner should specifically explain the scientific basis for his or her factual conclusions.

(1) Where the asserted utility is not specific or substantial, a *prima facie* showing must establish that it is more likely than not that a person of ordinary skill in the art would not consider that any utility asserted by the applicant would be specific and substantial. The *prima facie* showing must contain the following elements:

(i) An explanation that clearly sets forth the reasoning used in concluding that the asserted utility for the claimed invention is not both specific and substantial nor well-established;

(ii) Support for factual findings relied upon in reaching this conclusion; and

(iii) An evaluation of all relevant evidence of record, including utilities taught in the closest prior art.

(2) Where the asserted specific and substantial utility is not credible, a *prima facie* showing of no specific and substantial credible utility must establish that it is more likely than not that a person skilled in the art would not consider credible any specific and substantial utility asserted by the applicant for the claimed invention. The *prima facie* showing must contain the following elements:

(i) An explanation that clearly sets forth the reasoning used in concluding that the asserted specific and substantial utility is not credible;

(ii) Support for factual findings relied upon in reaching this conclusion; and

(iii) An evaluation of all relevant evidence of record, including utilities taught in the closest prior art.

(3) Where no specific and substantial utility is disclosed or is well-established, a *prima facie* showing of no specific and substantial utility need only establish that applicant has not asserted a utility and that, on the record before the examiner, there is no known well-established utility.

(D) A rejection based on lack of utility should not be maintained if an asserted utility for the claimed invention would be considered specific, substantial, and credible by a person of ordinary skill in the art in view of all evidence of record.

Office personnel are reminded that they must treat as true a statement of fact made by an applicant in relation to an asserted utility, unless countervailing evidence can be provided that shows that one of ordinary skill in the art would have a legitimate basis to doubt the credibility of such a statement. Similarly, Office personnel must accept an opinion from a qualified expert that is based upon relevant facts whose accuracy is not being questioned; it is improper to disregard the opinion solely because of a disagreement over the significance or meaning of the facts offered.

Once a *prima facie* showing of no specific and substantial credible utility has been properly established, the applicant bears the burden of rebutting it. The applicant can do this by amending the claims, by providing reasoning or arguments, or by providing evidence in the form of a declaration under 37 CFR 1.132 or a patent or a printed publication that rebuts the basis or logic of the *prima facie* showing. If the applicant responds to the *prima facie* rejection, the Office personnel should review the original disclosure, any evidence relied upon in establishing the *prima facie* showing, any claim amendments, and any new reasoning or evidence provided by the applicant in support of an asserted specific and substantial credible utility. It is essential for Office personnel to recognize, fully consider and respond to each substantive element of any response to a rejection based on lack of utility. Only where the totality of the record continues to show that the asserted utility is not specific, substantial, and credible should a rejection based on lack of utility be maintained.

If the applicant satisfactorily rebuts a *prima facie* rejection based on lack of utility under 35 U.S.C. 101, withdraw the 35 U.S.C. 101 rejection and the corresponding rejection imposed under 35 U.S.C. 112, first paragraph.

## 2107.01 General Principles Governing Utility Rejections [R-5]

*35 U.S.C. 101. Inventions patentable*

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof may obtain a patent therefor, subject to the conditions and requirements of this title.

See MPEP § 2107 for guidelines for the examination of applications for compliance with the utility requirement of 35 U.S.C. 101.

The Office must examine each application to ensure compliance with the "useful invention" or utility requirement of 35 U.S.C. 101. In discharging this obligation, however, Office personnel must keep in mind several general principles that control applica-

tion of the utility requirement. As interpreted by the Federal courts, 35 U.S.C. 101 has two purposes. First, 35 U.S.C. 101 defines which categories of inventions are eligible for patent protection. An invention that is not a machine, an article of manufacture, a composition or a process cannot be patented. See *Diamond v. Chakrabarty*, 447 U.S. 303, 206 USPQ 193 (1980); *Diamond v. Diehr*, 450 U.S. 175, 209 USPQ 1 (1981). Second, 35 U.S.C. 101 serves to ensure that patents are granted on only those inventions that are "useful." This second purpose has a Constitutional footing — Article I, Section 8 of the Constitution authorizes Congress to provide exclusive rights to inventors to promote the "useful arts." See *Carl Zeiss Stiftung v. Renishaw PLC*, 945 F.2d 1173, 20 USPQ2d 1094 (Fed. Cir. 1991). Thus, to satisfy the requirements of 35 U.S.C. 101, an applicant must claim an invention that is statutory subject matter and must show that the claimed invention is "useful" for some purpose either explicitly or implicitly. Application of this latter element of 35 U.S.C. 101 is the focus of these guidelines.

Deficiencies under the "useful invention" requirement of 35 U.S.C. 101 will arise in one of two forms. The first is where it is not apparent why the invention is "useful." This can occur when an applicant fails to identify any specific and substantial utility for the invention or fails to disclose enough information about the invention to make its usefulness immediately apparent to those familiar with the technological field of the invention. *Brenner v. Manson*, 383 U.S. 519, 148 USPQ 689 (1966); >*In re Fisher*, 421 F.3d 1365, 76 USPQ2d 1225 (Fed. Cir. 2005);< *In re Ziegler*, 992 F.2d 1197, 26 USPQ2d 1600 (Fed. Cir. 1993). The second type of deficiency arises in the rare instance where an assertion of specific and substantial utility for the invention made by an applicant is not credible.

## I. SPECIFIC AND SUBSTANTIAL REQUIREMENTS

To satisfy 35 U.S.C. 101, an invention must be "useful." Courts have recognized that the term "useful" used with reference to the utility requirement can be a difficult term to define. *Brenner v. Manson*, 383 U.S. 519, 529, 148 USPQ 689, 693 (1966) (simple everyday word like "useful" can be "pregnant with ambiguity when applied to the facts of life."). Where an applicant has set forth a specific and substantial utility, courts have been reluctant to uphold a rejection under 35 U.S.C. 101 solely on the basis that the applicant's opinion as to the nature of the specific and substantial utility was inaccurate. For example, in *Nelson v. Bowler*, 626 F.2d 853, 206 USPQ 881 (CCPA 1980), the court reversed a finding by the Office that the applicant had not set forth a "practical" utility under 35 U.S.C. 101. In this case the applicant asserted that the composition was "useful" in a particular pharmaceutical application and provided evidence to support that assertion. Courts have used the labels "practical utility," "substantial utility," or "specific utility" to refer to this aspect of the "useful invention" requirement of 35 U.S.C. 101. The Court of Customs and Patent Appeals has stated:

> Practical utility is a shorthand way of attributing "real-world" value to claimed subject matter. In other words, one skilled in the art can use a claimed discovery in a manner which provides some immediate benefit to the public.

*Nelson v. Bowler*, 626 F.2d 853, 856, 206 USPQ 881, 883 (CCPA 1980).

Practical considerations require the Office to rely on the inventor's understanding of his or her invention in determining whether and in what regard an invention is believed to be "useful." Because of this, Office personnel should focus on and be receptive to assertions made by the applicant that an invention is "useful" for a particular reason.

### A. Specific Utility

A "specific utility" is *specific* to the subject matter claimed >and can "provide a well-defined and particular benefit to the public." *In re Fisher*, 421 F.3d 1365, 1371, 76 USPQ2d 1225, 1230 (Fed. Cir. 2005)<. This contrasts with a *general* utility that would be applicable to the broad class of the invention. Office personnel should distinguish between situations where an applicant has disclosed a specific use for or application of the invention and situations where the applicant merely indicates that the invention may prove useful without identifying with specificity why it <u>is</u> considered useful. For example, indicating that a compound may be useful in treating unspecified disorders, or that the compound has "useful biological" properties, would not be sufficient to define a specific utility for the compound. >See, e.g., *In re Kirk*, 376 F.2d 936, 153 USPQ 48 (CCPA 1967);

*In re Joly*, 376 F.2d 906, 153 USPQ 45 (CCPA 1967).< Similarly, a claim to a polynucleotide whose use is disclosed simply as a "gene probe" or "chromosome marker" would not be considered to be *specific* in the absence of a disclosure of a specific DNA target. >See *In re Fisher*, 421 F.3d at 1374, 76 USPQ2d at 1232 ("Any EST [expressed sequence tag] transcribed from any gene in the maize genome has the potential to perform any one of the alleged uses…. Nothing about [applicant's] seven alleged uses set the five claimed ESTs apart from the more than 32,000 ESTs disclosed in the [ ] application or indeed from any EST derived from any organism. Accordingly, we conclude that [applicant] has only disclosed general uses for its claimed ESTs, not specific ones that satisfy § 101.").< A general statement of diagnostic utility, such as diagnosing an unspecified disease, would ordinarily be insufficient absent a disclosure of what condition can be diagnosed. Contrast the situation where an applicant discloses a specific biological activity and reasonably correlates that activity to a disease condition. Assertions falling within the latter category are sufficient to identify a specific utility for the invention. Assertions that fall in the former category are insufficient to define a specific utility for the invention, especially if the assertion takes the form of a general statement that makes it clear that a "useful" invention <u>may</u> arise from what has been disclosed by the applicant. *Knapp v. Anderson*, 477 F.2d 588, 177 USPQ 688 (CCPA 1973).

### B. Substantial Utility

*>"[A]n application must show that an invention is useful to the public as disclosed in its current form, not that it may prove useful at some future date after further research. Simply put, to satisfy the 'substantial' utility requirement, an asserted use must show that the claimed invention has a significant and presently available benefit to the public." *Fisher*, 421 F.3d at 1371, 76 USPQ2d at 1230. The claims at issue in *Fisher* were directed to expressed sequence tags (ESTs), which are short nucleotide sequences that can be used to discover what genes and downstream proteins are expressed in a cell. The court held that "the claimed ESTs can be used only to gain further information about the underlying genes and the proteins encoded for by those genes. The claimed ESTs themselves are not an end of [applicant's] research effort, but only tools to be used along the way in the search for a practical utility…. [Applicant] does not identify the function for the underlying protein-encoding genes. Absent such identification, we hold that the claimed ESTs have not been researched and understood to the point of providing an immediate, well-defined, real world benefit to the public meriting the grant of a patent." *Id.* at 1376, 76 USPQ2d at 1233-34). Thus a< "substantial utility" defines a "real world" use. Utilities that require or constitute carrying out further research to identify or reasonably confirm a "real world" context of use are not substantial utilities. For example, both a therapeutic method of treating a known or newly discovered disease and an assay method for identifying compounds that themselves have a "substantial utility" define a "real world" context of use. An assay that measures the presence of a material which has a stated correlation to a predisposition to the onset of a particular disease condition would also define a "real world" context of use in identifying potential candidates for preventive measures or further monitoring. On the other hand, the following are examples of situations that require or constitute carrying out further research to identify or reasonably confirm a "real world" context of use and, therefore, do not define "substantial utilities":

(A) Basic research such as studying the properties of the claimed product itself or the mechanisms in which the material is involved;

(B) A method of treating an *unspecified* disease or condition;

(C) A method of assaying for or identifying a material that itself has no specific and/or substantial utility;

(D) A method of making a material that itself has no specific, substantial, and credible utility; and

(E) A claim to an intermediate product for use in making a final product that has no specific, substantial and credible utility.

Office personnel must be careful not to interpret the phrase "immediate benefit to the public" or similar formulations in other cases to mean that products or services based on the claimed invention must be "currently available" to the public in order to satisfy the utility requirement. See, e.g., *Brenner v. Manson*, 383 U.S. 519, 534-35, 148 USPQ 689, 695 (1966). Rather, any reasonable use that an applicant

has identified for the invention that can be viewed as providing a public benefit should be accepted as sufficient, at least with regard to defining a "substantial" utility.

### C. Research Tools

Some confusion can result when one attempts to label certain types of inventions as not being capable of having a specific and substantial utility based on the setting in which the invention is to be used. One example is inventions to be used in a research or laboratory setting. Many research tools such as gas chromatographs, screening assays, and nucleotide sequencing techniques have a clear, specific and unquestionable utility (e.g., they are useful in analyzing compounds). An assessment that focuses on whether an invention is useful only in a research setting thus does not address whether the invention is in fact "useful" in a patent sense. Instead, Office personnel must distinguish between inventions that have a specifically identified substantial utility and inventions whose asserted utility requires further research to identify or reasonably confirm. Labels such as "research tool," "intermediate" or "for research purposes" are not helpful in determining if an applicant has identified a specific and substantial utility for the invention.

### II. WHOLLY INOPERATIVE INVENTIONS; "INCREDIBLE" UTILITY

An invention that is "inoperative" (i.e., it does not operate to produce the results claimed by the patent applicant) is not a "useful" invention in the meaning of the patent law. See, e.g., *Newman v. Quigg*, 877 F.2d 1575, 1581, 11 USPQ2d 1340, 1345 (Fed. Cir. 1989); *In re Harwood*, 390 F.2d 985, 989, 156 USPQ 673, 676 (CCPA 1968) ("An inoperative invention, of course, does not satisfy the requirement of 35 U.S.C. 101 that an invention be useful."). However, as the Federal Circuit has stated, "[t]o violate [35 U.S.C.] 101 the claimed device must be totally incapable of achieving a useful result." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1571, 24 USPQ2d 1401, 1412 (Fed. Cir. 1992) (emphasis added). See also *E.I. du Pont De Nemours and Co. v. Berkley and Co.*, 620 F.2d 1247, 1260 n.17, 205 USPQ 1, 10 n.17 (8th Cir. 1980) ("A small degree of utility is sufficient . . . The claimed invention must only be capable of performing some beneficial function . . . An invention does not lack utility merely because the particular embodiment disclosed in the patent lacks perfection or performs crudely . . . A commercially successful product is not required . . . Nor is it essential that the invention accomplish all its intended functions . . . or operate under all conditions . . . partial success being sufficient to demonstrate patentable utility . . . In short, the defense of non-utility cannot be sustained without proof of total incapacity." If an invention is only partially successful in achieving a useful result, a rejection of the claimed invention as a whole based on a lack of utility is not appropriate. See *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995); *In re Gardner*, 475 F.2d 1389, 177 USPQ 396 (CCPA), *reh'g denied*, 480 F.2d 879 (CCPA 1973); *In re Marzocchi*, 439 F.2d 220, 169 USPQ 367 (CCPA 1971).

Situations where an invention is found to be "inoperative" and therefore lacking in utility are rare, and rejections maintained solely on this ground by a Federal court even rarer. In many of these cases, the utility asserted by the applicant was thought to be "incredible in the light of the knowledge of the art, or factually misleading" when initially considered by the Office. *In re Citron*, 325 F.2d 248, 253, 139 USPQ 516, 520 (CCPA 1963). Other cases suggest that on initial evaluation, the Office considered the asserted utility to be inconsistent with known scientific principles or "speculative at best" as to whether attributes of the invention necessary to impart the asserted utility were actually present in the invention. *In re Sichert*, 566 F.2d 1154, 196 USPQ 209 (CCPA 1977). However cast, the underlying finding by the court in these cases was that, based on the factual record of the case, it was clear that the invention could not and did not work as the inventor claimed it did. Indeed, the use of many labels to describe a single problem (e.g., a false assertion regarding utility) has led to some of the confusion that exists today with regard to a rejection based on the "utility" requirement. Examples of such cases include: an invention asserted to change the taste of food using a magnetic field (*Fregeau v. Mossinghoff*, 776 F.2d 1034, 227 USPQ 848 (Fed. Cir. 1985)), a perpetual motion machine (*Newman v. Quigg*, 877 F.2d 1575, 11 USPQ2d 1340 (Fed. Cir. 1989)), a flying machine operating on "flapping or flutter function" (*In re Houghton*, 433 F.2d 820,

167 USPQ 687 (CCPA 1970)), a "cold fusion" process for producing energy (*In re Swartz*, 232 F.3d 862, 56 USPQ2d 1703, (Fed. Cir. 2000)), a method for increasing the energy output of fossil fuels upon combustion through exposure to a magnetic field (*In re Ruskin*, 354 F.2d 395, 148 USPQ 221 (CCPA 1966)), uncharacterized compositions for curing a wide array of cancers (*In re Citron*, 325 F.2d 248, 139 USPQ 516 (CCPA 1963)), and a method of controlling the aging process (*In re Eltgroth*, 419 F.2d 918, 164 USPQ 221 (CCPA 1970)). These examples are fact specific and should not be applied as a *per se* rule. Thus, in view of the rare nature of such cases, Office personnel should not label an asserted utility "incredible," "speculative" or otherwise unless it is clear that a rejection based on "lack of utility" is proper.

### III. THERAPEUTIC OR PHARMACOLOGICAL UTILITY

Inventions asserted to have utility in the treatment of human or animal disorders are subject to the same legal requirements for utility as inventions in any other field of technology. *In re Chilowsky*, 229 F.2d 457, 461-2, 108 USPQ 321, 325 (CCPA 1956) ("There appears to be no basis in the statutes or decisions for requiring any more conclusive evidence of operativeness in one type of case than another. The character and amount of evidence needed may vary, depending on whether the alleged operation described in the application appears to accord with or to contravene established scientific principles or to depend upon principles alleged but not generally recognized, but the degree of certainty as to the ultimate fact of operativeness or inoperativeness should be the same in all cases"); *In re Gazave*, 379 F.2d 973, 978, 154 USPQ 92, 96 (CCPA 1967) ("Thus, in the usual case where the mode of operation alleged can be readily understood and conforms to the known laws of physics and chemistry, operativeness is not questioned, and no further evidence is required."). As such, pharmacological or therapeutic inventions that provide any "immediate benefit to the public" satisfy 35 U.S.C. 101. The utility being asserted in *Nelson* related to a compound with pharmacological utility. *Nelson v. Bowler*, 626 F.2d 853, 856, 206 USPQ 881, 883 (CCPA 1980). Office personnel should rely on *Nelson* and other cases as providing general guidance when evaluating the utility of an invention that is based on any therapeutic, prophylactic, or pharmacological activities of that invention.

Courts have repeatedly found that the mere identification of a pharmacological activity of a compound that is relevant to an asserted pharmacological use provides an "immediate benefit to the public" and thus satisfies the utility requirement. As the Court of Customs and Patent Appeals held in *Nelson v. Bowler*:

> Knowledge of the pharmacological activity of any compound is obviously beneficial to the public. It is inherently faster and easier to combat illnesses and alleviate symptoms when the medical profession is armed with an arsenal of chemicals having known pharmacological activities. Since it is crucial to provide researchers with an incentive to disclose pharmacological activities in as many compounds as possible, we conclude that adequate proof of any such activity constitutes a showing of practical utility.

*Nelson v. Bowler*, 626 F.2d 853, 856, 206 USPQ 881, 883 (CCPA 1980).

In *Nelson v. Bowler*, the court addressed the practical utility requirement in the context of an interference proceeding. Bowler challenged the patentability of the invention claimed by Nelson on the basis that Nelson had failed to sufficiently and persuasively disclose in his application a practical utility for the invention. Nelson had developed and claimed a class of synthetic prostaglandins modeled on naturally occurring prostaglandins. Naturally occurring prostaglandins are bioactive compounds that, at the time of Nelson's application, had a recognized value in pharmacology (e.g., the stimulation of uterine smooth muscle which resulted in labor induction or abortion, the ability to raise or lower blood pressure, etc.). To support the utility he identified in his disclosure, Nelson included in his application the results of tests demonstrating the bioactivity of his new substituted prostaglandins relative to the bioactivity of naturally occurring prostaglandins. The court concluded that Nelson had satisfied the practical utility requirement in identifying the synthetic prostaglandins as pharmacologically active compounds. In reaching this conclusion, the court considered and rejected arguments advanced by Bowler that attacked the evidentiary basis for Nelson's assertions that the compounds were pharmacologically active.

In *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980), an inventor claimed protection for pharmaceuti-

cal compositions for treating leukemia. The active ingredient in the compositions was a structural analog to a known anticancer agent. The applicant provided evidence showing that the claimed analogs had the same general pharmaceutical activity as the known anticancer agents. The court reversed the Board's finding that the asserted pharmaceutical utility was "incredible," pointing to the evidence that showed the relevant pharmacological activity.

In *Cross v. Iizuka*, 753 F.2d 1040, 224 USPQ 739 (Fed. Cir. 1985), the Federal Circuit affirmed a finding by the Board of Patent Appeals and Interferences that a pharmacological utility had been disclosed in the application of one party to an interference proceeding. The invention that was the subject of the interference count was a chemical compound used for treating blood disorders. Cross had challenged the evidence in Iizuka's specification that supported the claimed utility. However, the Federal Circuit relied extensively on *Nelson v. Bowler* in finding that Iizuka's application had sufficiently disclosed a pharmacological utility for the compounds. It distinguished the case from cases where only a generalized "nebulous" expression, such as "biological properties," had been disclosed in a specification. Such statements, the court held, "convey little explicit indication regarding the utility of a compound." *Cross*, 753 F.2d at 1048, 224 USPQ at 745 (citing *In re Kirk*, 376 F.2d 936, 941, 153 USPQ 48, 52 (CCPA 1967)).

Similarly, courts have found utility for therapeutic inventions despite the fact that an applicant is at a very early stage in the development of a pharmaceutical product or therapeutic regimen based on a claimed pharmacological or bioactive compound or composition. The Federal Circuit, in *Cross v. Iizuka*, 753 F.2d 1040, 1051, 224 USPQ 739, 747-48 (Fed. Cir. 1985), commented on the significance of data from *in vitro* testing that showed pharmacological activity:

> We perceive no insurmountable difficulty, under appropriate circumstances, in finding that the first link in the screening chain, *in vitro* testing, may establish a practical utility for the compound in question. Successful *in vitro* testing will marshal resources and direct the expenditure of effort to further *in vivo* testing of the most potent compounds, thereby providing an immediate benefit to the public, analogous to the benefit provided by the showing of an *in vivo* utility.

The Federal Circuit has reiterated that therapeutic utility sufficient under the patent laws is not to be confused with the requirements of the FDA with regard to safety and efficacy of drugs to marketed in the United States.

> FDA approval, however, is not a prerequisite for finding a compound useful within the meaning of the patent laws. *Scott [v. Finney]*, 34 F.3d 1058, 1063, 32 USPQ2d 1115, 1120 [(Fed.Cir. 1994)]. Usefulness in patent law, and in particular in the context of pharmaceutical inventions, necessarily includes the expectation of further research and development. The stage at which an invention in this field becomes useful is well before it is ready to be administered to humans. Were we to require Phase II testing in order to prove utility, the associated costs would prevent many companies from obtaining patent protection on promising new inventions, thereby eliminating an incentive to pursue, through research and development, potential cures in many crucial areas such as the treatment of cancer.

*In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995). Accordingly, Office personnel should not construe 35 U.S.C. 101, under the logic of "practical" utility or otherwise, to require that an applicant demonstrate that a therapeutic agent based on a claimed invention is a safe or fully effective drug for humans. See, e.g., *In re Sichert*, 566 F.2d 1154, 196 USPQ 209 (CCPA 1977); *In re Hartop*, 311 F.2d 249, 135 USPQ 419 (CCPA 1962); *In re Anthony*, 414 F.2d 1383, 162 USPQ 594 (CCPA 1969); *In re Watson*, 517 F.2d 465, 186 USPQ 11 (CCPA 1975).

These general principles are equally applicable to situations where an applicant has claimed a process for treating a human or animal disorder. In such cases, the asserted utility is usually clear — the invention is asserted to be useful in treating the particular disorder. If the asserted utility is <u>credible,</u> there is no basis to challenge such a claim on the basis that it lacks utility under 35 U.S.C. 101.

See MPEP § 2107.03 for special considerations for asserted therapeutic or pharmacological utilities.

### IV. RELATIONSHIP BETWEEN 35 U.S.C. 112, FIRST PARAGRAPH, AND 35 U.S.C. 101

A deficiency under >the utility prong of< 35 U.S.C. 101 also creates a deficiency under 35 U.S.C. 112, first paragraph. See *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995); *In re Jolles*, 628 F.2d 1322, 1326 n.10, 206 USPQ 885, 889 n.11 (CCPA 1980); *In re Fouche*, 439 F.2d 1237, 1243, 169 USPQ 429, 434 (CCPA 1971) ("If such compositions are in

fact useless, appellant's specification cannot have taught how to use them."). Courts have also cast the 35 U.S.C. 101/35 U.S.C. 112 relationship such that 35 U.S.C. 112 presupposes compliance with 35 U.S.C. 101. See *In re Ziegler*, 992 F.2d 1197, 1200-1201, 26 USPQ2d 1600, 1603 (Fed. Cir. 1993) ("The how to use prong of section 112 incorporates as a matter of law the requirement of 35 U.S.C. 101 that the specification disclose as a matter of fact a practical utility for the invention. ... If the application fails as a matter of fact to satisfy 35 U.S.C. § 101, then the application also fails as a matter of law to enable one of ordinary skill in the art to use the invention under 35 U.S.C. § 112."); *In re Kirk*, 376 F.2d 936, 942, 153 USPQ 48, 53 (CCPA 1967) ("Necessarily, compliance with § 112 requires a description of how to use presently useful inventions, otherwise an applicant would anomalously be required to teach how to use a useless invention."). For example, the Federal Circuit noted, "[o]bviously, if a claimed invention does not have utility, the specification cannot enable one to use it." *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995). As such, a rejection properly imposed under 35 U.S.C. 101 >for lack of utility< should be accompanied with a rejection under 35 U.S.C. 112, first paragraph. It is equally clear that a rejection based on "lack of utility," whether grounded upon 35 U.S.C. 101 or 35 U.S.C. 112, first paragraph, rests on the same basis (i.e., the asserted utility is not credible). To avoid confusion, any >lack of utility< rejection that is imposed on the basis of 35 U.S.C. 101 should be accompanied by a rejection based on 35 U.S.C. 112, first paragraph. The 35 U.S.C. 112, first paragraph, rejection should be set out as a separate rejection that incorporates by reference the factual basis and conclusions set forth in the 35 U.S.C. 101 rejection. The 35 U.S.C. 112, first paragraph, rejection should indicate that because the invention as claimed does not have utility, a person skilled in the art would not be able to use the invention as claimed, and as such, the claim is defective under 35 U.S.C. 112, first paragraph. A 35 U.S.C. 112, first paragraph, rejection >based on lack of utility< should not be imposed or maintained unless an appropriate basis exists for imposing a >utility< rejection under 35 U.S.C. 101. In other words, Office personnel should not impose a 35 U.S.C. 112, first paragraph, rejection grounded on a "lack of utility" basis unless a 35 U.S.C. 101 rejection is proper. In particular, the factual showing needed to impose a rejection under 35 U.S.C. 101 must be provided if a rejection under 35 U.S.C. 112, first paragraph, is to be imposed on "lack of utility" grounds.

It is important to recognize that 35 U.S.C. 112, first paragraph, addresses matters other than those related to the question of whether or not an invention lacks utility. These matters include whether the claims are fully supported by the disclosure (*In re Vaeck*, 947 F.2d 488, 495, 20 USPQ2d 1438, 1444 (Fed. Cir. 1991)), whether the applicant has provided an enabling disclosure of the claimed subject matter (*In re Wright*, 999 F.2d 1557, 1561-1562, 27 USPQ2d 1510, 1513 (Fed. Cir. 1993)), whether the applicant has provided an adequate written description of the invention and whether the applicant has disclosed the best mode of practicing the claimed invention (*Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927-928, 16 USPQ2d 1033, 1036-1037 (Fed. Cir. 1990)). See also *Transco Products Inc. v. Performance Contracting Inc.*, 38 F.3d 551, 32 USPQ2d 1077 (Fed. Cir. 1994); *Glaxo Inc. v. Novopharm Ltd.* 52 F.3d 1043, 34 USPQ2d 1565 (Fed. Cir. 1995). The fact that an applicant has disclosed a specific utility for an invention and provided a credible basis supporting that specific utility does not provide a basis for concluding that the claims comply with all the requirements of 35 U.S.C. 112, first paragraph. For example, if an applicant has claimed a process of treating a certain disease condition with a certain compound and provided a credible basis for asserting that the compound is useful in that regard, but to actually practice the invention as claimed a person skilled in the relevant art would have to engage in an undue amount of experimentation, the claim may be defective under 35 U.S.C. 112, but not 35 U.S.C. 101. To avoid confusion during examination, any rejection under 35 U.S.C. 112, first paragraph, based on grounds other than "lack of utility" should be imposed separately from any rejection imposed due to "lack of utility" under 35 U.S.C. 101 and 35 U.S.C. 112, first paragraph.

## 2107.02 Procedural Considerations Related to Rejections for Lack of Utility [R-5]

### I. THE CLAIMED INVENTION IS THE FOCUS OF THE UTILITY REQUIREMENT

The claimed invention is the focus of the assessment of whether an applicant has satisfied the utility requirement. Each claim (i.e., each "invention"), therefore, must be evaluated on its own merits for compliance with all statutory requirements. Generally speaking, however, a dependent claim will define an invention that has utility if the >independent< claim **>from which the dependent claim depends is drawn to the same statutory class of invention as the dependent claim and the independent claim defines< an invention having utility. An exception to this general rule is where the utility specified for the invention defined in a dependent claim differs from that indicated for the invention defined in the independent claim from which the dependent claim depends. Where an applicant has established utility for a species that falls within an identified genus of compounds, and presents a generic claim covering the genus, as a general matter, that claim should be treated as being sufficient under 35 U.S.C. 101. Only where it can be established that other species clearly encompassed by the claim do not have utility should a rejection be imposed on the generic claim. In such cases, the applicant should be encouraged to amend the generic claim so as to exclude the species that lack utility.

It is common and sensible for an applicant to identify several specific utilities for an invention, particularly where the invention is a product (e.g., a machine, an article of manufacture or a composition of matter). However, regardless of the category of invention that is claimed (e.g., product or process), an applicant need only make one credible assertion of specific utility for the claimed invention to satisfy 35 U.S.C. 101 and 35 U.S.C. 112; additional statements of utility, even if not "credible," do not render the claimed invention lacking in utility. See, e.g., *Raytheon v. Roper*, 724 F.2d 951, 958, 220 USPQ 592, 598 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 835 (1984) ("When a properly claimed invention meets at least one stated objective, utility under 35 U.S.C. 101 is clearly shown."); *In re Gottlieb*, 328 F.2d 1016, 1019, 140 USPQ 665, 668 (CCPA 1964) ("Having found that the antibiotic is useful for some purpose, it becomes unnecessary to decide whether it is in fact useful for the other purposes 'indicated' in the specification as possibly useful."); *In re Malachowski*, 530 F.2d 1402, 189 USPQ 432 (CCPA 1976); *Hoffman v. Klaus*, 9 USPQ2d 1657 (Bd. Pat. App. & Inter. 1988). Thus, if applicant makes one credible assertion of utility, utility for the claimed invention as a whole is established.

Statements made by the applicant in the specification or incident to prosecution of the application before the Office cannot, standing alone, be the basis for a lack of utility rejection under 35 U.S.C. 101 or 35 U.S.C. 112. *Tol-O-Matic, Inc. v. Proma Produkt- Und Mktg. Gesellschaft m.b.h.*, 945 F.2d 1546, 1553, 20 USPQ2d 1332, 1338 (Fed. Cir. 1991) (It is not required that a particular characteristic set forth in the prosecution history be achieved in order to satisfy 35 U.S.C. 101.). An applicant may include statements in the specification whose technical accuracy cannot be easily confirmed if those statements are not necessary to support the patentability of an invention with regard to any statutory basis. Thus, the Office should not require an applicant to strike nonessential statements relating to utility from a patent disclosure, regardless of the technical accuracy of the statement or assertion it presents. Office personnel should also be especially careful not to read into a claim unclaimed results, limitations or embodiments of an invention. See *Carl Zeiss Stiftung v. Renishaw PLC*, 945 F.2d 1173, 20 USPQ2d 1094 (Fed. Cir. 1991); *In re Krimmel*, 292 F.2d 948, 130 USPQ 215 (CCPA 1961). Doing so can inappropriately change the relationship of an asserted utility to the claimed invention and raise issues not relevant to examination of that claim.

### II. IS THERE AN ASSERTED OR WELL-ESTABLISHED UTILITY FOR THE CLAIMED INVENTION?

Upon initial examination, the examiner should review the specification to determine if there are any statements asserting that the claimed invention is useful for any particular purpose. A complete disclosure should include a statement which identifies a specific and substantial utility for the invention.

### A. An Asserted Utility Must Be Specific and Substantial

A statement of specific and substantial utility should fully and clearly explain why the applicant believes the invention is useful. Such statements will usually explain the purpose of or how the invention may be used (e.g., a compound is believed to be useful in the treatment of a particular disorder). Regardless of the form of statement of utility, it must enable one ordinarily skilled in the art to understand why the applicant believes the claimed invention is useful.

Except where an invention has a well-established utility, the failure of an applicant to specifically identify why an invention is believed to be useful renders the claimed invention deficient under 35 U.S.C. 101 and 35 U.S.C. 112, first paragraph. In such cases, the applicant has failed to identify a "specific and substantial utility" for the claimed invention. For example, a statement that a composition has an unspecified "biological activity" or that does not explain why a composition with that activity is believed to be useful fails to set forth a "specific and substantial utility." *Brenner v. Manson*, 383 US 519, 148 USPQ 689 (1966) (general assertion of similarities to known compounds known to be useful without sufficient corresponding explanation why claimed compounds are believed to be similarly useful insufficient under 35 U.S.C. 101); *In re Ziegler*, 992 F.2d 1197, 1201, 26 USPQ2d 1600, 1604 (Fed. Cir. 1993) (disclosure that composition is "plastic-like" and can form "films" not sufficient to identify specific and substantial utility for invention); *In re Kirk*, 376 F.2d 936, 153 USPQ 48 (CCPA 1967) (indication that compound is "biologically active" or has "biological properties" insufficient standing alone). See also *In re Joly*, 376 F.2d 906, 153 USPQ 45 (CCPA 1967); *Kawai v. Metlesics*, 480 F.2d 880, 890, 178 USPQ 158, 165 (CCPA 1973) (contrasting description of invention as sedative which did suggest specific utility to general suggestion of "pharmacological effects on the central nervous system" which did not). In contrast, a disclosure that identifies a particular biological activity of a compound and explains how that activity can be utilized in a particular therapeutic application of the compound does contain an assertion of specific and substantial utility for the invention.

Situations where an applicant either fails to indicate why an invention is considered useful, or where the applicant inaccurately describes the utility should rarely arise. One reason for this is that applicants are required to disclose the best mode known to them of practicing the invention at the time they file their application. An applicant who omits a description of the specific and substantial utility of the invention, or who incompletely describes that utility, may encounter problems with respect to the best mode requirement of 35 U.S.C. 112, first paragraph.

### B. No Statement of Utility for the Claimed Invention in the Specification Does Not Per Se Negate Utility

Occasionally, an applicant will not explicitly state in the specification or otherwise assert a specific and substantial utility for the claimed invention. If no statements can be found asserting a specific and substantial utility for the claimed invention in the specification, Office personnel should determine if the claimed invention has a well-established utility. An invention has a well-established utility if (i) a person of ordinary skill in the art would immediately appreciate why the invention is useful based on the characteristics of the invention (e.g., properties or applications of a product or process), and (ii) the utility is specific, substantial, and credible. If an invention has a well-established utility, rejections under 35 U.S.C. 101 and 35 U.S.C. 112, first paragraph, based on lack of utility should not be imposed. *In re Folkers*, 344 F.2d 970, 145 USPQ 390 (CCPA 1965). For example, if an application teaches the cloning and characterization of the nucleotide sequence of a well-known protein such as insulin, and those skilled in the art at the time of filing knew that insulin had a well-established use, it would be improper to reject the claimed invention as lacking utility solely because of the omitted statement of specific and substantial utility.

If a person of ordinary skill would not immediately recognize a specific and substantial utility for the claimed invention (i.e., why it would be useful) based on the characteristics of the invention or statements made by the applicant, the examiner should reject the application under 35 U.S.C. 101 and under 35 U.S.C. 112, first paragraph, as failing to identify a specific and substantial utility for the claimed invention. The rejection should clearly indicate that the basis of the

rejection is that the application fails to identify a specific and substantial utility for the invention. The rejection should also specify that the applicant must reply by indicating why the invention is believed useful and where support for any subsequently asserted utility can be found in the specification as filed. See MPEP § 2701.

If the applicant subsequently indicates why the invention is useful, Office personnel should review that assertion according to the standards articulated below for review of the credibility of an asserted utility.

## III. EVALUATING THE CREDIBILITY OF AN ASSERTED UTILITY

### A. An Asserted Utility Creates a Presumption of Utility

In most cases, an applicant's assertion of utility creates a presumption of utility that will be sufficient to satisfy the utility requirement of 35 U.S.C. 101. See, e.g., *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980); *In re Irons*, 340 F.2d 974, 144 USPQ 351 (CCPA 1965); *In re Langer*, 503 F.2d 1380, 183 USPQ 288 (CCPA 1974); *In re Sichert*, 566 F.2d 1154, 1159, 196 USPQ 209, 212-13 (CCPA 1977). As the Court of Customs and Patent Appeals stated in *In re Langer*:

> As a matter of Patent Office practice, a specification which contains a disclosure of utility which corresponds in scope to the subject matter sought to be patented must be taken as sufficient to satisfy the utility requirement of § 101 for the entire claimed subject matter unless there is a reason for one skilled in the art to question the objective truth of the statement of utility or its scope.

*In re Langer*, 503 F.2d at 1391, 183 USPQ at 297 (emphasis in original). The "Langer" test for utility has been used by both the Federal Circuit and the Court of Customs and Patent Appeals in evaluation of rejections under 35 U.S.C. 112, first paragraph, where the rejection is based on a deficiency under 35 U.S.C. 101. In *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995), the Federal Circuit explicitly adopted the Court of Customs and Patent Appeals formulation of the "Langer" standard for 35 U.S.C. 112, first paragraph rejections, as it was expressed in a slightly reworded format in *In re Marzocchi*, 439 F.2d 220, 223, 169 USPQ 367, 369 (CCPA 1971), namely:

> [A] specification disclosure which contains a teaching of the manner and process of making and using the invention in terms which correspond in scope to those used in describing and defining the subject matter sought to be patented must be taken as in compliance with the enabling requirement of the first paragraph of § 112 unless there is reason to doubt the objective truth of the statements contained therein which must be relied on for enabling support. (emphasis added).

Thus, *Langer* and subsequent cases direct the Office to presume that a statement of utility made by an applicant is true. See *In re Langer*, 503 F.2d at 1391, 183 USPQ at 297; *In re Malachowski*, 530 F.2d 1402, 1404, 189 USPQ 432, 435 (CCPA 1976); *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995). For obvious reasons of efficiency and in deference to an applicant's understanding of his or her invention, when a statement of utility is evaluated, Office personnel should not begin by questioning the truth of the statement of utility. Instead, any inquiry must start by asking if there is any reason to question the truth of the statement of utility. This can be done by simply evaluating the logic of the statements made, taking into consideration any evidence cited by the applicant. If the asserted utility is credible (i.e., believable based on the record or the nature of the invention), a rejection based on "lack of utility" is not appropriate. Clearly, Office personnel should not begin an evaluation of utility by assuming that an asserted utility is likely to be false, based on the technical field of the invention or for other general reasons.

Compliance with 35 U.S.C. 101 is a question of fact. *Raytheon v. Roper*, 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed. Cir. 1983) *cert. denied*, 469 U.S. 835 (1984). Thus, to overcome the presumption of truth that an assertion of utility by the applicant enjoys, Office personnel must establish that it is more likely than not that one of ordinary skill in the art would doubt (i.e., "question") the truth of the statement of utility. The evidentiary standard to be used throughout *ex parte* examination in setting forth a rejection is a preponderance of the totality of the evidence under consideration. *In re Oetiker*, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed. Cir. 1992) ("After evidence or argument is submitted by the applicant in response, patentability is determined on the totality of the record, by a preponderance of evidence with due consideration to persuasiveness of

argument."); *In re Corkill*, 771 F.2d 1496, 1500, 226 USPQ 1005, 1008 (Fed. Cir. 1985). A preponderance of the evidence exists when it suggests that it is more likely than not that the assertion in question is true. *Herman v. Huddleston*, 459 U.S. 375, 390 (1983). To do this, Office personnel must provide evidence sufficient to show that the statement of asserted utility would be considered "false" by a person of ordinary skill in the art. Of course, a person of ordinary skill must have the benefit of both facts and reasoning in order to assess the truth of a statement. This means that if the applicant has presented facts that support the reasoning used in asserting a utility, Office personnel must present countervailing facts and reasoning sufficient to establish that a person of ordinary skill would not believe the applicant's assertion of utility. *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995). The initial evidentiary standard used during evaluation of this question is a preponderance of the evidence (i.e., the totality of facts and reasoning suggest that it is more likely than not that the statement of the applicant is false).

### B. When Is an Asserted Utility Not Credible?

Where an applicant has specifically asserted that an invention has a particular utility, that assertion cannot simply be dismissed by Office personnel as being "wrong," even when there may be reason to believe that the assertion is not entirely accurate. Rather, Office personnel must determine if the assertion of utility is credible (i.e., whether the assertion of utility is believable to a person of ordinary skill in the art based on the totality of evidence and reasoning provided). An assertion is credible unless (A) the logic underlying the assertion is seriously flawed, or (B) the facts upon which the assertion is based are inconsistent with the logic underlying the assertion. Credibility as used in this context refers to the reliability of the statement based on the logic and facts that are offered by the applicant to support the assertion of utility.

One situation where an assertion of utility would not be considered credible is where a person of ordinary skill would consider the assertion to be "incredible in view of contemporary knowledge" and where nothing offered by the applicant would counter what contemporary knowledge might otherwise suggest. Office personnel should be careful, however, not to label certain types of inventions as "incredible" or "speculative" as such labels do not provide the correct focus for the evaluation of an assertion of utility. "Incredible utility" is a conclusion, not a starting point for analysis under 35 U.S.C. 101. A conclusion that an asserted utility is incredible can be reached only after the Office has evaluated both the assertion of the applicant regarding utility and any evidentiary basis of that assertion. The Office should be particularly careful not to start with a presumption that an asserted utility is, *per se*, "incredible" and then proceed to base a rejection under 35 U.S.C. 101 on that presumption.

Rejections under 35 U.S.C. 101 >based on a lack of credible utility< have been * sustained by federal courts **>when, for example,< the applicant failed to disclose any utility for the invention or asserted a utility that could only be true if it violated a scientific principle, such as the second law of thermodynamics, or a law of nature, or was wholly inconsistent with contemporary knowledge in the art. *In re Gazave,* 379 F.2d 973, 978, 154 USPQ 92, 96 (CCPA 1967). Special care * should be taken when assessing the credibility of an asserted therapeutic utility for a claimed invention. In such cases, a previous lack of success in treating a disease or condition, or the absence of a proven animal model for testing the effectiveness of drugs for treating a disorder in humans, should not, standing alone, serve as a basis for challenging the asserted utility under 35 U.S.C. 101. >See MPEP § 2107.03 for additional guidance with regard to therapeutic or pharmacological utilities.<

### IV. INITIAL BURDEN IS ON THE OFFICE TO ESTABLISH A *PRIMA FACIE* CASE AND PROVIDE EVIDENTIARY SUPPORT THEREOF

To properly reject a claimed invention under 35 U.S.C. 101, the Office must (A) make a *prima facie* showing that the claimed invention lacks utility, and (B) provide a sufficient evidentiary basis for factual assumptions relied upon in establishing the *prima facie* showing. *In re Gaubert*, 524 F.2d 1222, 1224, 187 USPQ 664, 666 (CCPA 1975) ("Accordingly, the PTO must do more than merely question operability - it must set forth factual reasons which would lead one skilled in the art to question the objective truth of the statement of operability"). If the Office cannot develop a proper *prima facie* case and provide evidentiary support for a rejection under 35 U.S.C.

101, a rejection on this ground should not be imposed. See, e.g., *In re Oetiker*, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed. Cir. 1992) ("[T]he examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability. If that burden is met, the burden of coming forward with evidence or argument shifts to the applicant.... If examination at the initial stage does not produce a *prima facie* case of unpatentability, then without more the applicant is entitled to grant of the patent."). See also *Fregeau v. Mossinghoff*, 776 F.2d 1034, 227 USPQ 848 (Fed. Cir. 1985) (applying *prima facie* case law to 35 U.S.C. 101); *In re Piasecki*, 745 F.2d 1468, 223 USPQ 785 (Fed. Cir. 1984).

The *prima facie* showing must be set forth in a well-reasoned statement. Any rejection based on lack of utility should include a detailed explanation why the claimed invention has no specific and substantial credible utility. Whenever possible, the examiner should provide documentary evidence regardless of publication date (e.g., scientific or technical journals, excerpts from treatises or books, or U.S. or foreign patents) to support the factual basis for the *prima facie* showing of no specific and substantial credible utility. If documentary evidence is not available, the examiner should specifically explain the scientific basis for his or her factual conclusions.

Where the asserted utility is not specific or substantial, a *prima facie* showing must establish that it is more likely than not that a person of ordinary skill in the art would not consider that any utility asserted by the applicant would be specific and substantial. The *prima facie* showing must contain the following elements:

(A) An explanation that clearly sets forth the reasoning used in concluding that the asserted utility for the claimed invention is neither both specific and substantial nor well-established;

(B) Support for factual findings relied upon in reaching this conclusion; and

(C) An evaluation of all relevant evidence of record, including utilities taught in the closest prior art.

Where the asserted specific and substantial utility is not credible, a *prima facie* showing of no specific and substantial credible utility must establish that it is more likely than not that a person skilled in the art would not consider credible any specific and substantial utility asserted by the applicant for the claimed invention. The *prima facie* showing must contain the following elements:

(A) An explanation that clearly sets forth the reasoning used in concluding that the asserted specific and substantial utility is not credible;

(B) Support for factual findings relied upon in reaching this conclusion; and

(C) An evaluation of all relevant evidence of record, including utilities taught in the closest prior art.

Where no specific and substantial utility is disclosed or is well-established, a *prima facie* showing of no specific and substantial utility need only establish that applicant has not asserted a utility and that, on the record before the examiner, there is no known well-established utility.

It is imperative that Office personnel use specificity in setting forth and initial rejection under 35 U.S.C. 101 and support any factual conclusions made in the *prima facie* showing.

By using specificity, the applicant will be able to identify the assumptions made by the Office in setting forth the rejection and will be able to address those assumptions properly.

V. **EVIDENTIARY REQUESTS BY AN EXAMINER TO SUPPORT AN ASSERTED UTILITY**

In appropriate situations the Office may require an applicant to substantiate an asserted utility for a claimed invention. See *In re Pottier*, 376 F.2d 328, 330, 153 USPQ 407, 408 (CCPA 1967) ("When the operativeness of any process would be deemed unlikely by one of ordinary skill in the art, it is not improper for the examiner to call for evidence of operativeness."). See also *In re Jolles*, 628 F.2d 1322, 1327, 206 USPQ 885, 890 (CCPA 1980); *In re Citron*, 325 F.2d 248, 139 USPQ 516 (CCPA 1963); *In re Novak*, 306 F.2d 924, 928, 134 USPQ 335, 337 (CCPA 1962). In *In re Citron*, the court held that when an "alleged utility appears to be incredible in the light

of the knowledge of the art, or factually misleading, applicant must establish the asserted utility by acceptable proof." 325 F.2d at 253, 139 USPQ at 520. The court approved of the board's decision which affirmed the rejection under 35 U.S.C. 101 "in view of the art knowledge of the lack of a cure for cancer and the absence of any clinical data to substantiate the allegation." 325 F.2d at 252, 139 USPQ at 519 (emphasis in original). The court thus established a higher burden on the applicant where the statement of use is incredible or misleading. In such a case, the examiner should challenge the use and require sufficient evidence of operativeness. The purpose of this authority is to enable an applicant to cure an otherwise defective factual basis for the operability of an invention. Because this is a curative authority (e.g., evidence is requested to enable an applicant to support an assertion that is inconsistent with the facts of record in the application), Office personnel should indicate not only why the factual record is defective in relation to the assertions of the applicant, but also, where appropriate, what type of evidentiary showing can be provided by the applicant to remedy the problem.

Requests for additional evidence should be imposed rarely, and only if necessary to support the scientific credibility of the asserted utility (e.g., if the asserted utility is not consistent with the evidence of record and current scientific knowledge). As the Federal Circuit recently noted, "[o]nly after the PTO provides evidence showing that one of ordinary skill in the art would reasonably doubt the asserted utility does the burden shift to the applicant to provide rebuttal evidence sufficient to convince such a person of the invention's asserted utility." *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995) (citing *In re Bundy*, 642 F.2d 430, 433, 209 USPQ 48, 51 (CCPA 1981)). In *Brana*, the court pointed out that the purpose of treating cancer with chemical compounds does not suggest, *per se*, an incredible utility. Where the prior art disclosed "structurally similar compounds to those claimed by applicants which have been proven *in vivo* to be effective as chemotherapeutic agents against various tumor models . . ., one skilled in the art would be without basis to reasonably doubt applicants' asserted utility on its face." 51 F.3d at 1566, 34 USPQ2d at 1441. As courts have stated, "it is clearly improper for the examiner to make a demand for further test data, which as evidence would be essentially redundant and would seem to serve for nothing except perhaps to unduly burden the applicant." *In re Isaacs*, 347 F.2d 887, 890, 146 USPQ 193, 196 (CCPA 1965).

### VI. CONSIDERATION OF A REPLY TO A *PRIMA FACIE* REJECTION FOR LACK OF UTILITY

If a rejection under 35 U.S.C. 101 has been properly imposed, along with a corresponding rejection under 35 U.S.C. 112, first paragraph, the burden shifts to the applicant to rebut the *prima facie* showing. *In re Oetiker*, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed. Cir. 1992) ("The examiner bears the initial burden, on review of the prior art or on any other ground, of presenting a *prima facie* case of unpatentability. If that burden is met, the burden of coming forward with evidence or argument shifts to the applicant. . . After evidence or argument is submitted by the applicant in response, patentability is determined on the totality of the record, by a preponderance of evidence with due consideration to persuasiveness of argument."). An applicant can do this using any combination of the following: amendments to the claims, arguments or reasoning, or new evidence submitted in an affidavit or declaration under 37 CFR 1.132, or in a printed publication. New evidence provided by an applicant must be relevant to the issues raised in the rejection. For example, declarations in which conclusions are set forth without establishing a nexus between those conclusions and the supporting evidence, or which merely express opinions, may be of limited probative value with regard to rebutting a *prima facie* case. *In re Grunwell*, 609 F.2d 486, 203 USPQ 1055 (CCPA 1979); *In re Buchner*, 929 F.2d 660, 18 USPQ2d 1331 (Fed. Cir. 1991). See MPEP § 716.01(a) through § 716.01(c).

If the applicant responds to the *prima facie* rejection, Office personnel should review the original disclosure, any evidence relied upon in establishing the *prima facie* showing, any claim amendments, and any new reasoning or evidence provided by the applicant in support of an asserted specific and substantial credible utility. It is essential for Office personnel to recognize, fully consider and respond to each substantive element of any response to a rejection based on lack of utility. Only where the totality of the record continues to show that the asserted utility is not specific,

substantial, and credible should a rejection based on lack of utility be maintained. If the record as a whole would make it more likely than not that the asserted utility for the claimed invention would be considered credible by a person of ordinary skill in the art, the Office cannot maintain the rejection. *In re Rinehart*, 531 F.2d 1048, 1052, 189 USPQ 143, 147 (CCPA 1976).

### VII. EVALUATION OF EVIDENCE RELATED TO UTILITY

There is no predetermined amount or character of evidence that must be provided by an applicant to support an asserted utility, therapeutic or otherwise. Rather, the character and amount of evidence needed to support an asserted utility will vary depending on what is claimed (*Ex parte Ferguson*, 117 USPQ 229 (Bd. App. 1957)), and whether the asserted utility appears to contravene established scientific principles and beliefs. *In re Gazave*, 379 F.2d 973, 978, 154 USPQ 92, 96 (CCPA 1967); *In re Chilowsky*, 229 F.2d 457, 462, 108 USPQ 321, 325 (CCPA 1956). Furthermore, the applicant does not have to provide evidence sufficient to establish that an asserted utility is true "beyond a reasonable doubt." *In re Irons,* 340 F.2d 974, 978, 144 USPQ 351, 354 (CCPA 1965). Nor must an applicant provide evidence such that it establishes an asserted utility as a matter of statistical certainty. *Nelson v. Bowler*, 626 F.2d 853, 856-57, 206 USPQ 881, 883-84 (CCPA 1980) (reversing the Board and rejecting Bowler's arguments that the evidence of utility was statistically insignificant. The court pointed out that a rigorous correlation is not necessary when the test is reasonably predictive of the response). See also *Rey-Bellet v. Englehardt*, 493 F.2d 1380, 181 USPQ 453 (CCPA 1974) (data from animal testing is relevant to asserted human therapeutic utility if there is a "satisfactory correlation between the effect on the animal and that ultimately observed in human beings"). Instead, evidence will be sufficient if, considered as a whole, it leads a person of ordinary skill in the art to conclude that the asserted utility is more likely than not true.

## 2107.03 Special Considerations for Asserted Therapeutic or Pharmacological Utilities

The Federal courts have consistently reversed rejections by the Office asserting a lack of utility for inventions claiming a pharmacological or therapeutic utility where an applicant has provided evidence that reasonably supports such a utility. In view of this, Office personnel should be particularly careful in their review of evidence provided in support of an asserted therapeutic or pharmacological utility.

### I. A REASONABLE CORRELATION BETWEEN THE EVIDENCE AND THE ASSERTED UTILITY IS SUFFICIENT

As a general matter, evidence of pharmacological or other biological activity of a compound will be relevant to an asserted therapeutic use if there is a reasonable correlation between the activity in question and the asserted utility. *Cross v. Iizuka*, 753 F.2d 1040, 224 USPQ 739 (Fed. Cir. 1985); *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980); *Nelson v. Bowler*, 626 F.2d 853, 206 USPQ 881 (CCPA 1980). An applicant can establish this reasonable correlation by relying on statistically relevant data documenting the activity of a compound or composition, arguments or reasoning, documentary evidence (e.g., articles in scientific journals), or any combination thereof. The applicant does not have to prove that a correlation exists between a particular activity and an asserted therapeutic use of a compound as a matter of statistical certainty, nor does he or she have to provide actual evidence of success in treating humans where such a utility is asserted. Instead, as the courts have repeatedly held, all that is required is a reasonable correlation between the activity and the asserted use. *Nelson v. Bowler*, 626 F.2d 853, 857, 206 USPQ 881, 884 (CCPA 1980).

### II. STRUCTURAL SIMILARITY TO COMPOUNDS WITH ESTABLISHED UTILITY

Courts have routinely found evidence of structural similarity to a compound known to have a particular therapeutic or pharmacological utility as being supportive of an assertion of therapeutic utility for a new compound. In *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980), the claimed compounds were found to have utility based on a finding of a close structural relationship to daunorubicin and doxorubicin and shared pharmacological activity with those compounds, both of which were known to be

useful in cancer chemotherapy. The evidence of close structural similarity with the known compounds was presented in conjunction with evidence demonstrating substantial activity of the claimed compounds in animals customarily employed for screening anticancer agents. Such evidence should be given appropriate weight in determining whether one skilled in the art would find the asserted utility credible. Office personnel should evaluate not only the existence of the structural relationship, but also the reasoning used by the applicant or a declarant to explain why that structural similarity is believed to be relevant to the applicant's assertion of utility.

### III. DATA FROM *IN VITRO* OR ANIMAL TESTING IS GENERALLY SUFFICIENT TO SUPPORT THERAPEUTIC UTILITY

If reasonably correlated to the particular therapeutic or pharmacological utility, data generated using *in vitro* assays, or from testing in an animal model or a combination thereof almost invariably will be sufficient to establish therapeutic or pharmacological utility for a compound, composition or process. A cursory review of cases involving therapeutic inventions where 35 U.S.C. 101 was the dispositive issue illustrates the fact that the Federal courts are not particularly receptive to rejections under 35 U.S.C. 101 based on inoperability. Most striking is the fact that in those cases where an applicant supplied a reasonable evidentiary showing supporting an asserted therapeutic utility, almost uniformly the 35 U.S.C. 101-based rejection was reversed. See, e.g., *In re Brana*, 51 F.3d 1560, 34 USPQ 1436 (Fed. Cir. 1995); *Cross v. Iizuka*, 753 F.2d 1040, 224 USPQ 739 (Fed. Cir. 1985); *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980); *Nelson v. Bowler*, 626 F.2d 853, 856, 206 USPQ 881, 883 (CCPA 1980); *In re Malachowski*, 530 F.2d 1402, 189 USPQ 432 (CCPA 1976); *In re Gaubert*, 530 F.2d 1402, 189 USPQ 432 (CCPA 1975); *In re Gazave*, 379 F.2d 973, 154 USPQ 92 (CCPA 1967); *In re Hartop*, 311 F.2d 249, 135 USPQ 419 (CCPA 1962); *In re Krimmel*, 292 F.2d 948, 130 USPQ 215 (CCPA 1961). Only in those cases where the applicant was unable to come forward with any relevant evidence to rebut a finding by the Office that the claimed invention was inoperative was a 35 U.S.C. 101 rejection affirmed by the court. *In re Citron*, 325 F.2d 248, 253, 139 USPQ 516, 520 (CCPA 1963) (therapeutic utility for an uncharacterized biological extract not supported or scientifically credible); *In re Buting*, 418 F.2d 540, 543, 163 USPQ 689, 690 (CCPA 1969) (record did not establish a credible basis for the assertion that the single class of compounds in question would be useful in treating disparate types of cancers); *In re Novak*, 306 F.2d 924, 134 USPQ 335 (CCPA 1962) (claimed compounds did not have capacity to effect physiological activity upon which utility claim based). Contrast, however, *In re Buting* to *In re Gardner*, 475 F.2d 1389, 177 USPQ 396 (CCPA 1973), *reh'g denied*, 480 F.2d 879 (CCPA 1973), in which the court held that utility for a genus was found to be supported through a showing of utility for one species. In no case has a Federal court required an applicant to support an asserted utility with data from human clinical trials.

If an applicant provides data, whether from *in vitro* assays or animal tests or both, to support an asserted utility, and an explanation of why that data supports the asserted utility, the Office will determine if the data and the explanation would be viewed by one skilled in the art as being reasonably predictive of the asserted utility. See, e.g., *Ex parte Maas*, 9 USPQ2d 1746 (Bd. Pat. App. & Inter. 1987); *Ex parte Balzarini*, 21 USPQ2d 1892 (Bd. Pat. App. & Inter. 1991). Office personnel must be careful to evaluate all factors that might influence the conclusions of a person of ordinary skill in the art as to this question, including the test parameters, choice of animal, relationship of the activity to the particular disorder to be treated, characteristics of the compound or composition, relative significance of the data provided and, most importantly, the explanation offered by the applicant as to why the information provided is believed to support the asserted utility. If the data supplied is consistent with the asserted utility, the Office cannot maintain a rejection under 35 U.S.C. 101.

Evidence does not have to be in the form of data from an art-recognized animal model for the particular disease or disease condition to which the asserted utility relates. Data from any test that the applicant reasonably correlates to the asserted utility should be evaluated substantively. Thus, an applicant may provide data generated using a particular animal model with an appropriate explanation as to why that data supports the asserted utility. The absence of a

certification that the test in question is an industry-accepted model is not dispositive of whether data from an animal model is in fact relevant to the asserted utility. Thus, if one skilled in the art would accept the animal tests as being reasonably predictive of utility in humans, evidence from those tests should be considered sufficient to support the credibility of the asserted utility. *In re Hartop*, 311 F.2d 249, 135 USPQ 419 (CCPA 1962); *In re Krimmel*, 292 F.2d 948, 953, 130 USPQ 215, 219 (CCPA 1961); *Ex parte Krepelka*, 231 USPQ 746 (Bd. Pat. App. & Inter. 1986). Office personnel should be careful not to find evidence unpersuasive simply because no animal model for the human disease condition had been established prior to the filing of the application. See *In re Chilowsky*, 229 F.2d 457, 461, 108 USPQ 321, 325 (CCPA 1956) ("The mere fact that something has not previously been done clearly is not, in itself, a sufficient basis for rejecting all applications purporting to disclose how to do it."); *In re Wooddy*, 331 F.2d 636, 639, 141 USPQ 518, 520 (CCPA 1964) ("It appears that no one on earth is certain as of the present whether the process claimed will operate in the manner claimed. Yet absolute certainty is not required by the law. The mere fact that something has not previously been done clearly is not, in itself, a sufficient basis for rejecting all applications purporting to disclose how to do it.").

### IV. HUMAN CLINICAL DATA

Office personnel should not impose on applicants the unnecessary burden of providing evidence from human clinical trials. There is no decisional law that requires an applicant to provide data from human clinical trials to establish utility for an invention related to treatment of human disorders (see *In re Isaacs*, 347 F.2d 889, 146 USPQ 193 (CCPA 1963); *In re Langer*, 503 F.2d 1380, 183 USPQ 288 (CCPA 1974)), even with respect to situations where no art-recognized animal models existed for the human disease encompassed by the claims. *Ex parte Balzarini*, 21 USPQ2d 1892 (Bd. Pat. App. & Inter. 1991) (human clinical data is not required to demonstrate the utility of the claimed invention, even though those skilled in the art might not accept other evidence to establish the efficacy of the claimed therapeutic compositions and the operativeness of the claimed methods of treating humans). Before a drug can enter human clinical trials, the sponsor, often the applicant, must provide a convincing rationale to those especially skilled in the art (e.g., the Food and Drug Administration) that the investigation may be successful. Such a rationale would provide a basis for the sponsor's expectation that the investigation may be successful. In order to determine a protocol for phase I testing, the first phase of clinical investigation, some credible rationale of how the drug might be effective or could be effective would be necessary. Thus, as a general rule, if an applicant has initiated human clinical trials for a therapeutic product or process, Office personnel should presume that the applicant has established that the subject matter of that trial is reasonably predictive of having the asserted therapeutic utility.

### V. SAFETY AND EFFICACY CONSIDERATIONS

The Office must confine its review of patent applications to the statutory requirements of the patent law. Other agencies of the government have been assigned the responsibility of ensuring conformance to standards established by statute for the advertisement, use, sale or distribution of drugs. The FDA pursues a two-prong test to provide approval for testing. Under that test, a sponsor must show that the investigation does not pose an unreasonable and significant risk of illness or injury and that there is an acceptable rationale for the study. As a review matter, there must be a rationale for believing that the compound could be effective. If the use reviewed by the FDA is not set forth in the specification, FDA review may not satisfy 35 U.S.C. 101. However, if the reviewed use is one set forth in the specification, Office personnel must be extremely hesitant to challenge utility. In such a situation, experts at the FDA have assessed the rationale for the drug or research study upon which an asserted utility is based and found it satisfactory. Thus, in challenging utility, Office personnel must be able to carry their burden that there is no sound rationale for the asserted utility even though experts designated by Congress to decide the issue have come to an opposite conclusion. "FDA approval, however, is not a prerequisite for finding a compound useful within the meaning of the patent laws." *In re Brana*, 51 F.3d 1560, 34 USPQ2d 1436 (Fed. Cir. 1995) (citing *Scott*

*v. Finney*, 34 F.3d 1058, 1063, 32 USPQ2d 1115, 1120 (Fed. Cir. 1994)).

Thus, while an applicant may on occasion need to provide evidence to show that an invention will work as claimed, it is improper for Office personnel to request evidence of safety in the treatment of humans, or regarding the <u>degree</u> of effectiveness. See *In re Sichert*, 566 F.2d 1154, 196 USPQ 209 (CCPA 1977); *In re Hartop*, 311 F.2d 249, 135 USPQ 419 (CCPA 1962); *In re Anthony*, 414 F.2d 1383, 162 USPQ 594 (CCPA 1969); *In re Watson*, 517 F.2d 465, 186 USPQ 11 (CCPA 1975); *In re Krimmel*, 292 F.2d 948, 130 USPQ 215 (CCPA 1961); *Ex parte Jovanovics*, 211 USPQ 907 (Bd. Pat. App. & Inter. 1981).

## VI. TREATMENT OF SPECIFIC DISEASE CONDITIONS

Claims directed to a method of treating or curing a disease for which there have been no previously successful treatments or cures warrant careful review for compliance with 35 U.S.C. 101. The credibility of an asserted utility for treating a human disorder may be more difficult to establish where current scientific understanding suggests that such a task would be impossible. Such a determination has always required a good understanding of the state of the art as of the time that the invention was made. For example, prior to the 1980's, there were a number of cases where an asserted use in treating cancer in humans was viewed as "incredible." *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980); *In re Buting*, 418 F.2d 540, 163 USPQ 689 (CCPA 1969); *Ex parte Stevens*, 16 USPQ2d 1379 (Bd. Pat. App. & Inter. 1990); *Ex parte Busse*, 1 USPQ2d 1908 (Bd. Pat. App. & Inter. 1986); *Ex parte Krepelka*, 231 USPQ 746 (Bd. Pat. App. & Inter. 1986); *Ex parte Jovanovics*, 211 USPQ 907 (Bd. Pat. App. & Inter. 1981). The fact that there is no known cure for a disease, however, cannot serve as the basis for a conclusion that such an invention lacks utility. Rather, Office personnel must determine if the asserted utility for the invention is credible based on the information disclosed in the application. Only those claims for which an asserted utility is not <u>credible</u> should be rejected. In such cases, the Office should carefully review what is being claimed by the applicant. An assertion that the claimed invention is useful in treating a symptom of an incurable disease may be considered credible by a person of ordinary skill in the art on the basis of a fairly modest amount of evidence or support. In contrast, an assertion that the claimed invention will be useful in "curing" the disease may require a significantly greater amount of evidentiary support to be considered credible by a person of ordinary skill in the art. *In re Sichert*, 566 F.2d 1154, 196 USPQ 209 (CCPA 1977); *In re Jolles*, 628 F.2d 1322, 206 USPQ 885 (CCPA 1980). See also *Ex parte Ferguson*, 117 USPQ 229 (Bd. Pat. App. & Inter. 1957).

In these cases, it is important to note that the Food and Drug Administration has promulgated regulations that enable a party to conduct clinical trials for drugs used to treat life threatening and severely-debilitating illnesses, even where no alternative therapy exists. See 21 CFR 312.80-88 (1994). Implicit in these regulations is the recognition that experts qualified to evaluate the effectiveness of therapeutics can and often do find a sufficient basis to conduct clinical trials of drugs for incurable or previously untreatable illnesses. Thus, affidavit evidence from experts in the art indicating that there is a reasonable expectation of success, supported by sound reasoning, usually should be sufficient to establish that such a utility is <u>credible</u>.

## 2111 Claim Interpretation; Broadest Reasonable Interpretation [R-5]

**CLAIMS MUST BE GIVEN THEIR BROADEST REASONABLE INTERPRETATION**

During patent examination, the pending claims must be "given their broadest reasonable interpretation consistent with the specification." >The Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303, 75 USPQ2d 1321 (Fed. Cir. 2005) expressly recognized that the USPTO employs the "broadest reasonable interpretation" standard:

> The Patent and Trademark Office ("PTO") determines the scope of claims in patent applications not solely on the basis of the claim language, but upon giving claims their broadest reasonable construction "in light of the specification as it would be interpreted by one of ordinary skill in the art." *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364[, 70 USPQ2d 1827] (Fed. Cir. 2004). Indeed, the rules of the PTO require that application claims must "conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." 37 CFR 1.75(d)(1).