# EXHIBIT 2

Dockets.Justia.com

In addition, each applicant provides the noted disclosures to support the claims:

| | Applicant A | Applicant B |
|---|---|---|
| Disclosure | The disclosure describes specific software, i.e., specific program code segments, that are to be employed to configure a general purpose microprocessor to create specific logic circuits. These circuits are indicated to be the "means" corresponding to the claimed means limitations. | The disclosure states that it would be a matter of routine skill to select an appropriate conventional computer system and implement the claimed process on that computer system. The disclosure does not have specific disclosure that corresponds to the two "means" limitations recited in the claim (i.e., no specific software or logic circuit). The disclosure does have an explanation of how to solve the wavefunction equations of a chemical compound, and indicates that the solutions of those wavefunction equations can be employed to determine the physical structure of the corresponding compound. |
| Result | Claim defines specific computer, patentability stands independently from process claim. | Claim encompasses any computer embodiment of process claim; patentability stands or falls with process claim. |
| Explanation | Disclosure identifies the specific machine capable of performing the indicated functions. | Disclosure does not provide any information to distinguish the "implementation" of the process on a computer from the factors that will govern the patentability determination of the process *per se*. As such, the patentability of this apparatus claim will stand or fall with that of the process claim. |

**(b) Statutory Process Claims**

A claim that requires one or more acts to be performed defines a process. However, not all processes are statutory under 35 U.S.C. 101. To be statutory, a claimed computer-related process must either: (A) result in a physical transformation outside the computer for which a practical application in the technological arts is either disclosed in the specification or would have been known to a skilled artisan (discussed in i) below), or (B) be limited by the language in the claim to a practical application within the technological arts (discussed in ii) below). See *Diamond v. Diehr*, 450 U.S. at 183–84, 209 USPQ at 6 (quoting *Cochrane v. Deener*, 94 U.S. 780, 787–88 (1877)) ("A [statutory] process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. . . . The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."). See also *Alappat*, 33 F.3d at 1543, 31 USPQ2d at 1556–57 (quoting *Diamond v. Diehr*, 450 U.S. at 192, 209 USPQ at 10). See also *id.* at 33 F.3d 1569, 31 USPQ2d at 1578–79 (Newman, J., concurring) ("unpatentability of the principle does not defeat patentability of its practical applications") (citing *O'Reilly v. Morse*, 56 U.S. (15 How.) at 114–19). The claimed practical application must be a further limitation upon the claimed subject matter if the process is confined to the internal operations of the computer. If a physical transformation occurs outside the computer, it is not necessary to claim the practical application. A disclosure that permits a skilled artisan to practice the claimed invention, i.e., to put it to a practical use, is sufficient. On the other hand, it is necessary to claim the practical application if there is no physical transformation or if the process merely manipulates concepts or converts one set of numbers into another.

A claimed process is clearly statutory if it results in a physical transformation outside the computer, i.e., falls into one or both of the following specific categories ("safe harbors").

### i) Safe Harbors

— **Independent Physical Acts (Post–Computer Process Activity)**

A process is statutory if it requires physical acts to be performed outside the computer independent of and following the steps to be performed by a programmed computer, where those acts involve the manipulation of tangible physical objects and result in the object having a different physical attribute or structure. *Diamond v. Diehr*, 450 U.S. at 187, 209 USPQ at 8. Thus, if a process claim includes one or more post–computer process steps that result in a physical transformation outside the computer (beyond merely conveying the direct result of the computer operation, see Section IV.B.2(d)iii)), the claim is clearly statutory.

Examples of this type of statutory process include the following:

— A method of curing rubber in a mold which relies upon updating process parameters, using a computer processor to determine a time period for curing the rubber, using the computer processor to determine when the time period has been reached in the curing process and then opening the mold at that stage.

— A method of controlling a mechanical robot which relies upon storing data in a computer that represents various types of mechanical movements of the robot, using a computer processor to calculate positioning of the robot in relation to given tasks to be performed by the robot, and controlling the robot's movement and position based on the calculated position.

— **Manipulation of Data Representing Physical Objects or Activities (Pre–Computer Process Activity)**

Another statutory process is one that requires the measurements of physical objects or activities to be transformed outside of the computer into computer data (*In re Gelnovatch*, 595 F.2d 32, 41 n.7, 201 USPQ 136, 145 n.7 (CCPA 1979) (data–gathering step did not measure physical phenomenon)), where the data comprises signals corresponding to physical objects or activities external to the computer system, and where the process causes a physical transformation of the signals which are intangible representations of the physical objects or activities. *Schrader*, 22 F.3d at 294, 30 USPQ2d at 1459 citing with approval *Arrhythmia*, 958 F.2d at 1058–59, 22 USPQ2d at 1037–38; *Abele*, 684 F.2d at 909, 214 USPQ at 688; *In re Taner*, 681 F.2d 787, 790, 214 USPQ 678, 681 (CCPA 1982).

Examples of this type of claimed statutory process include the following:

— A method of using a computer processor to analyze electrical signals and data representative of human cardiac activity by converting the signals to time segments, applying the time segments in reverse order to a high pass filter means, using the computer processor to determine the amplitude of the high pass filter's output, and using the computer processor to compare the value to a predetermined value. In this example the data is an intangible representation of physical activity, i.e., human cardiac activity. The transformation occurs when heart activity is measured and an electrical signal is produced. This process has real world value in predicting vulnerability to ventricular tachycardia immediately after a heart attack.

— A method of using a computer processor to receive data representing Computerized Axial Tomography ("CAT") scan images of a patient, performing a calculation to determine the difference between a local value at a data point and an average value of the data in a region surrounding the point, and displaying the difference as a gray scale for each point in the image, and displaying the resulting image. In this example the data is an intangible representation of a physical object, i.e., portions of the anatomy of a patient. The transformation occurs when the condition of the human body is measured with X–rays and the X–rays are converted into electrical digital signals that represent the condition of the human body. The real world value of the invention lies in creating a new CAT scan image of body tissue without the presence of bones.

— A method of using a computer processor to conduct seismic exploration, by imparting spherical seismic energy waves into the earth from a seismic source, generating a plurality of reflected signals in response to the seismic energy waves at a set of receiver positions in an array, and summing the reflection signals to produce a signal simulating the reflection response of the earth to the seismic energy. In this example, the electrical signals processed by the computer represent reflected seismic energy. The transformation occurs by converting the spherical seismic energy waves into electrical signals which provide a geophysical representation of formations below the

earth's surface. Geophysical exploration of formations below the surface of the earth has real world value.

If a claim does not clearly fall into one or both of the safe harbors, the claim may still be statutory if it is limited by the language in the claim to a practical application in the technological arts.

### ii) Computer-Related Processes Limited to a Practical Application in the Technological Arts

There is always some form of physical transformation within a computer because a computer acts on signals and transforms them during its operation and changes the state of its components during the execution of a process. Even though such a physical transformation occurs within a computer, such activity is not determinative of whether the process is statutory because such transformation alone does not distinguish a statutory computer process from a nonstatutory computer process. What is determinative is not how the computer performs the process, but what the computer does to achieve a practical application. See *Arrhythmia*, 958 F.2d at 1057, 22 USPQ2d at 1036.

A process that merely manipulates an abstract idea or performs a purely mathematical algorithm is nonstatutory despite the fact that it might inherently have some usefulness. In *Sarkar*, 588 F.2d at 1335, 200 USPQ at 139, the court explained why this approach must be followed:

> No mathematical equation can be used, as a practical matter, without establishing and substituting values for the variables expressed therein. Substitution of values dictated by the formula has thus been viewed as a form of mathematical step. If the steps of gathering and substituting values were alone sufficient, every mathematical equation, formula, or algorithm having any practical use would be per se subject to patenting as a "process" under 101. Consideration of whether the substitution of specific values is enough to convert the disembodied ideas present in the formula into an embodiment of those ideas, or into an application of the formula, is foreclosed by the current state of the law.

For such subject matter to be statutory, the claimed process must be limited to a practical application of the abstract idea or mathematical algorithm in the technological arts. See *Alappat*, 33 F.3d at 1543, 31 USPQ2d at 1556-57 (quoting *Diamond v. Diehr*, 450 U.S. at 192, 209 USPQ at 10). See also *Alappat* at 1569, 31 USPQ2d at 1578-79 (Newman, J., concurring) ("unpatentability of the principle does not defeat patentability of its practical applications") (citing *O'Reilly v. Morse*, 56 U.S. (15 How.) at 114-19). For example, a computer process that simply calculates a mathematical algorithm that models noise is nonstatutory. However, a claimed process for digitally filtering noise employing the mathematical algorithm is statutory.

Examples of this type of claimed statutory process include the following:

- A computerized method of optimally controlling transfer, storage and retrieval of data between cache and hard disk storage devices such that the most frequently used data is readily available.
- A method of controlling parallel processors to accomplish multi-tasking of several computing tasks to maximize computing efficiency. See, e.g., *In re Bernhart*, 417 F.2d 1395, 1400, 163 USPQ 611, 616 (CCPA 1969).
- A method of making a word processor by storing an executable word processing application program in a general purpose digital computer's memory, and executing the stored program to impart word processing functionality to the general purpose digital computer by changing the state of the computer's arithmetic logic unit when program instructions of the word processing program are executed.
- A digital filtering process for removing noise from a digital signal comprising the steps of calculating a mathematical algorithm to produce a correction signal and subtracting the correction signal from the digital signal to remove the noise.

### (c) Nonstatutory Process Claims

If the "acts" of a claimed process manipulate only numbers, abstract concepts or ideas, or signals representing any of the foregoing, the acts are not being applied to appropriate subject matter. Thus, a process consisting solely of mathematical operations, i.e., converting one set of numbers into another set of numbers, does not manipulate appropriate subject matter and thus cannot constitute a statutory process.

In practical terms, claims define nonstatutory processes if they:

— consist solely of mathematical operations without some claimed practical application (i.e., executing a "mathematical algorithm"); or

— simply manipulate abstract ideas, e.g., a bid (*Schrader*, 22 F.3d at 293–94, 30 USPQ2d at 1458–59) or a bubble hierarchy (*Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759), without some claimed practical application.

A claimed process that consists solely of mathematical operations is nonstatutory whether or not it is performed on a computer. Courts have recognized a distinction between types of mathematical algorithms, namely, some define a "law of nature" in mathematical terms and others merely describe an "abstract idea." See, e.g., *In re Meyer*, 688 F.2d 789, 794–95, 215 USPQ 193, 197 (CCPA 1982)

> Scientific principles, such as the relationship between mass and energy, and laws of nature, such as the acceleration of gravity, namely, a = 32 ft./sec.$^2$, can be represented in mathematical format. However, some mathematical algorithms and formulae do not represent scientific principles or laws of nature; they represent ideas or mental processes and are simply logical vehicles for communicating possible solutions to complex problems. The *presence of a mathematical algorithm or formula in a claim is merely an indication that a scientific principle, law of nature, idea or mental process may be the subject matter claimed and, thus, justify a rejection of that claim under 35 U.S.C 101; but the presence of a mathematical algorithm or formula is only a signpost for further analysis.* (Emphasis in original.)

Cf. *Alappat*, 33 F.3d at 1543 n.19, 31 USPQ2d at 1556 n.19 in which the Federal Circuit recognized the confusion:

> The Supreme Court has not been clear... as to whether such subject matter is excluded from the scope of 101 because it represents laws of nature, natural phenomena, or abstract ideas. See *Diehr*, 450 U.S. at 186 (viewed mathematical algorithm as a law of nature); *Gottschalk v. Benson*, 409 U.S. 63, 71–72 (1972) (treated mathematical algorithm as an "idea"). The Supreme Court also has not been clear as to exactly what kind of mathematical subject matter may not be patented. The Supreme Court has used, among others, the terms "mathematical algorithm," "mathematical formula," and "mathematical equation" to describe types of mathematical subject matter not entitled to patent protection standing alone. The Supreme Court has not set forth, however, any consistent or clear explanation of what it intended by such terms or how these terms are related, if at all.

Certain mathematical algorithms have been held to be nonstatutory because they represent a mathematical definition of a law of nature or a natural phenomenon. For example, a mathematical algorithm representing the formula $E = mc^2$ is a "law of nature" — it defines a "fundamental scientific truth" (i.e., the relationship between energy and mass). To comprehend how the law of nature relates to any object, one invariably has to perform certain steps (e.g., multiplying a number representing the mass of an object by the square of a number representing the speed of light). In such a case, a claimed process which consists solely of the steps that one must follow to solve the mathematical representation of $E = mc^2$ is indistinguishable from the law of nature and would "preempt" the law of nature. A patent cannot be granted on such a process.

Other mathematical algorithms have been held to be nonstatutory because they merely describe an abstract idea. An "abstract idea" may simply be <u>any</u> sequence of mathematical operations that are combined to solve a mathematical problem. The concern addressed by holding such subject matter nonstatutory is that the mathematical operations merely describe an idea and do not define a process that represents a practical application of the idea.

Accordingly, when a claim reciting a mathematical algorithm is found to define nonstatutory subject matter the basis of the 35 U.S.C. 101 rejection must be that, when taken as a whole, the claim recites a law of nature, a natural phenomenon, or an abstract idea.

### (d) Certain Claim Language Related to Mathematical Operation Steps of a Process

#### i) Intended Use or Field of Use Statements

Claim language that simply specifies an intended use or field of use for the invention generally will not limit the scope of a claim, particularly when only presented in the claim preamble. Thus, Office personnel should be careful to properly interpret such language. *Walter*, 618 F.2d at 769, 205 USPQ at 409 (Because none of the claimed steps were explicitly or implicitly limited to their application in seismic prospecting activities, the court held that "[a]lthough the claim preambles relate the claimed invention to the art of seismic prospecting, the claims themselves are not drawn to methods of or

apparatus for seismic prospecting; they are drawn to improved mathematical methods for interpreting the results of seismic prospecting."). Cf. *Alappat*, 33 F.3d at 1544, 31 USPQ2d at 1558. When such language is treated as nonlimiting, Office personnel should expressly identify in the Office action the claim language that constitutes the intended use or field of use statements and provide the basis for their findings. This will shift the burden to applicant to demonstrate why the language is to be treated as a claim limitation.

ii) **Necessary Antecedent Step to Performance of a Mathematical Operation or Independent Limitation on a Claimed Process**

In some situations, certain acts of "collecting" or "selecting" data for use in a process consisting of one or more mathematical operations will not further limit a claim beyond the specified mathematical operation step(s). Such acts merely determine values for the variables used in the mathematical formulae used in making the calculations. *Walter*, 618 F.2d at 769–70, 205 USPQ at 409. In other words, the acts are dictated by nothing other than the performance of a mathematical operation. *Sarker*, 588 F.2d at 1335, 200 USPQ at 139.

If a claim requires acts to be performed to create data that will then be used in a process representing a <u>practical application</u> of one or more mathematical operations, those acts <u>must</u> be treated as further limiting the claim beyond the mathematical operation(s) *per se*. Such acts are data gathering steps not dictated by the algorithm but by other limitations which require certain antecedent steps and as such constitute an independent limitation on the claim.

Examples of acts that independently limit a claimed process involving mathematical operations include:
- a method of conducting seismic exploration which requires generating and manipulating signals from seismic energy waves <u>before</u> "summing" the values represented by the signals (*Taner*, 681 F.2d at 788, 214 USPQ at 679); and
- a method of displaying X–ray attenuation data as a signed gray scale signal in a "field" using a particular algorithm, where the antecedent steps require generating the data using a particular machine (e.g., a computer tomography scanner). *Abele*, 684 F.2d at 908, 214 USPQ at 687 ("The specification indicates that such attenuation data is available only when an X–ray beam is produced by a CAT scanner, passed through an object, and detected upon its exit. Only after these steps have been completed is the algorithm performed, and the resultant modified data displayed in the required format.").

Examples of steps that do not independently limit one or more mathematical operation steps include:
- "perturbing" the values of a set of process inputs, where the subject matter "perturbed" was a number and the act of "perturbing" consists of substituting the numerical values of variables (*Gelnovatch*, 595 F.2d at 41 n.7, 201 USPQ at 145 n.7 ("Appellants' claimed step of perturbing the values of a set of process inputs (step 3), in addition to being a mathematical operation, appears to be a data–gathering step of the type we have held insufficient to change a nonstatutory method of calculation into a statutory process.... In this instance, the perturbed process inputs are not even measured values of physical phenomena, but are instead derived by numerically changing the values in the previous set of process inputs.")); and
- selecting a set of arbitrary measurement point values (*Sarkar*, 588 F.2d at 1331, 200 USPQ at 135).

Such steps do not impose independent limitations on the scope of the claim beyond those required by the mathematical operation limitation.

iii) **Post–Mathematical Operation Step Using Solution or Merely Conveying Result of Operation**

In some instances, certain kinds of post–solution "acts" will not further limit a process claim beyond the performance of the preceding mathematical operation step even if the acts are recited in the body of a claim. If, however, the claimed acts represent some "significant use" of the solution, those acts will invariably impose an independent limitation on the claim. A "significant use" is any activity which is more than merely outputting the direct result of the mathematical operation. Office personnel are reminded to rely on the applicant's characterization of the significance of the acts being assessed to resolve questions related to their relationship to the mathematical operations recited in the claim and the invention as a whole. See *Sarkar*, 588 F.2d at 1332 n.6, 200 USPQ at 136 n.6 ("post–solution" construction that was being modeled by the mathematical process not considered in deciding 35 U.S.C. 101 question because applicant indicated that such construction was not a material element of the invention). Thus, if a claim requires

that the direct result of a mathematical operation be evaluated and transformed into something else, Office personnel cannot treat the subsequent steps as being indistinguishable from the performance of the mathematical operation and thus not further limiting on the claim. For example, acts that require the conversion of a series of numbers representing values of a wavefunction equation for a chemical compound into values representing an image that conveys information about the three–dimensional structure of the compound and the displaying of the three–dimensional structure cannot be treated as being part of the mathematical operations.

Office personnel should be especially careful when reviewing claim language that requires the performance of "post–solution" steps to ensure that claim limitations are not ignored.

Examples of steps found not to independently limit a process involving one or more mathematical operation steps include:

— step of "updating alarm limits" found to constitute changing the number value of a variable to represent the result of the calculation (*Parker v. Flook*, 437 U.S. 584, 585, 198 USPQ 193, 195 (1978));

— final step of magnetically recording the result of a calculation (*Walter*, 618 F.2d at 770, 205 USPQ at 409 ("If 101 could be satisfied by the mere recordation of the results of a nonstatutory process on some record medium, even the most unskilled patent draftsman could provide for such a step."));

— final step of "equating" the process outputs to the values of the last set of process inputs found to constitute storing the result of calculations (*Gelnovatch*, 595 F.2d at 41 n.7, 201 USPQ at 145 n.7);

— final step of displaying result of a calculation "as a shade of gray rather than as simply a number" found to not constitute distinct step where the data were numerical values that did not represent anything (*Abele*, 684 F.2d at 909, 214 USPQ at 688 ("This claim presents no more than the calculation of a number and display of the result, albeit in a particular format. The specification provides no greater meaning to 'data in a field' than a matrix of numbers regardless of by what method generated. Thus, the algorithm is neither explicitly nor implicitly applied to any certain process. Moreover, that the result is displayed as a shade of gray rather than as simply a number provides no greater or better information, considering the broad range of applications encompassed by the claim.")); and

— step of "transmitting electrical signals representing" the result of calculations (*In re De Castelet*, 562 F.2d 1236, 1244, 195 USPQ 439, 446 (CCPA 1977) ("That the computer is instructed to transmit electrical signals, representing the results of its calculations, does not constitute the type of 'post solution activity' found in *Flook*, [437 U.S. 584, 198 USPQ 193 (1978)], and does not transform the claim into one for a process merely using an algorithm. The final transmitting step constitutes nothing more than reading out the result of the calculations.")).

(e) **Manipulation of Abstract Ideas Without a Claimed Practical Application**

A process that consists solely of the manipulation of an abstract idea without any limitation to a practical application is nonstatutory. See, e.g., *Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759. See also *Schrader*, 22 F.3d at 295, 30 USPQ2d at 1459. Office personnel have the burden to establish a *prima facie* case that the claimed invention taken as a whole is directed to the manipulation of abstract ideas without a practical application.

In order to determine whether the claim is limited to a practical application of an abstract idea, Office personnel must analyze the claim as a whole, in light of the specification, to understand what subject matter is being manipulated and how it is being manipulated. During this procedure, Office personnel must evaluate any statements of intended use or field of use, any data gathering step and any post–manipulation activity. See section IV.B.2(d) above for how to treat various types of claim language. Only when the claim is devoid of any limitation to a practical application in the technological arts should it be rejected under 35 U.S.C. 101. Further, when such a rejection is made, Office personnel must expressly state how the language of the claims has been interpreted to support the rejection.

V. **EVALUATE APPLICATION FOR COMPLIANCE WITH 35 U.S.C. 112**

Office personnel should begin their evaluation of an application's compliance with 35 U.S.C. 112 by considering the requirements of 35 U.S.C. 112, second paragraph. The second paragraph contains two separate and distinct requirements: (A) that the claim(s) set forth the subject matter applicants regard as the invention, and (B) that the claim(s) particularly point out and distinctly claim the invention. An application will be deficient

under 35 U.S.C. 112, second paragraph when (A) evidence including admissions, other than in the application as filed, shows applicant has stated that he or she regards the invention to be different from what is claimed, or when (B) the scope of the claims is unclear.

After evaluation of the application for compliance with 35 U.S.C. 112, second paragraph, Office personnel should then evaluate the application for compliance with the requirements of 35 U.S.C. 112, first paragraph. The first paragraph contains three separate and distinct requirements:

(A) adequate written description,
(B) enablement, and
(C) best mode.

An application will be deficient under 35 U.S.C. 112, first paragraph when the written description is not adequate to identify what the applicant has invented, or when the disclosure does not enable one skilled in the art to make and use the invention as claimed without undue experimentation. Deficiencies related to disclosure of the best mode for carrying out the claimed invention are not usually encountered during examination of an application because evidence to support such a deficiency is seldom in the record.

If deficiencies are discovered with respect to 35 U.S.C. 112, Office personnel must be careful to apply the appropriate paragraph of 35 U.S.C. 112.

### A. Determine Whether the Claimed Invention Complies with 35 U.S.C. 112, Second Paragraph Requirements

#### 1. Claims Setting Forth the Subject Matter Applicant Regards as Invention

Applicant's specification must conclude with claim(s) that set forth the subject matter which the applicant regards as the invention. The invention set forth in the claims is presumed to be that which applicant regards as the invention, unless applicant considers the invention to be something different from what has been claimed as shown by evidence, including admissions, outside the application as filed. An applicant may change what he or she regards as the invention during the prosecution of the application.

#### 2. Claims Particularly Pointing Out and Distinctly Claiming the Invention

Office personnel shall determine whether the claims set out and circumscribe the invention with a reasonable degree of precision and particularity. In this regard, the definiteness of the language must be analyzed, not in a vacuum, but always in light of the teachings of the disclosure as it would be interpreted by one of ordinary skill in the art. Applicant's claims, interpreted in light of the disclosure, must reasonably apprise a person of ordinary skill in the art of the invention. However, the applicant need not explicitly recite in the claims every feature of the invention. For example, if an applicant indicates that the invention is a particular computer, the claims do not have to recite every element or feature of the computer. In fact, it is preferable for claims to be drafted in a form that emphasizes what the applicant has invented (i.e., what is new rather than old).

A means plus function limitation is distinctly claimed if the description makes it clear that the means corresponds to well-defined structure of a computer or computer component implemented in either hardware or software and its associated hardware platform. Such means may be defined as:

— a programmed computer with a particular functionality implemented in hardware or hardware and software;
— a logic circuit or other component of a programmed computer that performs a series of specifically identified operations dictated by a computer program; or
— a computer memory encoded with executable instructions representing a computer program that can cause a computer to function in a particular fashion.

The scope of a "means" limitation is defined as the corresponding structure or material (e.g., a specific logic circuit) set forth in the written description and equivalents. See MPEP § 2181 through § 2186. Thus, a claim using means plus function limitations without corresponding disclosure of specific structures or materials that are not well-known fails to particularly point out and distinctly claim the invention. For example, if the applicant discloses only the functions to be performed and provides no express, implied or inherent disclosure of hardware or a combination of hardware and software that performs the functions, the application has not disclosed any "structure" which corresponds to the claimed

means. Office personnel should reject such claims under 35 U.S.C. 112, second paragraph. The rejection shifts the burden to the applicant to describe at least one specific structure or material that corresponds to the claimed means in question, and to identify the precise location or locations in the specification where a description of at least one embodiment of that claimed means can be found. In contrast, if the corresponding structure is disclosed to be a memory or logic circuit that has been configured in some manner to perform that function (e.g., using a defined computer program), the application has disclosed "structure" which corresponds to the claimed means.

When a claim or part of a claim is defined in computer program code, whether in source or object code format, a person of skill in the art must be able to ascertain the metes and bounds of the claimed invention. In certain circumstances, as where self-documenting programming code is employed, use of programming language in a claim would be permissible because such program source code presents "sufficiently high-level language and descriptive identifiers" to make it universally understood to others in the art without the programmer having to insert any comments. See Computer Dictionary 353 (Microsoft Press, 2ed. 1994) for a definition of "self-documenting code." Applicants should be encouraged to functionally define the steps the computer will perform rather than simply reciting source or object code instructions.

### B. Determine Whether the Claimed Invention Complies with 35 U.S.C. 112, First Paragraph Requirements

#### 1. Adequate Written Description

The satisfaction of the enablement requirement does not satisfy the written description requirement. See *In re Barker*, 559 F.2d 588, 591, 194 USPQ 470, 472 (CCPA 1977), *cert. denied, Barker v. Parker*, 434 U.S. 1064 (1978) (a specification may be sufficient to enable one skilled in the art to make and use the invention, but still fail to comply with the written description requirement). See also *In re DiLeone*, 436 F.2d 1404, 1405, 168 USPQ 592, 593 (CCPA 1971). For the written description requirement, an applicant's specification must reasonably convey to those skilled in the art that the applicant was in possession of the claimed invention as of the date of invention. The claimed invention subject matter need not be described literally, i.e., using the same terms, in order for the disclosure to satisfy the description requirement.

#### 2. Enabling Disclosure

An applicant's specification must enable a person skilled in the art to make and use the claimed invention without undue experimentation. The fact that experimentation is complex, however, will not make it undue if a person of skill in the art typically engages in such complex experimentation. For a computer-related invention, the disclosure must enable a skilled artisan to configure the computer to possess the requisite functionality, and, where applicable, interrelate the computer with other elements to yield the claimed invention, without the exercise of undue experimentation. The specification should disclose <u>how</u> to configure a computer to possess the requisite functionality or <u>how</u> to integrate the programmed computer with other elements of the invention, unless a skilled artisan would know how to do so without such disclosure. See, e.g., *Northern Telecom v. Datapoint Corp.*, 908 F.2d 931, 941-43, 15 USPQ2d 1321, 1328-30 (Fed. Cir.), *cert. denied, Datapoint Corp. v. Northern Telecom*, 498 U.S. 920 (1990) (judgment of invalidity reversed for clear error where expert testimony on both sides showed that a programmer of reasonable skill could write a satisfactory program with ordinary effort based on the disclosure); *DeGeorge v. Bernier*, 768 F.2d 1318, 1324, 226 USPQ 758, 762-63 (Fed. Cir. 1985) (superseded by statute with respect to issues not relevant here) (invention was adequately disclosed for purposes of enablement even though all of the circuitry of a word processor was not disclosed, since the undisclosed circuitry was deemed inconsequential because it did not pertain to the claimed circuit); *In re Phillips*, 608 F.2d 879, 882-83, 203 USPQ 971, 975 (CCPA 1979) (computerized method of generating printed architectural specifications dependent on use of glossary of predefined standard phrases and error-checking feature enabled by overall disclosure generally defining errors); *In re Donohue*, 550 F.2d 1269, 1271, 193 USPQ 136, 137 (CCPA 1977) ("Employment of block diagrams and descriptions of their functions is not fatal under 35 U.S.C. 112, first paragraph, providing the represented structure is conventional and can be determined without undue experimentation."); *In re Knowlton*, 481 F.2d 1357, 1366-68, 178 USPQ 486, 493-94 (CCPA 1973) (examiner's contention that a software invention

needed a detailed description of all the circuitry in the complete hardware system reversed).

For many computer-related inventions, it is not unusual for the claimed invention to involve more than one field of technology. For such inventions, the disclosure must satisfy the enablement standard for each aspect of the invention. See *In re Naquin*, 398 F.2d 863, 866, 158 USPQ 317, 319 (CCPA 1968) ("When an invention, in its different aspects, involves distinct arts, that specification is adequate which enables the adepts of each art, those who have the best chance of being enabled, to carry out the aspect proper to their specialty."); *Ex parte Zechnall*, 194 USPQ 461, 461 (Bd. App. 1973) ("appellants' disclosure must be held sufficient if it would enable a person skilled in the electronic computer art, in cooperation with a person skilled in the fuel injection art, to make and use appellants' invention"). As such, the disclosure must teach a person skilled in each art how to make and use the relevant aspect of the invention without undue experimentation. For example, to enable a claim to a programmed computer that determines and displays the three-dimensional structure of a chemical compound, the disclosure must

— enable a person skilled in the art of molecular modeling to understand and practice the underlying molecular modeling processes; and
— enable a person skilled in the art of computer programming to create a program that directs a computer to create and display the image representing the three-dimensional structure of the compound.

In other words, the disclosure corresponding to each aspect of the invention must be enabling to a person skilled in each respective art.

In many instances, an applicant will describe a programmed computer by outlining the significant elements of the programmed computer using a functional block diagram. Office personnel should review the specification to ensure that along with the functional block diagram the disclosure provides information that adequately describes each "element" in hardware or hardware and its associated software and how such elements are interrelated. See *In re Scarbrough*, 500 F.2d 560, 565, 182 USPQ 298, 301–02 (CCPA 1974) ("It is not enough that a person skilled in the art, by carrying on investigations along the line indicated in the instant application, and by a great amount of work eventually might find out how to make and use the instant invention. The statute requires the application itself to inform, not to direct others to find out for themselves (citation omitted)."); *Knowlton*, 481 F.2d at 1367, 178 USPQ at 493 (disclosure must constitute more than a "sketchy explanation of flow diagrams or a bare group of program listings together with a reference to a proprietary computer on which they might be run"). See also *In re Gunn*, 537 F.2d 1123, 1127–28, 190 USPQ 402, 405 (CCPA 1976); *In re Brandstadter*, 484 F.2d 1395, 1406–07, 17 USPQ 286, 294 (CCPA 1973); and *In re Ghiron*, 442 F.2d 985, 991, 169 USPQ 723, 727–28 (CCPA 1971).

## VI. DETERMINE WHETHER THE CLAIMED INVENTION COMPLIES WITH 35 U.S.C. 102 AND 103

As is the case for inventions in any field of technology, assessment of a claimed computer-related invention for compliance with 35 U.S.C. 102 and 103 begins with a comparison of the claimed subject matter to what is known in the prior art. If no differences are found between the claimed invention and the prior art, the claimed invention lacks novelty and is to be rejected by Office personnel under 35 U.S.C. 102. Once distinctions are identified between the claimed invention and the prior art, those distinctions must be assessed and resolved in light of the knowledge possessed by a person of ordinary skill in the art. Against this backdrop, one must determine whether the invention would have been obvious at the time the invention was made. If not, the claimed invention satisfies 35 U.S.C. 103. Factors and considerations dictated by law governing 35 U.S.C. 103 apply without modification to computer-related inventions.

If the difference between the prior art and the claimed invention is limited to descriptive material stored on or employed by a machine, Office personnel must determine whether the descriptive material is functional descriptive material or nonfunctional descriptive material, as described *supra* in sections IV.B.1(a) and IV. B.1(b). Functional descriptive material is a limitation in the claim and must be considered and addressed in assessing patentability under 35 U.S.C. 103. Thus, a rejection of the claim as a whole under 35 U.S.C. 103 is inappropriate unless the functional descriptive material would have been suggested by the prior art. Nonfunctional descriptive material cannot render nonobvious an invention that would have otherwise been obvious. Cf. *In re Gulack*, 703 F.2d 1381, 1385, 217 USPQ 401, 404 (Fed.

Cir. 1983) (when descriptive material is not functionally related to the substrate, the descriptive material will not distinguish the invention from the prior art in terms of patentability).

Common situations involving nonfunctional descriptive material are:

— a computer–readable storage medium that differs from the prior art solely with respect to nonfunctional descriptive material, such as music or a literary work, encoded on the medium,

— a computer that differs from the prior art solely with respect to nonfunctional descriptive material that cannot alter how the machine functions (i.e., the descriptive material does not reconfigure the computer), or

— a process that differs from the prior art only with respect to nonfunctional descriptive material that cannot alter how the process steps are to be performed to achieve the utility of the invention.

Thus, if the prior art suggests storing a song on a disk, merely choosing a particular song to store on the disk would be presumed to be well within the level of ordinary skill in the art at the time the invention was made. The difference between the prior art and the claimed invention is simply a rearrangement of nonfunctional descriptive material.

### VII. Clearly Communicate Findings, Conclusions and Their Bases

Once Office personnel have concluded the above analyses of the claimed invention under all the statutory provisions, including 35 U.S.C. 101, 112, 102 and 103, they should review all the proposed rejections and their bases to confirm their correctness. Only then should any rejection be imposed in an Office action. The Office action should clearly communicate the findings, conclusions and reasons which support them.

## Appendix to Examination Guidelines for Computer–Related Inventions

**Computer-Related Inventions**

---

**II. Determine What Applicant Has Invented and Is Seeking to Patent**

A. Identify and Understand Any Practical Application Asserted for the Invention

B. Review the Detailed Disclosure and Specific Embodiments of the Invention to Determine What the Applicant Has Invented

C. Review the Claims

---

**III. Conduct a Thorough Search of the Prior Art**

---

**IV. Determine Whether the Claimed Invention Complies with 35 U.S.C. § 101 (See A-2)**

---

**V. Evaluate Application for Compliance with 35 U.S.C. § 112**

A. Determine Whether the Claimed Invention Complies with 35 U.S.C. § 112, Second Paragraph

　1. Claims Setting Forth the Subject Matter Applicant Regards as Invention

　2. Claims Particularly Pointing Out and Distinctly Claiming the Invention

B. Determine Whether the Claimed Invention Complies with 35 U.S.C. § 112, First Paragraph

　1. Adequate Written Description

　2. Enabling Disclosure

---

**VI. Determine Whether the Claimed Invention Complies with 35 U.S.C. § § 102 and 103**

---

**VII. Clearly Communicate Findings, Conclusions and Their Bases**

A–1



## 2106.01 Computer Programming and 35 U.S.C. 112, First Paragraph

The requirements for sufficient disclosure of inventions involving computer programming is the same as for all inventions sought to be patented. Namely, there must be an adequate written description, the original disclosure should be sufficiently enabling to allow one to make and use the invention as claimed, and there must be presentation of a best mode for carrying out the invention.

The following guidelines, while applicable to a wide range of arts, are intended to provide a guide for analyzing 35 U.S.C. 112, first paragraph, issues in applications involving computer programs, software, firmware, or block diagram cases wherein one or more of the "block diagram" elements are at least partially comprised of a computer software component. It should be recognized that sufficiency of disclosure issues in computer cases necessarily will require an inquiry into both the sufficiency of the disclosed hardware as well as the disclosed software due to the interrelationship and interdependence of computer hardware and software.

### WRITTEN DESCRIPTION

The function of the description requirement is to ensure that the inventor had possession of, as of the filing date of the application relied on, the specific subject matter later claimed by him or her; how the specification accomplishes this is not material. *In re Herschler*, 591 F.2d 693, 700-01, 200 USPQ 711, 717 (CCPA 1979) and further reiterated in *In re Kaslow*, 707 F.2d 1366, 707 F.2d 1366, 217 USPQ 1089 (Fed. Cir. 1983). See also MPEP § 2163 - § 2163.04.

### BEST MODE

The purpose of the best mode requirement is to "restrain inventors from applying for patents while at the same time concealing from the public the preferred embodiments of their inventions which they have in fact conceived," *In re Gay*, 309 F.2d 769, 772, 135 USPQ 311, 315 (CCPA 1962); "only evidence of concealment

(accidental or intentional) is to be considered [in judging the adequacy of a best mode disclosure]. That evidence, in order to result in affirmance of a best mode rejection, must tend to show that the quality of an applicant's best mode disclosure is so poor as to effectively result in concealment." *In re Sherwood*, 613 F.2d 809, 816–817, 204 USPQ 537, 544 (CCPA 1980). Also, see *White Consol. Indus. v. Vega Servo–Control Inc.*, 214 USPQ 796, 824 (S.D. Mich. 1982), *aff'd on related grounds*, 713 F.2d 788, 218 USPQ 961 (Fed. Cir. 1983). See also MPEP § 2165 – § 2165.04.

There are two factual inquiries to be made in determining whether a specification satisfies the best mode requirement. First, there must be a subjective determination as to whether at the time the application was filed, the inventor knew of a best mode of practicing the invention. Second, if the inventor had a best mode of practicing the invention, there must be an objective determination as to whether the best mode was disclosed in sufficient detail to allow one skilled in the art to practice it. *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 41 USPQ2d 1801, 1804 (Fed. Cir. 1997); *Chemcast Corp. v. Arco Industries*, 913 F.2d 923, 927–28, 16 USPQ2d 1033, 1036 (Fed. Cir. 1990). "As a general rule, where software constitutes part of a best mode of carrying out an invention, description of such a best mode is satisfied by a disclosure of the functions of the software. This is because, normally, writing code for such software is within the skill of the art, not requiring undue experimentation, once its functions have been disclosed. . . . [F]low charts or source code listings are not a requirement for adequately disclosing the functions of software." *Fonar Corp.*, 107 F.3d at 1549, 41 USPQ2d at 1805 (citations omitted).

**ENABLEMENT**

When basing a rejection on the failure of the applicant's disclosure to meet the enablement provisions of the first paragraph of 35 U.S.C. 112, the examiner must establish on the record that he has a reasonable basis for questioning the adequacy of the disclosure to enable a person of ordinary skill in the art to make and use the claimed invention without resorting to *undue experimentation*. See *In re Brown*, 477 F.2d 946, 177 USPQ 691 (CCPA 1973); *In re Ghiron*, 442 F.2d 985, 169 USPQ 723 (CCPA 1971). Once the examiner has advanced a reasonable basis for questioning the adequacy of the disclosure, it becomes incumbent on the applicant to rebut that challenge and factually demonstrate that his or her application disclosure is in fact sufficient. See *In re Doyle*, 482 F.2d 1385, 1392, 179 USPQ 227, 232 (CCPA 1973); *In re Scarbrough*, 500 F.2d 560, 566, 182 USPQ 298, 302 (CCPA 1974); *In re Ghiron, supra*. See also MPEP § 2106, paragraph V.B.2 and § 2164 – § 2164.08(c).

## 2106.02 Disclosure in Computer Programming Cases

To establish a reasonable basis for questioning the adequacy of a disclosure, the examiner must present a factual analysis of a disclosure to show that a person skilled in the art would not be able to make and use the claimed invention without resorting to undue experimentation.

In computer applications, it is not unusual for the claimed invention to involve two areas of prior art or more than one technology, e.g., an appropriately programmed computer and an area of application of said computer. *White Consol. Indus.*, 214 USPQ at 821. In regard to the "skilled in the art" standard, in cases involving both the art of computer programming, and another technology, the examiner must recognize that the knowledge of persons skilled in both technologies is the appropriate criteria for determining sufficiency. See *In re Naquin*, 398 F.2d 863, 158 USPQ 317 (CCPA 1968); *In re Brown*, 477 F.2d 946, 177 USPQ 691 (CCPA 1973); and *White Consol. Indus. v. Vega Servo–Control, Inc.*, 214 USPQ 796, 822 (S.D.Mich. 1982), *aff'd on related grounds*, 713 F.2d 788, 218 USPQ 961 (Fed. Cir. 1983).

In a typical computer application, system components are often represented in a "block diagram" format, i.e., a group of hollow rectangles representing the elements of the system, functionally labelled, and interconnected by lines. Such block diagram computer cases may be categorized into (A) systems which include but are more comprehensive than a computer and (B) systems wherein the block elements are totally within the confines of a computer.

### BLOCK ELEMENTS MORE COMPREHENSIVe THAN A COMPUTER

The first category of such block diagram cases involves systems which include a computer as well as other system hardware and/or software components. In order to meet his burden of establishing a reasonable basis for questioning the adequacy of such disclosure, the examiner should initiate a factual analysis of the system by

focusing on each of the individual block element components. More specifically, such an inquiry should focus on the diverse functions attributed to each block element as well as the teachings in the specification as to how such a component could be implemented. If based on such an analysis, the examiner can reasonably contend that more than routine experimentation would be required by one of ordinary skill in the art to implement such a component or components, that component or components should specifically be challenged by the examiner as part of a 35 U.S.C. 112, first paragraph rejection. Additionally, the examiner should determine whether certain of the hardware or software components depicted as block elements are themselves complex assemblages which have widely differing characteristics and which must be precisely coordinated with other complex assemblages. Under such circumstances, a reasonable basis may exist for challenging such a functional block diagram form of disclosure. See *In re Ghiron*, 442 F.2d 985, 169 USPQ 723 (CCPA 1971) and *In re Brown, supra*. Moreover, even if the applicant has cited prior art patents or publications to demonstrate that particular block diagram hardware or software components are old, it should not always be considered as self-evident how such components are to be interconnected to function in a disclosed complex manner. See *In re Scarbrough*, 500 F.2d 560, 566, 182 USPQ 298, 301 (CCPA 1974) and *In re Forman*, 463 F.2d 1125, 1129, 175 USPQ 12, 16 (CCPA 1972). Furthermore, in complex systems including a digital computer, a microprocessor, or a complex control unit as one of many block diagram elements, timing between various system elements may be of the essence and without a timing chart relating the timed sequences for each element, an unreasonable amount of work may be required to come up with the detailed relationships an applicant alleges that he has solved. See *In re Scarbrough*, 500 F.2d at 566, 182 USPQ at 302.

For example, in a block diagram disclosure of a complex claimed system which includes a microprocessor and other system components controlled by the microprocessor, a mere reference to a prior art, commercially available microprocessor, without any description of the precise operations to be performed by the microprocessor, fails to disclose how such a microprocessor would be properly programmed to either perform any required calculations or to coordinate the other system components in the proper timed sequence to perform the functions disclosed and claimed. If, in such a system, a particular program is disclosed, such a program should be carefully reviewed to ensure that its scope is commensurate with the scope of the functions attributed to such a program in the claims. See *In re Brown*, 477 F.2d at 951, 177 USPQ at 695. If the disclosure fails to disclose any program and if more than routine experimentation would be required of one skilled in the art to generate such a program, the examiner clearly would have a reasonable basis for challenging the sufficiency of such a disclosure. The amount of experimentation that is considered routine will vary depending on the facts and circumstances of individual cases. No exact numerical standard has been fixed by the courts, but the "amount of required experimentation must, however, be reasonable." *White Consol. Indus.*, 713 F.2d at 791, 218 USPQ at 963. One court apparently found that the amount of experimentation involved was reasonable where a skilled programmer was able to write a general computer program, implementing an embodiment form, within 4 hours. *Hirschfield v. Banner*, 462 F. Supp. 135, 142, 200 USPQ 276, 279 (D.D.C. 1978), *aff'd*, 615 F.2d 1368 (D.C. Cir. 1986), *cert. denied*, 450 U.S. 994 (1981). On the other hand, another court found that, where the required period of experimentation for skilled programmers to develop a particular program would run to 1½ to 2 man years, this would be "a clearly unreasonable requirement" (*White Consol. Indus.*, 713 F.2d at 791, 218 USPQ at 963).

### BLOCK ELEMENTS WITHIN A COMPUTER

The second category of block diagram cases occurs most frequently in pure data processing applications where the combination of block elements is totally within the confines of a computer, there being no interfacing with external apparatus other than normal input/output devices. In some instances, it has been found that particular kinds of block diagram disclosures were sufficient to meet the enabling requirement of 35 U.S.C. 112, first paragraph. See *In re Knowlton*, 481 F.2d 1357, 178 USPQ 486 (CCPA 1973), *In re Comstock*, 481 F.2d 905, 178 USPQ 616 (CCPA 1973). Most significantly, however, in both the *Comstock* and *Knowlton* cases, the decisions turned on the appellants disclosure of (A) a reference to and reliance on an identified prior art computer system and (B) an operative computer program for the referenced prior art computer system. Moreover, in *Knowlton* the disclosure was presented in such a detailed fashion that the individual program's steps were specifically interrelated with the operative structural elements in the

referenced prior art computer system. The court in *Knowlton* indicated that the disclosure did not merely consist of a sketchy explanation of flow diagrams or a bare group of program listings together with a reference to a proprietary computer in which they might be run. The disclosure was characterized as going into considerable detail into explaining the interrelationships between the disclosed hardware and software elements. Under such circumstances, the Court considered the disclosure to be concise as well as full, clear, and exact to a sufficient degree to satisfy the literal language of 35 U.S.C. 112, first paragraph. It must be emphasized that because of the significance of the program listing and the reference to and reliance on an identified prior art computer system, absent either of these items, a block element disclosure within the confines of a computer should be scrutinized in precisely the same manner as the first category of block diagram cases discussed above.

Regardless of whether a disclosure involves block elements more comprehensive than a computer or block elements totally within the confines of a computer, the examiner, when analyzing method claims, must recognize that the specification must be adequate to teach how to practice the claimed method. If such practice requires a particular apparatus, it is axiomatic that the application must therefore provide a sufficient disclosure of that apparatus if such is not already available. See *In re Ghiron*, 442 F.2d 985, 991, 169 USPQ 723, 727 (CCPA 1971) and *In re Gunn*, 537 F.2d 1123, 1128, 190 USPQ 402, 406 (CCPA 1976). When the examiner questions the adequacy of computer system or computer programming disclosures, the examiner's reasons for finding the specification to be nonenabling should be supported by the record as a whole. In this regard, it is also essential for the examiner to reasonably challenge evidence submitted by the applicant. For example, in *In re Naquin, supra*, affiant's statement unchallenged by the examiner, that the average computer programmer was familiar with the subroutine necessary for performing the claimed process, was held to be a statement of fact which rendered the examiner's rejection baseless. In other words, unless the examiner presents a reasonable basis for challenging the disclosure in view of the record as a whole, a 35 U.S.C. 112, first paragraph rejection in a computer system or computer programming application will not be sustained on appeal. See *In re Naquin, supra,* and *In re Morehouse*, 545 F.2d 162, 165-66, 192 USPQ 29, 32 (CCPA 1976).

While no specific universally applicable rule exists for recognizing an insufficiently disclosed application involving computer programs, an examining guideline to generally follow is to challenge the sufficiency of such disclosures which fail to include either the computer program itself or a reasonably detailed flowchart which delineates the sequence of operations the program must perform. In programming applications software disclosure only includes a flowchart, as the complexity of functions and the generality of the individual components of the flowchart increase, the basis for challenging the sufficiency of such a flowchart becomes more reasonable because the likelihood of more than routine experimentation being required to generate a working program from such a flowchart also increases.

As stated earlier, once an examiner has advanced a reasonable basis or presented evidence to question the adequacy of a computer system or computer programming disclosure, the applicant must show that his or her specification would enable one of ordinary skill in the art to make and use the claimed invention without resorting to undue experimentation. In most cases, efforts to meet this burden involve submitting affidavits, referencing prior art patents or technical publications, arguments of counsel, or combinations of these approaches.

**AFFIDAVIT PRACTICE (37 CFR 1.132)**

In computer cases, affidavits must be critically analyzed. Affidavit practice usually initially involves analyzing the skill level and/or qualifications of the affiant, which should be of the routineer in the art. When an affiant's skill level is higher than that required by the routineer for a particular application, an examiner may challenge the affidavit since it would not be made by a routineer in the art, and therefore would not be probative as to the amount of experimentation required by a routineer in the art to implement the invention. An affiant having a skill level or qualifications above that of the routineer in the art would require less experimentation to implement the claimed invention than that for the routineer. Similarly, an affiant having a skill level or qualifications below that of the routineer in the art would require more experimentation to implement the claimed invention than that for the routineer in the art. In either situation, the standard of the routineer in the art would not have been met.

In computer systems or programming cases, the problems with a given affidavit, which relate to the sufficiency

of disclosure issue, generally involve affiants submitting few facts to support their conclusions or opinions. Some affidavits may go so far as to present conclusions on the ultimate legal question of sufficiency. *In re Brandstadter*, 484 F.2d 1395, 179 USPQ 286 (CCPA 1973) illustrates the extent of the inquiry into the factual basis underlying an affiant's conclusions or opinions. In *Brandstadter*, the invention concerned a stored program controller (computer) programmed to control the storing, retrieving, and forwarding of messages in a communications system. The disclosure consisted of broadly defined block diagrams of the structure of the invention and no flowcharts or program listings of the programs of the controller. The Court quoted extensively from the Examiner's Office Actions and Examiner's Answer in its opinion where it was apparent that the Examiner consistently argued that the disclosure was merely a broad system diagram in the form of labelled block diagrams along with statements of a myriad of desired results. Various affidavits were presented in which the affiants stated that all or some of the system circuit elements in the block diagrams were either well-known in the art or "could be constructed" by the skilled design engineer, that the controller was "capable of being programmed" to perform the stated functions or results desired, and that the routineer in the art "could design or construct or was able to program" the system. The Court did consider the affiants' statements as being some evidence on the ultimate legal question of enablement but concluded that the statements failed in their purpose since they recited conclusions or opinions with few facts to support or buttress these conclusions. With reference to the lack of a disclosed computer program or even a flowchart of the program to control the message switching system, the record contained no evidence as to the number of programmers needed, the number of man-hours and the level of skill of the programmers to produce the program required to practice the invention.

It should be noted also that it is not opinion evidence directed to the ultimate legal question of enablement, but rather factual evidence directed to the amount of time and effort and level of knowledge required for the practice of the invention from the disclosure alone which can be expected to rebut a *prima facie* case of nonenablement. See *Hirschfield*, 462 F. Supp. at 143, 200 USPQ at 281. It has also been held that where an inventor described the problem to be solved to an affiant, thus enabling the affiant to generate a computer program to solve the problem, such an affidavit failed to demonstrate that the application alone would have taught a person of ordinary skill in the art how to make and use the claimed invention. See *In re Brown*, 477 F.2d at 951, 177 USPQ at 695. The Court indicated that it was not factually established that the applicant did not convey to the affiant vital and additional information in their several meetings in addition to that set out in the application. Also of significance for an affidavit to be relevant to the determination of enablement is that it must be probative of the level of skill of the routineer in the art as of the time the applicant filed his application. See *In re Gunn*, 537 F.2d at 1128, 190 USPQ at 406. In this case, each of the affiants stated what was known at the time he executed the affidavit, and not what was known at the time the applicant filed his application.

## REFERENCING PRIOR ART DOCUMENTS

Earlier, it had been discussed that citing in the specification the commercial availability of an identified prior art computer system is very pertinent to the issue of enablement. But in some cases, this approach may not be sufficient to meet the applicant's burden. Merely citing in an affidavit extracts from technical publications in order to satisfy the enablement requirement is not sufficient if it is not made clear that a person skilled in the art would know which, or what parts, of the cited circuits could be used to construct the claimed device or how they could be interconnected to act in combination to produce the required results. See *In re Forman*, 463 F.2d at 1129, 175 USPQ at 16. This analysis would appear to be less critical where the circuits comprising applicant's system are essentially standard components comprising an identified prior art computer system and a standard device attached thereto.

Prior art patents are often relied on by applicants to show the state of the art for purposes of enablement. However, these patents must have an issue date earlier than the effective filing date of the application under consideration. See *In re Budnick*, 537 F.2d 535, 538, 190 USPQ 422, 424 (CCPA 1976). An analogous point was made in *In re Gunn, supra*, where the court indicated that patents issued after the filing date of the applicant's application are not evidence of subject matter known to any person skilled in the art since their subject matter may have been known only to the patentees and the Patent and Trademark Office.