# EXHIBIT B

Dockets.Justia.com

# DIRECTIVE 98/44/EC OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL

## of 6 July 1998

## on the legal protection of biotechnological inventions

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty establishing the European Community, and in particular Article 100a thereof,

Having regard to the proposal from the Commission ([1]),

Having regard to the opinion of the Economic and Social Committee ([2]),

Acting in accordance with the procedure laid down in Article 189b of the Treaty ([3]),

(1) Whereas biotechnology and genetic engineering are playing an increasingly important role in a broad range of industries and the protection of biotechnological inventions will certainly be of fundamental importance for the Community's industrial development;

(2) Whereas, in particular in the field of genetic engineering, research and development require a considerable amount of high-risk investment and therefore only adequate legal protection can make them profitable;

(3) Whereas effective and harmonised protection throughout the Member States is essential in order to maintain and encourage investment in the field of biotechnology;

(4) Whereas following the European Parliament's rejection of the joint text, approved by the Conciliation Committee, for a European Parliament and Council Directive on the legal protection of biotechnological inventions ([4]), the European Parliament and the Council have determined that the legal protection of biotechnological inventions requires clarification;

(5) Whereas differences exist in the legal protection of biotechnological inventions offered by the laws and practices of the different Member States; whereas such differences could create barriers to trade and hence impede the proper functioning of the internal market;

(6) Whereas such differences could well become greater as Member States adopt new and different legislation and administrative practices, or whereas national case-law interpreting such legislation develops differently;

(7) Whereas uncoordinated development of national laws on the legal protection of biotechnological inventions in the Community could lead to further disincentives to trade, to the detriment of the industrial development of such inventions and of the smooth operation of the internal market;

(8) Whereas legal protection of biotechnological inventions does not necessitate the creation of a separate body of law in place of the rules of national patent law; whereas the rules of national patent law remain the essential basis for the legal protection of biotechnological inventions given that they must be adapted or added to in certain specific respects in order to take adequate account of technological developments involving biological material which also fulfil the requirements for patentability;

(9) Whereas in certain cases, such as the exclusion from patentability of plant and animal varieties and of essentially biological processes for the production of plants and animals, certain concepts

---

([1]) OJ C 296, 8.10.1996, p. 4 and OJ C 311, 11.10.1997, p. 12.
([2]) OJ C 295, 7.10.1996, p. 11.
([3]) Opinion of the European Parliament of 16 July 1997 (OJ C 286, 22.9.1997, p. 87). Council Common Position of 26 February 1998 (OJ C 110, 8.4.1998, p. 17) and Decision of the European Parliament of 12 May 1998 (OJ C 167, 1.6.1998). Council Decision of 16 June 1998.

([4]) OJ C 68, 20.3.1995, p. 26.

in national laws based upon international patent and plant variety conventions have created uncertainty regarding the protection of biotechnological and certain microbiological inventions; whereas harmonisation is necessary to clarify the said uncertainty;

(10) Whereas regard should be had to the potential of the development of biotechnology for the environment and in particular the utility of this technology for the development of methods of cultivation which are less polluting and more economical in their use of ground; whereas the patent system should be used to encourage research into, and the application of, such processes;

(11) Whereas the development of biotechnology is important to developing countries, both in the field of health and combating major epidemics and endemic diseases and in that of combating hunger in the world; whereas the patent system should likewise be used to encourage research in these fields; whereas international procedures for the dissemination of such technology in the Third World and to the benefit of the population groups concerned should be promoted;

(12) Whereas the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs) (¹) signed by the European Community and the Member States, has entered into force and provides that patent protection must be guaranteed for products and processes in all areas of technology;

(13) Whereas the Community's legal framework for the protection of biotechnological inventions can be limited to laying down certain principles as they apply to the patentability of biological material as such, such principles being intended in particular to determine the difference between inventions and discoveries with regard to the patentability of certain elements of human origin, to the scope of protection conferred by a patent on a biotechnological invention, to the right to use a deposit mechanism in addition to written descriptions and lastly to the option of obtaining non-exclusive compulsory licences in respect of interdependence between plant varieties and inventions, and conversely;

(14) Whereas a patent for invention does not authorise the holder to implement that invention, but merely entitles him to prohibit third parties from exploiting it for industrial and commercial purposes; whereas, consequently, substantive patent law cannot serve to replace or render superfluous national, European or international law which may impose restrictions or prohibitions or which concerns the monitoring of research and of the use or commercialisation of its results, notably from the point of view of the requirements of public health, safety, environmental protection, animal welfare, the preservation of genetic diversity and compliance with certain ethical standards;

(15) Whereas no prohibition or exclusion exists in national or European patent law (Munich Convention) which precludes *a priori* the patentability of biological matter;

(16) Whereas patent law must be applied so as to respect the fundamental principles safeguarding the dignity and integrity of the person; whereas it is important to assert the principle that the human body, at any stage in its formation or development, including germ cells, and the simple discovery of one of its elements or one of its products, including the sequence or partial sequence of a human gene, cannot be patented; whereas these principles are in line with the criteria of patentability proper to patent law, whereby a mere discovery cannot be patented;

(17) Whereas significant progress in the treatment of diseases has already been made thanks to the existence of medicinal products derived from elements isolated from the human body and/or otherwise produced, such medicinal products resulting from technical processes aimed at obtaining elements similar in structure to those existing naturally in the human body and whereas, consequently, research aimed at obtaining and isolating such elements valuable to medicinal production should be encouraged by means of the patent system;

(18) Whereas, since the patent system provides insufficient incentive for encouraging research into and production of biotechnological medicines which are needed to combat rare or 'orphan' diseases, the Community and the Member States have a duty to respond adequately to this problem;

_____
(¹) OJ L 336, 23.12.1994, p. 213.

(19) Whereas account has been taken of Opinion No 8 of the Group of Advisers on the Ethical Implications of Biotechnology to the European Commission;

(20) Whereas, therefore, it should be made clear that an invention based on an element isolated from the human body or otherwise produced by means of a technical process, which is susceptible of industrial application, is not excluded from patentability, even where the structure of that element is identical to that of a natural element, given that the rights conferred by the patent do not extend to the human body and its elements in their natural environment;

(21) Whereas such an element isolated from the human body or otherwise produced is not excluded from patentability since it is, for example, the result of technical processes used to identify, purify and classify it and to reproduce it outside the human body, techniques which human beings alone are capable of putting into practice and which nature is incapable of accomplishing by itself;

(22) Whereas the discussion on the patentability of sequences or partial sequences of genes is controversial; whereas, according to this Directive, the granting of a patent for inventions which concern such sequences or partial sequences should be subject to the same criteria of patentability as in all other areas of technology: novelty, inventive step and industrial application; whereas the industrial application of a sequence or partial sequence must be disclosed in the patent application as filed;

(23) Whereas a mere DNA sequence without indication of a function does not contain any technical information and is therefore not a patentable invention;

(24) Whereas, in order to comply with the industrial application criterion it is necessary in cases where a sequence or partial sequence of a gene is used to produce a protein or part of a protein, to specify which protein or part of a protein is produced or what function it performs;

(25) Whereas, for the purposes of interpreting rights conferred by a patent, when sequences overlap only in parts which are not essential to the invention, each sequence will be considered as an independent sequence in patent law terms;

(26) Whereas if an invention is based on biological material of human origin or if it uses such material, where a patent application is filed, the person from whose body the material is taken must have had an opportunity of expressing free and informed consent thereto, in accordance with national law;

(27) Whereas if an invention is based on biological material of plant or animal origin or if it uses such material, the patent application should, where appropriate, include information on the geographical origin of such material, if known; whereas this is without prejudice to the processing of patent applications or the validity of rights arising from granted patents;

(28) Whereas this Directive does not in any way affect the basis of current patent law, according to which a patent may be granted for any new application of a patented product;

(29) Whereas this Directive is without prejudice to the exclusion of plant and animal varieties from patentability; whereas on the other hand inventions which concern plants or animals are patentable provided that the application of the invention is not technically confined to a single plant or animal variety;

(30) Whereas the concept 'plant variety' is defined by the legislation protecting new varieties, pursuant to which a variety is defined by its whole genome and therefore possesses individuality and is clearly distinguishable from other varieties;

(31) Whereas a plant grouping which is characterised by a particular gene (and not its whole genome) is not covered by the protection of new varieties and is therefore not excluded from patentability even if it comprises new varieties of plants;

(32) Whereas, however, if an invention consists only in genetically modifying a particular plant variety, and if a new plant variety is bred, it will still be excluded from patentability even if the genetic modification is the result not of an essentially biological process but of a biotechnological process;

(33) Whereas it is necessary to define for the purposes of this Directive when a process for the breeding of plants and animals is essentially biological;

(34) Whereas this Directive shall be without prejudice to concepts of invention and discovery, as developed by national, European or international patent law;

(35) Whereas this Directive shall be without prejudice to the provisions of national patent law whereby processes for treatment of the human or animal body by surgery or therapy and diagnostic methods practised on the human or animal body are excluded from patentability;

(36) Whereas the TRIPs Agreement provides for the possibility that members of the World Trade Organisation may exclude from patentability inventions, the prevention within their territory of the commercial exploitation of which is necessary to protect *ordre public* or morality, including to protect human, animal or plant life or health or to avoid serious prejudice to the environment, provided that such exclusion is not made merely because the exploitation is prohibited by their law;

(37) Whereas the principle whereby inventions must be excluded from patentability where their commercial exploitation offends against *ordre public* or morality must also be stressed in this Directive;

(38) Whereas the operative part of this Directive should also include an illustrative list of inventions excluded from patentability so as to provide national courts and patent offices with a general guide to interpreting the reference to *ordre public* and morality; whereas this list obviously cannot presume to be exhaustive; whereas processes, the use of which offend against human dignity, such as processes to produce chimeras from germ cells or totipotent cells of humans and animals, are obviously also excluded from patentability;

(39) Whereas *ordre public* and morality correspond in particular to ethical or moral principles recognised in a Member State, respect for which is particularly important in the field of biotechnology in view of the potential scope of inventions in this field and their inherent relationship to living matter; whereas such ethical or moral principles supplement the standard legal examinations under patent law regardless of the technical field of the invention;

(40) Whereas there is a consensus within the Community that interventions in the human germ line and the cloning of human beings offends against *ordre public* and morality; whereas it is therefore important to exclude unequivocally from patentability processes for modifying the germ line genetic identity of human beings and processes for cloning human beings;

(41) Whereas a process for cloning human beings may be defined as any process, including techniques of embryo splitting, designed to create a human being with the same nuclear genetic information as another living or deceased human being;

(42) Whereas, moreover, uses of human embryos for industrial or commercial purposes must also be excluded from patentability; whereas in any case such exclusion does not affect inventions for therapeutic or diagnostic purposes which are applied to the human embryo and are useful to it;

(43) Whereas pursuant to Article F(2) of the Treaty on European Union, the Union is to respect fundamental rights, as guaranteed by the European Convention for the Protection of Human Rights and Fundamental Freedoms signed in Rome on 4 November 1950 and as they result from the constitutional traditions common to the Member States, as general principles of Community law;

(44) Whereas the Commission's European Group on Ethics in Science and New Technologies evaluates all ethical aspects of biotechnology; whereas it should be pointed out in this connection that that Group may be consulted only where biotechnology is to be evaluated at the level of basic ethical principles, including where it is consulted on patent law;

(45) Whereas processes for modifying the genetic identity of animals which are likely to cause them suffering without any substantial medical benefit in terms of research, prevention, diagnosis or therapy to man or animal, and also animals resulting from such processes, must be excluded from patentability;

(46) Whereas, in view of the fact that the function of a patent is to reward the inventor for his creative efforts by granting an exclusive but time-bound right, and thereby encourage inventive activities,

the holder of the patent should be entitled to prohibit the use of patented self-reproducing material in situations analogous to those where it would be permitted to prohibit the use of patented, non-self-reproducing products, that is to say the production of the patented product itself;

(47) Whereas it is necessary to provide for a first derogation from the rights of the holder of the patent when the propagating material incorporating the protected invention is sold to a farmer for farming purposes by the holder of the patent or with his consent; whereas that initial derogation must authorise the farmer to use the product of his harvest for further multiplication or propagation on his own farm; whereas the extent and the conditions of that derogation must be limited in accordance with the extent and conditions set out in Council Regulation (EC) No 2100/94 of 27 July 1994 on Community plant variety rights (1);

(48) Whereas only the fee envisaged under Community law relating to plant variety rights as a condition for applying the derogation from Community plant variety rights can be required of the farmer;

(49) Whereas, however, the holder of the patent may defend his rights against a farmer abusing the derogation or against a breeder who has developed a plant variety incorporating the protected invention if the latter fails to adhere to his commitments;

(50) Whereas a second derogation from the rights of the holder of the patent must authorise the farmer to use protected livestock for agricultural purposes;

(51) Whereas the extent and the conditions of that second derogation must be determined by national laws, regulations and practices, since there is no Community legislation on animal variety rights;

(52) Whereas, in the field of exploitation of new plant characteristics resulting from genetic engineering, guaranteed access must, on payment of a fee, be granted in the form of a compulsory licence where, in relation to the genus or species concerned, the plant variety represents significant technical progress of considerable economic interest compared to the invention claimed in the patent;

(53) Whereas, in the field of the use of new plant characteristics resulting from new plant varieties in genetic engineering, guaranteed access must, on payment of a fee, be granted in the form of a compulsory licence where the invention represents significant technical progress of considerable economic interest;

(54) Whereas Article 34 of the TRIPs Agreement contains detailed provisions on the burden of proof which is binding on all Member States; whereas, therefore, a provision in this Directive is not necessary;

(55) Whereas following Decision 93/626/EEC (2) the Community is party to the Convention on Biological Diversity of 5 June 1992; whereas, in this regard, Member States must give particular weight to Article 3 and Article 8(j), the second sentence of Article 16(2) and Article 16(5) of the Convention when bringing into force the laws, regulations and administrative provisions necessary to comply with this Directive;

(56) Whereas the Third Conference of the Parties to the Biodiversity Convention, which took place in November 1996, noted in Decision III/17 that 'further work is required to help develop a common appreciation of the relationship between intellectual property rights and the relevant provisions of the TRIPs Agreement and the Convention on Biological Diversity, in particular on issues relating to technology transfer and conservation and sustainable use of biological diversity and the fair and equitable sharing of benefits arising out of the use of genetic resources, including the protection of knowledge, innovations and practices of indigenous and local communities embodying traditional lifestyles relevant for the conservation and sustainable use of biological diversity',

---

(1) OJ L 227, 1.9.1994, p. 1. Regulation as amended by Regulation (EC) No 2506/95 (OJ L 258, 28.10.1995, p. 3).

(2) OJ L 309, 31.12.1993, p. 1.

HAVE ADOPTED THIS DIRECTIVE:

CHAPTER I

**Patentability**

*Article 1*

1. Member States shall protect biotechnological inventions under national patent law. They shall, if necessary, adjust their national patent law to take account of the provisions of this Directive.

2. This Directive shall be without prejudice to the obligations of the Member States pursuant to international agreements, and in particular the TRIPs Agreement and the Convention on Biological Diversity.

*Article 2*

1. For the purposes of this Directive,

(a) 'biological material' means any material containing genetic information and capable of reproducing itself or being reproduced in a biological system;

(b) 'microbiological process' means any process involving or performed upon or resulting in microbiological material.

2. A process for the production of plants or animals is essentially biological if it consists entirely of natural phenomena such as crossing or selection.

3. The concept of 'plant variety' is defined by Article 5 of Regulation (EC) No 2100/94.

*Article 3*

1. For the purposes of this Directive, inventions which are new, which involve an inventive step and which are susceptible of industrial application shall be patentable even if they concern a product consisting of or containing biological material or a process by means of which biological material is produced, processed or used.

2. Biological material which is isolated from its natural environment or produced by means of a technical process may be the subject of an invention even if it previously occurred in nature.

*Article 4*

1. The following shall not be patentable:

(a) plant and animal varieties;

(b) essentially biological processes for the production of plants or animals.

2. Inventions which concern plants or animals shall be patentable if the technical feasibility of the invention is not confined to a particular plant or animal variety.

3. Paragraph 1(b) shall be without prejudice to the patentability of inventions which concern a microbiological or other technical process or a product obtained by means of such a process.

*Article 5*

1. The human body, at the various stages of its formation and development, and the simple discovery of one of its elements, including the sequence or partial sequence of a gene, cannot constitute patentable inventions.

2. An element isolated from the human body or otherwise produced by means of a technical process, including the sequence or partial sequence of a gene, may constitute a patentable invention, even if the structure of that element is identical to that of a natural element.

3. The industrial application of a sequence or a partial sequence of a gene must be disclosed in the patent application.

*Article 6*

1. Inventions shall be considered unpatentable where their commercial exploitation would be contrary to *ordre public* or morality; however, exploitation shall not be deemed to be so contrary merely because it is prohibited by law or regulation.

2. On the basis of paragraph 1, the following, in particular, shall be considered unpatentable:

(a) processes for cloning human beings;

(b) processes for modifying the germ line genetic identity of human beings;

(c) uses of human embryos for industrial or commercial purposes;

(d) processes for modifying the genetic identity of animals which are likely to cause them suffering without any substantial medical benefit to man or animal, and also animals resulting from such processes.

### Article 7

The Commission's European Group on Ethics in Science and New Technologies evaluates all ethical aspects of biotechnology.

## CHAPTER II

### Scope of protection

### Article 8

1. The protection conferred by a patent on a biological material possessing specific characteristics as a result of the invention shall extend to any biological material derived from that biological material through propagation or multiplication in an identical or divergent form and possessing those same characteristics.

2. The protection conferred by a patent on a process that enables a biological material to be produced possessing specific characteristics as a result of the invention shall extend to biological material directly obtained through that process and to any other biological material derived from the directly obtained biological material through propagation or multiplication in an identical or divergent form and possessing those same characteristics.

### Article 9

The protection conferred by a patent on a product containing or consisting of genetic information shall extend to all material, save as provided in Article 5(1), in which the product in incorporated and in which the genetic information is contained and performs its function.

### Article 10

The protection referred to in Articles 8 and 9 shall not extend to biological material obtained from the propagation or multiplication of biological material placed on the market in the territory of a Member State by the holder of the patent or with his consent, where the multiplication or propagation necessarily results from the application for which the biological material was marketed, provided that the material obtained is not subsequently used for other propagation or multiplication.

### Article 11

1. By way of derogation from Articles 8 and 9, the sale or other form of commercialisation of plant propagating material to a farmer by the holder of the patent or with his consent for agricultural use implies authorisation for the farmer to use the product of his harvest for propagation or multiplication by him on his own farm, the extent and conditions of this derogation corresponding to those under Article 14 of Regulation (EC) No 2100/94.

2. By way of derogation from Articles 8 and 9, the sale or any other form of commercialisation of breeding stock or other animal reproductive material to a farmer by the holder of the patent or with his consent implies authorisation for the farmer to use the protected livestock for an agricultural purpose. This includes making the animal or other animal reproductive material available for the purposes of pursuing his agricultural activity but not sale within the framework or for the purpose of a commercial reproduction activity.

3. The extent and the conditions of the derogation provided for in paragraph 2 shall be determined by national laws, regulations and practices.

## CHAPTER III

### Compulsory cross-licensing

### Article 12

1. Where a breeder cannot acquire or exploit a plant variety right without infringing a prior patent, he may apply for a compulsory licence for non-exclusive use of the invention protected by the patent inasmuch as the licence is necessary for the exploitation of the plant variety to be protected, subject to payment of an appropriate royalty. Member States shall provide that, where such a licence is granted, the holder of the patent will be entitled to a cross-licence on reasonable terms to use the protected variety.

2. Where the holder of a patent concerning a biotechnological invention cannot exploit it without infringing a prior plant variety right, he may apply for a compulsory licence for non-exclusive use of the plant variety protected by that right, subject to payment of an appropriate royalty. Member States shall provide that, where such a licence is granted, the holder of the variety right will be entitled to a cross-licence on reasonable terms to use the protected invention.

3. Applicants for the licences referred to in paragraphs 1 and 2 must demonstrate that:

(a) they have applied unsuccessfully to the holder of the patent or of the plant variety right to obtain a contractual licence;

(b) the plant variety or the invention constitutes significant technical progress of considerable economic interest compared with the invention claimed in the patent or the protected plant variety.

4. Each Member State shall designate the authority or authorities responsible for granting the licence. Where a licence for a plant variety can be granted only by the Community Plant Variety Office, Article 29 of Regulation (EC) No 2100/94 shall apply.

# CHAPTER IV

## Deposit, access and re-deposit of a biological material

### Article 13

1. Where an invention involves the use of or concerns biological material which is not available to the public and which cannot be described in a patent application in such a manner as to enable the invention to be reproduced by a person skilled in the art, the description shall be considered inadequate for the purposes of patent law unless:

(a) the biological material has been deposited no later than the date on which the patent application was filed with a recognised depositary institution. At least the international depositary authorities which acquired this status by virtue of Article 7 of the Budapest Treaty of 28 April 1977 on the international recognition of the deposit of micro-organisms for the purposes of patent procedure, hereinafter referred to as the 'Budapest Treaty', shall be recognised;

(b) the application as filed contains such relevant information as is available to the applicant on the characteristics of the biological material deposited;

(c) the patent application states the name of the depository institution and the accession number.

2. Access to the deposited biological material shall be provided through the supply of a sample:

(a) up to the first publication of the patent application, only to those persons who are authorised under national patent law;

(b) between the first publication of the application and the granting of the patent, to anyone requesting it or, if the applicant so requests, only to an independent expert;

(c) after the patent has been granted, and notwithstanding revocation or cancellation of the patent, to anyone requesting it.

3. The sample shall be supplied only if the person requesting it undertakes, for the term during which the patent is in force:

(a) not to make it or any material derived from it available to third parties; and

(b) not to use it or any material derived from it except for experimental purposes, unless the applicant for or proprietor of the patent, as applicable, expressly waives such an undertaking.

4. At the applicant's request, where an application is refused or withdrawn, access to the deposited material shall be limited to an independent expert for 20 years from the date on which the patent application was filed. In that case, paragraph 3 shall apply.

5. The applicant's requests referred to in point (b) of paragraph 2 and in paragraph 4 may only be made up to the date on which the technical preparations for publishing the patent application are deemed to have been completed.

### Article 14

1. If the biological material deposited in accordance with Article 13 ceases to be available from the recognised depositary institution, a new deposit of the material shall be permitted on the same terms as those laid down in the Budapest Treaty.

2. Any new deposit shall be accompanied by a statement signed by the depositor certifying that the newly deposited biological material is the same as that originally deposited.

# CHAPTER V

## Final provisions

### Article 15

1. Member States shall bring into force the laws, regulations and administrative provisions necessary to comply with this Directive not later than 30 July 2000. They shall forthwith inform the Commission thereof.

When Member States adopt these measures, they shall contain a reference to this Directive or shall be accompanied by such reference on the occasion of their official publication. The methods of making such reference shall be laid down by Member States.

2. Member States shall communicate to the Commission the text of the provisions of national law which they adopt in the field covered by this Directive.

*Article 16*

The Commission shall send the European Parliament and the Council:

(a) every five years as from the date specified in Article 15(1) a report on any problems encountered with regard to the relationship between this Directive and international agreements on the protection of human rights to which the Member States have acceded;

(b) within two years of entry into force of this Directive, a report assessing the implications for basic genetic engineering research of failure to publish, or late publication of, papers on subjects which could be patentable;

(c) annually as from the date specified in Article 15(1), a report on the development and implications of patent law in the field of biotechnology and genetic engineering.

*Article 17*

This Directive shall enter into force on the day of its publication in the *Official Journal of the European Communities*.

*Article 18*

This Directive is addressed to the Member States.

Done at Brussels, 6 July 1998.

*For the European Parliament*  *For the Council*
*The President*  *The President*
J. M. GIL-ROBLES  R. EDLINGER