# EXHIBIT F

Dockets.Justia.com



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Europäisches
Patentamt

European
Patent Office

Office européen
des brevets

Fax +49 89 / 2399 - 4465

Beschwerdekammern

Boards of Appeal

Chambres de recours



Vossius & Partner
Postfach 86 07 67
81634 München
ALLEMAGNE

| | Datum/Date |
| --- | --- |
| | **1 7. 02. 09** |

| Zeichen/Ref./Réf. | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
| --- | --- |
| K2709OPP(EP)S3 | 95305605.8 - 2405 / 0705903 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire | |
| The University of Utah Research Foundation | |

**Appeal number:** | **T 0666/05 - 3304**

Please find enclosed a copy of the decision dated 13-11-2008.

**PROC** | **DISP**

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341



Annex(es):

**Registered letter with advice of delivery**

EPO Form 3032    12/07



| EPA / EPO / OEB<br>D-80298 München<br>Tel. +49 89 / 2399-0 | Europäisches<br>Patentamt | European<br>Patent Office | Office européen<br>des brevets |
|---|---|---|---|
| Fax +49 89 / 2399 - 4465 | Beschwerdekammern | Boards of Appeal | Chambres de recours |



Warcoin, Jacques
Cabinet Régimbeau
20, rue de Chazelles
75847 Paris cedex 17
FRANCE

| | Datum/Date |
|---|---|
| | 17. 02. 09 |

_OPPO 02 - OPPO 03_

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| E18565-TER-FFP | OPPO 01 | 95305605.8 - 2405 / 0705903 |

Anmelder//Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire
The University of Utah Research Foundation

## Appeal number:

| T 0666/05 - 3304 |
|---|

Please find enclosed a copy of the decision dated 13-11-2008.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es): 3 copies (O1 - O2 - O3)
**Registered letter with advice of delivery**

EPO Form 3032    12/07



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

**Europäisches
Patentamt**

**European
Patent Office**

**Office européen
des brevets**

Fax +49 89 / 2399 - 4465    Beschwerdekammern    Boards of Appeal    Chambres de recours

Bird, William Edward
Bird Goen & Co.,
Klein Dalenstraat 42A
3020 Winksele
BELGIQUE



| | Datum/Date |
|---|---|
| | **17. 02. 09** |

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n° //Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| K1873EP | OPPO 04 | 95305605.8 - 2405 / 0705903 |

Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire
**The University of Utah Research Foundation**

**Appeal number:**    | **T 0666/05 - 3304** |

Please find enclosed a copy of the decision dated 13-11-2008.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341



Annex(es):

**Registered letter with advice of delivery**

EPO Form 3032    12/07



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Fax +49 89 / 2399 - 4465

Europäisches
Patentamt

European
Patent Office

Office européen
des brevets

Beschwerdekammern

Boards of Appeal

Chambres de recours

Swinkels, Bart Willem
Nederlandsch Octrooibureau,
P.O. Box 29720
2502 LS The Hague
PAYS-BAS



| | |
|---|---|
| | Datum/Date<br>17. 02. 09 |
| Zeichen/Ref./Réf.<br>BZ718BSW/CS          OPPO 05 | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°.<br>95305605.8 - 2405 / 0705903 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire<br>The University of Utah Research Foundation | |

**Appeal number:**   |   T 0666/05 - 3304

Please find enclosed a copy of the decision dated 13-11-2008.

PROC | DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341



Annex(es):

**Registered letter with advice of delivery**





EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Fax +49 89 / 2399 - 4465

Europäisches
Patentamt

European
Patent Office

Office européen
des brevets

Beschwerdekammern

Boards of Appeal

Chambres de recours

Greenpeace e.V.
Grosse Elbstrasse 39
22767 Hamburg
ALLEMAGNE



| | Datum/Date |
|---|---|
| | **1 7. 02. 09** |

| Zeichen/Ref./Réf. | OPPO 06 | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| | | 95305605.8 - 2405 / 0705903 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire | | |
| The University of Utah Research Foundation | | |

**Appeal number:** | **T 0666/05 - 3304** |
|---|---|

Please find enclosed a copy of the decision dated 13-11-2008.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341



Annex(es):

**Registered letter with advice of delivery**



| Europäisches Patentamt | European Patent Office | Office européen des brevets |
|---|---|---|
| Beschwerdekammern | Boards of Appeal | Chambres de recours |

**Case Number:** T 0666/05 - 3.3.04

# D E C I S I O N
## of the Technical Board of Appeal 3.3.04
### of 13 November 2008

**Appellant I:**
(Patent Proprietor)

The University of Utah Research Foundation
615 Arapeen Drive, Suite 310
Salt Lake City,
Utah 84108   (US)

**Representative:**

Jaenichen, Hans-Rainer
Vossius & Partner
P.O. Box 86 07 67
D-81634 München   (DE)


**Appellant II:**
(Opponent 01)

Institut Curie
26, rue d'Ulm
F-75248 Paris Cedex 05   (FR)

**Representative:**

Warcoin, Jacques
Cabinet Régimbeau
20, rue de Chazelles
F-75847 Paris Cedex 17   (FR)


**Appellant III:**
(Opponent 02)

Assistance Publique-Hôpitaux de Paris
3, avenue Victoria
F-75004 Paris   (FR)

**Representative:**

Warcoin, Jacques
Cabinet Régimbeau
20, rue de Chazelles
F-75847 Paris Cedex 17   (FR)


**Appellant IV:**
(Opponent 03)

Institut Gustave Roussy-IGR
39, rue Camille Desmoulins
F-94800 Villejuif   (FR)

**Representative:**

Warcoin, Jacques
Cabinet Régimbeau
20, rue de Chazelles
F-75847 Paris Cedex 17   (FR)

| | |
|---|---|
| **Other Party:**<br>(Opponent 04) | Vereniging van Stichtingen Klinische Genetica, et al.<br>Postbus 9600<br>NL-2300 RC Leiden    (NL) |
| | |
| **Representative:** | Bird, William Edward<br>Bird Goën & Co.<br>Klein Dalenstraat 42A<br>BE-3020 Winksele    (BE) |
| | |
| **Other Party**<br>(Opponent 05) | De Staat der Nederlanden<br>Minister van Volksgezondheid, Welzijn en Sport<br>Parnassusplein 5<br>NL-2511 VX Den Haag    (NL) |
| | |
| **Representative:** | Swinkels, Bart Willems<br>Nederlandsch Octrooibureau<br>P.O. Box 29720<br>NL-2502 LS Den Haag    (NL) |
| | |
| **Other Party**<br>(Opponent 06) | Greenpeace e. V.<br>Große Elbstraße 39<br>D-22767 Hamburg    (DE) |
| | |
| **Representative:** | Then, Christoph<br>Greenpeace e.V.<br>Große Elbstraße 39<br>D-22767 Hamburg    (DE) |

**Decision under appeal:**    **Interlocutory decision of the Opposition Division of the European Patent Office posted 09 June 2005 concerning maintenance of European patent No. 0705903 in amended form.**

**Composition of the Board:**

| | |
|---|---|
| **Chair:** | U. Kinkeldey |
| **Members:** | M. Wieser |
| | D. S. Rogers |
| | G. Alt |
| | R. Moufang |

## Summary of Facts and Submissions

I.      Appeals were lodged by the Patent Proprietor
        (Appellant I) and by Opponents 01 to 03 (Appellants II
        to IV) against the decision of the Opposition Division
        dated 9 June 2005 according to which European patent
        No. 0 705 903 could be maintained in amended form
        (Article 102(3) EPC 1973). The patent has the title
        "Mutations in the 17q-linked breast and ovarian cancer
        susceptibility gene" and claims priority from seven US
        applications, P1 to P7, of which the fourth P4 and the
        fifth P5 were filed on 29 November 1994 and
        24 March 1995, respectively.

II.     Six oppositions (Opponents 01 to 06) were filed against
        the patent covering the grounds of Article 100(a) in
        combination with Articles 52(2), 52(4), 53(a), 54, 56
        and 57 EPC 1973, Article 100(b) in combination with
        Article 83 EPC 1973 and Article 100(c) in combination
        with Article 123(2) EPC 1973.

        It is to be noted that the oppositions were filed
        before the entry into force of the EPC 2000 and
        therefore in the original notices of opposition all
        references to the Articles of the EPC were to the
        Articles of the EPC 1973. Taking into account the
        relevant transitional provisions, in this decision,
        instead of referring to Articles 52(2), 52(4), 53(a),
        54, 56, 57, 83 and 123 EPC 1973, reference will be made
        to the corresponding Articles of the EPC 2000 that is
        Articles 52(2), 53(c), 53(a), 54, 56, 57, 83 and 123
        EPC 2000 respectively, unless otherwise stated.
        Throughout this decision the EPC 2000 will be referred
        to as the EPC.

III.    The Opposition Division decided that the subject-matter
        of claims 1 and 2 of the main request before it lacked
        novelty (Article 54 EPC) and, by exercising its
        discretion under Article 114(2) EPC, did not admit
        Patent Proprietor's auxiliary request I into the
        procedure, which was filed at the oral proceedings
        before it. Further it decided that the claims of
        auxiliary request II did not comply with Articles 123(2)
        and 84 EPC. However, the Opposition Division decided
        that claims 1 to 3 of Patent Proprietor's auxiliary
        request III, filed during the oral proceedings, met all
        requirements of the EPC.

IV.     The Board dispatched a communication dated
        21 January 2008, wherein the parties where asked
        whether they maintained their actual requests in the
        light of decision T 1213/05 of 27 September 2007,
        posted on 12 December 2007.

V.      Oral proceedings before the Board took place on 12 and
        13 November 2008.

        Appellant I requested that the decision under appeal be
        set aside and that the patent be maintained on the
        basis of claims 1 to 9 of the main request filed with a
        letter dated 2 June 2008.

        The Appellants II to IV (Opponents 01 to 03) requested
        that the decision under appeal be set aside and that
        the patent be revoked.

        Opponents 04 to 06, which are parties as of right
        according to Article 107 EPC, also requested that the

decision under appeal be set aside and that the patent
be revoked.

VI.    Claim 1, 2 and 7 of the main request read as follows:

"1. A method for diagnosing a predisposition for breast
and ovarian cancer in a human subject which comprises
determining whether there is germline alteration
185delAG -> ter39 in the BRCA1 gene in a tissue sample
of said subject, said alteration indicating a
predisposition to said cancer.

2. A method for diagnosing a breast or ovarian lesion
of a human subject for neoplasia associated with the
BRCA1 gene locus which comprises determining whether
there is mutation 185delAG -> ter39 in the BRCA1 gene
in a sample from said lesion.

7. A nucleic acid probe having 15 to 30 nucleotides of
SEQ ID NO:1 and containing the mutation 185delAG ->
ter39."

Claims 3 to 6 refer to preferred embodiments of the
methods according to claims 1 and 2. Claim 8 refers to
a replicative cloning vector comprising the nucleic
acid of claim 7 and claim 9 to a host cell transformed
with the vector of claim 8.

VII.   The following documents are mentioned in the present
decision:

D1:        Miki et al., Science (Oct. 1994) 266: 66-71

D5:          Shattuck-Eidens et al., JAMA (Feb. 1995)
             273: 535-541


D6:          Simard et al., Nature Genetics (Dec. 1994)
             8: 392-398


D9:          Kelsell et al., Hum. Mol. Genet. (1993) 2:
             1823-1828


D17:         Information concerning GenBank Sequence,
             Accession number U14680


D29:         Tonin et al., Am. J. Hum. Genet. (1995) 57:
             189


D42:         Feunteun et al., Am. J. Hum. Genet. (1993)
             52: 736-742


D47:         Extracts from the BIC database


D96:         Editorial, Nature Genetics (Dec. 1994) 8:
             310


D100:        Declaration of Dr Critchfield of 22 November
             2004


D115:        Menczer et Ben-Baruch, Obstet. Gynecol.
             (1991) 77: 276-277


D116:        Modan et al., JAMA (Dec. 1996) 276: 1823-
             1825


D117:        Wooster et al., Science (Sep. 1994) 265:
             2088-2090

D119:     Overview of the frequency of BRCA1 mutations
          in European countries

D144:     Declaration of Dr Critchfield of 9 October
          2008

VIII.  The submissions made by Appellant I can be summarized
       as follows:

*Amendments (Article 123(2) and (3) EPC)*

The amendments in claims 1 and 2 were supported by the
application as filed, e.g. by the originally filed
claims 17 and 18 in combination with Table 14 on
page 57 of the description. To single out a single
mutation from a list of thirty-four mutations resulted
in a restriction of the scope of protection
(Article 123(3) EPC) and could not be considered as an
amendment violating the requirements of Article 123(2)
EPC. The omission of a reference to SEQ ID NO: 1 and
wild type allelic variants thereof did not introduce
new matter. It was an established principle that a
compound known in the art (the BRCA1 gene) needed not
to be structurally defined in a claim if it could be
referred to by using a generally accepted designation.

*Clarity (Article 84 EPC)*

The relevant date was the filing date of the fourth
priority document P4. At that date the structural
formula, i.e. the coding sequence of the BRCA1 gene,
was known from the disclosure in document D1 in
connection with document D17. Based on this disclosure
in the prior art and in the patent in suit, the skilled

person was enabled to determine whether the mutation
185delAG -> ter39 was present in the BRCA1 gene. Thus
the claims were clear and met the requirements of
Article 84 EPC.

*Priority right (Article 87 EPC 1973 and Articles 88 and
89 EPC)*

The methods according to claims 1 and 2 relied on the
detection of the mutation 185delAG -> ter39. The same
invention was disclosed in priority document P4 (see
claims 1 and 3 and Table 14 on page 92 of P4). Although
the nucleic acid probe of claim 7, due to the term
"having", might contain a nucleotide sequence in
addition to the 15 to 30 nucleotides of SEQ ID NO:1
containing the 185delAG -> ter39 mutation, this
additional sequence was not necessarily one derived
from SEQ ID NO:1. Also priority document P4 used the
term "having" in order to define probes (see page 29,
lines 5 to 7 of P4). Therefore claims 1 to 9 were
entitled to claim priority from priority document P4.

*Novelty (Article 54 EPC)*

As the claims were entitled to claim priority from
priority document P4, there was no relevant prior art
on file for the assessment of novelty. The requirements
of Articles 54 EPC were thus met.

*Inventive step (Article 56 EPC)*

The closest state of the art was represented by
document D1. The problem underlying the patent in suit
was the identification of a mutation that allowed the

provision of an effective screening method. The identification of the 185delAG -> ter39 mutation, which was an extremely frequent mutation, to which none of the available prior art documents contained any information or hint, was considered to be a "lucky strike". At the best document D1 contained an invitation to start a scientific research program to find such mutation. As it was not predictable at all that such mutation existed, its detection was based on an inventive step as required by Article 56 EPC.

The objections raised under Articles 52(2) EPC, 52(4) EPC 1973, 53(a) and 57 EPC lacked substantiation and should be rejected by the Board.

IX.    The submissions made by Appellants II to IV and Opponents 04 to 06 can be summarized as follows:

*Amendments (Article 123(2) and (3) EPC)*

To single out one specific mutation from a list of thirty four mutations was an amendment contravening the requirements of Article 123(2) EPC.

Claim 16 as granted contained a step of comparison with the reference molecule SEQ ID NO: 1 or a wild-type allelic variant thereof. The omission of this reference step violated the requirements of Article 123(3) EPC. This was because claim 1 now encompassed also the comparison with non-wild-type allelic variants of the gene. Contrary to Appellant I's argument, the BRCA1 gene was an unknown compound at the relevant priority date (P4) and thus needed to be structurally defined when mentioned in a patent claim.

*Clarity (Article 84 EPC)*

The diagnostic method of claim 1 did not refer to an identifiable reference sequence and thus missed an essential feature.

A further missing feature was the identification in the claim of the specific population group in which the germline alteration 185delAG -> ter39 appeared with high frequency, namely the Ashkenazi Jewish people.

The use of the term "BRCA1 gene" in claim 1 had the result that it was no longer clear what fell within the scope of the claim, as this term itself was not clear at the filing date of priority document P4.

Finally, claims 1 and 2 were not supported by the description.

*Priority right (Article 87 EPC 1973 and Articles 88 and 89 EPC)*

From priority document P4 it was not possible either to identify the definite BRCA1 cDNA sequence or the localization of the 185delAG -> ter39 mutation.

The claims could only enjoy priority right from priority document P5, being the earliest of the seven priority documents disclosing SEQ ID NOs: 1 and 2 corresponding exactly to SEQ ID NOs: 1 and 2 as disclosed in the application as filed.
Deciding differently would not only contradict decision T 1213/05 (supra) but also the gist of decision G 2/98 of the Enlarged Board of Appeal (OJ EPO 2001, 413).

Such possible contradiction could not be justified by
the argument that present claim 1 did not refer to a
substance, but to a diagnostic method using it. Anyhow,
such argument would not apply to claim 7 referring to a
nucleic acid probe and explicitly referring to SEQ ID
NO: 1.

*Novelty (Article 54 EPC)*

As a consequence, documents D5 and D6, both published
between priority documents P4 and P5, belonged to the
state of the art and thus anticipated the claimed
subject-matter.

*Inventive step (Article 56 EPC)*

Even if the claims were entitled to claim priority from
priority document P4, there was no inventive step. The
closest prior art was represented by document D1,
disclosing the BRCA1 sequence and already showing
several mutations thereof. The problem to be solved was
therefore the provision of an alternative mutation of
the BRCA1 gene. Upon combination of the teaching in
document D1 with the disclosure in document D115 the
finding of the 185delAG -> ter39 mutation was
inevitable and any unexpected advantage represented
simply a bonus effect which could not substantiate a
finding of an inventive step according to EPO case law.

The inventors had carried out the necessary
experimentation faster than others merely because they
had been able to put more money and manpower into the
project, but this did not justify the recognition of an
inventive step. Suitable kindreds were also available

to other scientific groups, and sooner or later one of
these groups would have been successful as well. Any
problems that might have been encountered in the course
of the project would have been overcome by the skilled
person using conventional means.

The problem to be solved had been reformulated during
the opposition procedure, namely to be the provision of
a diagnostic method for detecting a particularly
frequent mutation in the BRCA1 gene. This problem was
not derivable from the application as originally filed.
Accordingly the reformulation was not acceptable in the
light of the established case law of the Boards of
Appeal.

Moreover, the reformulated problem had not been solved
over the entire scope of the claims, as the germline
alteration 185delAG -> ter39 appeared with high
frequency in a very limited part of the human
population only. In the rest of the human population
this mutation when used in a diagnostic method did not
give rise to any "surprising effect" due to its low
frequency.

*Patentable inventions, exceptions to patentability,
industrial applicability*

Although the claimed diagnostic methods were practised
on tissue samples, the logical link between the sample
and the human body has not been broken. Claims 1 to 6
therefore did not refer to patentable inventions
according to Article 53(c) EPC.

The commercial exploitation of the patent was
unethical. The subject-matter of claims 1 to 6
contravened the requirements of Article 53(a) EPC.

Claim 7 referred to a fragment of the human genome
which was not a patentable invention according to
Article 52(2) EPC. The nucleic acid probe according to
claim 7 had no industrial applicability, contrary to
the requirements of Article 57 EPC.

## Reasons for the Decision

For ease of reading if reference is made, either
individually or collectively, to Appellants II to IV
(Opponents 01 to 03) and the other parties (Opponents
04 to 06), such reference shall be to "the Opponents".

1.    The appeals are admissible.

### Main Request

*Clarity (Article 84 EPC)*

2.    The claims of the main request differ from the claims
      as granted and it must thus be assessed whether they
      fulfil the requirements of Article 84 EPC in so far as
      the amendments are concerned.

3.    The Opponents have argued that claims 1 and 2 were
      unclear, because they did not refer to the nucleotide
      sequence set forth in SEQ ID NO: 1 as the reference
      sequence, in contrast to the claims originally filed
      and granted. The term "BRCA1 gene" used in claims 1 and

2 was unclear, as the prior art disclosures of the
exact sequence of this gene had changed over time.

4.     As concerns the term "BRCA1 gene", the description of
       the patent in suit states that this term refers to
       "polynucleotides, all of which are in the BRCA1 region,
       that are likely to be expressed in normal tissue,
       certain alleles of which predispose an individual to
       develop breast, ovarian, colorectal and prostate
       cancer" (page 14, lines 45 to 47), and that "[t]he
       coding sequence for a BRCA1 polypeptide is shown in SEQ
       ID NO:1" (page 14, lines 55 to 56).

Furthermore, documents D1 and D17, which were available
to the public at the fourth priority date of the patent
in suit, refer to the BRCA1 gene. The fourth priority
document of the patent in suit is the earliest priority
document in which the mutation 185delAG -> ter39 is
mentioned (see Table 14 on page 92). The subject-matter
of claims 1 and 2 of the main request relating to the
determination of this mutation, can thus not be
entitled to a priority date earlier than the fourth
priority date, and this has not been contested by
Appellant I. Document D1 describes the identification
of the BRCA1 gene and discloses in Figure 2 the
predicted amino acid sequence for BRCA1. In the legend
to Figure 2, it is stated that the BRCA1 nucleotide
sequence was deposited in GenBank with accession number
U14680; this GenBank entry is part of document D17. The
patent in suit also refers to said GenBank entry and
states on page 43, lines 50 to 51 that the "sequence of
the BRCA1 cDNA (up through the stop codon) has also
been deposited with GenBank and assigned accession
number U-14680".

In view of these disclosures in the patent in suit and
in the prior art, the Board is convinced that the term
"BRCA1 gene" would already have been clear to a skilled
person at the earliest possible priority date. The
skilled person would also know from his/her common
general knowledge that the alteration termed "185delAG
-> ter39" referred to a deletion of the nucleotides
"AG" in position 185, which would result in a stop-
codon in codon number 39. In the nucleotide sequence of
the BRCA1 gene shown in SEQ ID NO: 1 of the patent in
suit and in the GenBank entry U-14680 of document D17,
the nucleotides "AG" do indeed occur in position 185.

5.      With respect to the Opponents' argument that the prior
        art disclosures of the sequence of the BRCA1 gene had
        changed over time, the Board notes that no evidence has
        been presented by the Opponents that there have been
        any changes in the disclosures of the BRCA1 gene
        sequences in positions 185 and 186, which are the
        relevant positions when carrying out the methods of
        claims 1 and 2. Given the disclosures of the BRCA1 gene
        sequences in SEQ ID NO: 1 of the patent in suit and in
        document D17 of the prior art, the Board is convinced
        that it would be clear to the skilled person that the
        presence of the mutation 185delAG -> ter39 in the BRCA1
        gene could be determined by establishing whether the
        nucleotides "AG" of the positions corresponding to
        numbers 185 and 186 are present or absent in the
        nucleotide sequence of the sample, and that there is
        thus no lack of clarity in claims 1 and 2.

6.      The Opponents have further argued that claims 1 and 2
        were not supported by the description and did not state
        the essential features of the invention, because these

claims did not state what the reference BRCA1 sequence was.

7.      The Board cannot follow this argument but is convinced that the skilled person would know the BRCA1 gene sequence, both from the patent in suit and from the prior art, and would be able to use this knowledge to determine whether the mutation 185delAG -> ter39 is present or absent in a sample. Further information on how the claimed diagnostic methods can be carried out is disclosed for instance in the passage from page 20, line 7 to page 21, line 15 of the description of the patent in suit.

8.      It has furthermore been argued by the Opponents that claims 1 and 2 did not state all the essential features of the claimed invention, contrary to Article 84 EPC. The mutation 185delAG -> ter39 was not the most important mutation in most European countries, as evidenced by document D119, but occurred at a high frequency only in people of Ashkenazi Jewish descent, as shown by document D29. Screening for this mutation would only make sense in a population where it was frequently occurring. According to the established case law of the Boards of Appeal, all features which are necessary for solving the technical problem with which the patent is concerned were to be regarded as essential features, which had to be indicated in the claims; therefore the target group had to be included into the relevant claims.

9.      The Board cannot agree with the Opponents that claims 1 and 2 do not state all the essential features of the invention. In the Board's view the invention is not

directed to methods for screening a human population.
Instead, the invention relates to methods for
diagnosing either a predisposition for breast and
ovarian cancer (claim 1) or a breast and ovarian lesion
for neoplasia (claim 2) **in/of a human subject.**
Therefore the Board is convinced that the determination
of the presence of the mutation 185delAG -> ter39 in
the BRCA1 gene in a sample of a human subject would
allow the claimed diagnosis. Thus, the Board cannot
recognize any lack of essential features in claims 1
and 2.

10. The Opponents also submitted that claim 7 lacked
    clarity, because due to the use of the term "having",
    which had to be interpreted as "comprising", the claim
    was indefinite and thus unclear.

11. The Board agrees that the term "having" in claim 7 has
    to be interpreted as meaning "comprising", but cannot
    recognize that this results in a lack of clarity of the
    claim. The skilled person reading the claim would
    understand that the claimed nucleic acid probe
    comprises 15 to 30 nucleotides of SEQ ID NO: 1 and
    contains the mutation 185delAG -> ter39, and can also
    comprise other, additional sequences.

12. Therefore, the requirements of Article 84 EPC are met.

*Added matter (Article 123(2) EPC)*

13. Article 123(2) EPC requires that a European patent
    application or a European patent may not be amended in
    such a way that it contains subject-matter which
    extends beyond the content of the application as filed.

In accordance with the established case law of the
Boards of Appeal, the content of an application is the
disclosure that is directly and unambiguously derivable
from this application.

14.    Claim 1 of the main request relates to a "method for
       diagnosing a predisposition for breast and ovarian
       cancer in a human subject which comprises determining
       whether there is germ line alteration 185delAG -> ter39
       in the BRCA1 gene in a tissue sample of said subject,
       said alteration being indicative of a predisposition to
       said cancer".

15.    Claim 17 of the application as filed relates to a
       "method for diagnosing a predisposition for breast and
       ovarian cancer in a human subject which comprises
       determining whether there is a germ line alteration in
       the sequence of the BRCA 1 gene in a tissue sample of
       said subject compared to the nucleotide sequence set
       forth in SEQ. ID No: 1 or a wild-tyle [sic] allelic
       variant thereof, said alteration indicating a
       predisposition to said cancer being selected from the
       mutations as set forth in Tables 12, 12A and 14".

       In Table 14 of the application as filed, the mutation
       185delAG -> ter39 is one of the mutations listed.


       Claim 1 of the main request thus differs from claim 17
       of the application as filed in that only one of the
       mutations set forth in Tables 12, 12A and 14, i.e. the
       mutation 185delAG -> ter39, is mentioned, and in that
       it lacks the phrase "compared to the nucleotide

sequence set forth in SEQ. ID No: 1 or a wild-tyle
[*sic*] allelic variant thereof".

16. The Opponents have argued that the selection of only
one specific mutation out of the long list of mutations
set forth in Tables 12, 12A and 14 was not directly and
unambiguously derivable from the application as filed,
which only disclosed methods for testing for a
plurality of mutations, for instance in the passages on
page 2, lines 3 to 7; page 5, lines 2 to 8 and 45 to 52,
and page 19, lines 3 to 9 of the application as filed
(published version), which referred to the plural form
of "alleles" and "mutations". Therefore, claim 1 did
not comply with Article 123(2) EPC.

17. The Board cannot follow this argument, because claim 17
of the application as filed states that the claimed
method comprises determining whether there is **a germ
line alteration** in the sequence of the BRCA1 gene, **said
alteration** being selected from the mutations set forth
in Tables 12, 12A and 14. Determining in the claimed
method only one of any of the specific mutations listed
in Tables 12, 12A and 14, for instance the second
mutation of Table 14, 185delAG -> ter39, is thus
disclosed in the application as filed.

18. The Opponents have furthermore argued that claim 1
contravened Article 123(2) EPC because the application
as filed only disclosed methods comprising a step of
comparison with the nucleotide sequence set forth in
SEQ ID No: 1 or a wild-type allelic variant thereof,
which step was not stated in claim 1 of the main
request.

19.     The Board considers that the expression "compared to
        the nucleotide sequence set forth in SEQ ID No: 1 or a
        wild-type allelic variant thereof" in claim 17 as filed
        does not define an actual step of comparison to be
        carried out in the claimed methods, but only serves as
        a reference in the definition of the alteration that is
        to be determined (see also point (28) infra). When
        determining whether there is mutation 185delAG -> ter39
        in a tissue sample, the skilled person would always
        establish whether or not the nucleotides "AG" in
        positions 185 and 186 of the BRCA1 gene are absent in
        the sequence of the patient's sample, and there would
        be no difference if the method was carried out in
        accordance with the method of claim 17 as filed or in
        accordance with the method of claim 1 of the main
        request. Therefore, the subject-matter of claim 1 is
        directly and unambiguously derivable from the
        application as filed.

20.     Accordingly, the subject-matter of claim 2 can be
        derived from claim 18 of the application as filed.
        As concerns the dependent claims 3 to 6, the subject-
        matter of claim 3 can be derived from claims 19 to 21
        and 23 as filed, claim 4 can be derived from claims 22
        and 23 as filed, claim 5 can be derived from claim 26
        as filed, and claim 6 can be derived from claim 25 as
        filed.

21.     With respect to claim 7, the Opponents have argued that
        the length of the claimed "nucleic acid probe having 15
        to 30 nucleotides of SEQ ID NO: 1 and containing the
        mutation 185delAG -> ter39" was not disclosed in the
        application as filed, and that, therefore, the claim
        did not comply with Article 123(2) EPC.

22.    Claim 4 of the application as filed relates to a
       "nucleic acid probe wherein the nucleotide sequence is
       a portion of a nucleic acid as claimed in any one of
       claims 1 to 3 including a mutation or polymorphism
       compared to the nucleotide sequence set forth in SEQ.ID
       No: 1 selected from the mutations set forth in Tables
       12, 12A and 14 and the polymorphisms set forth in
       Tables 18 and 19", but does not specify a length of 15
       to 30 nucleotides. With respect to the disclosure of
       this length, the Board can follow Appellant I's
       argument that because the application as filed
       discloses on page 14, lines 19 to 22 the broad range of
       "at least about five codons (15 nucleotides)", and page
       11, lines 13 to 15 discloses the single value of "30
       nucleotides", the range of "15 to 30 nucleotides" was
       directly and unambiguously derivable from the
       application as filed, in accordance with the
       established case law of the Boards of Appeal (see for
       instance decisions T 201/83, OJ EPO 1984, 481, point (7)
       and T 925/98 of 13 March 2001, point (2)). Thus,
       claim 7 fulfils the requirements of Article 123(2) EPC.

23.    The subject-matter of claims 8 and 9 is disclosed in
       claims 5 and 7 of the application as filed,
       respectively.

24.    Consequently, claims 1 to 9 comply with
       Article 123(2) EPC.

*Extension of scope (Article 123(3) EPC)*

25.    According to Article 123(3) EPC, a patent may not be
       amended in such a way as to extend the protection it
       confers.

26.    Claims 16 and 17 as granted relate to diagnostic
       methods which comprise determining whether there is a
       alteration in the sequence of the BRCA 1 gene in a
       tissue sample compared to the nucleotide sequence set
       forth in SEQ ID NO: 1 or a wild-type allelic variant
       thereof, said alteration being selected from a list of
       34 specific mutations, one of which is the mutation
       185delAG -> ter39.

       Claims 1 and 2 of the main request relate to diagnostic
       methods which comprise determining whether there is the
       mutation 185delAG -> ter39 in the BRCA 1 gene in a
       tissue sample. In contrast to claims 16 and 17 as
       granted, claims 1 and 2 of the main request do not
       contain the expression "compared to the nucleotide
       sequence set forth in SEQ ID NO: 1 or a wild-type
       allelic variant thereof".

27.    The Opponents have argued that, due to the absence of
       said expression in the claims of the main request,
       there was an extension of scope of protection, contrary
       to Article 123(3) EPC, firstly because the methods now
       claimed lacked a comparison step with the full-length
       sequence, which step was mandatory in the methods of
       claims 16 and 17 as granted, and secondly because the
       reference for determining the mutation in the methods
       of the main request now also included non-wild-type
       allelic variants of the nucleotide sequence set forth

in SEQ ID NO: 1, and was thus broader than in the
claims as granted.

28.     The Board does not share the Opponents' interpretation
        of the claims as granted and considers that the
        expression "compared to the nucleotide sequence set
        forth in SEQ ID NO: 1 or a wild-type allelic variant
        thereof" in claims 16 and 17 as granted does not mean
        that the claimed methods actually comprise a step of
        "comparing" the entire sequence of the BRCA1 gene with
        the sequence of SEQ ID NO: 1 or a wild-type allelic
        variant thereof (see point (19) above). Instead, SEQ ID
        NO: 1 is used in said claims only as a reference for
        defining the specific mutations listed, inter alia the
        mutation 185delAG -> ter39. The determination of this
        mutation is the same in the methods of the claims as
        granted and in the methods of the claims of the main
        request which do not refer to SEQ ID NO: 1; in both
        cases, a skilled person would establish whether or not
        the nucleotides "AG" in positions 185 and 186 of the
        BRCA1 gene are absent in the sequence of the patient's
        sample.

29.     The Board's interpretation that claims 16 and 17 as
        granted do not comprise a mandatory step of comparing
        the entire sequence of the BRCA1 gene present in the
        patient's sample with the sequence of SEQ ID NO: 1 or a
        wild-type allelic variant thereof is further supported
        by dependent claims 20 to 22 and 24 as granted.

        Claims 20 and 21 as granted, which are directly or
        indirectly dependent on claims 16 and 17, state that an
        oligonucleotide BRCA1 gene probe is contacted with mRNA
        or genomic DNA from the sample, and hybridization of

said probe is determined. Claim 22, which is dependent
on claims 20 and 21, defines the probe as "an allele-
specific probe for a mutant BRCA1 allele". The skilled
person would understand that a method in which an
allele-specific probe is used to determine a specific
mutation would not comprise the comparison of the full-
length gene sequence of the patient with SEQ ID NO: 1
or a wild-type allelic variant thereof as a mandatory
feature.

Furthermore, claim 24 as granted, which is dependent on
claims 16 and 17, states that "all or part of the BRCA1
gene in said sample is amplified and the sequence of
said amplified sequence is determined". The Board
considers that the amplification of only part of the
BRCA1 gene would not make sense to a skilled person if
the method required that the entire gene sequence would
have to be compared with the sequence of SEQ ID NO: 1
or a wild-type allelic variant thereof. Although it may
theoretically be possible to interpret the expression
"part of the BRCA1 gene" in claim 24 as granted as
referring only to the case where all exon sequences are
amplified, which would then allow the comparison with
the entire sequence of SEQ ID NO: 1 or a wild-type
allelic variant thereof, the Board is convinced that
this would not be the skilled person's understanding of
claim 24 read in combination with independent claims 16
and 17.

30.    The Board thus concludes that the methods of claims 16
and 17 as granted do not comprise a mandatory
comparison step with the entire nucleotide sequence of
SEQ ID NO: 1 or a wild-type allelic variant thereof,
and that the lack of such a step in the methods of

claims 1 and 2 of the main request cannot result in an
extension of scope of protection.

31.    The Board can also not recognize any extension of the
       scope of protection due to a broadening of the
       definition of the reference sequence used. It follows
       from the definition given on page 14, lines 45 to 51 of
       the patent in suit, that the term "BRCA1 gene" referred
       to in claims 1 and 2 of the main request encompasses
       all allelic variations of the DNA sequence, including
       mutated, non-wild type forms, which are not encompassed
       by the expression "nucleotide sequence set forth in SEQ
       ID No: 1 or a wild-type allelic variant thereof"
       referred to in claims 16 and 17 as granted. However,
       this difference does not affect the scope of the claims,
       since in order to determine whether the mutation
       185delAG -> ter39 is present in the sequence of a
       patient's sample, the skilled person would only
       establish whether the nucleotides "AG" in positions 185
       and 186 of the BRCA1 gene are absent or not. For this
       determination, it does not matter whether SEQ ID NO: 1
       or wild-type allelic variants thereof are used as the
       reference nucleotide sequence or whether the reference
       sequence would contain additional mutations.

32.    The Board cannot follow the Opponents' argument that
       claims 1 and 2 of the main request now covered the case
       where a comparison of the sequence of the patient's
       sample was made with a 185delAG -> ter39 mutant
       sequence and would thus entail a different, i.e. false
       result, in contrast to the methods of claims 16 and 17
       as granted. The Board is convinced that a skilled
       person aiming at diagnosing a patient by determining
       whether there is the mutation 185delAG -> ter39 in the

BRCA1 gene in a tissue sample would not make this
determination on the basis of a reference sequence
already having the mutation that is to be determined.
This would go against his/her common general knowledge
and would not make any sense. According to established
case law of the Boards of Appeal, a skilled person
should try to arrive at an interpretation of a claim
which is technically sensible and takes into account
the whole disclosure of the patent (see decisions
T 190/99 of 6 March 2001, point (2.4) and T 1241/03 of
1 September 2005, point (9)).

33.    In view of the above, the requirements of
       Article 123(3) EPC are fulfilled.

*Priority right (Article 87 EPC 1973 and Articles 88 and 89 EPC)*

34.    Documents D5 and D6 are scientific publications dated
       February 1995 and December 1994, respectively, thus
       published between the filing dates of the fourth
       priority document P4 (US 348824; 29 November 1994) and
       the fifth priority document P5 (US 409305;
       24 March 1995). It is undisputed that the disclosure in
       these documents, if it belonged to the state of the art
       under Article 54(2) EPC, would be highly relevant for
       the issues of novelty (Article 54 EPC) and/or inventive
       step (Article 56 EPC) of the claimed subject-matter.

       Documents D5 and D6 would not belong to the state of
       the art under Article 54(2) EPC if the claims were
       entitled to claim priority from the fourth priority
       document P4.

35.    The right to priority is governed by Article 87 EPC
       1973, which requires that the European patent
       (application) and the application whose priority is
       claimed relate to the same invention. Article 88(3) EPC
       further specifies that, if one or more priorities are
       claimed in respect of a European patent application,
       the right of priority shall cover only those elements
       of the application which are included in the respective
       priority application(s).

36.    According to the Opinion G 2/98 of the Enlarged Board
       of Appeal (OJ EPO 2001, 413, point (9)), the
       requirement for claiming priority of "the same
       invention", referred to in Article 87(1) EPC 1973,
       means that the priority of a previous application in
       respect of a claim in a European patent application in
       accordance with Article 88 EPC is to be acknowledged
       only if the skilled person can derive the subject-
       matter of the claim directly and unambiguously, using
       common general knowledge, from the previous application
       as a whole.

37.    The fourth priority document P4 discloses a method for
       diagnosing a predisposition to breast and ovarian
       cancer in a human comprising the detection of an
       alteration in the BRCA1 gene, said alteration
       indicating a predisposition to said cancer and being
       selected from the group consisting of the mutations set
       forth in Table 14 (see page 5, lines 26 to 29 and
       claims 1 and 3), whereby the first mutation of the list
       in Table 14 is the mutation 185delAG -> ter39.

       However, the nucleotide sequence of the cDNA coding for
       BRCA1 as disclosed in SEQ ID NO: 1 of the fourth

priority document P4 deviates from the corresponding
sequence disclosed in SEQ ID NO: 1 of the patent in
suit by 15 nucleotide residues. These deviations in the
BRCA1 coding sequence are listed in Exhibit 1 (Table 1)
of document D144 submitted by Appellant I with his
letter dated 10 October 2008. Nine of these deviations
lead to an amino acid change in the amino acid sequence
of SEQ ID NO: 2, while six are "silent deviations"
which do not result in amino acid changes. Thus, the
1863 amino acid long sequence of the BRCA1 protein
shown in SEQ ID NO: 2 of the fourth priority document
P4 deviates from the corresponding sequence disclosed
in SEQ ID NO: 2 of the patent in suit in 9 amino acid
positions. None of the 15 nucleotide changes is an
insertion or a deletion or results in a stop codon.
Within the BRCA1 coding sequence, the first of the 15
deviations occurs in nucleotide position 1364,
corresponding to codon number 415.

The earliest priority document disclosing the nucleo-
tide sequence coding for BRCA1 and the amino acid
sequence of the encoded protein, which are identical to
SEQ ID NOs: 1 and 2 disclosed in the patent in suit and
in the application as filed, is the fifth priority
document P5.

38.   The Opponents have argued that because of the above
mentioned differences in the nucleotide and amino acid
sequences between the fourth priority document P4 and
the patent in suit, only the fifth priority could be
accorded to the claims of the main request.

39.   With respect to claim 1, the Opponents have argued that
in view of said sequence differences, the meaning of

the term "BRCA1 gene" differed between the fourth
priority document, P4, and the patent in suit, and
because the BRCA1 gene was a technical feature of the
claim, the claimed invention could not be directly and
unambiguously derived from the fourth priority document
P4.

40.     The Board cannot follow this line of argument. The
invention claimed in claim 1 is a diagnostic method
which comprises determining whether there is germline
alteration 185delAG -> ter39 in the BRCA1 gene. In
order to determine in the claimed method whether there
is the mutation 185delAG -> ter39, it is not required
to determine any kind of difference between the
patient's nucleotide or amino acid sequence and a
reference sequence. It is only required to determine
whether there is a deletion of the nucleotides "AG" in
positions 185 and 186 of the BRCA1 gene. Neither this
mutation 185delAG -> ter39, nor the nucleotides of the
BRCA1 gene in the relevant positions 185 and 186 have
changed between the fourth priority document P4, the
fifth priority document P5 and the patent in suit. In
fact, the first nucleotide in the BRCA1 sequence which
deviates between the fourth priority document P4 on the
one hand and the fifth priority document P5 and the
patent in suit on the other hand is in position 1364,
thus more than 1000 nucleotides downstream of the
positions that are looked at in the claimed method. The
above mentioned sequence differences thus do not have
any impact on the actual invention claimed. The
mutation to be detected with the method of claim 1 is
exactly the same, irrespective of whether the sequence
information disclosed in the fourth priority document

P4, the fifth priority document P5 or the patent in
suit is used as a reference.

41.    The Opponents have also argued that SEQ ID NO: 1 of the
       fourth priority document P4 did not have the
       nucleotides "AG" in position 185, and that there was a
       severe ambiguity within this priority document because
       the footnote 2 of Table 14 referred to the BRCA1
       sequence in GenBank under accession number U14680. The
       Opponents submitted that from its first release onwards,
       this GenBank entry had disclosed the "correct" BRCA1
       sequence disclosed in the fifth priority document and
       the patent in suit which thus differed from the
       sequence of SEQ ID NO: 1 of the fourth priority
       document. There was thus no clear and unambiguous
       disclosure of the invention now claimed in the fourth
       priority date.

42.    The Board notes that SEQ ID NO: 1 of the fourth
       priority document P4 lacks the 56 nucleotides that are
       present at the 5' end of SEQ ID NO: 1 of the patent in
       suit, resulting in a different numbering of the
       nucleotides. In SEQ ID NO: 1 of the fourth priority
       document P4, the nucleotides "AG" that are deleted in
       the mutation 185delAG -> ter39 occur in position 129
       instead of position 185. By contrast, Table 14 of the
       fourth priority document P4 refers to the mutation
       185delAG -> ter39, and states in footnote 2 that
       "[n]ucleotides refer to the BRCA1 cDNA sequence in
       GENBANK under Accession No. U-14680". It has not been
       contested by any of the parties that in this sequence
       as released before the fourth priority date, nucleotide
       position 185 corresponds to the "AG" that is deleted in

the mutation 185delAG -> ter39 as disclosed in the
patent.

The Board considers that a skilled person reading the
fourth priority document would have easily recognized
by a simple sequence comparison that the nucleotides in
SEQ ID NO: 1 of this priority document and in the
sequence of GenBank entry U14680 are differently
numbered, and that position 185 of the mutation in
Table 14 would correspond to position 129 of SEQ ID NO:
1. In this way, the skilled person would have been able
to identify the exact location of the 185delAG -> ter39
mutation also in the sequence of SEQ ID NO: 1. The
Board is therefore convinced that the skilled person
would not have had problems to perform the method of
claim 1 on the basis of the information given in the
fourth priority document P4.

43.     It was a matter of dispute between the parties whether
the GenBank entry U14680 when it first became available
to the public on 8 October 1994 disclosed a BRCA1
nucleotide sequence which contained the same sequencing
"errors" as the nucleotide sequence of SEQ ID NO: 1 of
the fourth priority document P4, or the "correct"
nucleotide sequence as shown in SEQ ID NO: 1 of the
fifth priority document and the patent in suit. Since,
however, the sequence deviations under discussion do in
any case not occur in the region of the mutation
185delAG -> ter39, and thus do not affect the claimed
invention, the issue of the exact disclosure of the
GenBank entry U14680 of 8 October 1994 is not relevant
for the present case and need not be decided by the
Board.

44.    The Board is thus convinced that the invention of
       claim 1 is directly and unambiguously derivable from
       the fourth priority document P4 and enjoys the fourth
       priority date.

45.    In view of page 5, lines 27 to 29 and page 37, lines 4
       to 6 of the fourth priority document P4, the reasons
       given above as to why the subject-matter of claim 1
       enjoys the fourth priority date apply analogously also
       for the subject-matter of claim 2. Furthermore, the
       subject-matter of claims 3 to 6 is disclosed in
       claims 5, 7, 8 and 10 and on page 18, lines 10 to 20 of
       the fourth priority document P4.

46.    With respect to claim 7, the Opponents have argued that
       its subject-matter was not entitled to the fourth
       priority date because due to the use of the term
       "having", which had to be interpreted as meaning
       "comprising", the claimed nucleic acid probe could also
       comprise those nucleotides of SEQ ID NO: 1 which
       differed between the fourth priority document P4 and
       the patent in suit. SEQ ID NO: 1 was thus a technical
       feature of the claim, which feature was not disclosed
       in the fourth priority document P4.

47.    It has not been contested by Appellant I that the term
       "having" in claim 7 is to be interpreted as meaning
       "comprising", and the Board concurs with this
       interpretation. Therefore, claim 7 does indeed
       encompass nucleic acid probes which, in addition to the
       "15 to 30 nucleotides of SEQ ID NO: 1", comprise any
       other nucleotide sequences. These sequences include
       parts of SEQ ID NO: 1 which lie outside the region of
       the mutation 185delAG  -> ter39 and which differ

between the fourth priority document P4 and the patent
in suit, or any other additional sequences unrelated to
the BRCA1 gene.

48.     The Board considers that these additional, non-defined
        sequences, whose presence in the claimed nucleic acid
        probe is entirely optional, do not define the actual
        invention that is claimed. The claimed invention is
        defined as a nucleic acid probe which has 15 to 30
        nucleotides of SEQ ID NO: 1 and contains the mutation
        185delAG -> ter39. With respect to these features
        defining the claimed invention, the disclosures of the
        fourth priority document P4, the fifth priority
        document P5 and the patent in suit are identical, the
        first nucleotide deviation in the sequence of SEQ ID NO:
        1 occurring in position 1364. Therefore, the Board is
        convinced that the invention of claim 7 enjoys the
        fourth priority date.

49.     As concerns claims 8 and 9, their subject-matter is
        disclosed on page 26, lines 8 to 11 of the fourth
        priority document.

50.     The Board thus concludes that the subject-matter of
        claims 1 to 9 of the main request enjoys the fourth
        priority date and that, consequently, documents D5 and
        D6 do not constitute prior art under Article 54(2) EPC.

51.     It was repeatedly argued by the Opponents that to
        decide along the lines argued above would be
        incompatible with decision T 1213/05 (supra). However,
        with respect to the question of priority rights, the
        situation in the present case differs from the one
        dealt with in decision T 1213/05 (supra) in the context

of auxiliary request II then before that Board, which
concerned product claims and where the amino acid
sequence of SEQ ID NO: 2 was a technical feature of the
claimed invention (see points 19 to 34 of said
decision).

In the present case, the claimed invention relates to
the determination of a specific mutation, 185delAG ->
ter39, and to certain probes containing said mutation,
and this invention does not differ between the fourth
priority document P4, the fifth priority document P5
and the patent in suit, for the reasons given above.

*Novelty (Article 54 EPC)*

52.     As a consequence of the above decision on right to
        priority, documents D5 and D6, which are the only
        documents the Opponents relied on in the written
        procedure when objecting to the novelty of the claimed
        subject-matter, do not belong to the state of the art
        under Article 54(2) EPC.

53.     The Opponents have thus not objected to the novelty of
        the claimed subject-matter on the basis of any document
        which belongs to the state of the art under
        Article 54(2) EPC.

        As the Board also has no objections in this respect,
        the subject-matter of claims 1 to 9 is considered to be
        novel and to meet the requirements of Article 54 EPC.

*Inventive step (Article 56 EPC)*

54.    The closest prior art is represented by document D1
       which discloses the identification of the BRCA1 gene by
       positional cloning. Table 2 of the document discloses
       four predisposing mutations in BRCA1. The mutation
       185delAG -> ter39 is not mentioned in document D1.

55.    Having regard to document D1, the technical problem to
       be solved is the provision of a mutation that allows
       the development of an effective screening for inherited
       breast and ovarian cancer.

56.    The Board is satisfied that this problem has been
       solved by the specific mutation of the method according
       to claim 1.

56.1   Paragraph [0276] on page 60, lines 43 to 51 of the
       patent in suit states that the mutation 185delAG ->
       ter39 is a predisposing mutation that is relatively
       common, occurring in 12 % of the probands studied. The
       same paragraph further states that "[m]any of the
       probands screened to date for BRCA1 mutations were
       selected for having a high prior probability of having
       such mutations. Thus the mutations found in this set
       may not be representative of those which would be
       identified in other sets of patients. However, the two
       most frequent BRCA1 mutations (5382 ins C and 185 del
       AG) have been found multiple times in targeted
       screening in sets of probands who were either
       unselected for family history or ascertained with
       minimal family history." The patent in suit discloses
       that the mutation 185delAG -> ter39 occurs at a

relatively high frequency and thus allows effective
screening of a human subject.

56.2    Opponents have argued that according to the post-
published document D29, the mutation 185delAG -> ter39
was only predominant in people of Ashkenazi Jewish
descent, and could not generally be considered as a
particularly frequent mutation. Since the high
frequency of the mutation in the Ashkenazi Jewish
population was not disclosed in the patent in suit,
this advantageous property could not be used in the
formulation of the technical problem or support the
acknowledgment of an inventive step.

56.3    The Board agrees that the high frequency of the
mutation 185delAG -> ter39 in the Ashkenazi Jewish
population, which is not disclosed in the patent in
suit, cannot support the finding that the technical
problem has been solved. However, the Board takes the
position that on the basis of the evidence on file, in
particular document D100, a declaration of Dr
Critchfield, the mutation 185delAG -> ter39 is to be
considered as a frequent mutation also with respect to
the general population. According to document D100, the
frequency of the mutation 185delAG -> ter39 was 8.92 %
in samples of Ashkenazi ancestry analyzed for mutations
in BRCA1 at Myriad (see page 3, point 6), and 0.47 % in
non-Ashkenazi samples (see page 3, point 8). It is
further stated in point 8 of this document that
"[o]ther than the **185delAG** and 5385insC mutations, the
mutation with the highest frequency in the non-
Ashkenazi samples analyzed at Myriad is the C61G
mutation with a frequency of **0.30%**. Thus, the **185delAG**
mutations is **1.6** times more prevalent than the C61G

mutation among the **non-Ashkenazi** samples analyzed at Myriad". The Board concludes from this data that although the mutation 185delAG -> ter39 is considerably less frequent in non-Ashkenazi samples when compared to samples from people of Ashkenazi ancestry, the mutation is to be considered as a frequent one also in people who are not of Ashkenazi descent. Document D100 thus supports the statement in the patent in suit that the mutation 185delAG -> ter39 is a frequent one and thus allows effective screening.

56.4    Opponents have furthermore argued that the technical problem had not been solved over the whole scope of the claims, because the frequency of the mutation 185delAG -> ter39 varied dramatically from country to country, as evidenced by document D119 which gives an overview of BRCA1 mutation spectra in different European countries. This document showed that the frequency of the mutation 185delAG -> ter39 is relatively high in some countries, for instance in Spain (15 %) and in the United Kingdom (19 %), but very low in other European countries including Italy, Belgium, Germany, Switzerland and Austria. With respect to these latter countries, screening for the mutation 185delAG -> ter39 would not be useful and in no way cost-effective. An advantageous effect thus only existed for a very limited part of the human population, and not over the whole scope of the claim.

56.5    The Board cannot follow this line of argument since although the mutation 185delAG -> ter39 occurs less frequently in some countries than in others, this cannot prejudice the fact that this mutation is a frequent one in the general human population.

Furthermore, the determination of the presence of said mutation in the BRCA1 gene of a human subject according to the method of claim 1 would always allow the diagnosis of a predisposition for breast and ovarian cancer, irrespective of the country from which the human subject originates.

57.    The relevant question for assessing inventive step is whether or not, at the fourth priority date, the provision of a diagnostic method for finding the mutation 185delAG -> ter39 would have been obvious for a skilled person faced with the problem posed.

58.    The Board agrees with the Opponents and Appellant I that the skilled person in the present case would be a team of experts including at least a molecular geneticist and a medical doctor having access to patient samples.

59.    It has been pointed out in a number of decisions of the Boards of Appeal in the technical field of bio-technology that, in evaluating the attitude of the skilled person, one should not confuse the "hope to succeed", which is linked to the wish that a result be achieved, with the "reasonable expectation of success", which is linked to the ability to reasonably predict, based on the particular technical circumstances, a successful conclusion of the project within acceptable time limits (see decisions T 296/93 of 28 July 1994, point (7.4.4), T 923/92 of 8 November 1995, point (51), T 223/96 of 29 January 1999, point (23) and T 1213/05, supra, point (77)). In this respect, each case has to be assessed on its own merits, and any hindsight has to be avoided.

60.	The Board notes that from the content of document D1,
there was still a considerable degree of uncertainty
with respect to the mutations that predispose
individuals to BRCA1-linked breast and ovarian cancer
and to the development of BRCA1 screening methods.
Although at the time of its publication, the document
was seen by the scientific community as disclosing the
identification of the BRCA1 gene, the authors of the
document themselves expressed some caution in this
regard by giving their publication the title "A Strong
Candidate for the Breast and Ovarian Cancer
Susceptibility Gene BRCA1". At the end of document D1
(page 71, column 1, paragraph 1), it is stated: "The
large size and fragmented nature of the coding sequence
will make exhaustive searches for new mutations
challenging. Nevertheless, the percentage of total
breast and ovarian cancer caused by mutant BRCA1
alleles will soon be estimated, and individual mutation
frequencies and penetrances may be established. This in
turn may permit accurate genetic screening for
predisposition to a common, deadly disease."

The Board furthermore observes that document D1 does
not give any information on the frequencies of the
mutant alleles listed in Table 2 in BRCA1 predisposed
individuals. It was found out only later, i.e. after
the fourth priority date, that the mutation indicated
in Table 2 as occurring in kindred 1910 is a relatively
frequent mutation (see the comments on mutation
"5385insC" in document D100).

61.	The Board considers that the skilled person, departing
from the disclosure of document D1, would have readily
undertaken to identify BRCA1 predisposing mutations

suitable for effective screening in the hope to succeed.
This hope is expressed also by the authors of the
document by stating in the above quoted passage that
"the percentage of total breast and ovarian cancer
caused by mutant BRCA1 alleles will soon be estimated,
and individual mutation frequencies and penetrances may
be established". However, in the same paragraph, the
authors of document D1 describe the task of carrying
out exhaustive searches for new mutations as being
"challenging", in view of the large size and fragmented
nature of the coding sequence. The Board is therefore
convinced that, in view of the disclosure in
document D1, the skilled person, taking a conservative
attitude, would not have reasonably expected to
successfully identify a mutation that allows the
development of an effective screening for inherited
breast and ovarian cancer within acceptable time limits.
From the skilled person's perspective at the fourth
priority date of the patent in suit, finding such a
mutation would not only involve a substantial amount of
"challenging" work, but would also require a "lucky
strike", which could in no way be predicted on the
basis of document D1.

62.  Opponents have argued that finding the mutation
     185delAG -> ter39 was obvious because, starting from
     document D1, the skilled person would immediately have
     carried out an extensive screening of the available
     patient samples and, by doing so, would have inevitably
     arrived at said mutation. This was evidenced by the
     fact that the well-documented families "BOV3" known
     from document D9 (also mentioned in post-published
     document D5, Table 3) and "2979" known from document

D42 - access to these families was available at the
fourth priority date - contained the mutation
185delAG -> ter39, as confirmed by document D47. By
following the suggestion in document D1 to find
mutations, catalogue them and determine their
frequencies, the skilled person would also have
obtained the information of the frequency of the
mutation 185delAG -> ter39. Also, the more frequent a
mutation was, the higher was the chance to find it. To
carry out the screening involved nothing but repetitive
work, which would have inevitably resulted in the
claimed invention. The finding of the mutation 185delAG
-> ter39 was thus a "one-way street" situation, not a
lucky strike. This was also supported by the post-
published document D96, which stated that within days
after the disclosure of the complete nucleotide
sequence of BRCA1 in GenBank, oligonucleotide primers
had been prepared to start the genetic analysis, and
that less than a week later, some groups had already
found sequence changes in their own patient samples
(see column 1, last paragraph of the document).

63.    The Board cannot follow this line of argument as it is
based on an *ex post facto* analysis, which should be
avoided in the assessment of inventive step (see Case
Law of the Boards of Appeal of the European Patent
Office, 5th edition 2006, chapter I.D.5.). It is only
with the benefit of hindsight that one can now know
what the skilled person would have had to do at the
relevant time in order to arrive at the claimed
subject-matter. This does, however, not reflect the
skilled person's circumstances at the fourth priority
date, which should not be confused with the
circumstances of those scientists that, in the hope to

succeed, eagerly undertook the "challenging" search for
BRCA1 predisposing mutations and, by doing so, might
have arrived at the claimed invention.

64.    Opponents have further argued that the claimed subject-
matter was obvious over a combination of documents D1,
D115 and D117. Document D115 disclosed that a familial
aggregation of ovarian cancer occurs in the Israeli
Jewish population, and the skilled person would have
considered this population as a suitable group for
BRCA1 mutation analysis in order to find further
predisposing mutations. Upon screening these Israeli
Jewish women, the skilled person would inevitably have
identified 185delAG -> ter39 as a predisposing mutation.
This was evidenced by the post-published document D116
which showed that said mutation was detected in 38.9 %
of ovarian cancer patients with familial history and
13.1 % of family history-negative ovarian cancer cases
in this population (see abstract, section results).
Although document D115 did not mention the term "BRCA1",
there would have been no doubt for the skilled person
that said population was appropriate for the further
screening for BRCA1 mutations, because it was known
from document D117 that the BRCA2 gene was linked to
susceptibility to hereditary breast cancer only, i.e.
not ovarian cancer.

65.    The Board considers that the Opponents' argumentation
is again based on an *ex post facto* analysis and that in
the absence of a reasonable expectation of success (see
points 59 to 61 above), the skilled person would not
have undertaken the screening of the population of
document D115.

66.     Opponents have also argued that the detection of the
        mutation 185delAG -> ter39 was made easy by the
        disclosure of the mutation 188del11 in document D1 in
        view of the proximity of the two mutations in exon 2.

67.     However, in the Board's judgment, the skilled person
        could not expect from the disclosure of the mutation
        188del11 in document D1 to find a further predisposing
        mutation in this area of exon 2, let alone a mutation
        that would allow effective screening. Therefore, the
        Opponents' argument fails.

68.     Opponents have further argued that document D6
        disclosing the mutation 185delAG -> ter39 had been
        submitted for publication on 3 November 1994 (as was
        indicated on the last page of the document), thus
        shortly after the publication of document D1. According
        to the Opponents, this demonstrated that it had not
        been difficult to identify the mutation.

69.     The Board cannot see how the submission for publication
        of the mutation 185delAG -> ter39 in document D6 (the
        authors of which include three of the inventors of the
        patent in suit) shortly after the publication of
        document D1 could in any way prejudice the
        inventiveness of claim 1. The Board takes the position
        that, in view of what has been said points at (54) to
        (67) above, it is only with the benefit of hindsight
        that one could conclude that it would have been
        straightforward to arrive at the claimed invention.

70.     In view of the above considerations, the subject-matter
        of claim 1 is considered to involve an inventive step.
        Since claim 2 also requires the determination of the

mutation 185delAG -> ter39 in the claimed method, the
reasons given above as to why the subject-matter of
claim 1 involves an inventive step apply analogously
also for the subject-matter of claim 2. Claims 3 to 5
are dependent on claims 1 and 2 and their subject-
matter thus likewise involves an inventive step. The
nucleic acid probe of claim 7 is considered to involve
an inventive step because it must contain the mutation
185delAG -> ter39. The same applies to the replicative
cloning vector of claim 8 comprising an isolated
nucleic acid according to claim 7, and to the host
cells of claim 9 which are in vitro transformed with a
vector of claim 8.

Consequently, the subject-matter of claims 1 to 9
fulfils the requirements of Article 56 EPC.

*Sufficiency of disclosure (Article 83 EPC)*

71.    The Opposition Division decided in point (14) of the
       appealed decision that the patent disclosed a method
       for diagnosing a predisposition for breast and ovarian
       cancer based on the determination of the mutation
       185delAG -> ter39 in a manner sufficiently clear and
       complete for it to be carried out by a skilled person.

72.    None of the Opponents has submitted any evidence or
       argument to further substantiate this issue during the
       present appeal proceedings.

73.    The Board, having no reason to deviate from the
       decision taken by the Opposition Division in this
       respect, decides that the requirements of Article 83
       EPC are met.

*Patentable invention (Article 52(2) EPC)*

74.    In the notice of opposition, dated 22 February 2002,
       Opponent 06 argued that the sequences of the probes
       according to present claim 7 occur in nature and are
       therefore a discovery rather than an invention. In view
       of Article 52(2) EPC, said probes were thus not
       patentable. During the oral proceedings, this point was
       not further pursued by any of the Opponents.

75.    According to the case law of the Boards of Appeal (see
       decision T 272/95 of 23 October 2002), Article 52(2)(a)
       EPC is to be interpreted in accordance with the
       implementing Rule 29(2) EPC (corresponding to
       Rule 23e(2) EPC 1973) which states:

       "(2) An element isolated from the human body or
       otherwise produced by means of a technical process
       including the sequence or partial sequence of a gene
       may constitute a patentable invention, even if the
       structure of that element is identical to that of a
       natural element".

76.    Claims 7 relates to a nucleic acid **probe** comprising
       partial DNA sequences of the human BRCA1 gene, which is
       described in the patent in suit as having been obtained
       by technical processes. This probe is thus an isolated
       element of the human body as defined in Rule 29(2) EPC
       and thus patentable subject-matter. Accordingly, the
       subject-matter of claim 7 does not fall within the
       category of inventions which may not be patentable as
       being discoveries (Article 52(2)(a) EPC).

*Exceptions to patentability (Article 53(a) and (c) EPC)*

77.     Opponent 04 in the notice of opposition, dated
        25 February 2002, and Opponent 06 argued that methods
        for diagnosing a predisposition for breast and ovarian
        cancer or for diagnosing a breast or ovarian lesion for
        neoplasia in/of a human subject should not be regarded
        as patentable invention according to Article 52(4) EPC
        1973 (now Article 53(c) EPC). During the oral
        proceedings, this point was not further pursued by any
        of the Opponents.

78.     Article 53(c) EPC (which corresponds to Article 52(4)
        EPC 1973) states that European patents shall not be
        granted in respect of methods for treatment of the
        human or animal body by surgery or therapy and
        diagnostic methods **practised on the human or animal
        body.**

        The Enlarged Board of Appeal in its Opinion G 1/04 (OJ
        EPO 2006, 334) said that Article 52(4) EPC 1973
        excludes diagnostic methods practised on the human or
        animal body only if the method steps of technical
        nature belonging to the preceding steps which are
        constitutive for making a diagnosis as an intellectual
        exercise are performed on a living human or animal body
        (see point (6) of the reasons).

79.     According to present claims 1 to 6, all method steps of
        technical nature are performed on a tissue sample of a
        human subject. The Opponents' argument must therefore
        fail. The claims do not refer to subject-matter not
        patentable according to Article 53 (c) EPC
        (Article 52(4) EPC 1973).

80.     Furthermore, Opponent 04 argued that the subject-matter
        of the claims contravened the requirements of
        Article 53(a) EPC. If the patent was granted, patients
        were no longer able to have their genetic information
        read and interpreted by the organisation of their
        choice and it could not be guaranteed that criminal and
        medical gene databases were kept strictly separate,
        which was an accepted ethical principle in the member
        states of the EPO.

81.     Opponent 06 argued that the socio-economic consequences
        of the patenting of the claimed subject-matter should
        be considered by the Board under Article 53(a) EPC,
        because in the present case, these consequences touched
        ethical issues. Patenting of the claimed subject-matter
        would not only result in increased costs for patients,
        but would also influence the way in which diagnosis and
        research would be organized in Europe, which would be
        clearly to the detriment of patients and doctors. The
        fact that a particular group of patients, i.e. patients
        suspected to carry a predisposition to breast cancer,
        would be faced with severe disadvantages and would
        become dependent on the patent proprietor, was contrary
        to human dignity. Therefore, the claimed subject-matter
        constituted an exception to patentability under
        Article 53(a) EPC.

        A further indication that the legislator intended to
        enforce a critical examination of this aspect was seen
        in the transfer of Article 52(4) EPC 1973 to Article 53
        EPC, referring to exceptions to patentability.

82.     This Board, in a different composition, already in
        decision T 1213/05 (supra) has dealt with the socio-

economic and ethical consequences of the patenting of
diagnostic methods involving the use of human genetic
material.

The Board in the present composition follows decision
T 1213/05 (supra, see especially points (52) and (53))
and, on this basis, rejects Opponents' objection under
Article 53(a) EPC.

*Industrial applicability (Article 57 EPC)*

83.    Claim 7 refers to a nucleic acid probe defined by a
       nucleotide sequence.

       According to Appellants II to IV the possible uses of
       such probes were not industrial applications in the
       sense of Article 57 EPC in connection with Rule 29(3)
       EPC, which required that, with regard to inventions
       concerning the human body and its elements, the
       industrial application of a sequence or a partial
       sequence must be disclosed in the patent application.

       The capacity of a single stranded DNA sequence to
       hybridize with a complementary single-stranded sequence
       was a consequence of the physico-chemical properties of
       each single-stranded DNA molecule and was thus a
       universal characteristic thereof. Such universal
       characteristic could not be accepted as a basis for an
       industrial application within the meaning of Article 57
       and Rule 29(3) EPC.

       During the oral proceedings, this point was not further
       pursued by any of the Opponents.

84.    This Board, in a different composition, already in
       decision T 1213/05 (supra, see especially point (62))
       has dealt with the industrial applicability of nucleic
       acid probes.

       The Board found, and the present Board agrees with this
       position, that the provision of a probe useful in a
       diagnostic method cannot be considered to be merely a
       research tool for the detection of complementary single
       stranded DNA molecules, but that such probe can also be
       commercially applied for a diagnostic purpose, in the
       present case to detect the presence of a BRCA1 allele
       predisposing an individual to cancer.

85.    Accordingly, the requirements of Article 57 EPC are met.

*Adaptation of description*

86.    The description has been correctly adapted to the
       subject-matter of claims 1 to 9.

## Order

## For these reasons it is decided that:

1.    The decision under appeal is set aside.

2.    The case is remitted to the department of first
      instance with the order to maintain the patent in the
      following version:

      Description:    Pages 3, 3a, 4 to 24 and 138 submitted
                      at the oral proceedings on 13 November
                      2008; pages 25 to 137 of the patent
                      specification as granted.

      Claims:         1 to 9 of the main request, filed with a
                      letter dated 2 June 2008.

      Figures:        1 to 10 on pages 151 to 169 of the
                      patent specification as granted.

The Registrar:                          The Chair:

P. Cremona                              U. Kinkeldey

0174.D