# EXHIBIT G

Dockets.Justia.com



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Fax +49 89 / 2399 - 4465

Europäisches
Patentamt

Beschwerdekammern

European
Patent Office

Boards of Appeal

Office européen
des brevets

Chambres de recours

Vossius & Partner
Postfach 86 07 67
81634 München
ALLEMAGNE



| | Datum/Date |
|---|---|
| | 1 2. 12. 07 |

| Zeichen/Ref./Réf. | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|
| K2708OPP(EP)S3 | 95305601.7 - 2405 / 0705902 |

Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire
**The University of Utah Research Foundation, et al**

**Appeal number:** | T 1213 / 05 - 3304 |

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):
**Registered letter with advice of delivery**

EPO Form 3032    10/07



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Fax +49 89 / 2399 - 4465

**Europäisches
Patentamt**

Beschwerdekammern

**European
Patent Office**

Boards of Appeal

**Office européen
des brevets**

Chambres de recours

Dolder, Fritz
Rosenbergstrasse 6
Postfach 558
8304 Wallisellen-Zürich
SUISSE



| Datum/Date |
|---|
| 1 2. 12. 07 |

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| SP4/04 | OPPO 01 | 95305601.7 - 2405 / 0705902 |

Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire
**The University of Utah Research Foundation, et al**

**Appeal number:** | T 1213 / 05 - 3304 |

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):

**Registered letter with advice of delivery**

EPO Form 3032    10/07



EPA / EPO / OEB
D-80298 München
Tel.  +49 89 / 2399-0

Fax  +49 89 / 2399 - 4465

Europäisches
Patentamt

Beschwerdekammern

European
Patent Office

Boards of Appeal

Office européen
des brevets

Chambres de recours

Greenpeace e.V.
Grosse Elbstrasse 39
22767 Hamburg
ALLEMAGNE



| | Datum/Date |
|---|---|
| | **1 2. 12. 07** |

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| GREENPEACEDE+AT | OPPO 02 | 95305601.7 - 2405 / 0705902 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire | | |
| The University of Utah Research Foundation, et al | | |

**Appeal number:**   | **T 1213 / 05 - 3304** |

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar  -  P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):

**Registered letter with advice of delivery**



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Fax +49 89 / 2399 - 4465

Europäisches
Patentamt

European
Patent Office

Office européen
des brevets

Beschwerdekammern

Boards of Appeal

Chambres de recours

Warcoin, Jacques
Cabinet Régimbeau
20, rue de Chazelles
75847 Paris Cedex 17
FRANCE



| | | Datum/Date |
| | | **1 2. 12. 07** |

*04 and 05*

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| E18565 | OPPO 03 | 95305601.7 - 2405 / 0705902 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire | | |
| The University of Utah Research Foundation, et al | | |

**Appeal number:** | T 1213 / 05 - 3304 |

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):

**Registered letter with advice of delivery**

EPO Form 3032    10/07



Bird, William Edward
Bird Goen & Co.,
Klein Dalenstraat 42A
3020 Winksele
BELGIQUE



| Datum/Date |
|---|
| 1 2. 12. 07 |

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| K1874-EP | OPPO 06 | 95305601.7 - 2405 / 0705902 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire | | |
| The University of Utah Research Foundation, et al | | |

**Appeal number:**
<div style="border:1px solid">T 1213 / 05 - 3304</div>

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):

**Registered letter with advice of delivery**

EPO Form 3032    10/07



EPA / EPO / OEB
D-80298 München
Tel. +49 89 / 2399-0

Fax +49 89 / 2399 - 4465

Europäisches
Patentamt

Beschwerdekammern

European
Patent Office

Boards of Appeal

Office européen
des brevets

Chambres de recours

An die Erben von Herrn Dr. Wilhelms, Rolf E.
Mailage 1
29473 Göhrde
ALLEMAGNE



| Datum/Date |
|---|
| 1 2. 12. 07 |

| Zeichen/Ref./Réf. | | Anmeldung Nr./Application No./Demande n°.//Patent Nr./Patent No./ Brevet n°. |
|---|---|---|
| | OPPO 07 | 95305601.7 - 2405 / 0705902 |
| Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire | | |
| The University of Utah Research Foundation, et al | | |

**Appeal number:**

| T 1213 / 05 - 3304 |
|---|

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):

**Registered letter with advice of delivery**

EPO Form 3032    10/07



| EPA / EPO / OEB | Europäisches | European | Office européen |
|---|---|---|---|
| D-80298 München | Patentamt | Patent Office | des brevets |
| Tel. +49 89 / 2399-0 | | | |
| Fax +49 89 / 2399 - 4465 | Beschwerdekammern | Boards of Appeal | Chambres de recours |

Swinkels, Bart Willem
Nederlandsch Octrooibureau,
P.O. Box 29720
2502 LS The Hague
PAYS-BAS



<table>
<tr><td colspan="2"></td><td>Datum/Date<br>12. 12. 07</td></tr>
<tr><td>Zeichen/Ref./Réf.<br>BZ720EP     OPPO 08</td><td>Anmeldung Nr./Application No./Demande n°./Patent Nr./Patent No./ Brevet n°.<br>95305601.7 - 2405 / 0705902</td></tr>
<tr><td colspan="2">Anmelder/Applicant/Demandeur//Patentinhaber/Proprietor/Titulaire<br>The University of Utah Research Foundation, et al</td></tr>
</table>

**Appeal number:**      T 1213 /   05   - 3304

Please find enclosed a copy of the decision dated 27-09-2007.

PROC DISP

The Registrar - P. Cremona
Tel.: 089 / 2399 - 3341

Annex(es):
**Registered letter with advice of delivery**

EPO Form 3032     10/07



| Europäisches Patentamt | European Patent Office | Office européen des brevets |
|---|---|---|
| Beschwerdekammern | Boards of Appeal | Chambres de recours |

**Case Number:** T 1213/05 - 3.3.04

# D E C I S I O N
## of the Technical Board of Appeal 3.3.04
## of 27 September 2007

**Appellant I:**
(Patent Proprietor)

The University of Utah Research Foundation, et al.
615 Arapeen Drive, Suite 310
Salt Lake City
Utah 84108   (US)

**Representative:**

Jaenichen, Hans-Rainer
Vossius & Partner
Postfach 86 07 67
D-81634 München   (DE)

**Appellant II:**
(Opponent 01)

Sozialdemokratische Partei der Schweiz
(SP Schweiz)
Spitalgasse 34
CH-3001 Bern   (CH)

**Representative:**

Dolder, Fritz
Rosenbergstrasse 6
Postfach 558
CH-8304 Wallisellen-Zürich   (CH)

**Other Party:**
(Opponent 02)

Greenpeace e.V. et al.
Grosse Elbstrasse 39
D-22767 Hamburg   (DE)

**Representative:**

Then, Christoph
Greenpeace e.V. et al.
Grosse Elbstrasse 39
D-22767 Hamburg   (DE)

**Other Party:**
(Opponent 03)

Institut Curie
26, rue d'Ulm
F-75248 Paris Cedex   (FR)

**Representative:**

Warcoin, Jacques
Cabinet Régimbeau
20, rue de Chazelles
F-75847 Paris Cedex 17   (FR)

**Other Party:**          Assistance Publique-Hopitaux de Paris
(Opponent 04)             3 avenue Victoria
                          F-75004 Paris    (FR)


**Representative:**       Warcoin, Jacques
                          Cabinet Régimbeau
                          20, rue de Chazelles
                          F-75847 Paris Cedex 17    (FR)


**Other Party:**          Institut Gustave Roussy-IGR
(Opponent 05)             39 rue Camille Desmoulins
                          F-94800 Villejuif    (FR)


**Representative:**       Warcoin, Jacques
                          Cabinet Régimbeau
                          20, rue de Chazelles
                          F-75847 Paris Cedex 17    (FR)


**Other Party:**          Belgian Society of Human Genetics et al.
(Opponent 06)             Genetic Dpt. Hopital Erasme-IJLB
                          808 Lennikstraat
                          B-1079 Brussel    (BE)


**Representative:**       Bird, William Edward
                          Bird Goen & Co.
                          Klein Dalenstraat 42A
                          B-3020 Winksele    (BE)


**Other Party:**          Die Erben von Herrn Dr. Wilhelms, Rolf E.
(Opponent 07)             Mailage 1
                          D-29473 Göhrde    (DE)


**Other Party:**          De Staat der Nederlanden
(Opponent 08)             Minister van Volksgezondheid, Welzijn en Sport
                          Parnassusplein 5
                          NL-2511VX Den Haag    (NL)

**Representative:**       Swinkels, Bart Willem
                          Nederlandsch Octrooibureau
                          P.O. Box 29720
                          NL-2502 LS The Hague    (NL)

**Decision under appeal:**     **Interlocutory decision of the Opposition**
**Division of the European Patent Office posted**
**19 September 2005 concerning maintenance of**
**European patent No. 0705902 in amended form.**

**Composition of the Board:**

**Chair:**         U. Kinkeldey
**Members:**       M. Wieser
                  D. Rogers
                  B. Claes
                  G. Weiss

## Summary of Facts and Submissions

I.     Appeals were lodged by the Patent Proprietor
       (Appellant I) and Opponent 01 (Appellant II) against
       the interlocutory decision of the Opposition Division
       dated 19 September 2005 according to which European
       patent No. 0 705 902 could be maintained in amended
       form on the basis of claims 1 to 3 of the auxiliary
       request before it (Articles 102(3) and 106(3) EPC). The
       patent has the title "17q-Linked breast and ovarian
       cancer susceptibility gene" and claims priority from
       eight US applications (P1 to P8), of which the second
       (P2) and the fifth (P5) were filed on 2 September 1994
       and 24 March 1995, respectively.

II.    Eight oppositions had been filed against the patent
       covering the grounds of Article 100(a) EPC in
       combination with Articles 52(2) and (4), 53(a), 54, 56
       and 57 EPC, and Article 100(b) and (c) EPC.

III.   The Opposition Division decided that the main request
       before it did not meet the requirements of
       Articles 123(2) and (3) and 84 EPC.

IV.    The Board expressed its preliminary opinion in a
       communication dated 27 February 2007.

V.     With letter dated 8 June 2007, the Board was informed
       that Opponent 7 had passed away.

VI.    Oral proceedings before the Board took place from 24 to
       27 September 2007.

Appellant I requested that the decision under appeal be set aside and that the patent be maintained on the basis of a main request (claims 1 - 29 filed with a letter dated 30 January 2006), or auxiliary request I (claims 1 - 14 filed with a letter dated 30 January 2006), or auxiliary request II (claims 1 - 32 filed on 25 September 2007 at the Oral Proceedings), or to dismiss the appeal of Appellant II (which corresponds to upholding the claims held allowable by the Opposition Division - hereafter referred to as "auxiliary request III"). Further, Appellant I requested to refer three questions to the Enlarged Board of Appeal.

Appellant II requested that the decision under appeal be set aside, that the patent in suit be revoked and to refer five questions to the Enlarged Board of Appeal.

Opponents 2 to 5, parties as of right, requested that the decision under appeal be set aside and that the patent be revoked.

Opponents 6 and 8, parties as of right, requested that the appeal of Appellant I be dismissed.

VII.   Claim 1 of the main request read as follows:

"An isolated nucleic acid which comprises a coding sequence for the human BRCA1 polypeptide, wherein said polypeptide
-      has 1863 amino acids,
-      has a molecular weight of 208 kilodaltons, and
-      comprises the amino acid sequence of SEQ ID NO: 82,

said coding sequence being comprised in a genomic DNA
which is obtainable by:

(a)   providing a human genomic library;
(b)   screening the genomic library using a probe
      selected from the group consisting of:
      (i)    the following DNA sequence:

       AG GAA AGT TCT GCT GTT TTT AGC AAA AGC GTC CAG
      AAA GGA GAG CTT AGC AGG AGT CCT AGC CCT TTC ACC
      CAT ACA CAT TTG GCT CAG GGT TAC CGA AGA GGG GCC
      AAG AAA TTA GAG TCC TCA GAA GAG AAC TTA TCT AGT
      GAG GAT GAA GAG CTT CCC TGC TTC CAA CAC TTG TTA
      TTT GGT AAA GTA AAC AAT ATA CCT TCT CAG TCT ACT
      AGG CAT AGC ACC GTT GCT ACC GAG TGT CTG TCT AAG
      AAC ACA GAG GAG AAT TTA TTA TCA TTG AAG AAT AGC
      TTA AAT GAC TCG A

      and
      (ii)   the DNA sequence of any one of SEQ ID NOs:
             35, 38, 41, 42, 47, 57, 62, 67, 72 and 81
      and
(c)   producing a genomic DNA comprising said coding
      sequence;

wherein said genomic DNA comprising said coding
sequence is more than 100 kb in length;
and wherein the first exon within said genomic DNA
immediately follows the nucleotide sequence
corresponding to SEQ ID 35; or

said coding sequence being comprised in a cDNA which is
obtainable by:
(aa) providing a cDNA library using human mRNA from

breast, thymus, testis or ovary;

(bb) screening the cDNA library using a probe having
the following DNA sequence:

```
 AG GAA AGT TCT GCT GTT TTT AGC AAA AGC GTC CAG
AAA GGA GAG CTT AGC AGG AGT CCT AGC CCT TTC ACC
CAT ACA CAT TTG GCT CAG GGT TAC CGA AGA GGG GCC
AAG AAA TTA GAG TCC TCA GAA GAG AAC TTA TCT AGT
GAG GAT GAA GAG CTT CCC TGC TTC CAA CAC TTG TTA
TTT GGT AAA GTA AAC AAT ATA CCT TCT CAG TCT ACT
AGG CAT AGC ACC GTT GCT ACC GAG TGT CTG TCT AAG
AAC ACA GAG GAG AAT TTA TTA TCA TTG AAG AAT AGC
TTA AAT GAC TCG A
```

and

(cc) producing a cDNA comprising said coding sequence;
wherein said coding sequence comprises the following
nucleotides sequence:

```
 AG GAA AGT TCT GCT GTT TTT AGC AAA AGC GTC CAG
AAA GGA GAG CTT AGC AGG AGT CCT AGC CCT TTC ACC
CAT ACA CAT TTG GCT CAG GGT TAC CGA AGA GGG GCC
AAG AAA TTA GAG TCC TCA GAA GAG AAC TTA TCT AGT
GAG GAT GAA GAG CTT CCC TGC TTC CAA CAC TTG TTA
TTT GGT AAA GTA AAC AAT ATA CCT TCT CAG TCT ACT
AGG CAT AGC ACC GTT GCT ACC GAG TGT CTG TCT AAG
AAC ACA GAG GAG AAT TTA TTA TCA TTG AAG AAT AGC
TTA AAT GAC TCG A
```

and

wherein upon hybridization of a Northern blot with a
fragment of said cDNA a single transcript of 7.8 kb is
identified in breast, thymus, testis and ovary tissue."

VIII. Claim 2 of auxiliary request I read as follows:

"A hybridization probe wherein the sequence of said probe comprises a portion of a coding sequence for a mutant BRCA1 polypeptide, which is

(i)   a DNA sequence comprising the nucleotide sequence set forth in SEQ ID NO: 1 from nucleotide 120 to nucleotide 5708 or an allelic variant thereof having one of the following mutations defined with reference to SEQ ID NO: 1:

(a)   T substituted for C at position 4056;

(b)   an extra C at nucleotide position 5385; and

(c)   G substituted for T at position 5443; or

(ii) a corresponding RNA,
said coding sequence portion including a mutation compared to the nucleotide sequence set forth in SEQ ID NO: 1 from nucleotide 120 to nucleotide 5708 as defined in any of (a) to (c),

with the proviso that said coding sequence portion does not comprise positions 1364, 1369, 1454, 1492, 1494, 1571, 1581, 2201, 2430, 2731, 3499, 4060, 4535, 4689 and 5609 of SEQ ID NO: 1."

IX.   Claims 1 and 2 of auxiliary request II, which are identical to claims 1 and 2 as granted, read as follows:

"1. An isolated nucleic acid which comprises a coding sequence for the BRCA1 polypeptide defined by the amino acid sequence set forth in SEQ ID NO:2, or an amino acid sequence with at least 95% identity to the amino acid sequence of SEQ ID NO:2.

2. An isolated nucleic acid as claimed in claim 1 which
is a DNA comprising the nucleotide sequence set forth
in SEQ ID NO:1 from nucleotide 120 to nucleotide 5708
or a corresponding RNA."

X.    The three claims of auxiliary request III read as
follows:

"1.    A nucleic acid probe wherein the nucleotide
       sequence of said probe comprises the following DNA
       sequence:

        AG GAA AGT TCT GCT GTT TTT AGC AAA AGC GTC CAG
       AAA GGA GAG CTT AGC AGG AGT CCT AGC CCT TTC ACC
       CAT ACA CAT TTG GCT CAG GGT TAC CGA AGA GGG GCC
       AAG AAA TTA GAG TCC TCA GAA GAG AAC TTA TCT AGT
       GAG GAT GAA GAG CTT CCC TGC TTC CAA CAC TTG TTA
       TTT GGT AAA GTA AAC AAT ATA CCT TCT CAG TCT ACT
       AGG CAT AGC ACC GTT GCT ACC GAG TGT CTG TCT AAG
       AAC ACA GAG GAG AAT TTA TTA TCA TTG AAG AAT AGC
       TTA AAT GAC TCG A

       or a DNA probe comprising a nucleotide sequence
       selected from the group consisting of SEQ ID NOs:
       35, 38, 41, 42, 47, 57, 62, 66, 67, 72 and 81."

"2.    A replicative cloning vector which comprises (a)
       an isolated DNA according to claim 1 and (b) a
       replicon operative in a host cell for said
       vector."

"3.    Host cells in vitro transformed with a vector as
       claimed in claim 2."

XI.    The following documents are mentioned in the present
       decision:

       D1:        Miki et al., Science (Oct. 1994) 266: 66-71

       D3:        Friedman et al., Nature Genetics (Dec. 1994)
                  8: 399-404

       D4:        Castilla et al., Nature Genetics (Dec. 1994)
                  8: 387-391

       D10:       Kelsell et al., Hum. Mol. Genet. (1993) 2:
                  1823-1828

       D11:       Albertsen et al., Nature Genetics (Aug.
                  1994) 7: 472-479

       D17:       Simard et al., Nature Genetics (Dec. 1994)
                  8: 392-398

       D22:       Smith et al., Genes Chrom. Cancer (1994) 10:
                  71-76

       D31:       Clone Genbank Accession L18209 information

       D52:       Goldgar et al., Am. J. Hum. Genet. (1993)
                  52: 743-748

       D88:       Simard et al., Hum. Mol. Genet. (1993) 2:
                  1193-1199

       D112:      Feunton et al., Am. J. Hum. Genet. (1993)
                  52: 736-742

D120:      Declaration Dr Shattuck

D122:      Cropp et al., Cancer Res. (1994) 54: 2548-
           2551

D125:      Positional Cloning of BRCA1

D128:      Amplimer UM44_

D129:      Couch et al., Genomics (1994) 24: 419-424

D136:      Declaration Dr Matthijs

D154:      Davies, K. and White, M.; Breakthrough -
           The race to find the Breast Cancer Gene,
           1995, Ed. John Wiley & Sons, Inc., New York

D159:      Personal Communication Couch

D160:      Amplimer UM44_ History

D164:      Documentation on "Human Genome Sequence
           Quality Standards",
           http://www.genome.gov/pfv.cfm?pageID
           =10000923

D165:      Schmutz et al., Nature (2004) 429: 346-368

D166:      Bermuda Standards, http://www.gene.ucl.ac.uk
           /hugo/bermuda2.htm

D172:      Declaration Dr Critchfield

D173:       Directive 98/44/EC of the European
            Parliament and of the Council of 6 July
            1998, OJ EPO 2/1999, 101

D174:       Judgment of the Court of Justice of the
            European Communities dated 9 October 2001;
            Case C-377/98

D175:       Opinion of Advocate General Jacobs delivered
            on 14 June 2001, Case C-377/98


XII.    The submissions by Appellant I, insofar as they are
        relevant to the present decision, can be summarized as
        follows:

        **Main request**

        *Amendments (Article 123(2) EPC)*

        The subject-matter of claim 1 was directly and
        unambiguously derivable from the application as filed.
        The skilled person reading the application would
        realize that the probes specified in claim 1 could be
        used for the screening of genomic or cDNA libraries. In
        fact any part of the BRCA1 sequence would be useful for
        this purpose. Using the product-by-process format did
        not change the nature of the invention, as the product
        was still the same as in the application as filed. In
        view of the major technical contribution of the
        invention, allowing a product-by-process definition
        would be a fair solution in order to provide the
        entitlement to the second priority (P2).

*Auxiliary request I*

*Amendments (Article 123(2) EPC)*

The disclaimers in claims 2, 3, 6, 8, 12 and 13 were
allowable under Article 123(2) EPC since they merely
served to restore the second priority. The disclaimers
had been drafted on the basis of a comparison between
the second priority document and the European
application, not on the basis of the prior art.
The list of situations in which disclaimers were held
allowable in decisions G 1/03 and G 2/03 (OJ EPO 2004,
413) was not exhaustive, and was therefore not in
contradiction to allowing the present disclaimers under
Article 123(2) EPC. Furthermore, the disclaimers did
not provide a technical contribution, since none of the
sequence positions disclaimed were involved in causing
breast cancer.

*Auxiliary request II*

The filing of a new request the claims of which were
almost identical to the claims as granted had to be
allowed even at a late stage of the proceedings.

As priority document (P2) disclosed the same invention
as defined in the claims of auxiliary request II, the
claims were entitled to claim priority from priority
document (P2). Although priority document (P2) referred
to SEQ ID NOs: 1 and 2 which deviated from SEQ ID NO's:
1 and 2 disclosed in the application as filed, it
disclosed in an enabling form the same diagnostic
target as defined in claim 1 of auxiliary request II.

If a parameter which was used to define a substance in
a claim was known to vary within margins of
experimental errors, the occurrence of variation in
such a parameter between a priority document and the
corresponding later application did not necessarily
abrogate entitlement to the claimed priority.

For further detailed submissions see "Reasons for the
Decision" (points (19) and following).

### *Auxiliary request III*

*Articles 123(2)(3), 84, 52(2), 53(a), 57, 83 and 87 to
89 EPC*

The amendments complied with Article 123(2) and (3)
EPC, and the claims were clear under Article 84 EPC.

The objections raised by Opponents under Article 52(2)
and Article 53(a) EPC lacked substantiation and should
be rejected by the Board.

The probes according to claim 1 could be used as
diagnostic tools which had to be considered as being an
industrial application in the sense of Article 57 and
Rule 23e(3) EPC.

The claimed subject-matter was disclosed in a manner
sufficiently clear and complete for it to be carried
out by a skilled person (Article 83 EPC).

The claimed subject-matter was furthermore directly and
unambiguously derivable from the second priority
document (Articles 87 to 89 EPC).

*Novelty (Article 54 EPC)*

Document D11 was not prejudicial to the novelty of the probe of claim 1. Firstly, it had not been sufficiently proven by document D136 that the first sequence mentioned in claim 1 was indeed present in YAC clone 22HE5, as correctly pointed out in the decision of the Opposition Division. Secondly, document D11 only disclosed a library of clones which could not destroy the novelty of the probe specified in claim 1.

*Inventive step (Article 56 EPC)*

In view of the uncertainties with respect to the chromosomal localisation of the BRCA1 gene at the second priority date, it was problematic to select a closest prior art document. The technical problem to be solved was the provision of probes for the BRCA1 gene to detect breast cancer. The positional cloning of the BRCA1 gene was very complex and involved many uncertainties, and there could not have been a reasonable expectation of success. During the cloning procedure, the inventors had to take a multitude of decisions many of which had the potential of leading to ultimate failure. Picking the right breast and ovarian cancer families (kindreds) was one of the crucial points that led to success. The solution to the technical problem as provided by the claimed subject-matter was thus not obvious over the prior art.

XIII.   The submissions by Appellant II and by the parties as of right, Opponents 2 to 8, insofar as they are relevant to the present decision, can be summarized as follows:

*Main request*

*Amendments (Article 123(2) EPC)*

The product-by-process definition in claim 1 was not
acceptable under Article 123(2) EPC, and the
combination of features mentioned in claim 1 was not
disclosed in the application as filed.

*Auxiliary request I*

*Amendments (Article 123(2) EPC)*

The disclaimers in claims 2, 3, 6, 8, 12 and 13 did not
comply with Article 123(2) EPC since they provided a
technical contribution to the claimed subject-matter.
Furthermore, the reasons for which Appellant I
attempted to restore the second priority by use of said
undisclosed disclaimers were to overcome a non-
accidental disclosure and/or an inventive step
objection. This was not acceptable in view of decisions
G 1/03 and G 2/03.

*Auxiliary request II*

The request, submitted at the oral proceedings before
the Board, should not be admitted into the proceedings
as being late filed. Should the Board admit the request
the case had to be remitted to the department of first
instance.

The claims of auxiliary request II could only enjoy
priority right from priority document (P5), being the
earliest of the eight priority documents disclosing SEQ

ID NO's: 1 and 2 corresponding exactly to SEQ ID NO's:
1 and 2 as disclosed in the application as filed.

## *Auxiliary request III*

*Amendments (Articles 123(2)(3) and 84 EPC)*

Claim 1 did not comply with Article 123(2) EPC since
the legend to Figure 7 on page 4, lines 30 to 32 of the
application (published version), which referred to "a
probe consisting of nucleotide positions 3631 to 3930
of BRCA1", did not indicate that the positions of the
numbering of SEQ ID NO: 1 were meant.

*Patentable inventions (Article 52(2)(a) EPC)*

The claimed subject-matter was not patentable under
Article 52(2)(a) EPC since the sequences of the probes
according to claim 1 occurred in nature and were thus a
discovery rather than an invention.

*Exceptions to patentability (Article 53(a) EPC)*

No proof had been provided by Appellant I showing that
previous informed consent to the commercial
exploitation of the invention by patents had been given
by the donors of the cells critical for the invention,
and that a benefit sharing agreement had been made.
Therefore, the claimed invention was unethical and
excluded from patentability in view of Article 53(a)
EPC. Furthermore, the consequences of the patenting of
the claimed invention had to be taken into account when
examining the patentability under Article 53(a) EPC.

For further detailed submissions see "Reasons for the
Decision" (points (46) and following).

*Industrial applicability (Article 57 EPC)*

The nucleotide probes according to claim 1 were useful
for research purposes only which could not be
considered as being an industrial application in the
sense required by Article 57 and Rule 23e(3) EPC.

*Sufficiency of disclosure (Article 83 EPC)*

Since the patent did not disclose a technical
application of the claimed subject-matter it did not
disclose the invention in a manner sufficiently clear
and complete for it to be carried out by a skilled
person as required by Article 83 EPC.

*Right to priority (Articles 87 to 89 EPC)*

The subject-matter of claim 1 was not entitled to the
second priority date, since there was no indication on
page 6, lines 24 to 28 of the second priority document
that by referring to "a probe consisting of nucleotide
positions 3575 to 3874 of BRCA1", the positions of the
numbering of SEQ ID NO: 1 were meant.

*Novelty (Article 54 EPC)*

The YAC clone 22HE5 mentioned in Figure 2 of document
D11 was prejudicial to the novelty of claim 1. Evidence
for this was provided in document D136. Claim 1
encompassed any nucleic acid probe comprising the
mentioned sequence, and thus lacked novelty over any

isolated and individualized section of DNA comprising
this sequence, such as YAC clone 22HE5.

*Inventive step (Article 56 EPC)*

The closest prior art was represented by document D11,
and the technical problem to be solved was the
identification and isolation of the BRCA1 gene.

Starting from document D11, the skilled person would
have had a high expectation of success that the BRCA1
gene could be identified and isolated merely by the
application of conventional positional cloning
techniques. Arriving at the claimed subject-matter was
obvious from document D11 in combination with common
general knowledge, or, alternatively, from document D11
in combination with either document D128 or document
D31.

The inventors had carried out the necessary
experimentation faster than others merely because they
had been able to put more money and manpower into the
project, but this did not justify the recognition of an
inventive step. Suitable kindreds were also available
to other scientific groups, and sooner or later one of
these groups would have been successful as well. Any
problems that might have been encountered in the course
of the project would have been overcome by the skilled
person using conventional means.

# Reasons for the Decision

1.    The appeals are admissible.

## *Main request*

*Amendments (Article 123(2) EPC)*

2.    Claim 1 is directed to a nucleic acid which comprises a coding sequence for the human BRCA1 polypeptide, whereby the claimed product is defined by features of the polypeptide as well as by features of a process of genomic DNA and cDNA library screening (product-by-process).

3.    Article 123(2) EPC requires that a European patent application or a European patent may not be amended in such a way that it contains subject-matter which extends beyond the content of the application as filed. In accordance with the established case law of the Boards of Appeal, the content of an application comprises the disclosure that is directly and unambiguously derivable from this application.

4.    The Board considers that in the case of a product-by-process definition, the process defined in a claim also has to be directly and unambiguously derivable from the application as filed in order for the claim to comply with Article 123(2) EPC. This has not been contested by Appellant I.

4.1   As concerns the process steps of screening a genomic or cDNA library, page 14, lines 13 to 15 of the application (published version) of the patent in suit

states that "cDNA or genomic libraries of various types
may be screened as natural sources of the nucleic acids
of the present invention", and lines 17 to 18 mention
that clones are "probed for the presence of desired
sequences". Further, it is stated in lines 19 to 20
that the "DNA sequences used in this invention will
usually comprise at least about five codons (15
nucleotides), more usually at least about 7-15 codons,
and most preferably, at least about 35 codons".

4.2     On page 19 of the application as published, under the
heading "Methods of Use: Nucleic Acid Diagnosis and
Diagnostic Kits" it is stated that "in order to detect
the presence of a BRCA1 allele predisposing an
individual to cancer, a biological sample such as blood
is prepared and analyzed for the presence or absence of
susceptibility alleles of BRCA1" (lines 3 to 4).
Further on the same page, PCR-based methods of target
amplification and of detection of target sequences
using nucleic acid probes are described. In lines 55 to
56 of the same page it is then stated that "[e]xamplary
probes are provided in Table 9 of this patent
application and additionally include the nucleic acid
probe corresponding to nucleotide positions 3631 to
3930 of SEQ ID NO:1". The latter probe ("Northern
probe") was also used for RNA hybridization (see page 4,
lines 30 to 34 and Figure 7) and its sequence is the
one stated in points (b)(i) and (bb) of claim 1. The
probes in Table 9 represent intron borders and include
the probes of SEQ ID NOs: 35, 38, 41, 42, 47, 57, 62,
67, 72 and 81 referred to in point (b)(ii) of claim 1.
However, there is no disclosure on page 19 of the
application as published of using these probes in the
screening of genomic or cDNA libraries.

4.3    Claim 13 of the application as published is directed to
       a "nucleic acid probe suitable for a use as claimed in
       claim 11", wherein the nucleotide sequence of said
       probe may comprise the DNA sequence of the "Northern
       probe" or a sequence set forth in Table 9. As claim 11
       is directed to an isolated DNA, not to a use, claim 13
       should apparently refer to claim 12, the latter being
       directed to a "[u]se of an isolated nucleic acid (...)
       as a hybridization probe **to detect in a sample** (i) a
       DNA (...)" (emphasis added by the Board). Again, there
       is no suggestion of using the specified probes in the
       screening of genomic or cDNA libraries.

4.4    Appellant I has argued that it did not matter
       technically for which purpose the probes were disclosed,
       as any probe could be taken for the screening of a
       genomic or cDNA library. However, the Board considers
       that it is the actual teaching of the application as
       filed which is relevant, and that, therefore, the
       general disclosure of screening a genomic or cDNA
       library with a probe defined as comprising "at least
       about five codons" (see page 14, lines 13 to 20) cannot
       be combined with the more specific disclosure of using
       the "Northern probe" or a probe as set forth in Table 9
       for **a different purpose**, namely the detection of DNA in
       a sample (page 19 and claim 13), without contravening
       Article 123(2) EPC.

4.5    Appellant I has further referred to Exhibits 1 to 20 as
       filed during the first instance proceedings with letter
       of 19 November 2004 as showing support for claim 1 of
       the main request in the application as filed. Exhibits
       7, 8 and 15 relating to the steps of library screening
       as mentioned in points (b) and (bb) of claim 1

suggested that because the Northern blot probe sequence and the intron border DNA sequences fall into the definition given on page 14, lines 19 to 20 of the application as published (see point 4.1 above), this would provide a direct and unambiguous disclosure of these probes for screening a genomic or cDNA library. The Board cannot follow this reasoning since the specific probes mentioned in claim 1, steps (b) and (bb), have not been disclosed for use in screening a genomic or cDNA library.

5.    The Board concludes that in claim 1, step (b), the screening of the genomic library using any one of the probes specified in points (i) and (ii), and step (bb), the screening of a cDNA library using a probe having the specified DNA sequence, are not directly and unambiguously derivable from the application as filed.

6.    Consequently, the subject-matter of claim 1 of the main request does not comply with Article 123(2) EPC.

***Auxiliary request I***

*Amendments (Article 123(2) EPC)*

7.    Claim 2 of auxiliary request I contains the disclaimer "with the proviso that said coding sequence portion does not comprise positions 1364, 1369, 1454, 1492, 1494, 1571, 1581, 2201, 2430, 2731, 3499, 4060, 4535, 4689 and 5609 of SEQ ID NO: 1". Claims 3, 6, 8, 12 and 13 contain similar disclaimers. Said disclaimers cannot be found in the application as filed.

8.    Appellant I has submitted that the nucleotide and amino
      acid sequences disclosed in SEQ ID NOs: 1 and 2 of the
      second priority document have turned out to contain
      sequencing errors, and that the correct sequences as
      stated in the patent in suit are only disclosed in the
      fifth priority document (see grounds of appeal dated
      30 January 2006, point 6.1.2.3). The disclaimers
      exclude those positions within SEQ ID NO: 1 by which
      this nucleotide sequence differs between the second
      priority document and the application as filed. The
      disclaimers have been incorporated into the claims in
      order to safeguard the second priority (see grounds of
      appeal, point 6.2.2.3).

9.    Decisions G 1/03 and G 2/03 (OJ EPO 2004, 413) of the
      Enlarged Board of Appeal (EBA) provide criteria for
      allowing under Article 123(2) EPC a disclaimer which is
      not disclosed in the application as filed. According to
      these decisions, a disclaimer may be allowable in order
      to restore novelty by delimiting a claim against the
      state of the art under Article 54(3) and (4) EPC and
      against an accidental anticipation under Article 54(2)
      EPC, but not against a non-accidental anticipation
      under Article 54(2) EPC; an anticipation is said to be
      accidental if it is so unrelated to and remote from the
      claimed invention that the person skilled in the art
      would never have taken it into consideration when
      making the invention. A disclaimer which is or becomes
      relevant for the assessment of inventive step or
      sufficiency of disclosure adds subject-matter contrary
      to Article 123(2) EPC.

10.   Appellant I has submitted that the sole reason for
      introducing the disclaimers was to validly claim the

second priority, not to establish novelty and inventive
step. The Board cannot follow this argumentation, since
the issue of the right to priority cannot be seen in
isolation from the effect it has on novelty and
inventive step by virtue of Article 89 EPC, according
to which the date of priority shall count as the date
of filing of the European patent application for the
purpose of Article 54(2) EPC. There is no provision in
the EPC, that in order to obtain a patent, a priority
has to be validly claimed. Therefore, the actual reason
why Appellant I aims at claiming the second priority by
the introduction of disclaimers has to be seen in prior
art published between the second and fifth priority
date, notably document D1. It is undisputed that
document D1 is not an accidental disclosure and would
become highly relevant for the evaluation of novelty
and/or inventive step of the claimed subject-matter
(see point (35) below). Hence, the Board considers that
the disclaimers are in fact necessary to either restore
novelty over a non-accidental disclosure or to
establish an inventive step. These are, however, the
areas excluded from the allowability under
Article 123(2) EPC by the decisions of the EBA.

11.    Consequently, the subject-matter of the claims of
       auxiliary request I does not comply with Article 123(2)
       EPC.

**_Auxiliary request II_**

_Admission into the proceedings_

12.    Claims 1 and 2 of auxiliary request II are identical to
       claims 1 and 2 as granted (see section (IX) above).

13.     Auxiliary request II, which was not before the
        Opposition Division, was filed by Appellant I on the
        second day of the oral proceedings. Appellant II and
        Opponents 2 to 6 and 8 objected to its late
        introduction into the proceedings. Furthermore, in the
        case the Board should allow auxiliary request II into
        the proceedings, they requested that the case be
        remitted to the department of first instance for
        further consideration according to Article 111(1) EPC.

14.     According to the case law of the Boards of Appeal, a
        Patent Proprietor during opposition and
        opposition/appeal proceedings is entitled to amend a
        request already made; in particular he can reinstate
        the patent in the form in which it was granted,
        provided this does not constitute an abuse of the
        procedure. In requesting that the patent be maintained
        in a limited form the Patent Proprietor merely tries to
        delimit the patent to meet objections expressed by the
        EPO or the opponents. However, the Patent Proprietor
        does not, by virtue of such limitation, irrevocably
        abandon subject-matter covered by the patent as granted
        but not by the request as thus limited (cf decision
        T 123/85, OJ EPO 1989, 336).

15.     Appellant I has filed auxiliary request II at the oral
        proceedings, after having been informed by the Board
        that the claims of his main request and of auxiliary
        request I contravened the requirements of Article 123(2)
        EPC. Reinstatement of the patent in a form which almost
        precisely corresponds to the form in which it was
        granted is considered to be a straightforward response

to the course of the oral proceedings and does not
amount to an abuse of the procedure.

16.     In general, to expedite the proceedings, parties to
        appeal proceedings are supposed to submit all facts,
        evidence and requests at the outset, or - if this is
        not possible - as soon as they can. They should not be
        filed piecemeal, this principle being enshrined in
        Articles 10a and 10b of the Rules of Procedure of the
        Boards of Appeal.

17.     According to Article 114(2) EPC the European Patent
        Office may disregard facts or evidence which are not
        submitted in due time by the parties concerned. Thus,
        the Board may exercise its discretion when deciding on
        whether to admit late submissions.

        The decision to admit a new request into the
        proceedings should take into account, amongst other
        factors, a general interest in the appeal proceedings
        being conducted in an effective manner while still
        being brought to a close within a reasonable time (cf
        decision T 633/97 of 19 July 2000, point (2) of the
        reasons for the decision).

        The Board takes the view that the new auxiliary request
        II filed by Appellant I in response to the decisions
        announced by the Chair in the oral proceedings under
        Article 123(2) EPC with regard to his main request and
        auxiliary request I, whereby this auxiliary request II
        almost entirely corresponds to the claims as granted,
        does not raise additional technical or legal issues
        that neither the Board nor the other parties could have
        been expected to deal with. In fact, the question

whether or not the claims of auxiliary request II are
entitled to a certain priority date, which is the core
issue to be decided in the light of the disclosure in
document D1 published between the third and fourth
claimed priority dates of the patent in suit (see
points (19) to (34) below), was known to the parties to
be of outstanding importance during the opposition
procedure and had already been extensively discussed by
all parties involved in the context of the main request.

Therefore, in order to conduct the appeal proceedings
in an effective and fair manner, the Board exercised
its discretion and admitted Appellant I's auxiliary
request II into the proceedings.

18.   Remittal to the department of first instance lies
within the discretion of the Board (cf decision
T 249/93 of 27 May 1998, point (2) of the reasons for
the decision). It is acknowledged that there is no
absolute right for a party to have every aspect of a
case examined in two instances (see for example
decision T 133/87 of 23 June 1988). Other criteria, e.g.
the general interest that proceedings are brought to a
close within an appropriate period of time, have also
to be taken into account.

Taking into consideration that the parties already had
the opportunity to argue the issue of priority right
(Articles 87 to 89 EPC) of the subject-matter of the
claims of the patent as granted in the opposition
procedure, the Board, using its discretion, decided not
to remit the case to the department of first instance.

*Priority right (Articles 87 to 89 EPC)*

19.     Document D1 is a scientific publication dated
        7 October 1994, thus published between the filing date
        of the third priority document (P3)(US 308104;
        16 September 1994) and the fourth priority document
        (P4)(US 348824; 29 November 1994) of the patent in suit.
        Document D1 is authored by a group of 45 persons, among
        them the 10 inventors of the patent. It is undisputed
        that the disclosure in this document, if it belonged to
        the state of the art under Article 54(2) EPC, would be
        highly relevant for the issues of novelty (Article 54
        EPC) and/or inventive step (Article 56 EPC) of the
        subject-matter of Appellant I's auxiliary request II.

        Document D1 would not belong to the state of the art
        under Article 54(2) EPC, if the claims of auxiliary
        request II were entitled to claim priority from US
        308104 (P3), the third priority document.

        The third priority document (P3) discloses on pages 94
        to 98 SEQ ID NO: 1 showing the nucleotide sequence
        coding for BRCA1 and on pages 98 to 103 SEQ ID NO: 2
        showing the amino acid sequence of the protein. SEQ ID
        NOs: 1 and 2 are identically disclosed on pages 90 to
        94 and 94 to 99 of the second priority document (P2),
        US 300266; 2 September 1994. Therefore, when comparing
        the disclosure in the application as originally filed
        underlying the patent in suit, with the disclosure in
        the documents from which priority is claimed, the Board
        will refer to the second priority document (P2), which
        is the earliest priority document from which these
        sequences can be derived.

20.     The BRCA1 coding sequence disclosed in SEQ ID NO: 1 of
        priority document (P2) deviates from the BRCA1 coding
        sequence disclosed in the application as filed by 15
        nucleotide residues. Nine of these deviations lead to
        an amino acid exchange in SEQ ID NO: 2 while six are
        so-called "silent deviations". The earliest priority
        document disclosing the nucleotide sequence coding for
        BRCA1 and the amino acid sequence of the protein which
        are exactly identical to SEQ ID NOs: 1 and 2 disclosed
        on pages 58 to 67 and pages 67 to 73 of the application
        as filed is the fifth priority document (P5) (see
        pages 114 to 123 and 123 to 129 of US 409305; 24 March
        1995).

21.     The EBA in the Opinion G 2/98 (OJ EPO 2001, 413) came
        to the conclusion that the requirement for claiming
        priority in respect of "the same invention", referred
        to in Article 87(1) EPC, means that priority of a
        previous application in respect of a claim in a
        European patent application in accordance with
        Article 88 EPC is to be acknowledged only if the
        skilled person can derive the subject-matter of the
        claim directly and unambiguously, using common general
        knowledge, from the previous application as a whole.

        When examining whether a narrow or strict
        interpretation of the concept of "the same invention"
        referred to in Article 87(1) EPC should be applied, the
        EBA considered that a narrow and strict interpretation
        of the concept of "the same invention", equating it
        with the concept of "the same subject-matter" referred
        to in Article 87(4) EPC, was entirely consistent with
        Articles 4F and 4H of the Paris Convention (points (2)
        to (5) of the reasons for the Opinion). This followed

from the very aim and object of the right of priority:
the protection from novelty destroying disclosures
during a period of twelve months from the date of
filing of the first application is satisfied only in
case of the filing of a subsequent application relating
to the same invention.

In point (8.3) of the reasons the EBA considered an
issue that had been raised in decision T 73/88 (OJ EPO
1992, 557), which, in order to assess whether a claim
in a later European patent application was in respect
of the same invention as the priority application
pursuant to Article 87(1) EPC, made a distinction
between technical features which are related to the
function and effect of the invention and technical
features which are not. This approach was said to be
problematic because there are no suitable and clear,
objective criteria for making such a distinction; it
could thus give rise to arbitrariness. Different
deciding bodies might thus arrive at different results
when assessing these facts and circumstances.
Furthermore, as pointed out in the referral of the
President of the EPO underlying the Opinion, it had to
be borne in mind that the assessment by these different
deciding bodies of whether or not certain technical
features were related to the function and effect of the
claimed invention might completely change in the course
of proceedings. This was the case, in particular, if
new prior art was to be considered, with the possible
consequence that the validity of a hitherto
acknowledged right of priority could be put in jeopardy.
Such dependence would, however, be at variance with the
requirement of legal certainty.

Finally in point (9) of the reasons the EBA stated:

"... an extensive or broad interpretation of the
concept of "the same invention" referred to in
Article 87(1) EPC, making a distinction between
technical features which are related to the function
and effect of the invention and technical features
which are not, with the possible consequence that a
claimed invention is considered to remain the same even
though a feature is modified or deleted, or a further
feature is added (cf point 8.3 supra), is inappropriate
and prejudicial to a proper exercise of priority rights.
Rather, according to that analysis, a narrow or strict
interpretation of the concept of "the same invention",
equating it to the concept of "the same subject-matter"
referred to in Article 87(4) EPC (cf point (2) supra),
is necessary to ensure a proper exercise of priority
rights ...".

22.     In application of the Opinion G 2/98 (supra) of the EBA,
        the Boards of Appeal, in a number of decisions, have
        defined the concept of "the same invention" in the
        field of biotechnology and especially in connection
        with inventions referring to nucleotide sequences.

        Decision T 351/01 of 2 July 2003 was concerned with a
        patent referring to a polynucleotide encoding a
        biologically active tissue factor protein (TFP). The
        polynucleotide was defined in claim 1 by a reference to
        Figure 2. The figure showed a polynucleotide comprising
        the coding sequence for TFP, which was about 900
        nucleotides long (and the deduced TFP amino acid
        sequence) and in addition non-coding portions at both
        ends of the coding region.

The patent claimed priority from priority documents I
and II which disclosed a polynucleotide having the same
function, namely coding for TFP, but whose structure
differed from that of the polynucleotide of claim 1 by
five bases all found outside of the coding region. The
Board concluded, that, in the light of the EBA's
Opinion G 2/98 (supra), the Respondents' (Patent
Proprietor's) arguments to the avail that the claimed
invention was the TFP coding sequence which was the
same in all the documents and that the differences
observed in the non-coding portion were irrelevant,
were not convincing. Claim 1 was directed to a
polynucleotide as defined in Figure 2, i.e. to a
polynucleotide which had the sequence from the first to
the last nucleotide depicted in the figure. This
sequence like the one reported in Figure 2 of the first
and second priority documents encoded a TFP. However,
it was structurally different. Thus, it could not be
seen as the same subject-matter. For this reason, it
was decided that claim 1 did not enjoy priority rights
from the filing dates of either of priority documents I
or II.

23.    Decisions T 70/05 of 7 February 2006 and T 30/02 of
       9 October 2006 both were concerned with the entitlement
       of a prior art document to the claimed priority date.

       In decision T 70/05 (supra) the amino acid sequence of
       a death-domain-containing receptor disclosed in the
       priority document and in the application as filed
       differed at nine of 181 positions. In accordance with
       the "narrow or strict interpretation" laid down in
       Opinion G 2/98 (supra) the Board decided that claim 1

referring to the receptor defined by specific full-
length sequence ("amino acid residues 1 to 181 of SEQ
ID NO: 1") could not enjoy the claimed priority right.
In point (20) of the reasons for the decision the Board
stated:

"It is also the board's opinion that, based on a
disclosure of a "wrong" nucleotide or amino acid
sequence in the priority document - independently of
the reasons for the possible mistakes, either arising
from unintended sequencing or typing errors or else
arising from a conscious choice to file an application
at a very early stage and thus, comprising doubtful or
incomplete data - it would not be fair to acquire a
right over a broad area from which, only later on, the
"correct" sequence might be selected and disclosed in a
patent application. The possible advantages conferred
by such a practice would only encourage and, in the
long term, lead to a mischievous use of priority
rights."

24.    In decision T 30/02 a novelty attack was based on prior
       art document D16, which was only comprised in the state
       of the art if it enjoyed priority from document D15.
       Document D16 disclosed a recombinant DNA sequence
       encoding a xylanase characterised by a partial
       nucleotide sequence (SEQ ID NO: 13) which differed from
       SEQ ID NO: 7 of claim 1 of the patent in suit only in
       so far as it included two additional guanine residues
       at its 3' end. A DNA molecule comprising the sequence
       defined in SEQ ID NO. 13 of document D16 could be
       expected to hybridize to a DNA molecule comprising the
       sequence of SEQ ID NO: 7, thus rendered the patent in
       suit not novel.