Dockets.Justia.com

# EXHIBIT G

However, the earlier application, document D15, did not
contain SEQ ID NO: 13 of document D16 but only a
Figure 9 showing a partial DNA sequence which was
identical to SEQ ID NO: 13 of document D16 except for
that it lacked the two guanine residues at the 3' end.

When answering the question whether or not the skilled
person may have recognized the DNA of SEQ ID NO. 13 and
of Figure 9 of document D15 as representing the "same
subject-matter" and, thus, the "same invention" within
the meaning of Article 87 EPC, as required in the
Opinion G 2/98 (supra), the Board decided that the
presence of two additional guanine residues in SEQ ID
NO: 13 resulted in a different molecule that was not
directly and unambiguously derivable from the earlier
application, so that the priority right was not validly
claimed.

25.    Decision T 30/02 refers in point (15) of the reasons to
       decision T 923/92 (OJ EPO 1996, 564).

       In this earlier decision the Board decided that a claim
       referring to a process comprising the preparation of a
       protein which was defined by its function and by an
       amino acid sequence 1 to 527 as depicted in Figure 5,
       did not enjoy priority from documents (P1) and (P2)
       which contained a Figure 5 that differed from Figure 5
       of the patent in suit in respect of three amino acid
       positions 175, 178 and 191.

       In point (16) of the decision the Board stated, that
       the primary amino acid sequence of a protein (or the
       nucleotide sequence of a DNA) constituted a true

technical feature and relying on a given sequence
rather than on another one for the definition of the
subject-matter of an invention in a claim made a
critical difference.

In point (13), the Board commented on the relevance of
decision T 65/92 (this decision is relied upon by the
Appellant I in the present case in order to
substantiate his line of argumentation (see point (28)
below)) in the following way:

"In decision T 65/92 (supra), the board decided that a
difference in the reported upper limit of the molecular
weight of the glycosylated form of a polypeptide
between the priority document and the European patent
application (all other measured parameters being
identical) did not reflect a true structural difference
between the products of the two applications,
especially in view of the fact that the molecular
weight is able to be determined only approximately.
Contrary to that, in the present case, the primary
structure of human t-PA is not a parameter which is
determined approximately, unless one relies on a
general formula, which is not the case here."

26.    The present Board endorses the decisions discussed in
       points (22) to (25) above, taking into account the
       technical situation underlying each individual case.

       It has to be decided whether or not the specific
       technical situation in the present case requires the
       Board to develop, as Appellant I put it, "a more
       pragmatic approach" with regard to the issue of

priority rights concerning the concept of "the same invention".

27.     Indeed, Appellant I, in the written procedure and during oral proceedings, submitted various arguments why the Board in the present case should not follow the gist of the decisions discussed in points (22) to (25) above, but should come to the conclusion that the BRCA1 coding sequence disclosed in the application as filed enjoys priority from priority document (P2), although it deviates from the BRCA1 coding sequence disclosed in priority document (P2) by 15 nucleotide residues.

28.     Appellant I provided calculations, showing that the 5592 nucleotides (including stop codon) of the coding sequences of BRCA1 according to priority document (P2) and the application as filed shared a sequence identity of 99,73%. He argued that "silent mutations" would not generally be expected to disrupt protein function, so that the actually relevant sequence identity referred to 9 deviations out of 5592 nucleotides, i.e. 99,84%.

        Appellant I took the view, that, if parameters (here: the nucleic acid sequence) which are used to define a substance (here: a nucleic acid) in a claim are known to vary within margins of commonly encountered experimental errors, the occurrence of variation in such a parameter between a disclosure in a priority document and the corresponding later application did not necessarily abrogate entitlement to the claimed priority. Appellant I referred in this respect to decision T 65/92 of 13 June 1993, wherein the Board acknowledged the entitlement to the claimed priority for a claim referring to a protein defined by reference

to its molecular weight, although the molecular weight
ranges in the priority document and in the claim under
consideration were not identical. The difference in
molecular weight was considered to fall within the
experimental error of the method for determination and
was considered to have no influence on the fact that
the priority document and the patent application
related in substance to the same subject-matter. A
similar approach had been taken in decision T 1147/98
of 14 July 2000.

Appellant I argued, that DNA sequencing was a measuring
method which regularly produced experimental errors and
was unable to produce 100% accurate data. This was
acknowledged for example in documents D164 to D166,
wherein it was stated that, although the sequence
accuracy of so-called "finished sequences" should be no
less than 99,99%, also preliminary results of
sequencing projects were very useful, so that such
"working drafts" having sequence accuracy between 90
and 99% should also be published. Therefore, as DNA
sequencing had a certain margin of experimental error
this should be taken into account when considering the
validity of a priority claim directed to subject-matter
referring to a DNA sequence. Legal certainty for third
parties, an issue relied upon by Appellant II, was
considered to be a function of the technology it
referred to and the need for it could not be higher
than experimental certainty.

The skilled person was aware of the possibility of
sequencing errors and would have realized that the
BRCA1 coding sequence of priority document (P2),
containing two ambiguities ("N" at positions 1571 and

4535), was a preliminary version from which he/she
would have been able to inevitably arrive at the
correct sequence by using routine methods, like PCR,
library screening, or sub-cloning.

As it was clear that a skilled person would have
interpreted priority document (P2) and the application
as filed as relating in substance to the same BRCA1
coding sequence, the sequence deviations did not
negatively affect entitlement to the claimed priority
date.

29.    The argument, that a claim which explicitly refers to a
       **DNA sequence comprising a coding sequence for a
       specific polypeptide** should be entitled to claim
       priority from an earlier application disclosing a DNA
       sequence deviating from the claimed one within the
       margin of error of the used sequencing method, is not
       compatible with the EBA's conclusion in Opinion G 2/98
       (supra) that the requirement for claiming priority of
       "the same invention", referred to in Article 87(1) EPC,
       means that priority of a previous application in
       respect of a claim in a European patent application in
       accordance with Article 88 EPC is to be acknowledged
       only if the skilled person can derive the subject-
       matter of the claim directly and unambiguously, using
       common general knowledge, from the previous application
       as a whole.

       Indeed, also decision T 70/05 (supra) has applied the
       principles set out in the Opinion of the EBA G 2/98
       (supra), and held that no priority right can be claimed
       from an earlier application disclosing an amino acid or
       nucleotide sequence which differs from the sequence in

a later application only by unintended sequencing or
typing errors.

Furthermore, with regard to Appellant I's reflections
on the interrelation between legal certainty and
experimental certainty, the Board considers that the
acknowledgement of an "allowable" margin of error for a
specific detection method would be open for
interpretation and would lead to ambiguity and
vagueness.

30.    Appellant I argued that the nucleic acid of claim 1 was
a tool for diagnosis of predisposition to breast or
ovarian cancer. In order to assess whether the claims
were entitled to claim priority from priority document
(P2), it had to be established whether priority
document (P2) in this respect disclosed the same
invention as defined in the claims of auxiliary request
II. Thus, it had to be decided whether priority
document (P2), despite its reference to the deviated
amino acid sequence of SEQ ID NO: 2, disclosed in an
enabling form the same diagnostic tool as defined in
claim 1 of auxiliary request II.

The technical problem underlying the patent in suit was
the provision of the isolated BRCA1 gene as a tool to
diagnose a predisposition to breast or ovarian cancer.
The sequence deviations between priority document (P2)
and the application as filed were irrelevant for
solving this problem since in more than 180.000 tests
carried out in the past twelve years there had never
been allocated any relevance for the diagnosis of
breast or ovarian cancer predisposition. Moreover, as
soon as the inventors had published the BRCA1 coding

sequence in October 1994 in document D1, which sequence
corresponds to the "deviating" sequence disclosed in
priority document (P2), other scientists, using this
sequence, were able to provide accurate detection of
BRCA1 mutations and diagnosis of predisposition to
breast and ovarian cancer. This was evident from the
disclosure in documents D3, D4 and D17, all published
before the present inventors revised the BRCA1 coding
sequence to be identical to the one disclosed in the
application as filed.

31.    The Board emphasizes again that claims 1 and 2 refer to
a DNA sequence comprising a coding sequence for a
specific polypeptide.

To adopt the approach, that a decision on whether or
not a claim to a DNA sequence in respect of "the same
invention" as a priority document disclosing a
deviating DNA sequence, can only be taken after it has
been decided whether the deviations have an effect on
the function of the claimed DNA sequence (here: as a
diagnostic target or tool), is not compatible with the
Opinion G 2/98 (supra) of the EBA, which stated in
point (9) of the reasons for the decision that, making
a distinction between technical features which are
related to the function and effect of the invention and
technical features which are not, with the possible
consequence that a claimed invention is considered to
remain the same even though a feature is modified or
deleted, or a further feature is added, is
inappropriate and prejudicial to a proper exercise of
priority rights.

The Board considers, that a narrow interpretation of
the concept of "the same invention" equating it with
the concept of "the same subject-matter", as developed
by the EBA, is the correct approach to take. Thus, the
Board considers, that the DNA sequence disclosed in SEQ
ID NO: 1 and the amino acid sequence deduced therefrom
disclosed in SEQ ID NO:2 of priority document (P2) do
not refer to "the same invention" as the DNA sequence
and the amino acid sequence disclosed in SEQ ID NOs: 1
and 2 of the application as filed.

32.    Appellant I argued that the respective technical
       situation in the decisions cited in points (22) to (25)
       above (i.e. decision T 923/93, T 351/01, T 30/02 and
       T 70/05) was fundamentally different from the situation
       underlying the patent in suit.

       Decision T 923/93 (supra) only referred to deviations
       in the amino acid sequence of a protein having a
       defined biological function. In the case underlying
       decision T 30/02 (supra) two additional guanine
       residues resulted in the encoded xylanase being
       structurally different. No evidence had been provided
       that this structural difference did not cause a
       functional difference. Decision T 70/05 (supra) was
       concerned with a case which contained no information
       concerning the effect of sequence deviations between a
       prior art document and its priority document. Finally
       in case T 351/01 (supra) the Board was confronted with
       deviations between a polynucleotide sequence in the
       patent and in the priority documents, wherein said
       deviations were in the non-coding part. However in the
       case underlying decision T 351/01 (supra), as well as
       in all other cases, the parties had not put forward

arguments about the origin and the lack of relevance of
the deviations.

Thus, the present case differed from all these cases in
so far as Appellant I had provided arguments that the
deviations were within the margin of error of the
sequencing method and that said deviations had no
effect on the successful use of the DNA sequence in
diagnosis of cancer in 180.000 cases.

33.    The Board repeats that the Opinion of the EBA G 2/98
       (supra) held, that an approach which makes a
       distinction between technical features which are
       related to the function and effect of an invention and
       technical features which are not is problematic, can
       give rise to arbitrariness and is therefore
       inappropriate and prejudicial to a proper exercise of
       priority rights.

       This principle has been followed in decisions
       concerning the field of DNA technology (see points (22)
       to (25) above). In decision T 351/01 (supra) the Board
       denied the right to priority in a case where the
       sequence deviations between the priority document and
       the patent were situated in the non-coding region, thus
       not having any effect on the sequence and thus function
       of the encoded protein. In decision T 70/05 (supra) it
       was explicitly stated, that no priority right could be
       claimed from an earlier application disclosing an amino
       acid or nucleotide sequence which differs from the
       sequence in a later application only by unintended
       sequencing or typing errors.

The submission of arguments referring to this issue,
which according to Appellant I distinguishes the
present case from the cases discussed above, is not
automatically considered as proof that the Opinion G
2/98 and the case law of the Boards of appeal applying
it are based on an incorrect interpretation of the law.

34.     Furthermore, the Board observes that the case law of
        the Boards of Appeal with regard to the entitlement to
        priority of a claim referring to a nucleotide or amino
        acid sequence is uniform and definite. The arguments
        presented by Appellant I, therefore, cannot convince
        the Board that there is a special situation involved in
        the underlying case which could justify a deviation
        from this case law. Accordingly, the Board arrives at
        the decision that the subject-matter of the claims of
        Appellant I's auxiliary request II is only entitled to
        claim priority from the fifth priority document (P5),
        (US 409305; 24 March 1995).

*Novelty (Article 54 EPC)*

35.     As a consequence of the above decision on right to
        priority document D1 belongs to the state of the art
        under Article 54(2) EPC.

        At the oral proceedings, Appellant I stated that
        document D1 was novelty destroying for the subject-
        matter of claim 1 of auxiliary request II.

        In view of this statement the Board sees no reason to
        further examine the claims of this request.

*Referral of questions to the EBA (Article 112(1)(a) EPC)*

36.    Appellant I requested to refer the following questions
       to the EBA according to Article 112(1)(a) EPC:

       "(1) If a priority document and a European patent
       application as filed concern the same physical entity
       but describe it in deviating form relying on the same
       physical characterisation method, can a claim to the
       physical entity enjoy priority under Article 87 EPC
       since it relates to the same invention according to G
       2/98, when said descriptions only deviate within the
       margin of error of the physical characterization method
       employed at the time when the physical entity was
       characterized?

       (2) More precisely, if a claim defines an invention by
       reference to a nucleotide sequence (or an amino acid
       sequence translated therefrom) does this subject-matter
       enjoy priority under Article 87 EPC as interpreted by G
       2/98 from a disclosure in a priority document of a
       nucleotide sequence (or amino acid sequence translated
       therefrom) differing to an extent which is within the
       margin of error of the sequencing method employed at
       the time the nucleotide sequence was determined,
       provided that there is no reasonable doubt with regard
       to the physical identity of the molecule described in
       the priority document and referred to in the claim
       under consideration?

       (3) If the answers to questions 1 and 2 are no, are the
       answers any different if it has been established that
       the deviations are technically irrelevant for the use
       of the invention in normal practice?"

37.     Article 112(1)(a) EPC stipulates that the Board of
        Appeal, following a request from a party to the appeal,
        shall refer any question to the EBA if it considers
        that a decision is required in order to ensure uniform
        application of the law, or if an important point of law
        arises.

38.     The questions proposed by Appellant I do not relate to
        a uniform application of the law, as this Board does
        not take a view of the law which would deviate from
        earlier cases (see points (22) to (25) above).

39.     The second alternative according to Article 112(1)(a)
        EPC concerns the possibility of questions to be
        referred to the EBA in case there exists an important
        point of law.

        Question (1) as formulated by Appellant I relies on the
        hypothesis that the "**same physical entity**" described in
        a priority document and in a European patent
        application in deviating form, relying on the same
        method of characterization, relates to "**the same
        invention according to G 2/98**", when said deviating
        description only results from the margin of error of
        the physical characterization method. Based on this
        assumption it is asked whether a claim to the physical
        entity in the European patent application can validly
        claim priority from the priority document.

        This question, in a more precise form, is repeated in
        question (2), where the answer is made dependent on the
        further hypothetical provision "**... that there is no
        reasonable doubt with regard to the physical identity**

**of the molecule described in the priority document and referred to in the claim under consideration."**

In question (3) it is asked whether the answers to questions (1) and (2) depend on whether or not the deviations are technically relevant, which in the present case means, whether or not the deviations have an influence on the ability of BRCA1 to be used as a diagnostic tool.

40.    The EBA in its Opinion G 2/98 (supra) has already decided that a narrow and strict interpretation of the concept of "the same invention" is to be applied, equating it with the concept of "the same subject-matter" referred to in Article 87(4) EPC. The EBA in its Opinion did not provide any basis for speculation that this narrow interpretation should, in a specific technical field, be replaced by an approach which takes into consideration possibly unintended errors resulting from specific physical characterization methods. Moreover the EBA has stated that a distinction between technical features which are related to the function and effect of the invention and technical features which are not is problematic and has to be avoided.

41.    Questions that are based on hypothetical considerations are not suitable for a referral (cf decision T 118/89 of 19 September 1990). Furthermore, no referral based on questions already decided by the EBA can be permitted (cf decision T 82/93, OJ EPO 1996, 274).

In view of the above, Appellant I's request for referral of questions to the EBA is refused.

**_Auxiliary request III (Claims as maintained by the Opposition Division)_**

_Amendments (Articles 123(2)(3) and 84 EPC)_

42.    The Board considers that the probe with the nucleotide sequence specified in claim 1 is directly and unambiguously derivable from the application as filed, particularly from page 4, lines 31 and 32 of the published version. The skilled person would understand this passage as referring to the numbering of the sequence presented in SEQ ID NO: 1, particularly in view of page 13, lines 50 to 51 stating that the "coding sequence for a BRCA1 polypeptide is shown in SEQ ID NO: 1", and claim 13 of the application as filed. The sequences of SEQ ID NOs: 35, 38, 41, 42, 47, 57, 62, 67, 72 and 81 are directly and unambiguously derivable from Table 9 on pages 44 and 45 of the application as published.

Claims 1 to 3, therefore, comply with Article 123(2) EPC.

As the subject-matter of claims 1 to 3 has been restricted in comparison to that of the claims as granted, the requirements of Article 123(3) EPC are also met.

The claims are clear and supported by the description as required by Article 84 EPC.

*Patentable inventions (Article 52(2)(a) EPC)*

43.    It has been submitted by the Opponents that the
       sequences of the probes according to claim 1 occur in
       nature and are therefore a discovery rather than an
       invention. In view of Article 52(2) EPC, said probes
       were thus not patentable. During the oral proceedings,
       this point was not further pursued by any of the
       Opponents.

44.    According to the case law of the Boards of Appeal (see
       decision T 272/95 of 23 October 2002), Article 52(2)(a)
       EPC is to be interpreted in accordance with the
       implementing Rule 23e(2) EPC which states:

       "(2) An element isolated from the human body or
       otherwise produced by means of a technical process
       including the sequence or partial sequence of a gene
       may constitute a patentable invention, even if the
       structure of that element is identical to that of a
       natural element".

45.    Claims 1 to 3 relate to nucleic acid **probes** comprising
       partial DNA sequences of the human BRCA1 gene, which
       are described in the patent in suit as having been
       obtained by technical processes (see especially page 5,
       paragraph [0024], and Table 9). These probes are thus
       isolated elements of the human body as defined in
       Rule 23e(2) EPC and thus patentable subject-matter.
       Accordingly, the subject-matter of claims 1 to 3 does
       not fall within the category of inventions which may
       not be patentable as being discoveries (Article 52(2)(a)
       EPC).

*Exceptions to patentability (Article 53(a) EPC)*

46.    Appellant II and Opponent 02 presented different lines
       of argumentation why the claimed subject-matter was
       excluded from patentability under Article 53(a) EPC.

47.    Appellant II submitted that no proof had been provided
       by Appellant I that the donors of the cells that had
       been critical to identify the BRCA1 gene had given a
       previous informed consent to the use of said cells. In
       the opinion of Appellant II, such previous informed
       consent would have had to include an explicit consent
       to the commercial exploitation of the research results
       by patents as well as a benefit sharing agreement, in
       particular with respect to members of kindreds 2082 and
       2080, the cell donations of which had been essential in
       arriving at the claimed invention. In the absence of
       such proof, it had to be assumed that the initial
       obtaining of these research results involved severe
       ethical violations, and thus a violation of "ordre
       public" or morality as referred to in Article 53(a) EPC.

48.    The Board observes that the EPC contains no provision
       establishing a requirement for applicants to submit
       evidence of a previous informed consent or a benefit
       sharing agreement. According to Rule 23b(1) EPC, the
       Directive 98/44/EC on the Legal Protection of
       Biotechnological Inventions (document D173; hereafter
       referred to as "the Directive") shall be used as a
       supplementary means of interpretation of the relevant
       provisions of the Convention and of Chapter VI
       ("Biotechnological inventions") of Part II of the
       Implementing Regulations. Recital (26) of the Directive
       states:

"Whereas if an invention is based on biological
material of human origin or if it uses such material,
where a patent application is filed, the person from
whose body the material is taken must have had an
opportunity of expressing free and informed consent
thereto, **in accordance with national law**" (emphasis
added by the Board).

49.     The legislator has thus not provided for a procedure of
        verifying the informed consent in the framework of the
        grant of biotechnological patents under the EPC.

50.     The Court of Justice of the European Communities in the
        judgment in case C-377/98 dated 9 October 2001
        concerning the application for annulment of the
        Directive by the Kingdom of the Netherlands, supported
        by Italy and Norway (document D174) has dealt with a
        similar argument. There the applicant had submitted in
        its fifth plea that the absence in the Directive of a
        provision requiring verification of the consent of the
        donor or recipient of products obtained by
        biotechnological means undermined the right to self-
        determination. The Court rejected this plea stating
        that reliance on the fundamental right of human
        integrity was "clearly misplaced as against a directive
        which concerns only the grant of patents and whose
        scope does not therefore extend to activities before
        and after that grant, whether they involve research or
        the use of the patented products" (point (79) of the
        judgment). The Court furthermore stated that "[t]he
        grant of a patent does not preclude legal limitations
        or prohibitions applying to research into patentable
        products or the exploitation of patented products, as
        the 14th recital of the preamble to the Directive

points out. The purpose of the Directive is not to
replace the restrictive provisions which guarantee,
outside the scope of the Directive, compliance with
certain ethical rules which include the right to self-
determination by informed consent" (point (80) of the
judgment).

The Board furthermore notes that also the "Opinion of
Advocate General Jacobs" delivered on 14 June 2001 in
case C-377/98 (document D175), stated in point (211)
that "[i]n my view, however, although the requirement
of consent to all potential uses of human material may
be regarded as fundamental, patent law is not the
appropriate framework for the imposition and monitoring
of such a requirement".

51.    Accordingly, the Board does not accept Appellant II's
       argument that the claimed subject-matter is not
       patentable under Article 53(a) EPC.

52.    Opponent 02 argued that the socio-economic consequences
       of the patenting of the claimed subject-matter should
       be considered by the Board under Article 53(a) EPC,
       because in the present case, these consequences touched
       ethical issues. Patenting of the claimed subject-matter
       would not only result in increased costs for patients,
       but would also influence the way in which diagnosis and
       research would be organized in Europe, which would be
       clearly to the detriment of patients and doctors. The
       fact that a particular group of patients, i.e. patients
       suspected to carry a predisposition to breast cancer,
       would be faced with severe disadvantages and would
       become dependent on the patent proprietor, was contrary
       to human dignity. Therefore, the claimed subject-matter

constituted an exception to patentability under
Article 53(a) EPC.

53.   In order to deal with the objection of Opponent 02 it
      is helpful to look at the pertinent wording of
      Article 53(a) EPC:

      "European patents shall not be granted in respect of
      inventions the... exploitation of which would be
      contrary to "ordre public" or morality...".

      It is important to note that Article 53(a) EPC refers
      to the "exploitation of the invention", not about the
      "exploitation of the patent".

      The objections raised by Opponent 02 are directed to
      the possible consequences of the exploitation of the
      patent in suit. It thus seems that such an objection,
      which goes to the exploitation of the patent and not to
      the exploitation of the invention, does not fall within
      Article 53(a) EPC. Thus, Opponent 02's objections under
      Article 53(a) EPC must be rejected upon this basis.

      In an attempt to evade this legal consequence of the
      wording of Article 53(a) EPC, Opponent 02 sought to
      argue that the exploitation of the patent, in this case,
      could be assimilated to the exploitation of the
      invention, and thus the exploitation of the patent *per
      se* was contrary to "ordre public" and morality.
      Opponent 02 stressed that this invention concerned
      breast and ovarian cancer and had a significant impact
      on public health, thus in these special circumstances
      the Board should apply Article 53(a) EPC to the
      exploitation of the patent. The Board accepts that

public health care is a sensitive area, however the
Board sees no basis in the EPC to distinguish in this
respect between inventions concerning different
technical fields. Such an approach has been confirmed
by the EBA in its decision G 1/98 (OJ EPO 2000, 111;
point (3.9) of the reasons) where the EBA stated that
the EPO has not been vested with the task of taking
into account the economic effects of the grant of
patents in specific areas and restricting the field of
patentable subject-matter accordingly.

In the Board's opinion the possible consequences of
exploitation of the patent identified by Opponent 02
are the result of the exclusionary nature of the rights
granted by a patent, that is the right to stop
competitors from using the invention.

The objection of Opponent 02, reduced to its essence,
is that the inevitable consequences of the exploitation
of the patent in suit are contrary to "ordre public" or
morality. Logically, such an objection applies to the
exploitation of any patent, as the nature of the
consequences of the exploitation of a patent (which
derive from the exclusionary nature of private property
rights), are the same for all patents.

Thus, for the reasons stated above, the Board rejects
this objection.

54.    Opponent 02 has further argued that the implementation
       of the Directive in the national law of France and
       Germany had made it clear that socio-economic and
       ethical concerns about the patenting of human genes had
       to be taken into account. The French legislator had

explicitly provided that not genes as such, but only
functions derived from genes should be patentable, and
the German legislator had provided a separate
legislation for the patenting of human genes in view of
ethical concerns.

55.    Opponent 02 therefore seems to imply that the correct
       implementation of the Directive requires the
       importation of socio-economic concerns into the text of
       the Directive, upon the basis that certain EU member
       states have adopted this approach to implementing the
       Directive.

       The Board does not agree with this position. The
       content of national legislation does not form part of
       the legal order established by the EPC and is thus
       irrelevant to the issue of how the EPC should be
       interpreted.

       Opponent 02 also referred to the resolution of the
       European Parliament, P6_TA(2005)0407 of 26 October 2005
       "Patents on biotechnological inventions" ("the
       Resolution"). Opponent 02 argued that the Resolution
       could be used to interpret the Directive and thus
       introduce socio-economic and ethical issues into the
       EPO's patent granting process.

       Opponent 02 referred in the Oral Proceedings, in
       particular, to recitals J and L and paragraphs 4 and 5
       of the Resolution. These state:

       "J.   whereas the Directive allows the patenting of
             human DNA only in connection with a function, but
             it is unclear whether a patent on DNA covers only

2561.D

the application in this function or whether other
functions are also covered by the patent,

L.   whereas over-generous granting of patents can
     stifle innovation,

4.   Considers that the Directive provides the
     framework for this in most cases, but that it
     still leaves important questions open, such as the
     patenting of human DNA;

5.   Calls on the European Patent Office and the Member
     States to grant patents on human DNA only in
     connection with a concrete application and for the
     scope of the patent to be limited to this concrete
     application so that other users can use and patent
     the same DNA sequence for other applications
     (purpose-bound protection)".

Recitals J, L and paragraph 4, can be considered as
general statements of fact and/or opinion. Paragraph 5
is the only part of the Resolution relied on by
Opponent 02 that calls for action on the part of the
EPO. The wording of paragraph 5 contains no suggestion
that the EPO has been, or should be, vested with the
task of taking into account the socio-economic effects
of the grant of patents in specific areas and
restricting the field of patentable subject-matter
accordingly. Thus the Resolution provides no support
for Opponent 02's already rejected objection under
Article 53(a) EPC (see point (53) above), or for any
further objection based upon some general duty to take
into account the socio-economic effects of the grant of

patents in specific areas and to restrict the field of
patentable subject-matter accordingly.

56.     No arguments or evidence have been brought forward to
        the Board showing that the **publication or exploitation**
        of the claimed probes, vectors and cells is contrary to
        "ordre public" or morality. Furthermore, Rule 23e(2)
        EPC (cf point (44) above), which implements
        Article 53(a) EPC (see decision T 272/95, supra), does
        not exclude the subject-matter of claim 1 from
        patentability under Article 53(a) EPC.

57.     The Board thus concludes that the subject-matter of
        claims 1 to 3 is not excluded from patentability under
        Article 53(a) EPC.

*Referral of questions to the EBA (Article 112(2)(a) EPC)*

58.     Appellant II requested to refer the following questions
        to the EBA according to Article 112(1)(a) EPC:

        "- In the case of patent applications which depend on
        donations of biological material of human origin in a
        critical way, is it necessary in view of Article 53(a)
        EPC that the previous informed consent of the donors of
        critical material is proven in the application
        proceedings by documents (or other means of proof)?

        If the answer to the question is "yes":

        - Should the previous informed consent in view of
        Article 53(a) EPC include an explicit consent to the
        commercial exploitation of the donations with the aid
        of patents?

and:

- Should the previous informed consent in view of
Article 53(a) EPC include a benefit sharing agreement?"

59.    The questions suggested by Appellant II do not concern
the uniform application of the law, since this Board
does not take a view of the law different to any
earlier case.

Furthermore, when examining whether an important point
of law arises which may justify the referral of the
questions to the EBA, the Board observes that the EPC
contains no provisions concerning a necessity on behalf
of patent applicants or proprietors of providing any
kind of proof about a previous informed consent in the
proceedings before the EPO. When the legislator amended
the Implementing Regulations of the EPC by adding
Rules 23(b) to 23(e), it did not choose to introduce
such provisions, in accordance with Recital (26) of the
Directive, which in the context of previous informed
consent makes reference to national law (cf point (48)
above). The legal situation is thus considered to be
clear in this regard, and the Board concludes that no
important point of law arises.

Therefore, Appellant II's request for referral of
questions to the EBA is refused.

*Industrial applicability (Article 57 EPC) and Sufficiency of
disclosure (Article 83 EPC)*

60.     Claim 1 of auxiliary request III refers to a nucleic
        acid probe defined by its nucleotide sequence.

        According to Appellant II the possible uses of such
        probes were the cloning of BRCA1, the detection of
        BRCA1 or of mutations thereof in Southern blots and the
        detection of BRCA1 transcripts in Northern blots. These
        were not industrial applications in the sense of
        Article 57 EPC in connection with Rule 23e(3) EPC,
        which required that, with regard to inventions
        concerning the human body and its elements, the
        industrial application of a sequence or a partial
        sequence must be disclosed in the patent application.

        The capacity of a single stranded DNA sequence to
        hybridize with a complementary single-stranded sequence
        was a consequence of the physico-chemical properties of
        each single-stranded DNA molecule and was thus a
        universal characteristic thereof. It could not have
        been the intention of the legislator to accept such
        universal characteristic as basis for an industrial
        application within the meaning of Article 57 and
        Rule 23e(3) EPC, as this would have the consequence
        that each and every single-stranded DNA was
        industrially applicable thereby depriving Rule 23e(3)
        EPC of any range of application.

61.     Opponent 02, although referring to the requirements of
        Article 83 EPC, argued that the subject-matter of
        claim 1 did not meet the patentability requirements of
        the EPC, as it referred to a sequence for which no use

and no function was indicated which meant that it
lacked any technical application.

62.     It is not disputed between the parties that the patent
        in suit discloses that the present invention relates to
        the human breast cancer predisposing gene BRCA1, some
        alleles of which cause susceptibility to cancer,
        particularly breast and ovarian cancer (see paragraph
        [0017] of the patent in suit). In view of the provision
        of such a diagnostic target, a probe sequence
        specifically hybridizing to the BRCA1 gene, or as in
        the case of the probes according to claim 1
        specifically hybridizing to the transcribed mRNA, is
        considered to be useful for diagnostic purposes.
        Therefore, the probes according to claim 1 do not only
        serve as research tools for the detection of
        complementary single stranded DNA molecules as argued
        by Appellant II, they also can be commercially applied
        for diagnostic purposes in order to detect the presence
        of BRCA1 allele predisposing an individual to cancer.
        The probes are explicitly disclosed in the patent as
        being useful in nucleic acid diagnosis and diagnostic
        kits (see paragraphs [0149], [0155] and [0156] of the
        patent in suit) and furthermore can be used to detect
        the length of a BRCA1 transcript and thereby detect
        larger deletions in the gene.

63.     In the letter dated 18 January 2006, Appellant II
        argued, that the results obtainable by using the
        claimed probes at the relevant date were speculative
        and could not be considered to result in a specific,
        substantial and plausible diagnostic test. On pages 11
        to 14 of said letter he referred to document D154 and

extensively cited contemporary statements
("zeitgenössische Aussagen").

64.     These statements were made by a number of scientists
        who all were involved in research projects dealing with
        BRCA1. Although none of the statements contains an
        exact date, Appellant II considers all of them to date
        from autumn 1994. The statements draw a picture of the
        situation in the scientific community in 1994. They
        describe the aims and strategies of the different
        working groups, they express doubts and critics on the
        results of other groups and even refer to rivalries
        between specific groups. They do not, however, allow
        one to convincingly draw the conclusion, that the
        subject-matter of claim 1 of auxiliary request III
        lacks industrial applicability.

65.     Appellant II has repeatedly referred to a decision of
        the Opposition Division published in the Official
        Journal of the EPO (2002, page 293), which concerned a
        patent application disclosing a list of speculative
        functions of a claimed protein. The Board notes however
        that the technical circumstances underlying this
        decision are different from the present ones, so that
        for this reason alone it can have no bearing on the
        present case.

66.     The Board considers decision T 898/05 of 7 July 2006 to
        be relevant to the present case. It refers to the
        nucleotide sequence and the encoded amino acid sequence
        of the human transmembrane receptor Zcytor1, which is
        proposed for use in different screening methods for
        receptor ligands as well as for agonists and
        antagonists of the natural ligand. For the agonists as

well as for the antagonists several therapeutic
applications are indicated. The Board when analysing
the relevant case law of the Boards of Appeal with
regard to the requirements of Article 57 EPC (cf Case
Law of the Board of Appeal of the EPO, 5th Edition 2006,
Chapter I.E.1), considers that this Article refers to
the concepts of "financial (commercial) gain" (cf
decision T 144/83, OJ EPO 1986, 301) and "profitable
use" (cf decision T 870/04 of 11 May 2005). The Board
came to the conclusion that these concepts were not to
be understood in the narrow sense of an actual or
potential profit or of a commercial interest, but
rather they had to be "...understood in the wider sense
that the invention claimed must have such a sound and
concrete technical basis that the skilled person can
recognize that its contribution to the art could lead
to practical exploitation in industry."

The Board continued that it is necessary to disclose in
definite technical terms the purpose of an invention
and how it can be used in industrial practice to solve
a given technical problem, this being the actual
benefit or advantage of exploiting the invention. It
was concluded that a product which is definitely
described and plausibly shown to be usable, i.e. in the
case of decision T 898/05 for curing a disease, might
be considered to meet the requirements of Article 57
and Rule 23e(3) EPC (cf points (1) to (8) of the
reasons for the decision).

67.    This Board considers that the nucleic acid probes of
       claim 1 of auxiliary request III are definitely
       described and plausibly shown in the patent to be
       useful in the diagnosis of cancer, particularly breast

or ovarian cancer and finds itself therefore confronted
with a technical situation corresponding to the one
underlying decision T 898/05 which it considers to be
based on a correct interpretation of the law.

Accordingly, the requirements of Article 57 and
Rule 23e(3) EPC are met by the subject-matter of clams
1 to 3 of auxiliary request III.

68. Appellant II, in a letter dated 14 July 2007, has
further requested to refer two question to the EBA
pursuant to Article 112(1)(a) EPC. The Board notes that
the first question concerned Appellant I's main request
only, which was found by the Board not to meet the
requirements of Article 123(2) EPC (see points (2) to
(6) above). Thus, it is the second question that will
be addressed in the present decision. It read as
follows:

"Do sequences or partial sequences of a gene, the
function of which is merely declared to be a probe,
fulfil the requirement of industrial applicability
according to Rule 23e(3) and Article 57 EPC?"

69. The question proposed by Appellant II (see point (68)
above) does not relate to a uniform application of the
law, as this Board does not take a view of the law
different to earlier cases.

When examining whether an important point of law may
justify the referral of the question to the EBA in
accordance with Article 112(1) EPC, the Board notes
that Rule 23e(3) EPC requires that the industrial
application of a sequence must be disclosed **in the**

**patent application.** The same wording can be found in
Article 5.3 and recital (22) of the Directive. The
Board, having found that the **patent application**
discloses an industrial application of the claimed
nucleic acid probe, namely its use in diagnosis of
cancer, considers Appellant II's question wherein it is
assumed that the claimed sequence "is merely declared
to be a probe", which, therefore, denies its use as a
diagnostic tool, as being hypothetical and not relating
to the facts of the present case. Such questions
however, shall not be referred to the EBA (cf decision
T 118/89 supra). Appellant II's request is therefore
rejected.

70.     The Board is moreover convinced in view of the above
        considerations that the patent contains sufficient
        information to allow a skilled person to make and
        technically apply the subject-matter of claims 1 to 3,
        so that, contrary to the argumentation brought forward
        by Opponent 02, the requirements of Article 83 EPC are
        met.

*Right to priority (Articles 87 to 89 EPC)*

71.     The second priority document (P2) refers at page 6,
        lines 24 to 26 to "a probe consisting of nucleotide
        positions 3575 to 3874 of BRCA1" which was used for
        hybridization in a blot containing RNA from different
        tissues, and at page 24, lines 14 to 15 to the "coding
        sequence for a BRCA1 polypeptide is shown in SEQ ID NO:
        1". The Board can follow Appellant I's argumentation
        that a skilled person would understand that the
        nucleotide positions mentioned on page 6 are the
        positions of SEQ ID NO: 1, since in the only other

nucleotide sequence disclosed in the second priority
document (P2) being long enough, i.e. SEQ ID NO: 13,
positions 3575 to 3874 lie in the intron (denoted in
lower case letters). A skilled person would realize
that it did not make sense to use an intron sequence to
hybridize in a Northern blot to an RNA molecule from
which the introns are spliced out.

Nucleotide positions 3575 to 3874 of SEQ ID NO: 1 of
the second priority document (P2) have been shown by
Appellant I to be identical to nucleotide positions
3631 to 3930 of SEQ ID NO: 1 of the application, which
sequence is specified in claim 1. This has not been
disputed by any of the other parties. Furthermore,
page 27, line 21 explicitly refers to "probes
comprising (...) polynucleotides of the present
invention". Therefore, the Board considers that a
nucleic acid probe comprising the DNA sequence
specified in claim 1 is directly and unambiguously
derivable from the second priority document (P2).

Moreover, the Board is convinced that a nucleic acid
probe comprising a nucleotide sequence selected from
the group consisting of SEQ ID NOs: 35, 38, 41, 42, 47,
57, 62, 67, 72 and 81 is directly and unambiguously
derivable from Table 9 on pages 73 and 74 of the second
priority document.

The Board thus considers that the second priority is
validly claimed for the subject-matter of claims 1 to
3.

*Novelty (Article 54 EPC)*

72.     Opponents have argued that the YAC clone 22HE5
        mentioned in Figure 2 of document D11 was prejudicial
        to the novelty of the subject-matter of claim 1. It had
        been shown by document D136 that this YAC clone
        contained exon 11 along with other exons of BRCA1, and
        the first sequence mentioned in claim 1 also related to
        exon 11.

73.     The Board cannot follow this line of argument, since it
        has not actually been proven by document D136 or any
        other document on file that the YAC clone 22HE5
        mentioned in document D11 contains any of the sequences
        specified in claim 1. According to the established case
        law of the Boards of Appeal (see e.g. decision T 464/94
        of 21 May 1997), it is not appropriate to base a
        decision on the novelty of a claimed invention on
        considerations of likelihood. Rather, in order to
        revoke a patent for lack of novelty, the deciding body
        must be certain that based on the arguments and
        evidence submitted, the claimed subject-matter lacks
        novelty. In the absence of the required proof, the
        Board must thus conclude that the subject-matter of
        claim 1 is novel over document D11. In this respect,
        the Board concurs with the opinion expressed by the
        Opposition Division in the decision under appeal.

*Inventive step (Article 56 EPC)*

74.     The closest prior art is considered to be represented
        by document D11 which discloses a physical map of the
        BRCA1 region on chromosome 17q12-21, said map
        comprising a contig of 137 overlapping YAC and P1

2561.D

clones. The location of the BRCA1 gene is indicated to
be proximal (centromeric) to the marker D17S78 and
distal (telomeric) to the marker D17S776 (see Figure 2
of document D11).

74.1    Appellant I argued that considering document D11 as the
        closest prior art was based on hindsight and therefore
        inappropriate. As shown in Exhibit 22 submitted with
        letter of 24 July 2007, the prior art documents D52,
        D88, D10, D22, D112 and D122 had suggested chromosomal
        regions for BRCA1 different to that disclosed in
        document D11, and it only turned out later that the
        region for BRCA1 indicated in document D11 was correct.

74.2    The Board notes that documents D52, D88 and D10, which
        were published earlier than document D11, suggest
        regions for the BRCA1 gene that are larger in size but
        include the one suggested in document D11. As document
        D11 had already narrowed down the BRCA1 region, the
        Board considers that the skilled person would have
        preferred to start from this smaller region rather than
        from those regions suggested in documents D52, D88 and
        D10.

74.3    Document D22, which was published three months before
        document D11, suggests that the BRCA1 gene lies distal
        to the marker D17S702 and proximal to the marker EDH17B.
        The analyses of the results from "family 64" gave rise
        to the suggestion that the marker EDH17B could be the
        distal boundary for the BRCA1 gene (which information
        is in contradiction to that of document D11). At the
        end of document D22 a section "Note Added in Proof"
        states: "Subsequent analysis of the offspring of
        individual 309 in family 64 has indicated that the

ovarian cancer case did not inherit the putative linked
haplotype. This suggests that either the ovarian cancer
is a sporadic case or that the family is not linked to
17q12-21." The Board notes that in view of this
statement, the skilled person would not have relied on
the information that the marker EDH17B is the distal
boundary, and would have given more weight to the
information given in document D11.

74.4    Document D112, which was published more than a year
        before document D11, suggests a location for the
        breast-ovarian cancer locus between the markers D17S588
        and D17S579. It is stated on page 742, first paragraph:
        "[I]n contrast, the recombination that places the
        cancer gene below D17S579 is evident only in woman 25.
        She developed breast cancer at age 57 years, an age
        significantly higher than the mean age at onset (41.5
        years) of breast cancer in the family. None of her five
        daughters (ages between 20 and 37 years) is affected.
        If this case of breast cancer is sporadic, the
        recombinant has not mapping value". Because of this
        statement, the skilled person would have been reluctant
        to rely on the information concerning the marker
        D17S579. Since this information is furthermore in
        contradiction to that of document D11, the Board
        considers that the skilled person would not have
        started from document D112 as the closest prior art.

74.5    Document D122 provides information which, contrary to
        the other documents mentioned above, is not based on
        linkage studies with breast/ovarian cancer families,
        but on examination of sporadic breast cancers for
        deletions as measured by loss of heterozygosity. The
        smallest common region that was deleted occurred

between the markers D17S846 and D17S746. The document
discusses possible reasons for an inconsistency with
the results of another publication, one such reason
being that "the locus we have defined may be relevant
only in sporadic breast cancer and not in hereditary
breast cancer" (page 2549, column 2, lines 4 to 6). The
possibility of two separate loci on 17q12-21 important
in breast cancer development, BRCA1 and a second locus
defined by loss of heterozygosity, is also discussed in
document D11 (see page 477, column 1, lines 36 to 44),
as the region identified in the earlier document D122
does not overlap with that identified in document D11.
Since the data of document D112 are not based on
linkage studies with affected families, the Board
considers that a skilled person would have given more
weight to the information disclosed in document D11.

74.6    In view of these considerations, the Board concludes
        that while the correct chromosomal region including the
        BRCA1 gene was indeed in doubt at the second priority
        date, document D11 would have been selected by the
        skilled person as the most promising starting point.

75.     Having regard to the closest prior art document D11,
        the technical problem to be solved is the provision
        of nucleic acid probes which are suitable to identify
        the BRCA1 gene.

        The Board is satisfied that this problem has been
        solved by the nucleic acid probes according to claim 1.
        The probe with the sequence first mentioned in claim 1
        has been shown to detect a single transcript in
        Northern blots (see Figure 7 of the patent in suit),
        and the sequences of SEQ ID NOs: 35, 38, 41, 42, 47,

57, 62, 66, 67, 72 and 81 consist of fragments of the
BRCA1 gene (i.e. SEQ ID NO: 1) representing intron/exon
junctions (see Table 9 of the patent in suit), which
are likewise suitable to detect the BRCA1 gene.

76.    In order to be able to provide nucleic acid probes
       suitable to detect the BRCA1 gene, a skilled person
       starting from the disclosure of document D11 would
       first have to identify the BRCA1 gene and isolate (at
       least part of) its sequence. The key question is
       therefore whether at the second priority date, a
       skilled person would have reasonably expected to be
       able to identify and isolate the BRCA1 gene.

77.    A number of decisions of the Boards of Appeal in the
       technical field of biotechnology have pointed out that,
       in evaluating the attitude of the skilled person, one
       should not confuse the "hope to succeed", which is
       linked to the wish that a result be achieved, with the
       "reasonable expectation of success", which is linked to
       the ability to reasonably predict, based on the
       particular technical circumstances, a successful
       conclusion of the project within acceptable time limits
       (see decisions T 296/93, OJ EPO 1995, 627, T 923/92, OJ
       EPO 1996, 564, and T 223/96 of 29 January 1999). In
       this respect, each case has to be assessed on its own
       merits, and any hindsight has to be avoided.

78.    It is evident that the skilled person, departing from
       the disclosure of document D11, would have readily
       undertaken to identify the BRCA1 gene in the hope to
       succeed. The question remains, however, whether, when
       evaluating realistically the chances of success at the

second priority date, he or she would have had a
reasonable expectation of achieving the desired result.

79.   For the reasons given hereinafter, the Board found the
      arguments concerning this question as put forward by
      Appellant I more convincing than those put forward by
      Appellant II and the remaining Opponents.

79.1  In order to identify the BRCA1 gene, for which no
      information about its protein product was available at
      the relevant priority date, a skilled person would have
      been aware that a positional cloning approach had to be
      applied. As a first step in such an approach,
      polymorphic markers are identified by linkage analysis
      using DNA of well-documented families (kindreds) with
      inherited cases of the disease in question (here:
      breast cancer), in order to narrow the putative
      chromosomal region containing the gene to a manageable
      size of about 600 kb (see for instance documents D120
      and D125).

79.2  In the present case, the closest prior art document D11
      had already narrowed the relevant chromosomal region
      down to approximately 1.5 Megabases (Mb) and provided a
      physical map of this region. Although this region was
      the most promising starting point, there was however no
      certainty that it did indeed contain the BRCA1 gene
      (see points (74.1) to (74.6) above). A skilled person
      would have been well aware that any cloning efforts
      starting from the wrong chromosomal region would
      evidently result in ultimate failure.

79.3    Furthermore, there was no certainty that suitable
        polymorphic markers could indeed be identified in order
        to further narrow down the relevant chromosomal region.
        In order to be successful, it would not only be
        necessary to find polymorphic markers that map to the
        region, but also to have well-documented kindreds with
        cases of inherited breast cancer at hand, which would
        need to contain individuals with recombination events
        located such that they would provide the necessary
        mapping information. Apart from the substantial amount
        of experimentation involved in the linkage analysis,
        success thus required a substantial amount of luck
        which a skilled person could not reasonably predict.

79.4    If refining the chromosomal region containing the BRCA1
        gene to a sufficiently small size would have been
        successful, the next steps would be to identify gene
        sequences within that chromosomal region and to look
        for a gene which contains a causal mutation, i.e. a
        mutation existing within that gene which is found to
        co-segregate with breast cancer in a statistically
        significant manner, but not with control or non-cancer
        patients. Finding such a mutation would not only
        involve substantial amounts of work, but would also
        require a "lucky strike", which could in no way be
        predicted even if well-documented breast cancer
        kindreds were available.

80.     Considering the uncertainties of the project as
        outlined above, the Board concludes that at the second
        priority date, a person skilled in the art would not
        have reasonably expected to successfully arrive at the
        cloning of the BRCA1 gene within acceptable time limits
        merely by way of routine experimentation. The Board is

convinced that solving the technical problem was a
major breakthrough which was not obvious to the skilled
person.

81.     The Opponents have argued that the claimed subject-
        matter was obvious to the skilled person because
        document D11 referred to sequence information relating
        to clone extremities which were available from GenBank
        and directly from the authors. One of these sequences
        had the accession number L18209 and contained a CpG
        island, as was evidenced by document D31, which
        corresponded to the promoter region of the BRCA1 gene.
        It would thus have lead the skilled person to the
        identification of the BRCA1 gene.

        In this regard, the Board considers that the Opponents
        have not sufficiently proven if or what information on
        the sequence termed L18209 was available to the public
        at the second priority date. Document D31 is a print-
        out of a database entry which carries the date
        10 October 1995, and cannot thus constitute evidence as
        to what was available to the public on 2 September
        1994, the second priority date. Document D11 itself
        neither mentions the term "L18209", nor does it provide
        information about its sequence. For these reasons the
        argumentation based on sequence L18209 must fail.

82.     Opponents have also argued that in order to further
        narrow down the BRCA1 region identified in document D11
        to a size of approximately 650 kb, the marker D17S1141,
        also known as UM44_, would have been available to the
        skilled person. This would then have easily led to the
        identification of the BRCA1 coding region. Document
        D128, a print-out of the gdb database, disclosed this

marker as having been available from Dr Chamberlain as
of 18 February 1994. Documents D159 and D160, also
print-outs of database entries, provided additional
evidence that the marker was publicly available. The
post-published document D129 described the marker in
detail.

Concerning the question whether a disclosure available
from the internet, like for example the database entry
of document D128, is part of the state of the art under
Article 54(2) EPC, a strict standard of proof is to be
applied (see decision T 1134/06 of 16 January 2007). In
the present case, the Board does however not consider
it necessary to investigate the question whether
document D128 was indeed available to the public at the
second priority date, because even if it was, the Board
could not follow Opponents' line of argument that the
claimed subject-matter lacked an inventive step under
Article 56 EPC. The reason for this is that the skilled
person would not have known from the supposed
disclosure of document D128 that the marker D17S1141
was suitable to narrow down the approximately 1.5 Mb
BRCA1 region as identified in document D11. This fact
only became known to the skilled person after the
second priority date. As pointed out in numerous
decisions by the Boards of Appeal, any *ex post facto*
analysis has to be strictly avoided in the assessment
of inventive step (see Case Law of the Boards of Appeal
of the European Patent Office, 5th edition 2006,
chapter I.D.5.).

83.     For these reasons, the subject-matter of claim 1 is
considered to involve an inventive step. Since claim 2
relates to a replicative cloning vector comprising a

DNA according to claim 1, and since claim 3 relates to a host cell transformed with a vector of claim 2, the Board likewise considers the subject-matter of claims 2 and 3 to involve an inventive step.

84.    In view of the above, the claims of auxiliary request III are allowable.

**Order**

**For these reasons it is decided that:**

The appeals are dismissed.

The Registrar:                              The Chair:



P. Cremona                                  U. Kinkeldey