# EXHIBIT
# 6

Dockets.Justia.com

109TH CONGRESS
2D SESSION

# S. 3822

To improve access to and appropriate utilization of valid, reliable and accurate molecular genetic tests by all populations thus helping to secure the promise of personalized medicine for all Americans.

---

## IN THE SENATE OF THE UNITED STATES

AUGUST 3, 2006

Mr. OBAMA introduced the following bill; which was read twice and referred to the Committee on Finance

---

# A BILL

To improve access to and appropriate utilization of valid, reliable and accurate molecular genetic tests by all populations thus helping to secure the promise of personalized medicine for all Americans.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the ''Genomics and Person-

5    alized Medicine Act of 2006''.

6    **SEC. 2. FINDINGS.**

7    Congress makes the following findings:

1    (1) The completion of the Human Genome
2    Project in 2003 paved the way for a more sophisti-
3    cated understanding of disease causation, which has
4    contributed to the advent of ''personalized medi-
5    cine''.

6    (2) Personalized medicine is the application of
7    genomic and molecular data to better target the de-
8    livery of health care, facilitate the discovery and clin-
9    ical testing of new products, and help determine a
10   patient's predisposition to a particular disease or
11   condition.

12   (3) Many commonly-used drugs are typically ef-
13   fective in only 40 to 60 percent of the patient popu-
14   lation.

15   (4) In the United States, up to 15 percent of
16   hospitalized patients experience a serious adverse
17   drug reaction, and more than 100,000 deaths are at-
18   tributed annually to such reactions.

19   (5) Pharmacogenomics has the potential to dra-
20   matically increase the efficacy and safety of drugs
21   and reduce healthcare costs, and is fundamental to
22   the practice of genome-based personalized medicine.

23   (6) Pharmacogenomics is the study of how
24   genes affect a person's response to drugs. This rel-
25   atively new field combines pharmacology (the science

1  of drugs) and genomics (the study of genes and
2  their functions) to develop effective, safe medications
3  and dosing regimens that will be tailored to an indi-
4  vidual's genetic makeup.

5  (7) The cancer drug Gleevec was developed
6  based on knowledge of the chromosomal
7  translocation that causes chronic myelogenous leu-
8  kemia, which is characterized by an abnormal
9  growth in the number of white blood cells. The mean
10  5-year survival for affected patients who are treated
11  with Gleevec is 95 percent, which contrasts to a 5-
12  year survival of 50 percent for patients treated with
13  older therapies.

14  (8) The ERBB2 gene helps cells grow, divide
15  and repair themselves. One in 4 breast cancers are
16  characterized by too many copies of this gene, which
17  causes uncontrolled and rapid tumor growth.
18  Pharmacogenomics research led to both the develop-
19  ment of the test for this type of breast cancer as
20  well as an effective biologic, Herceptin.

21  (9) Warfarin, a blood thinner used to prevent
22  the formation of life-threatening clots, significantly
23  elevates patient risk for bleeding in the head or gas-
24  trointestinal tract, both of which are associated with
25  increased rates of hospitalization, disability and

1 death. Pharmacogenomic researchers have identified
2 and developed tests for genetic variants in the
3 cytochrome P450 metabolizing enzyme (CYP2C9)
4 and vitamin K epoxide reductase complex that in-
5 crease risk for these adverse events. By using a com-
6 panion diagnostic test for these two genes, physi-
7 cians can modify the dosing regimen and decrease
8 the likelihood of adverse events.

9     (10) Although the cancer drug 6-
10 mercaptopurine (6–MP) cures 85 percent of children
11 with acute lymphoblastic leukemia, historically, a
12 significant number of patients would die inexplicably
13 from the drug. Researchers later discovered that 1
14 in 10 individuals has an under-active version of the
15 metabolizing enzyme thiopurine methyltransferase
16 (TPMT) and should receive only a fraction of the
17 standard dose of purine drugs. Physicians now are
18 able to screen for TPMT gene variants before ad-
19 ministering these drugs.

20     (11) Research into the genetics of breast cancer
21 identified two pivotal genes, BRCA1 and BRCA2,
22 mutations in which correspond to a significantly in-
23 creased lifetime risk of developing breast and ovar-
24 ian cancer. Individuals in affected families or with
25 specific risk factors may use genetic testing to iden-

1 tify whether they carry mutations in these genes and
2 to inform their decisions about treatment options,
3 including mastectomy and oophorectomy.

4 (12) Realizing the promise of personalized med-
5 icine will require continued Federal leadership and
6 agency collaboration, expansion and acceleration of
7 genomics research, a capable genomics workforce, in-
8 centives to encourage development and collection of
9 data on the analytic and clinical validity of genomic
10 tests and therapies, and improved regulation over
11 the quality of genetic tests, direct-to-consumer ad-
12 vertising and use of personal genomic information.

**SEC. 3. DEFINITIONS.**

14 In this Act:

15 (1) BIOMARKER.—The term "biomarker"
16 means an analyte found in a patient specimen that
17 is objectively measured and evaluated as an indi-
18 cator of normal biologic processes, pathogenic proc-
19 esses, or pharmacologic responses to a therapeutic
20 intervention.

21 (2) LABORATORY-DEVELOPED GENETIC
22 TEST.—The term "laboratory-developed genetic
23 test" means a molecular genetic test that is de-
24 signed, validated, conducted, and offered as a service
25 by a clinical laboratory subject to the Clinical Lab-

oratory Improvement Amendments (referred to in this Act as "CLIA") using either commercially available analyte specific reagents (FDA-regulated) or reagents prepared by the laboratory (not FDA-regulated), or some combination thereof.

(3) MOLECULAR GENETIC TEST.—The term "molecular genetic test" means an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal and biochemical changes.

(4) PHARMACOGENETIC TEST.—The term "pharmacogenetic test" means a molecular genetic test intended to identify individual variations in DNA sequence related to drug absorption and disposition (pharmacokinetics) or drug action (pharmacodynamics), including polymorphic variation in the genes that encode the functions of transporters, receptors, metabolizing enzymes, and other proteins.

(5) PHARMACOGENOMIC TEST.—

(A) IN GENERAL.—The term "pharmacogenomic test" means a molecular genetic test intended to identify individual variations in single-nucleotide polymorphisms, haplotype markers, or alterations in gene expression or inac-

tivation, that may be correlated with pharmacological function and therapeutic response.

(B) VARIATIONS AND ALTERATIONS.—For purposes of this paragraph, the variations or alterations referred to in subparagraph (A) may be a pattern or profile of change, rather than a change in an individual marker.

(6) SECRETARY.—The term ''Secretary'' means the Secretary of Health and Human Services.

## SEC. 4. GENOMICS AND PERSONALIZED MEDICINE INTER-AGENCY WORKING GROUP.

(a) IN GENERAL.—The Secretary shall establish within the Department of Health and Human Services the Genomics and Personalized Medicine Interagency Working Group (referred to in this Act as the ''IWG'').

(b) PURPOSE.—It shall be the purpose of the IWG to expand and accelerate genetics and genomics research, and the translation of findings from such research into clinical and public health application, by—

(1)(A) enhancing communication about current and proposed activities and areas of focus by the Department of Health and Human Services and other relevant Federal departments and agencies, including communication focused on findings and recommendations from—

(i) the advisory groups on genetics of the Secretary, including the Secretary's Advisory Committee on Genetics, Health, and Society, and the Advisory Committee on Heritable Disorders and Genetic Diseases in Newborns and Children; and

(ii) the National Academies of Science, including the Institute of Medicine; and

(B) identifying areas of need and opportunity; and

(2) facilitating collaboration, coordination, and integration of activities, within the Federal agencies, and among such agencies and their public and private partners to leverage resources and avoid duplication of effort.

(c) IWG CHAIRPERSON.—The Secretary shall serve as chairperson of the IWG. The Secretary may not designate another person to serve as a chairperson of the IWG.

(d) MEMBERS.—In addition to the Secretary, the IWG shall include members from the—

(1) National Institutes of Health, including the National Human Genome Research Institute, the National Institute of Environmental Health Sciences, the Department of Clinical Bioethics, and

the National Center on Minority Health and Health
Disparities;

(2) Centers for Disease Control and Prevention,
including the Office of Genomics and Disease Pre-
vention;

(3) Food and Drug Administration, including
the Office of Clinical Pharmacology and Biopharma-
ceutics Review and the Office of In Vitro
Diagnostics;

(4) Health Resources and Services Administra-
tion, including the genetic services branch of the
Maternal and Child Health Bureau and the Bureau
of Health Professions;

(5) Office of Minority Health;

(6) Agency for Healthcare Research and Qual-
ity;

(7) Centers for Medicare & Medicaid Services;

(8) Veterans Health Administration;

(9) Office of the National Coordinator for
Health Information Technology;

(10) Department of Energy, including the
Human Genome Program and Joint Genome Insti-
tute of the Office of Science; and

(11) other Federal departments and agencies as
determined appropriate by the Secretaries.

(e) DUTIES OF THE IWG.—In fulfilling the purpose described in subsection (b), members of the IWG shall—

(1) meet not less frequently than twice each year or at the call of the chairperson;

(2) draft recommendations for various heads of Federal departments and agencies; and

(3) provide opportunities for public input and comment on the deliberations and activities of the IWG, as appropriate.

(f) REPORT.—Not later than 1 year after the date of enactment of this Act, and biennially thereafter, the Secretary shall report to the appropriate committees of Congress and to the public on IWG activities, with respect to meeting the purpose described in subsection (b) and carrying out the duties described in subsection (e).

(g) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to carry out this section, $5,000,000 for fiscal year 2007, and such sums as may be necessary for each of fiscal years 2008 through 2012.

**SEC. 5. EXPANSION AND ACCELERATION OF GENETIC AND GENOMICS RESEARCH.**

(a) GENETICS AND GENOMICS RESEARCH.—

(1) IN GENERAL.—The Secretary shall expand and accelerate research and programs to collect genetic and genomic data that will advance the field of

genomics and personalized medicine, with prioritized
focus on—

    (A) studies of diseases and health conditions with substantial public health impact;

    (B) population-based studies of genotype prevalence, gene-disease association, gene-drug response association, and gene-environment interactions;

    (C) systematic review and synthesis of the results of population-based studies using methods of human genome epidemiology;

    (D) translation of genomic information into molecular genetic screening tools, diagnostics, and therapeutics, through well-conducted clinical trials and studies;

    (E) translation of genomic information into tools for public health investigations and ongoing biosurveillance and monitoring;

    (F) systematic review of data on analytic validity and clinical validity of molecular genetic tests;

    (G) comprehensive studies of clinical utility, including cost-effectiveness and cost-benefit analyses, of molecular genetic tests and therapeutics;

1         (H) population based studies to assess the

2     awareness, knowledge, and use of genetic tests

3     and their impact on the population health and

4     health disparities; and

5         (I) methods to enhance provider uptake or

6     adoption of pharmacogenomic products into

7     practice.

8     (2) BIOBANKING.—

9         (A) NATIONAL BIOBANKING RESEARCH

10     INITIATIVE.—The Secretary, in collaboration

11     with the IWG, shall develop a plan for a na-

12     tional biobanking research initiative that—

13         (i) addresses priority areas of focus,

14     as described in paragraph (1);

15         (ii) builds upon current genomic re-

16     search initiatives (existing as of the date

17     the plan is issued) domestically and, as

18     practicable, internationally;

19         (iii) is prospective and long-term in

20     design;

21         (iv) takes into consideration public re-

22     view and comment;

23         (v) is designed to support collection

24     and synthesis of evidence for public health

25     and clinical applications;

(vi) meets rigorous standards and guidelines regarding ethics, legality, and social issues;

(vii) ensures diverse representation of individuals in the research or data collection that would allow statistically significant analyses of population subgroups as appropriate; and

(viii) reflects public-private partnership.

(B) NATIONAL BIOBANKING DISTRIBUTED DATABASE.—

(i) IN GENERAL.—The Secretary, acting through the Director of the National Human Genome Research Institute at the National Institutes of Health and the Director of the Office of Genomics and Disease Prevention at the Centers for Disease Control and Prevention, shall establish a system for the integration of data, including genomic data and associated environmental and clinical health information, which shall facilitate the pooled analysis and synthesis of such data.

(ii) DISTRIBUTED DATABASE.—With
respect to such national biobanking data-
base, the Secretary shall—

(I) establish a grant program for
local or regional biobanking initia-
tives, in accordance with subpara-
graph (C), with priority given for local
or regional biobanks that—

(aa) are established or com-
plement activities related to the
implementation of the national
biobanking research initiative,
pursuant to subparagraph (A);

(bb) are based on well-de-
fined populations, such as co-
horts of newborn infants
screened by State health depart-
ments for metabolic disorders,
population-based registries of
cancer and other diseases, and
family-based registries;

(cc) collect data from par-
ticipants with diverse genetic pro-
files, environmental exposures,

1      and health conditions and dis-
2      eases; and

3              (dd) participate in and con-
4          tribute data to consortia estab-
5          lished to develop and apply best
6          practices and standards in the re-
7          search area of such consortium;

8          (II) assist in the development of
9      uniform standards and guidelines for
10      the collection, submission, and storage
11      of biobank data;

12          (III) develop and promulgate
13      guidelines regarding procedures, pro-
14      tocols, and policies for access of data
15      by non-governmental entities and the
16      safeguarding of the privacy of biobank
17      subjects, in accordance with the Office
18      for Human Research Protection and
19      Clinical Research Policy Analysis and
20      Coordination program at the National
21      Institutes of Health, and other guide-
22      lines as appropriate;

23          (IV) review and make rec-
24      ommendations to address ownership

issues with respect to genomic samples and analyses;

(V) encourage voluntary submission of biobanking data obtained or analyzed with private or non-Federal funds;

(VI) facilitate submission of data, including secure and efficient electronic submission;

(VII) incorporate data from Federal surveys, such as the National Health and Nutrition Examination Survey;

(VIII) develop and disseminate standard consent forms, including those that allow multiple uses of data for research purposes;

(IX) conduct, directly or by contract, analytical research, including clinical, epidemiological, and social research, using biobank data;

(X) allow public use of data only—

(aa) with appropriate privacy safeguards in place; and

1          (bb) for health research pur-
2      poses;

3          (XI) determine appropriate pro-
4      cedures for industry access to biobank
5      data for research and development of
6      new or improved tests and treatments,
7      and submission of data generated
8      from such samples to the Food and
9      Drug Administration as part of the
10     approval process for drugs and de-
11     vices; and

12         (XII) make analytic findings
13     from biobanking initiatives supported
14     by Federal funding publicly available
15     within an appropriate timeframe to be
16     determined by the Secretary, which
17     findings shall not contain identifiable
18     information of patients.

19     (iii) NATIONAL RESOURCES.—The
20 IWG shall sponsor national efforts to bring
21 together the consortia described in clause
22 (ii)(I)(dd) to build national data resources.
23 (C) BIOBANK INITIATIVES GRANTS.—

24     (i) IN GENERAL.—The Secretary shall
25 establish a grant program for eligible insti-

1 tutions to enable the institutions to develop

2 or expand biobanking initiatives to advance

3 the application of genomics to the practice

4 of medicine and contribute to the under-

5 standing of the genetic causes of disease.

6 (ii) ELIGIBILITY.—An academic med-

7 ical center or other institution shall be eli-

8 gible for a grant under this subparagraph

9 if the center or institution has—

10 (I) practical experience and dem-

11 onstrated expertise in genomics and

12 its clinical and public health applica-

13 tions;

14 (II) an established scientific advi-

15 sory committee to—

16 (aa) advise staff on genomic

17 issues, including related ethical,

18 legal, and social issues;

19 (bb) evaluate and approve

20 research studies utilizing the

21 biobank data; and

22 (cc) provide a forum for evi-

23 dence-based reviews and integra-

24 tion of research findings to deter-

25 mine if and how such findings

1        may be used in health care and

2        disease prevention;

3        (III) an established community

4        advisory committee comprised of com-

5        munity advocates, potential study par-

6        ticipants, and other stakeholders, to—

7        (aa) provide a non-scientific

8        perspective on the biobanking ini-

9        tiative;

10       (bb) guide the development

11       of patient-oriented materials;

12       (cc) support outreach to mi-

13       nority and other underserved

14       communities; and

15       (dd) provide a forum for the

16       discussion of ethical, social, and

17       legal issues pertaining to the bio-

18       banking initiative;

19       (IV) mechanisms to ensure pa-

20       tient privacy and protection of infor-

21       mation from non-health applications;

22       and

23       (V) a demonstrated ability to re-

24       cruit patients from diverse cultural

25       backgrounds.

1     (iii) USE OF FUNDS.—An eligible in-
2     stitution that receives a grant under this
3     subparagraph shall use the grant funds to
4     develop or expand a biobanking initiative,
5     which may include the following activities:
6          (I) Support for advisory commit-
7     tees.
8          (II) Recruitment and education
9     of patients.
10          (III) Development of consent
11     protocols.
12          (IV) Obtaining genetic samples
13     and clinical information.
14          (V) Establishment and mainte-
15     nance of secure storage for genetic
16     samples and clinical information.
17          (VI) Conduct of data analyses
18     and evidence-based systemic reviews
19     that allow for the following:
20               (aa) Identification of bio-
21          markers and other surrogate
22          markers to improve predictions of
23          onset of disease, response to
24          therapy, and clinical outcomes.

(bb) Increased under-standing of gene-environment interactions.

(cc) Development of molec-ular genetic screening, diagnostic, and therapeutic interventions.

(dd) Genotypic characteriza-tion of tissue samples.

(VII) Support for participation in research consortia concerned with es-tablishing and developing best prac-tices and standards in the relevant re-search areas.

(VIII) Development and imple-mentation of protocols for external re-searchers to access non-identifiable patient samples and associated health information for research activities.

(IX) Other activities, as deter-mined appropriate by the Secretary.

(b) RACE, GENOMICS, AND HEALTH.—

(1) IN GENERAL.—The Secretary shall expand and intensify efforts to increase knowledge about the—

(A) interaction between genetics and the environment, and the influence of such inter-action on the causality and treatment of diseases common in racial and ethnic minority populations; and

(B) ways in which molecular genetic screening, diagnostics, and treatments may be used to improve the health and health care of racial and ethnic minority populations.

(2) RACE AND GENOMICS.—Not later than 1 year after the date of enactment of this Act, the Secretary, in collaboration with the IWG, shall prepare, with public input, and publish trans-agency guidance regarding the following:

(A) An appropriate definition for race and ethnicity for use in genomic research and programs operated or supported by the Federal Government.

(B) Guiding ethics, principles, and protocols for the inclusion and designation of racial and ethnic populations in genomics research and programs operated or supported by the Federal Government.

1    (C) Ways to increase access to effective
2    pharmacogenomic and other clinical genetic
3    services for minority populations.

4    (D) Research opportunities and funding
5    support in the area of race and genomics that
6    may improve the health and health care of mi-
7    nority populations.

8    (E) Ways to enhance integration of Fed-
9    eral Government-wide efforts and activities per-
10   taining to race, genomics, and health.

11   (F) Any needs for additional privacy pro-
12   tections in preventing stigmatization and inap-
13   propriate use of genetic information.

14   (c) AUTHORIZATION OF APPROPRIATIONS.—There is
15   authorized to be appropriated to carry out this section,
16   $150,000,000 for fiscal year 2007, and such sums as may
17   be necessary for each of fiscal years 2008 through 2012.

18   **SEC. 6. GENOMICS WORKFORCE AND TRAINING.**

19   (a) IN GENERAL.—The Secretary, acting through the
20   Administrator of the Health Resources and Services Ad-
21   ministration and the Director of the Centers for Disease
22   Control and Prevention, and in collaboration with the
23   IWG, shall expand and intensify efforts to—

1    (1) support efforts to recruit and retain health
2  professionals from diverse backgrounds in the
3  genomics workforce;

4    (2) in collaboration with appropriate profes-
5  sional accreditation organizations, assess and make
6  recommendations to improve the quality of genomics
7  training; and

8    (3) develop a plan to integrate genomics into all
9  aspects of health professional training.

10  (b) ELIGIBLE ENTITY.—For purposes of this section,
11  the term "eligible entity" includes professional genetics
12  and genomics societies and academic institutions deter-
13  mined appropriate by the Secretary.

14  (c) RECRUITMENT AND RETENTION.—The Secretary
15  shall provide financial and technical support to eligible en-
16  tities to increase recruitment and retention of trainees in
17  genetics and genomics by—

18    (1) providing education and awareness opportu-
19  nities, practical and research experiences, and finan-
20  cial incentives such as scholarships or loan repay-
21  ment;

22    (2) considering development of genomic sub-
23  specialty fellowships or concentrations within genet-
24  ics training programs;

1     (3) considering development of combined resi-
2     dency programs or joint subspecialty fellowships
3     with other specialties;

4     (4) providing support for laboratory-based ge-
5     netics or genomics fellowships for medical and other
6     health professional students; and

7     (5) carrying out other activities determined ap-
8     propriate by the Secretary.

9 (d) GENETICS AND GENOMICS TRAINING.—The Sec-
10 retary, directly or through contracts or grants to eligible
11 entities, shall ensure the adequacy of genetics and
12 genomics training for diagnosis, treatment, and counseling
13 of adults and children for both rare and common dis-
14 orders, through support of efforts to—

15     (1) strengthen the core training content of the
16     various clinical disciplines to reflect new knowledge
17     and evolving practice of genetics and genomics;

18     (2) develop and disseminate model residency
19     and other training program curricula and teaching
20     materials that integrate and broaden the base of
21     medical genetics and genomics training;

22     (3) assist the review of board and other certi-
23     fying examinations by professional societies and ac-
24     creditation bodies to ensure adequate focus on the
25     fundamental principles of genomics; and

1  (4) explore options for distance or on-line learn-
2  ing for degree or continuing education programs.

3  (e) INTEGRATION.—The Secretary shall support ini-
4  tiatives to increase the integration of genetics and
5  genomics into all aspects of clinical and public health prac-
6  tice by—

7  (1) generating greater awareness of the rel-
8  evance and application of genetics and genomics to
9  common disorders; and

10  (2) promoting genetics and genomics com-
11  petency across all clinical, public health and labora-
12  tory disciplines through the development and dis-
13  semination of health professional guidelines which
14  shall—

15  (A) include focus on appropriate adminis-
16  tration and interpretation of genomic tests, and
17  subsequent clinical and public health decision-
18  making; and

19  (B) specifically target health professionals
20  without formal training or experience in the
21  field of genomics.

22  (f) AUTHORIZATION OF APPROPRIATIONS.—There
23  are authorized to be appropriated to carry out this section
24  $10,000,000 for fiscal year 2007 and such sums as may
25  be necessary for each of fiscal years 2008 through 2012.

## SEC. 7. REALIZING THE POTENTIAL OF PERSONALIZED MEDICINE.

(a) INCENTIVES.—

(1) TAX CREDIT FOR RESEARCH AND DEVELOPMENT RELATED TO COMPANION DIAGNOSTIC TESTS.—

(A) IN GENERAL.—Subpart D of part IV of subchapter A of chapter 1 of the Internal Revenue Code of 1986 is amended by adding at the end the following new section:

## "SEC. 45N. COMPANION DIAGNOSTIC TEST CREDIT.

"(a) ALLOWANCE OF CREDIT.—For purposes of section 38, in the case of an eligible taxpayer, the companion diagnostic test credit for any taxable year is an amount equal to the qualified research expenses paid or incurred by the taxpayer during the taxable year in connection with the development of a qualified companion diagnostic test.

"(b) ELIGIBLE TAXPAYER.—For purposes of this section, the term 'eligible taxpayer' means a taxpayer who has been requested to develop a qualified companion diagnostic test by the Secretary of Health and Human Services in connection with a drug—

"(1) for which an application has been submitted under section 501(b)(1) of the Federal Food, Drug, and Cosmetic Act, or

1    ''(2) for which an application has been ap-
2    proved under such section.

3    ''(c) QUALIFIED COMPANION DIAGNOSTIC TEST.—
4    For purposes of this section, the term 'qualified com-
5    panion diagnostic test' means a diagnostic test in connec-
6    tion with a drug which—

7        ''(1) is designed to provide information which
8        can be used to increase the safety or effectiveness of
9        the drug, and

10        ''(2) is approved by the Secretary of Health and
11        Human Services.

12    ''(d) QUALIFIED RESEARCH EXPENSES.—For pur-
13    poses of this section, the term 'qualified research expenses'
14    has the meaning given to such term under section 41(b).

15    ''(e) NO DOUBLE BENEFIT.—

16        ''(1) COORDINATION WITH OTHER DEDUCTIONS
17        AND CREDITS.—Except as provided in paragraph
18        (2), the amount of any deduction or other credit al-
19        lowable under this chapter for any expense taken
20        into account in determining the amount of the credit
21        under subsection (a) shall be reduced by the amount
22        of such credit attributable to such expense.

23        ''(2) RESEARCH AND DEVELOPMENT COSTS.—

24            ''(A) IN GENERAL.—Except as provided in
25            subparagraph (B), any amount which is taken

into account in determining the amount of the credit under subsection (a) for any taxable year shall not be taken into account for purposes of determining the credit under section 41 for such taxable year.

"(B) COSTS TAKEN INTO ACCOUNT IN DE-TERMINING BASE PERIOD RESEARCH EX-PENSES.—Any amount taken into account in determining the amount of the credit under subsection (a) for any taxable year shall be taken into account in determining base period research expenses for purposes of applying section 41 to subsequent taxable years.

"(f) REGULATIONS.—The Secretary, in consultation with the Secretary of Health and Human Services, shall promulgate such regulations as are necessary to carry out the purposes of this section.

"(g) TERMINATION.—This section shall not apply to expenses paid or incurred in taxable years beginning after the date which is 5 years after the date of enactment of this section.".

(B) CREDIT TREATED AS PART OF GEN-ERAL BUSINESS CREDIT.—Section 38(b) of the Internal Revenue Code of 1986 is amended by striking "and" at the end of paragraph (29), by

striking the period at the end of paragraph (30) and inserting ", plus", and by adding at the end the following new paragraph:

"(31) the companion diagnostic test credit determined under section 45N(a).".

(C) CLERICAL AMENDMENT.—The table of sections for subpart D of subchapter A of chapter 1 of the Internal Revenue Code of 1986 is amended by adding at the end the following new item:

"Sec. 45N. Companion diagnostic test credit.".

(D) EFFECTIVE DATE.—The amendments made by this paragraph shall apply to expenses paid or incurred in taxable years beginning after the date of enactment of this Act.

(2) NATIONAL ACADEMY OF SCIENCES STUDY.—Not later than 6 months after the date of enactment of this Act, the Secretary shall enter into a contract with the National Research Council of the National Academy of Sciences to study and recommend appropriate incentives to encourage—

(A) co-development of companion diagnostic testing by a drug sponsor;

(B) development of companion diagnostic testing for already-approved drugs by the drug sponsor;

(C) companion diagnostic test development by device companies that are not affiliated with the drug sponsor; and

(D) action on other issues determined appropriate by the Secretary.

(b) GENETIC TEST QUALITY.—

(1) IN GENERAL.—The Secretary shall improve the safety, efficacy, and availability of information about genetic tests, including pharmacogenetic and pharmacogenomic tests.

(2) INSTITUTE OF MEDICINE STUDY.—Not later than 30 days after the date of enactment of this Act, the Secretary shall enter into a contract with the Institute of Medicine to conduct a study and a prepare a report that includes recommendations to improve Federal oversight and regulation of genetic tests, with specific recommendations on the development of the decision matrix under paragraph (3). Such study shall be completed not later than 1 year after the date on which such contract was entered into.

(3) DECISION MATRIX.—

(A) IN GENERAL.—The Secretary, taking into consideration the recommendations of the Institute of Medicine report under paragraph

1 (2), shall develop a decision matrix (referred to
2 in this section as the "matrix") to improve the
3 oversight and regulation of genetic tests, includ-
4 ing pharmacogenomics and pharmacogenetic
5 tests by—

6 (i) determining the classification of
7 genetic tests that have not yet been classi-
8 fied, or of which the classification is un-
9 clear, questioned, or challenged;

10 (ii) determining which types of tests,
11 including laboratory-developed tests, re-
12 quire review and the level of review needed
13 for such tests;

14 (iii) determining which agency shall
15 have oversight over the review process of
16 such tests that are determined to require
17 review; and

18 (iv) determining, to the extent prac-
19 ticable, which requirements the agency
20 shall apply to the types of tests identified
21 in clause (ii).

22 (B) LEVEL OF REVIEW.—In determining
23 the level of review needed by a genetic test, the
24 Secretary shall take into consideration—

(i) characteristics of the test and its target disease or condition;

(ii) intended use of the test;

(iii) potential for improved medical conditions and patient harms; and

(iv) social consequences of the test.

(C) COMPARATIVE ANALYSIS.—To inform development of the matrix, the Secretary shall undertake a comparative analysis of laboratory review requirements under the Clinical Laboratory Improvement Act and those of the Food and Drug Administration to assess and reduce differences in such requirements, and to eliminate redundancies and decrease burden of review, as practicable.

(D) REGULATIONS.—Not later than 30 months after the date of enactment of this Act, the Secretary shall promulgate regulations to implement the matrix.

(4) ADVERSE EVENTS.—The Secretary, acting through the Commissioner of Food and Drugs and the Administrator of the Centers for Medicare & Medicaid Services, shall—

1          (A) develop or expand adverse event re-
2      porting systems to encompass reports of ad-
3      verse events resulting from genetic testing; and
4          (B) respond appropriately to any adverse
5      events resulting from such testing.
6      (5) AUTHORIZATION OF APPROPRIATIONS.—
7  There is authorized to be appropriated to carry out
8  this subsection, $10,000,000 for fiscal year 2007,
9  and such sums as may be necessary for each of fis-
10  cal years 2008 through 2012.
11  (c) FOOD AND DRUG ADMINISTRATION.—
12      (1) IN GENERAL.—
13          (A) SUMMARY INFORMATION.—If a genetic
14      test that is determined to be within the jurisdic-
15      tion of the Food and Drug Administration but
16      that does not require review, as determined
17      under the matrix, the sponsor of such test shall
18      provide the Secretary with summary informa-
19      tion on how the test was validated and its per-
20      formance characteristics, which information
21      shall be made easily accessible for the public.
22          (B) SOURCE OF INFORMATION.—The in-
23      formation described under subparagraph (A)
24      may be obtained from the labeling submitted
25      for CLIA complexity categorization.

1  (2) REQUIREMENT FOR COMPANION DIAG-
2  NOSTIC TESTING.—The Secretary may require the
3  sponsor of a drug or biological product—

4      (A) to codevelop a companion diagnostic
5  test, after filing an investigational new drug ap-
6  plication or a new drug application to address
7  significant safety concerns of the drug or bio-
8  logical product;

9      (B) to develop a companion diagnostic test
10  if phase IV data demonstrate significant safety
11  or effectiveness concerns with use of the drug
12  or biological product; and

13      (C) to relabel the drug or biological prod-
14  uct to require validated companion diagnostic
15  testing when evidence of improved outcomes has
16  been established in practice or if data dem-
17  onstrate significant safety concerns with use of
18  such drug or biological product.

19  (3) PHARMACOGENOMIC DATA SUBMISSION.—
20  The Secretary shall encourage and facilitate vol-
21  untary pharmacogenomic data submission from drug
22  sponsors, which may include—

23      (A) the development and dissemination of
24  guidance on relevant policies, procedure and
25  practice regarding such submission;

1       (B) the provision of technical assistance;

2       (C) the establishment of a mechanism to

3 store, maintain and analyze such data, in col-

4 laboration with the National Institutes of

5 Health and the Centers for Disease Control and

6 Prevention;

7       (D) determining when such data may be

8 used to support an investigational new drug or

9 a new drug application;

10       (E) the conduct of a study of the use of

11 genomic approaches to understand and reduce

12 adverse drug reactions; and

13       (F) other activities determined appropriate

14 by the Commissioner.

15     (4) LABELING FOR CERTAIN GROUPS.—Not

16 later than 6 months of enactment of this Act, the

17 Secretary shall prepare and publish guidance regard-

18 ing the approval, licensing, or clearance of any prod-

19 uct under the Federal Food, Drug and Cosmetic Act

20 (21 U.S.C. 301 et seq.) or section 351 of the Public

21 Health Service Act (42 U.S.C. 262) with an indica-

22 tion, contraindication, warning, or any other labeling

23 information that is specific to a racial or ethnic

24 group.

1    (5) TERMINATION OF CERTAIN ADVERTISING
2 CAMPAIGNS.—The Food and Drug Administration
3 shall collaborate with the Federal Trade Commission
4 to identify and terminate, pursuant to section 5 of
5 the Federal Trade Commission Act (15 U.S.C. 45),
6 advertising campaigns that make false, misleading,
7 deceptive, or unfair claims about molecular genetic
8 tests.

9    (d) CENTERS FOR MEDICARE & MEDICAID SERV-
10 ICES.—

11    (1) IN GENERAL.—If a genetic test that is de-
12 termined to be within the jurisdiction of the Centers
13 for Medicare & Medicaid Services does not require
14 review as determined under the matrix, the sponsor
15 of such test shall provide the Administrator of the
16 Centers for Medicare & Medicaid Services with sum-
17 mary information on how the test was validated and
18 its performance characteristics, which information
19 shall be made easily accessible for the public.

20    (2) SPECIALTY AREA.—To ensure the accuracy,
21 validity, and reliability of clinical genetic tests that
22 do not require premarket approval by or notification
23 to the Food and Drug Administration, and to im-
24 prove oversight of genetic test laboratories, the Di-
25 rector of the Division of Laboratory Services of the

Survey and Certification Group of the Center for
Medicaid and State Operations of the Centers for
Medicare & Medicaid Services, in collaboration with
the Clinical Laboratory Improvement Advisory Committee at the Centers for Disease Control and Prevention, shall establish a specialty area for molecular
and biochemical genetic tests, in order to—

 (A) develop criteria for establishing analytic and clinical validity for genetic tests that
are determined to require review under the matrix;

 (B) specify requirements for proficiency
testing for laboratories;

 (C) provide guidance regarding the scope
of duty for laboratory directors;

 (D) make information easily accessible to
the public about—

  (i) laboratory certification; and

  (ii) analytic and clinical validity for
genetic tests that are determined to require
high level review under the matrix; and

 (E) conduct other activities at the discretion of the Administrator of the Centers for
Medicare & Medicaid Services.

1 (3) REIMBURSEMENT.—To foster adoption of
2 molecular genetic screening tools, the Administrator
3 of the Centers for Medicare & Medicaid Services
4 shall—

5 (A) assess and update current procedure
6 terminology codes as warranted; and

7 (B) determine and implement fair and rea-
8 sonable coverage policies and reimbursement
9 rates for medically necessary genetic and
10 genomic treatments and services, including lab-
11 oratory testing.

12 (e) CENTERS FOR DISEASE CONTROL AND PREVEN-
13 TION.—

14 (1) DIRECT-TO-CONSUMER MARKETING.—Not
15 later than 12 months after the date of enactment of
16 this Act, the Director of the Centers for Disease
17 Control and Prevention, with respect to molecular
18 genetic tests for which consumers have direct access,
19 shall—

20 (A) conduct an analysis of the public
21 health impact of direct-to-consumer marketing
22 to the extent possible from available data
23 sources;

24 (B) analyze the validity of claims made in
25 direct-to-consumer marketing; and

1         (C) make recommendations to Congress re-
2         garding necessary interventions to protect the
3         public from potential harms of direct-to-con-
4         sumer marketing and access to molecular ge-
5         netic tests.

6     (2) PUBLIC AWARENESS.—The Director shall
7 expand efforts to educate and increase awareness of
8 the general public about genomics and its applica-
9 tions to improve health, prevent disease and elimi-
10 nate health disparities. Such efforts shall include
11 the—

12         (A) ongoing collection of data on the
13         awareness, knowledge and use of genetic tests
14         through public health surveillance systems, and
15         analysis of the impact of such tests on popu-
16         lation health; and

17         (B) integration of the use of validated ge-
18         netic and genomic tests in public health pro-
19         grams as appropriate.

20     (3) AUTHORIZATION OF APPROPRIATIONS.—
21 There is authorized to be appropriated to carry out
22 this subsection, $30,000,000 for fiscal year 2007,
23 and such sums as may be necessary for each of fis-
24 cal years 2008 through 2012.

1 (f) AGENCY FOR HEALTHCARE RESEARCH AND
2 QUALITY.—The Director of the Agency for Healthcare
3 Research and Quality, after consultation with the IWG
4 and other public and private organizations, as appropriate,
5 shall support the assessment of the clinical utility and
6 cost-effectiveness of companion diagnostic tests that guide
7 prescribing decisions, through research that—

8     (1) develops standardized tools and methodolo-
9     gies to assess the cost-effectiveness of such tests, as
10     well as criteria for use;

11     (2) establishes and validates drug dosing algo-
12     rithms for which such tests can improve outcomes,
13     taking into consideration—

14         (A) a reduction in toxicity, adverse events,
15         and mortality;

16         (B) improved clinical outcomes and quality
17         of life, including decreased requirements for
18         monitoring and laboratory testing; and

19         (C) the impact on the direct and indirect
20         costs of health care, which may include costs
21         due to length of hospital stay, length of time to
22         identify safe and effective dosing for patients,
23         toxicity and adverse events, and other measures
24         of health care utilization and outcomes;

1        (3) accelerates development and rapid adoption
2    by providers and payers as appropriate, of com-
3    panion diagnostic testing that could significantly en-
4    hance the safety of a medication by identifying pa-
5    tients at risk for toxic events from use of such medi-
6    cation or by improving dosing regimens for such
7    medication; and

8        (4) prioritizes the development of such tests for
9    diseases and health conditions that have a signifi-
10   cant public health impact because of prevalence, risk
11   of complications from treatment, and other factors
12   determined appropriate by the Director.

13   (g) AUTHORIZATION OF APPROPRIATIONS.—There is
14   authorized to be appropriated to carry out this section,
15   $30,000,000 for fiscal year 2007, and such sums as may
16   be necessary for each of fiscal years 2008 through 2012.

## SEC. 8. SENSE OF THE SENATE REGARDING GENETIC NON-DISCRIMINATION AND PRIVACY.

19   It is the sense of the Senate that—

20       (1) in order for personalized medicine to ad-
21   vance and achieve success in both reducing the bur-
22   den of disease and reducing health care costs, strong
23   privacy protections, including protections against ge-
24   netic discrimination, must be enacted and imple-
25   mented;

1     (2) without a Federal law banning genetic dis-
2 crimination, people may fear losing their health in-
3 surance and their employment, and subsequently—

4     (A) avoid participating in research that
5 collects genetic information; and

6     (B) even decline clinical molecular testing
7 that may provide lifesaving information;

8     (3) fear of genetic discrimination will slow the
9 pace of discovery in research and hinder the uptake
10 of molecular testing in a clinical setting, both of
11 which will undermine efforts to translate and apply
12 personalized medicine technology; and

13     (4) adequate privacy protections, including a
14 Federal prohibition against genetic discrimination,
15 are necessary prerequisites to advancing personal-
16 ized medicine.

○