# EXHIBIT
# 14

Dockets.Justia.com

This is the accessible text file for GAO report number GAO-03-536 entitled 'Technology Transfer: Agencies' Rights to Federally Sponsored Biomedical Inventions' which was released on July 01, 2003.

This text file was formatted by the U.S. General Accounting Office (GAO) to be accessible to users with visual impairments, as part of a longer term project to improve GAO products' accessibility. Every attempt has been made to maintain the structural and data integrity of the original printed product. Accessibility features, such as text descriptions of tables, consecutively numbered footnotes placed at the end of the file, and the text of agency comment letters, are provided but may not exactly duplicate the presentation or format of the printed version. The portable document format (PDF) file is an exact electronic replica of the printed version. We welcome your feedback. Please E-mail your comments regarding the contents or accessibility features of this document to Webmaster@gao.gov.

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. Because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

Report to Congressional Committees:

United States General Accounting Office:

GAO:

July 2003:

Technology Transfer:

Agencies' Rights to Federally Sponsored Biomedical Inventions:

GAO-03-536:

GAO Highlights:

Highlights of GAO-03-536, a report to Congressional Committees

Why GAO Did This Study:

The Bayh-Dole Act gives federal contractors, grantees, and cooperative agreement funding recipients the option to retain ownership rights to inventions they create as part of a federally sponsored research project and profit from commercializing them. The act also protects the government's interests, in part by requiring that federal agencies and their authorized funding recipients retain a license to practice the invention for government purposes. GAO examined (1) who is eligible to use and benefit from the government's license to federally funded biomedical inventions, (2) the extent to which the federal government has licenses to those biomedical inventions it procures or uses most commonly, and (3) the extent to which federal agencies and authorized federal funding recipients have actually used or benefited from these licenses. GAO focused its work on the Department of Veterans Affairs (VA), the Department of Defense (DOD), and the National Institutes of Health (NIH).

NIH commented that the report implies that the government's right to use its license is more limited than it actually is. GAO recognizes that the right of federal agencies and their funding recipients to use

a federally funded invention is unrestricted. However, GAO believes
that these license rights can be used only to meet needs that are
reasonably related to the requirements of federal programs.

What GAO Found:

Federal agencies and their authorized funding recipients are eligible
to use the government's licenses to federally funded inventions for
the benefit of the government. Government researchers can use the
technology without paying a royalty, and federal agencies can
authorize their funding recipients to use the government's licenses
for specific contracts, grant awards, or cooperative agreements
meeting a federal government need. The government is not entitled to
automatic price discounts simply because it purchases products that
incorporate inventions in which it happens to hold a license.
Furthermore, the government's rights attach only to the inventions
created by federally funded research and do not necessarily extend to
later inventions based on them. Thus, the government may have no
rights in a next-generation invention that builds on federally funded
technology if the new invention were not itself created by federally
sponsored research.

Few of the biomedical products that federal agencies most commonly buy
appear to incorporate federally funded inventions. In 2001 the
government had licensing rights in only 6 brand name drugs associated
with the top 100 pharmaceuticals that VA procured and in 4 brand name
drugs associated with the top 100 pharmaceuticals that DOD dispensed.
GAO was unable to determine the extent to which the government had
rights to other types of biomedical products because there are no
databases showing the underlying patents for most of these products
and such products may incorporate numerous components that might not
be covered by identifiable patents.

The federal government uses its licenses to biomedical inventions
primarily for research; however, researchers generally do not document
such usage. These licenses are valuable because researchers can use
the inventions without concerns about possible challenges for
unauthorized use. Neither VA nor DOD has used the government's
licenses to procure biomedical products because they cannot readily
determine whether products use federally funded technologies and they
believe they already receive favorable pricing through the Federal
Supply Schedule and national contracts. Furthermore, neither VA nor
DOD has used the government's license to manufacture a biomedical
product for its use.

Rights to Federally Sponsored Inventions

* Federal agencies and their authorized funding recipients can use the
government's license to federally funded inventions without paying a
royalty.

* Federal agencies can authorize their contractors to make products
that incorporate federally funded inventions for government use
without risking patent infringement.

* The government's license does not entitle federal agencies to
automatic price discounts just because a product incorporates a
federally funded invention.


www.gao.gov/cgi-bin/getrpt?GAO-03-536.

To view the full product, including the scope and methodology, click
on the link above. For more information, contact Robin Nazzaro at
(202) 512-3841 or nazzaror@gao.gov.

[End of section]

Contents:

Letter:

Results in Brief:

Background:

The Government's License Has Limited Applicability:

The Government Appears to Hold Few Licenses to the Biomedical Products It Purchases:

The Government Has Used Its Biomedical Licenses Primarily for Research:

Observations:

Agency Comments and Our Evaluation:

Appendix I: Objectives, Scope, and Methodology:

Appendix II: The Top 100 Pharmaceuticals Procured by VA on the Basis of Dollar Value, Fiscal Year 2001:

Appendix III: The Top 100 Pharmaceuticals Dispensed by DOD on the Basis of Dollar Value, July 1, 2001-June 30, 2002:

Appendix IV: Comments from the National Institutes of Health:

Table:

Table 1: DOD's and VA's Expenditures on Drugs Incorporating Federally Sponsored Inventions, Fiscal Year 2001:

Abbreviations:

AIDS: acquired immunodeficiency syndrome:

DOD: Department of Defense:

FDA: Food and Drug Administration:

HHS: Department of Health and Human Services:

HIV: human immunodeficiency virus:

NIH: National Institutes of Health:

USPTO: U.S. Patent and Trademark Office:

VA: Department of Veterans Affairs:

United States General Accounting Office:

Washington, DC 20548:

July 1, 2003:

Congressional Committees:

Since 1980, the Bayh-Dole Act and subsequent executive actions generally have given federal contractors, grantees, and cooperative

agreement funding recipients the option to retain ownership rights to, and profit from, commercializing the inventions they create as part of federally sponsored research projects. In return for these rights, they are required to file for patent protection, pursue commercialization of the inventions, give preferences to small businesses in licensing, ensure that any products resulting from the inventions are substantially manufactured in the United States, and comply with certain reporting requirements. The Bayh-Dole Act also provides federal agencies and their authorized funding recipients with a "nonexclusive, nontransferable, irrevocable, paid-up license" to practice these federally funded inventions for government purposes.

We assessed (1) who is eligible to use and benefit from the government's licenses to biomedical inventions created under federally sponsored research, (2) the extent to which the federal government has licenses to those biomedical inventions it procures or uses most commonly, and (3) the extent to which those eligible have actually used or benefited from these licenses. We focused our work on the Department of Veterans Affairs (VA) and the Department of Defense (DOD)--which are responsible for the bulk of the government's biomedical procurements-- and the National Institutes of Health (NIH), within the Department of Health and Human Services (HHS), which funds most biomedical research.

To determine who is eligible to use and benefit from the government's licenses to biomedical inventions, we reviewed the Bayh-Dole Act, other statutes, federal agencies' implementing regulations, applicable case law, and the positions taken by federal agencies in interpreting these laws. To assess the extent to which the government has licenses to the underlying inventions for the biomedical products it uses, we primarily analyzed the patents behind the top 100 pharmaceuticals that VA procured and DOD dispensed during 2001. For our analysis, we used databases maintained by the Food and Drug Administration (FDA) and the U.S. Patent and Trademark Office (USPTO) as well as VA, DOD, and NIH. Finally, to assess the extent to which eligible parties have used or benefited from the government's licenses, we determined (1) whether VA and DOD contracting personnel used them in procuring pharmaceuticals and medical devices and (2) whether VA, DOD, and NIH research personnel used them in conducting research. We conducted our review from April 2002 through April 2003 in accordance with generally accepted government auditing standards. Additional details on our scope and methodology are included in appendix I.

Results in Brief:

Federal agencies and their authorized funding recipients are eligible to use the government's licenses to federally funded inventions for the benefit of the government. Specifically, government researchers can use the technology without having to pay a royalty, and a federal agency can have a contractor produce the item for its use without obtaining a separate license. Third parties--contractors, grantees, and cooperative agreement funding recipients--can use the government's licenses when granted this authority for a specific contract, grant award, or cooperative agreement meeting a federal government need. The government is not entitled to automatic price discounts simply because it purchases products that incorporate inventions in which it happens to holds a license. In addition, the government's rights attach only to the inventions created by federally funded research and do not necessarily extend to later inventions based on them. Thus, the government may have no rights in a next-generation invention that builds on federally funded technology if the new invention were not itself created by federally sponsored research.

Few of the biomedical products that the federal government most commonly buys appear to incorporate federally funded inventions. We found, for example, that federally funded inventions were used to make

only 6 brand name drugs associated with the top 100 pharmaceuticals
that VA procured for use by veterans and 4 brand name drugs associated
with the top 100 pharmaceuticals that DOD dispensed in 2001. We could
not determine the extent to which the federal government holds rights
to other types of biomedical products, such as hospital beds and
wheelchairs, because (1) there are no databases showing the underlying
patents for most of these products and (2) the products may incorporate
numerous components that might not be covered by identifiable patents.
However, we found no federal government rights to the selected medical
devices we examined; and VA and DOD officials told us that the
government would rarely have patent rights in such products.

The federal government uses its licenses to biomedical inventions
primarily for performing research; however, the extent of such usage
cannot be determined because researchers generally do not keep records,
according to VA, DOD, and NIH officials. Citing a generally accepted
practice among government and university scientists, government
researchers have typically used the patented technologies of others
without obtaining permission or a license. However, patent law does not
appear to provide for such use without obtaining permission or a
license from the patent owner. Agency officials said that when their
scientists' use of federally funded inventions is challenged, they
inform the patent holders of the government's license. Neither VA nor
DOD has used the government's licenses to procure biomedical products
because they cannot readily determine if products incorporate federally
funded technologies and they believe they already receive favorable
pricing through the Federal Supply Schedule and national contracts.
Furthermore, neither VA nor DOD has used the government's license to
hire a contractor to manufacture a biomedical product for its use.

In commenting on a draft of this report, NIH stated that because we tie
the exercise of the government's license rights to the needs of the
federal government, we give the impression that the government's
license rights are more limited than they actually are. While we agree
with NIH that federal agencies and their funding recipients have
unrestricted rights to use a federally funded invention for federal
government purposes, it is important to recognize that they can use
these rights only to meet needs that are reasonably related to the
requirements of federal programs.

Background:

Prior to 1980, federal agencies generally retained title to any
inventions resulting from federally funded research--whether the
research was conducted by contractors and grantees or by federal
scientists in their own laboratories--although specific policies varied
among the agencies. Increasingly, this situation was a source of
dissatisfaction because of a general belief that technology resulting
from federally funded research was not being transferred to U.S.
businesses for developing new or improved commercial products. For
example, there were concerns that biomedical and other technological
advances resulting from federally funded research at universities were
not leading to new products because the universities had little
incentive to seek uses for inventions to which the government held
title. Additionally, the complexity of the rules and regulations and
the lack of a uniform policy for these inventions often frustrated
those who did seek to use the research.

In 1980, the Congress enacted two laws that have fostered the transfer
of federal technology to U.S. businesses.[Footnote 1] The Stevenson-
Wydler Technology Innovation Act of 1980 (P.L. 96-480, Oct. 21, 1980)
promoted the transfer of technology from federal laboratories to the
private sector. The Bayh-Dole Act (P.L. 96-517, Dec. 12, 1980) gave
universities, nonprofit organizations, and small businesses the option
to retain title to inventions developed with federal funding. It also

authorized federal agencies to grant exclusive licenses to patents on federally owned inventions that were made at federal laboratories or that federal agencies patented after a federal funding recipient opted not to retain title.

To protect the public's interest in commercializing federally funded technology, the Bayh-Dole Act required, among other things, that a contractor or grantee that retains title to a federally funded invention (1) file for patent protection and attempt commercialization and (2) comply with certain reporting requirements.[Footnote 2] The act also specified that the government would retain "a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States any subject invention throughout the world."[Footnote 3]

The Bayh-Dole Act did not give large businesses the right to retain title to their federally funded inventions. Subsequently, in February 1983, President Reagan issued a memorandum on patent policy to executive agency heads stating that, to the extent permitted by law, the government's policy is to extend the policy enunciated in the Bayh-Dole Act to all federally funded inventions arising under research and development contracts, grants, and cooperative agreements. In April 1987, President Reagan issued Executive Order 12591, which, among other things, requires executive agencies to promote the commercialization of federally funded inventions in accordance with the 1983 memorandum.

Our 1999 report noted that federal agencies were not always aware of the government's licenses and could not tell us the circumstances under which these licenses had been employed.[Footnote 4] Nevertheless, agency officials said that the government's license to practice federally funded inventions is important because agency scientists could use these inventions without being concerned that such use would be challenged.

The Government's License Has Limited Applicability:

Federal agencies and their authorized funding recipients have the right to benefit from the use of a federally funded invention without risk of infringing the patents. Government scientists can use these inventions in their research without having to pay royalties. Federal contractors, grantees, and cooperative agreement funding recipients may use the government's license if they are authorized to do so. For example, federal agencies can contract with a third party to manufacture products containing such inventions. However, the government's license to use a federally funded invention does not automatically entitle the government to price discounts when purchasing products that happen to incorporate the invention. The government's license also does not necessarily extend to later inventions related to or based on the federally funded invention.

The Government's License Protects Its Right to Practice the Invention:

The Bayh-Dole Act gives the government the right to "practice"--or use--a federally funded invention without being liable for patent infringement. There are two primary ways in which the government can use its right to practice an invention in which it has retained a license. First, the government can contract with a third party to make a product that incorporates the invention for or on behalf of the government without either the government or the contractor being liable for patent infringement. It is our understanding that this right has never been invoked for biomedical products. Second, the government can use the invention itself without obtaining a license from or paying a royalty to the patent owner. As discussed later in this report, federal research officials say that this is a common occurrence in the research arena, making the license to use federally funded inventions a valuable

asset to the government.

The Government's License Is Available to Federal Agencies and
Authorized Funding Recipients:

The government's right to practice an invention is limited to federal
agencies and their funding recipients specifically authorized to use
the invention for federal government purposes. The Bayh-Dole Act
provides that the license is "nontransferable," which means that the
government may not sell or otherwise authorize another to practice an
invention in its stead. This concept is not unique to the Bayh-Dole
Act. Such language appears frequently in patent practice, where
nonexclusive licensing agreements are typically construed as
restricting assignment of the license without the licensor's consent.
In the Bayh-Dole Act, the term "nontransferable" is followed
immediately by qualifying text--language that allows the government to
authorize others to practice the invention for or on its behalf but
which restricts the purposes for which it may do so.

Federal agencies typically have authorized contractors to use the
government's license to develop and produce mission-critical hardware,
such as a weapon system. This use of the government's license satisfies
a legitimate federal governmental need in support of a congressionally
authorized program.

Such linkages to an agency's mission are less prevalent when grants or
cooperative agreements are used, as is typically the case with NIH,
which sponsors biomedical research to benefit the public health. This
research serves the public good through biomedical advances from
publishing scientific results and developing new technology that
improve people's life. This good may represent a sufficient government
need for NIH to authorize its grantees to use the government's license
as a basis for using federally funded inventions in their research.
However, according to a senior NIH attorney, NIH does not use this
rationale to authorize grantees to exercise the government's licenses
and has not included a clause in its grant agreements authorizing the
use of federally funded inventions as part of the research. As a
result, NIH's grantees might be sued for infringement and must
negotiate any licensing agreements they believe they need to support
their work. Furthermore, the government's license to use a federally
funded invention generally does not apply to HHS's purchases of drugs
and vaccines because (1) HHS has never contracted for the manufacture
of a pharmaceutical made with federal funds for the government's use
and (2) HHS's funding assistance for acquiring drugs or vaccines for
distribution is intended to assist the states' public health services,
rather than to meet a federal agency's need.[Footnote 5]

The Government Is Not Automatically Entitled to Price Discounts:

The "paid-up license" that the Bayh-Dole Act specifically confers on
the federal government[Footnote 6] is often referred to as a "royalty-
free license." The term "royalty-free" license (and even "paid-up
license") has sometimes been misinterpreted in a way that effectively
eliminates the conditions set forth in the statute. The license for
which the federal government is "paid up" entitles it to practice an
invention itself, or to have others practice the invention on the
government's behalf. The statute does not give the federal government
the far broader right to purchase, "off the shelf" and royalty free
(i.e., at a discounted price), products that happen to incorporate a
federally funded invention when they are not produced under the
government's license.

The Government's License May Not Extend to Related Inventions:

An invention rarely represents a completely new form of technology

because the inventor almost always has used "prior art" in developing
the ideas that led to an invention. Prior art is the intellectual
basis--the knowledge base--upon which the novelty of an invention is
established or the basis that determines whether the "invention" would
have been obvious to one skilled in the art. In making an invention, an
inventor typically would build on the prior art in the particular
technology, and some of this prior art might have been developed by
either government scientists or federal funding recipients. However, an
intellectual property interest in prior art does not in and of itself
give one an interest in someone else's subsequent invention.

Also, an invention often is part of a family of related inventions. One
research project may spawn multiple inventions that, for example, are
separate and distinct or are further developments of a basic invention
for specific applications. Similarly, the idea on which the original
invention is based may trigger new inventions.[Footnote 7] The question
of whether the government has an interest in later inventions also
arises in instances involving the same technologies when the patents to
these inventions are related in some fashion. Patents may be related
because they protect inventions springing from the same essential
technologies or scientists discover additional uses for an invention.
For example, while a patent application is pending at USPTO, the
applicant may decide to clarify the description of an invention because
what initially was viewed as a single invention is found to be two or
more inventions or because the USPTO patent examiner determines that
patent application claims must be separated and independently
supported.

Whether the government has the right to practice an invention because
it retains a license to use it under the Bayh-Dole Act depends upon
whether the invention was developed with federal funding and is,
therefore, subject to the act. An invention is a "subject invention" if
it is conceived or first actually reduced to practice "in the
performance of work under a funding agreement" (contract, grant, or
cooperative agreement) to which the act applies. Rights to the parent
patent do not automatically generate rights vis-à-vis related
subsequent patents. In this regard, the government is not entitled to
any different protection than other entities that fund research.

There is one exception to the general rule that inclusion depends upon
whether each invention was itself conceived or first actually reduced
to practice in performing federally funded research. This exception
holds that while the owner of a "dominant patent" can block the
unlicensed use of that patent and related patents, the owner may not
assert that patent either to deprive its licensee's right to a
"subservient patent" or, similarly, block the government's license to
use a subservient patent for a federally funded invention. Thus, if the
owner of a dominant patent subsequently makes a new invention in the
course of work under a federal contract or other federal assistance,
the owner cannot assert the dominant patent to frustrate the
government's exercise of its license to use the second invention.

The Government Appears to Hold Few Licenses to the Biomedical Products
It Purchases:

Although determining the extent to which the government has licenses
in biomedical products is difficult, the number appears to be small.
For pharmaceuticals, one of the largest sectors of the biomedical
market, we found that the government had an interest--either because of
its license under the Bayh-Dole Act or as the owner or "assignee" of
the patent--in only 6 brand name drugs associated with the top 100
products, by dollar value, that VA procured in fiscal year 2001 and 4
brand name drugs associated with the top 100 products, by dollar value,
that DOD dispensed from July 2001 to June 2002. (See apps. II and III.)
All four of the DOD drugs were among the six federally funded

pharmaceuticals that VA purchased. As shown in table 1, VA and DOD
spent about $120 million on these six drugs in fiscal year 2001.

Table 1: DOD's and VA's Expenditures on Drugs Incorporating Federally
Sponsored Inventions, Fiscal Year 2001:

Dollars in millions.

Procrit (epoetin alpha); Use: Treats severe anemia
caused by such conditions as cancer, acquired immunodeficiency
syndrome (AIDS), or surgery; DOD's and VA's expenditures:
$45.5.

Xalatan (latanoprost); Use: Treats eye conditions,
including glaucoma and ocular hypertension, in which increased
pressure can lead to a gradual loss of vision; DOD's and
VA's expenditures: 21.8.

Epogen (epoetin alpha); Use: Treats severe anemia
caused by such conditions as cancer, AIDS, or surgery; DOD's and VA's
expenditures: 15.6.

Neupogen (filgrastim); Use: Decreases the chance
of infection in patients with cancer by promoting the growth of white
blood cells; DOD's and VA's expenditures: 14.2.

Taxol (paclitaxel); Use: Treats metastatic breast
and ovarian cancer and Kaposi's sarcoma, as well as head and neck
cancer, non-small-cell lung cancer, small-cell lung cancer, and bladder
cancer; DOD's and VA's expenditures: 12.2.

Zerit (stavudine); Use: Treats infection caused by
the human immunodeficiency virus (HIV); DOD's and
VA's expenditures: 10.2.

Total; DOD's and VA's expenditures: $119.5.

Sources: DOD and VA (data), GAO (analysis).

Note: Drug names are presented in terms of brand name products, and the
corresponding generic drug name is included in parentheses.

[End of table]

We could not determine the extent to which the government holds
rights to other types of biomedical products because (1) no databases
exist showing the underlying patents for most of these products and
(2) products such as hospital beds and wheelchairs may incorporate
numerous components that might not be covered by identifiable patents.
Our examination found no government rights to any of five medical
devices for which the VA Medical Center in Milwaukee, Wisconsin, had
spent more than $1 million during fiscal year 2002. The medical devices
we analyzed included electric hospital beds, closed circuit
televisions, blood pressure monitors, low-air-loss and air-pressure
mattresses, and wheelchairs. Officials from VA and DOD believe that the
government would rarely have patent rights to such products.

The Government Has Used Its Biomedical Licenses Primarily for Research:

Officials from VA, DOD, and NIH said that their agencies use the
government's licenses to biomedical inventions primarily in performing
research. These officials could not tell us the extent of such usage,
however, because researchers generally do not keep records. Instead,
government researchers often use the technology and inform the patent
owner of the government's rights only if there is a claim of

infringement or other question regarding the government's use. In fact, government scientists usually do not obtain licenses for any patented technology they may use in research. They told us that using technology for research purposes without obtaining permission is a generally accepted practice among both government and university scientists.

VA and DOD officials said they do not consider the government's licenses for procurements because they (1) would not be able to determine readily which products incorporate patented technologies or whether the government helped fund the technology's development, (2) believe they already receive favorable pricing through the Federal Supply Schedule and national contracts, and (3) are not required by law to do so. Similarly, the VA and DOD officials said they had not used the government's licenses to have a contractor manufacture biomedical products for federal use.

Biomedical Licenses Are Primarily Used for Research:

DOD and NIH attorneys told us that the government primarily uses its biomedical licenses for research. According to these officials, the government's licenses are valuable because they allow researchers to use the inventions without concern about possible challenges alleging that the use was unauthorized. However, no governmentwide database exists to track how often government researchers actually use the licenses, and agencies did not have records showing how often or under what circumstances these licenses have been employed.

NIH officials said that their agency does not routinely document its researchers' use of patented technologies. Thus, they have no way to readily determine which patented technologies have been used or whether the government had an interest in them. However, the NIH officials cited additional reasons why NIH researchers seldom obtain licenses to conduct research: First, NIH researchers may not really need a license because they can work with the underlying principles behind the technology simply by using the information that has been published. Second, there is a prevailing practice not to enforce patent rights among federal agencies and nonprofit organizations that conduct academic research. Third, under 28 U.S.C. § 1498, federal agencies cannot be enjoined from using patented technology in conducting research; the patent owner's only recourse is to sue the government for a reasonable royalty.

An Army patent attorney told us that he advises researchers to inform him of any patented technologies they are using in their research. He also said, however, that this does not always happen in practice and that he and the researchers generally are not aware of a potentially infringing use until the patent owner informs them. At that time, he researches the matter and seeks permission, obtains a license, or informs the patent owner of the government's interest if there is one. Because the attorney does not have records on government licenses, he has to research each case individually. He added that he had invoked the privileges of the licenses for research purposes but could not readily tell us how often this had occurred.

A VA official said that, like NIH, VA researchers usually do not know whether the technology they use for research is patented. Furthermore, information about the government's interest in the development of products is difficult to obtain because extensive research would be required. She said that VA procures some research materials using Material Transfer Agreements with universities. For the most part, however, VA simply goes about its research assuming it has the right to use the technologies of others unless there is a challenge. She was unaware of any patent infringement cases that had been filed against VA.

The "General Research Exception" Is Cited in Using Patented
Technologies:

VA, DOD, and NIH have each relied, to some extent, on the concept that
a researcher could use patented technology for research as long as the
research is for purely scientific endeavors. According to agency
officials, such use is a generally accepted practice within the
research community on the basis of what some believe is a "general
research exception." However, some agency officials questioned how this
exception might be viewed in light of the decision rendered by the
Court of Appeals for the Federal Circuit in Madey v. Duke University,
307 F.3d 1351 (Fed. Cir. 2002). Concerning the availability of the
experimental use exception to a university, the court ruled that the
experimental use exception is very narrow and strictly limited,
extending only to experimental uses that are not in furtherance of the
infringer's legitimate business and are solely for the infringer's
amusement, to satisfy idle curiosity, or for strictly philosophical
inquiry. The court also stated that the profit or nonprofit status of
the user is not determinative of whether the use qualifies for the
experimental use exception. Experimental use may infringe a patent when
the use furthers the infringer's business. For example, the business of
a research institution includes conducting research.

Some patent owners believe that allowing others to use their patented
technologies for research purposes may pose no threat and may actually
be to their benefit. In fact, representatives from corporations
involved in the research and development of products in the biomedical
area told us that they welcome additional research that will continue
to advance the state of the art as long as such use is not merely an
attempt to use the patents for commercial purposes without obtaining a
license. They said that there has been an unstated "gentlemen's
agreement" among researchers in this regard that will not be affected
by the Madey case. If true, government researchers may, as a practical
matter, be able in many cases to continue using the patented
technologies of others without obtaining licenses.

Licenses Have Not Been Used for Biomedical Procurements:

VA and DOD procurement officials were unaware of any instances in which
a federal agency had used the government's licenses to have contractors
manufacture products that incorporate federally funded inventions.
Furthermore, these procurement officials said that, as discussed above,
the government's license does not provide an automatic discount for
federal government procurements. They added that even if they wanted to
use the license for procurements, they would not know which products
incorporate federally funded inventions.

The VA and DOD officials also said that the government's licenses would
probably not significantly reduce their procurement costs because they
believe they already receive favorable pricing through the Federal
Supply Schedule and national contracts. In particular, for a branded
pharmaceutical to be listed on the Federal Supply Schedule, the
manufacturer must agree to give the government a 24-percent discount
over the nonfederal average manufacturer price.[Footnote 8]
Furthermore, the federal government has negotiated national contracts
that provide even greater discounts for some pharmaceuticals.

Observations:

The government's license under the Bayh-Dole Act provides protection
against claims of patent infringement when federal agencies or their
authorized funding recipients use federally funded inventions.
Scientists working for federal agencies and their contractors generally
are authorized to use federally funded inventions; however, agencies
have not necessarily provided similar authorization in their grant

agreements for scientists at universities and other institutions. The decision rendered by the Court of Appeals for the Federal Circuit in Madey v. Duke University calls into question the validity of the general research exception that many scientists have cited as a basis for using the patented technology of others in their research.

Agency Comments and Our Evaluation:

We provided NIH with a draft of this report for its review and comment. NIH stated that because our report ties the exercise of the government's license rights to the needs of the federal government, we give the impression that the government's license rights are more limited than they actually are. While we agree with NIH that federal agencies and their funding recipients have unrestricted rights to use a federally funded invention for federal government purposes, it is important to recognize that they can use these rights only to meet needs that are reasonably related to the requirements of federal programs. NIH also provided comments to improve the report's technical accuracy, which we incorporated as appropriate. (See app. IV for NIH's written comments and our responses.):

We will send copies of this report to interested Members of Congress; the Secretary of Defense; the Secretary of Health and Human Services; the Secretary of Veterans Affairs; and the Director, Office of Management and Budget. We will also make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions about this report, please contact me at (202) 512-3841. Key contributors to this report were Richard Cheston, Deborah Ortega, Bert Japikse, Frankie Fulton, and Lynne Schoenauer.

Robin M. Nazzaro
Director, Natural Resources and Environment:

Signed by Robin M. Nazzaro:

List of Congressional Committees:

The Honorable Orrin G. Hatch:

Chairman:

The Honorable Patrick J. Leahy:

Ranking Minority Member:

Committee on the Judiciary:

United States Senate:

The Honorable Sam Brownback:

Chairman:

The Honorable John B. Breaux:

Ranking Minority Member:

Subcommittee on Science, Technology, and Space:

Committee on Commerce, Science, and Transportation:

United States Senate:

The Honorable Lamar Smith:

Chairman:

The Honorable Howard L. Berman:

Ranking Minority Member:

Subcommittee on Courts, the Internet, and Intellectual Property:

Committee on the Judiciary:

House of Representatives:

The Honorable Sherwood L. Boehlert:

Chairman:

The Honorable Ralph M. Hall:

Ranking Minority Member:

Committee on Science:

House of Representatives:

[End of section]

Appendix I: Objectives, Scope, and Methodology:

We examined the manner in which federal agencies administer, use, and benefit from intellectual property created under federally sponsored research programs related to public health, health care, and medical technology. Our objectives were to assess (1) who is eligible to use and benefit from the government's licenses to biomedical inventions created under federally sponsored research, (2) the extent to which the government has licenses to those biomedical inventions it procures or uses most commonly, and (3) the extent to which those eligible have actually used or benefited from these licenses.

To determine who is eligible to use and benefit from the government's licenses, we reviewed the applicable laws, regulations, and procedures, including an examination of relevant case law. We also obtained the views of a senior attorney responsible for handling these cases in the Office of General Counsel of the Department of Health and Human Services.

To assess the extent of the government's licenses to biomedical inventions, we concentrated on pharmaceuticals because (1) pharmaceuticals represent a major component of the federal government's biomedical procurements--an estimated $3.5 billion annually--and (2) government databases can be used to identify the underlying patents to pharmaceuticals approved by the Food and Drug Administration (FDA). In conducting our work, we first obtained data on the generic product name, total purchases by dollar amount, and number of prescriptions filled for the top 100 pharmaceuticals purchased by the Department of Veterans Affairs (VA) and the Department of Defense (DOD), which procure most of the government's biomedical products for use by their hospitals and other medical facilities. VA's data covered procurements for fiscal year 2001. DOD's data covered the 12-month period from July 1, 2001, to June 30, 2002, because the agency began consolidating its pharmacy program sales data on July 1, 2001.

For each of the VA and DOD pharmaceuticals, we used FDA's Electronic Orange Book to identify the corresponding brand name product(s) and

their patents. We focused on brand name products rather than generics
because the former often utilize technologies with protected active
patents and typically generate higher sales, whereas generic drugs
often enter the market only after a product's active patents have
expired. We examined possible equivalent brand names to ensure that we
identified the government's licenses to available alternative products.
FDA's Electronic Orange Book included 210 of the 217 brand name
products we reviewed. We also obtained patent numbers for three of the
seven pharmaceuticals not included by examining their product Web
sites. Using the patent numbers, we then accessed the patent records in
the U.S. Patent and Trademark Office's (USPTO) patent database to
determine whether the government held any rights to the patented
technologies of each brand name pharmaceutical. We identified any cases
where the government was the owner or assignee or had a license to use
the invention because it sponsored the research.

In addition to our own assessment, we examined the National Institutes
of Health's (NIH) July 2001 report entitled NIH Response to the
Conference Report Request for a Plan to Ensure Taxpayers' Interests Are
Protected. NIH assessed the return to the taxpayers for therapeutic
drugs that use NIH-funded technology and have sales of at least $500
million per year, making them "blockbuster" drugs. From a survey of the
pharmaceutical industry, FDA, USPTO, and its own databases, NIH
determined that the government had rights to 4 of the 47 blockbuster
drugs it identified for 1999--Taxol, Epogen, Procrit, and Neupogen. We
found that all 4 of these were among VA's top 100 pharmaceutical
procurements and all but Taxol were among DOD's top 100.

To determine the extent of the government's ownership of or licenses to
use other biomedical products, we explored several methods to locate
relevant patent and licensing information for medical devices. However,
we found that (1) there are no databases showing the underlying patents
for most of these products and (2) products such as hospital beds and
wheelchairs typically incorporate numerous components that may or
may not be covered by identifiable patents. In addition, VA and DOD
procurement officials informed us that they do not have agencywide data
showing the most frequently purchased items because many devices are
purchased at the local level.

Because of these limitations, we identified five medical devices for
which the VA Hospital in Milwaukee, Wisconsin--a major procurer of
medical devices--had spent more than $1 million during fiscal year
2002. This approach also provided only limited information. We examined
the government's rights to each device by identifying it in the General
Services Administration's on-line supply catalog, which includes the
items on the Federal Supply Schedule, and reviewing the corresponding
item descriptions. However, we found that the catalog does not provide
patent or licensing information for any of the products. We also were
unable to determine from the USPTO patent database the specific patents
used for each medical device. Finally, our examination of product Web
sites found that they do not provide information on the products'
patented technologies or address whether the government has license
rights to them.

To examine how the government has used its licenses to federally funded
inventions, we interviewed DOD, NIH, and VA officials who procure
biomedical products or who are involved in scientific research. Also,
we researched relevant statutes and case law and met with knowledgeable
officials in NIH and industry to determine whether a general research
exception exists regarding patent infringement that applies to
government and other researchers conducting research for purely
scientific reasons.

We conducted our work from April 2002 through April 2003 in accordance
with generally accepted government auditing standards. We did not

independently verify the data that VA, DOD, or NIH provided or the data
obtained from the USPTO and FDA databases. However, agency officials
addressed each of our questions regarding their data.

[End of section]

Appendix II: The Top 100 Pharmaceuticals Procured by VA on the Basis of
Dollar Value, Fiscal Year 2001:

Dollars in millions.

1; Drug name: Simvastatin;
Amount procured[A]: $121.7; Active government rights: No.

2; Drug name: Olanzapine;
Amount procured[A]: 99.6; Active government rights: No.

3; Drug name: Lansoprazole;
Amount procured[A]: 63.8; Active government rights: No.

4; Drug name: Gabapentin;
Amount procured[A]: 61.2; Active government rights: No.

5; Drug name: Metformin hydrochloride; Amount procured[A]: 59.6;
Active government rights: No.

6; Drug name: Epoetin alfa[B]; Amount procured[A]: 53.3;
Active government rights: Yes.

7; Drug name: Risperidone;
Amount procured[A]: 49.9; Active government rights: No.

8; Drug name: Sertraline hydrochloride; Dollars in
millions: Amount procured[A]: 49.3;
Active government rights: No.

9; Drug name: Glucose test[C]; Amount procured[A]: 42.4;
Active government rights: Unknown.

10; Drug name: Fluoxetine hydrochloride; Amount procured[A]: 39.3;
Active government rights: No.

11; Drug name: Felodipine;
Amount procured[A]: 36.5; Active government rights: No.

12; Drug name: Clopidogrel bisulfate; Amount procured[A]: 36.1;
Active government rights: No.

13; Drug name: Ipratropium bromide; Amount procured[A]: 34.6;
Active government rights: No.

14; Drug name: Goserelin acetate; Amount procured[A]: 34.3;
Active government rights: No.

15; Drug name: Lisinopril;
Amount procured[A]: 28.9; Active government rights: No.

16; Drug name: Paroxetine hydrochloride; Amount procured[A]: 27.7;
Active government rights: No.

17; Drug name: Albuterol sulfate and ipratropium
bromide; Amount procured[A]: 24.8; Active government rights: No.

18; Drug name: Divalproex sodium; Amount procured[A]: 24.0;
Active government rights: No.

19; Drug name: Rosiglitazone maleate; Amount procured[A]: 23.9;
Active government rights: No.

20; Drug name: Bupropion hydrochloride; Amount procured[A]: 22.0;
Active government rights: No.

21; Drug name: Amlodipine besylate; Amount procured[A]: 20.8;
Active government rights: No.

22; Drug name: Atorvastatin calcium; Amount procured[A]: 20.2;
Active government rights: No.

23; Drug name: Interferon alfa-2b and
ribavirin[D]; Amount procured[A]: 20.0; Active government rights: No.

24; Drug name: Buspirone hydrochloride; Amount procured[A]: 19.5;
Active government rights: No.

25; Drug name: Insulin[E];
Amount procured[A]: 19.4; Active government rights: No.

26; Drug name: Bicalutamide;
Amount procured[A]: 19.0; Active government rights: No.

27; Drug name: Beclomethasone dipropionate;
Amount procured[A]: 18.9;
Active government rights: No.

28; Drug name: Celecoxib;
Amount procured[A]: 18.8; Active government rights: No.

29; Drug name: Finasteride;
Amount procured[A]: 17.4; Active government rights: No.

30; Drug name: Salmeterol xinafoate; Amount procured[A]: 17.2;
Active government rights: No.

31; Drug name: Enoxaparin sodium; Amount procured[A]: 16.5;
Active government rights: No.

32; Drug name: Diltiazem[E];
Amount procured[A]: 16.3; Active government rights: No.

33; Drug name: Oxycodone hydrochloride; Amount procured[A]: 16.0;
Active government rights: No.

34; Drug name: Latanoprost[F]; Amount procured[A]: 16.0;
Active government rights: Yes.

35; Drug name: Donepezil hydrochloride; Amount procured[A]: 15.7;
Active government rights: No.

36; Drug name: Lamivudine and zidovudine; Amount procured[A]: 15.4;
Active government rights: No.

37; Drug name: Nifedipine;
Amount procured[A]: 15.2; Active government rights: No.

38; Drug name: Fexofenadine hydrochloride; Dollars
in millions: Amount procured[A]: 15.1;
Active government rights: No.

39; Drug name: Cyclosporine;
Amount procured[A]: 15.0; Active government rights: No.

40; Drug name: Fluticasone propionate; Amount procured[A]: 14.9;
Active government rights: No.

41; Drug name: Quetiapine fumarate; Amount procured[A]: $14.4;
Active government rights: No.

42; Drug name: Citalopram hydrobromide; Amount procured[A]: 14.3;
Active government rights: No.

43; Drug name: Carvedilol;
Amount procured[A]: 14.0; Active government rights: No.

44; Drug name: Fentanyl[E];
Amount procured[A]: 13.5; Active government rights: No.

45; Drug name: Venlafaxine hydrochloride; Amount procured[A]: 12.3;
Active government rights: No.

46; Drug name: Albuterol[E];
Amount procured[A]: 11.6; Active government rights: No.

47; Drug name: Lovastatin;
Amount procured[A]: 11.3; Active government rights: No.

48; Drug name: Rofecoxib;
Amount procured[A]: 11.2; Active government rights: No.

49; Drug name: Levofloxacin;
Amount procured[A]: 11.1; Active government rights: No.

50; Drug name: Filgrastim[G];
Amount procured[A]: 11.1; Active government rights: Yes.

51; Drug name: Triamcinolone[E]; Amount procured[A]: 10.7;
Active government rights: No.

52; Drug name: Fosinopril sodium; Amount procured[A]: 10.7;
Active government rights: No.

53; Drug name: Carbidopa and levodopa; Amount procured[A]: 10.2;
Active government rights: No.

54; Drug name: Terbinafine hydrochloride; Amount procured[A]: 10.2;
Active government rights: No.

55; Drug name: Interferon beta-1a[C]; Amount procured[A]: 10.1;
Active government rights: Unknown.

56; Drug name: Sumatriptan[E]; Amount procured[A]: 10.0;
Active government rights: No.

57; Drug name: Warfarin sodium; Amount procured[A]: 10.0;
Active government rights: No.

58; Drug name: Paclitaxel[H];
Amount procured[A]: 9.5; Active government rights: Yes.

59; Drug name: Tramadol hydrochloride; Amount procured[A]: 9.2;
Active government rights: No.

60; Drug name: Nefazodone hydrochloride; Amount procured[A]: 9.2;
Active government rights: No.

61; Drug name: Mycophenolate mofetil[E]; Amount procured[A]: 8.7;

Active government rights: No.

62; Drug name: Amoxicillin and clavulanate
potassium; Amount procured[A]: 8.6; Active government rights: No.

63; Drug name: Etanercept[I];
Amount procured[A]: 8.4; Active government rights: No.

64; Drug name: Nitroglycerin;
Amount procured[A]: 8.2; Active government rights: No.

65; Drug name: Loratadine;
Amount procured[A]: 8.1; Active government rights: No.

66; Drug name: Stavudine[J];
Amount procured[A]: 7.9; Active government rights: Yes.

67; Drug name: Fluconazole;
Amount procured[A]: 7.9; Active government rights: No.

68; Drug name: Alendronate sodium; Amount procured[A]: 7.5;
Active government rights: No.

69; Drug name: Lamivudine; Amount procured[A]: 7.4; Dollars in
millions: Active government rights: No.

70; Drug name: Efavirenz;
Amount procured[A]: 7.4; Active government rights: No.

71; Drug name: Irinotecan hydrochloride; Amount procured[A]: 7.3;
Active government rights: No.

72; Drug name: Ranitidine hydrochloride; Amount procured[A]: 7.3;
Active government rights: No.

73; Drug name: Tamsulosin hydrochloride; Amount procured[A]: 7.3;
Active government rights: No.

74; Drug name: Cetirizine hydrochloride; Dollars
in millions: Amount procured[A]: 7.2;
Active government rights: No.

75; Drug name: Sotalol hydrochloride; Dollars in
millions: Amount procured[A]: 7.0;
Active government rights: No.

76; Drug name: Phenytoin[E];
Amount procured[A]: 6.9; Dollars in
millions: Active government rights: No.

77; Drug name: Terazosin hydrochloride; Dollars in
millions: Amount procured[A]: 6.9;
Active government rights: No.

78; Drug name: Carbamazepine;
Amount procured[A]: 6.9; Active government rights: No.

79; Drug name: Clozapine;
Amount procured[A]: 6.7; Active government rights: No.

80; Drug name: Irbesartan;
Amount procured[A]: 6.7; Active government rights: No.

81; Drug name: Brimonidine tartrate; Amount procured[A]: 6.7;
Active government rights: No.

82; Drug name: Amiodarone hydrochloride; Amount procured[A]: 6.6;
Active government rights: No.

83; Drug name: Glipizide;
Amount procured[A]: $6.5; Active government rights: No.

84; Drug name: Mirtazapine;
Amount procured[A]: 6.4; Active government rights: No.

85; Drug name: Carboplatin;
Amount procured[A]: 6.3; Active government rights: No.

86; Drug name: Mesalamine;
Amount procured[A]: 6.1; Active government rights: No.

87; Drug name: Indinavir sulfate; Amount procured[A]: 5.8;
Active government rights: No.

88; Drug name: Potassium chloride; Amount procured[A]: 5.8;
Active government rights: No.

89; Drug name: Nelfinavir mesylate; Amount procured[A]: 5.6;
Active government rights: No.

90; Drug name: Rituximab[C];
Amount procured[A]: 5.6; Active government rights: Unknown.

91; Drug name: Nicotine; Amount procured[A]: 5.6;
Active government rights: No.

92; Drug name: Omeprazole; Amount procured[A]: 5.6;
Active government rights: No.

93; Drug name: Tacrolimus; Amount procured[A]: 5.5;
Active government rights: No.

94; Drug name: Alprostadil; Amount procured[A]: 5.4;
Active government rights: No.

95; Drug name: Sildenafil citrate; Amount procured[A]: 5.1;
Active government rights: No.

96; Drug name: Rabeprazole sodium; Amount procured[A]: 5.0;
Active government rights: No.

97; Drug name: Azithromycin dihydrate; Amount procured[A]: 5.0;
Active government rights: No.

98; Drug name: Flutamide;
Amount procured[A]: 4.2; Active government rights: No.

99; Drug name: Ondansetron[E]; Amount procured[A]: 4.0;
Active government rights: No.

100; Drug name: Pioglitazone hydrochloride; Amount procured[A]: 3.5;
Active government rights: No.

Sources: VA (data), GAO (analysis).

Note: The table provides each drug's name on the basis of the active
ingredients as they are listed in FDA's Electronic Orange Book.

[A] Based on VA's prime vendor purchases, excluding any direct
purchases.

[B] Patent and licensing information about epoetin alpha was obtained from NIH. Two brand name epoetin alpha products, Epogen and Procrit, appear to use federally sponsored technology.

[C] A patent search for this item was not completed because we did not find a related listing in the Orange Book or locate the product's patent information.

[D] Interferon alpha-2b and ribavirin is not listed in the Orange Book. However, we obtained relevant patent information from the Web site devoted to the interferon/ribavirin product, Rebetron, http://www.rebetron.com/pro/rebetron/pi.html, accessed on August 26, 2002.

[E] Variations of the drug name appeared in the Orange Book, and we examined the patents underlying each relevant product.

[F] Xalatan, a brand name latanoprost product, appears to use federally sponsored technology.

[G] Patent and licensing information about filgrastim was obtained from NIH. A brand name filgrastim product, Neupogen, appears to use federally sponsored technology.

[H] Taxol, a brand name paclitaxel product, appears to use federally sponsored technology.

[I] Relevant patent information was obtained from the Web site for the etanercept brand name product, Enbrel, http://www.enbrel.com/hcp/about_enbrel/indications.jsp, accessed on August 1, 2002.

[J] Zerit, a brand name stavudine product, appears to use federally sponsored technology.

[End of table]

[End of section]

Appendix III: The Top 100 Pharmaceuticals Dispensed by DOD on the Basis of Dollar Value, July 1, 2001-June 30, 2002:

Rank: 1; Drug name: Omeprazole; Active government rights: No.

Rank: 2; Drug name: Simvastatin; Active government rights: No.

Rank: 3; Drug name: Atorvastatin calcium; Active government rights: No.

Rank: 4; Drug name: Celecoxib; Active government rights: No.

Rank: 5; Drug name: Rofecoxib; Active government rights: No.

Rank: 6; Drug name: Lansoprazole; Active government rights: No.

Rank: 7; Drug name: Loratadine; Active government rights: No.

Rank: 8; Drug name: Gabapentin; Active government rights: No.

Rank: 9; Drug name: Esomeprazole magnesium; Active government rights: No.

Rank: 10; Drug name: Clopidogrel bisulfate; Active government rights: No.

Rank: 11; Drug name: Alendronate sodium; Active government rights: No.

Rank: 12; Drug name: Fluoxetine hydrochloride; Active government rights: No.

Rank: 13; Drug name: Sertraline hydrochloride; Active government rights: No.

Rank: 14; Drug name: Paroxetine hydrochloride; Active government rights: No.

Rank: 15; Drug name: Amlodipine besylate; Active government rights: No.

Rank: 16; Drug name: Pravastatin sodium; Active government rights: No.

Rank: 17; Drug name: Pioglitazone hydrochloride; Active government rights: No.

Rank: 18; Drug name: Oxycodone hydrochloride; Active government rights: No.

Rank: 19; Drug name: Fluticasone propionate and salmeterol xinafoate; Active government rights: No.

Rank: 20; Drug name: Metformin hydrochloride; Active government rights: No.

Rank: 21; Drug name: Rosiglitazone maleate; Active government rights: No.

Rank: 22; Drug name: Venlafaxine hydrochloride; Active government rights: No.

Rank: 23; Drug name: Olanzapine; Active government rights: No.

Rank: 24; Drug name: Zolpidem tartrate; Active government rights: No.

Rank: 25; Drug name: Amoxicillin and clavulanate potassium; Active government rights: No.

Rank: 26; Drug name: Cetirizine hydrochloride; Active government rights: No.

Rank: 27; Drug name: Lisinopril; Active government rights: No.

Rank: 28; Drug name: Fluticasone propionate; Active government rights: No.

Rank: 29; Drug name: Fexofenadine hydrochloride; Active government rights: No.

Rank: 30; Drug name: Raloxifene hydrochloride; Active government rights: No.

Rank: 31; Drug name: Tolterodine tartrate; Active government rights: No.

Rank: 32; Drug name: Estrogens, conjugated; Active government rights: No.

Rank: 33; Drug name: Bupropion hydrochloride; Active government rights: No.

Rank: 34; Drug name: Ciprofloxacin[A]; Active government rights: No.

Rank: 35; Drug name: Pantoprazole sodium; Active government rights: No.

Rank: 36; Drug name: Rabeprazole sodium; Active government rights: No.

Rank: 37; Drug name: Levofloxacin; Active government rights: No.

Rank: 38; Drug name: Diltiazem hydrochloride; Active government rights: No.

Rank: 39; Drug name: Donepezil hydrochloride; Active government rights: No.

Rank: 40; Drug name: Citalopram hydrobromide; Active government rights: No.

Rank: 41; Drug name: Etanercept[B]; Active government rights: No.

Rank: 42; Drug name: Montelukast sodium; Active government rights: No.

Rank: 43; Drug name: Epoetin alfa[C]; Active government rights: Yes.

Rank: 44; Drug name: Blood sugar diagnostic[D]; Active government rights: Unknown.

Rank: 45; Drug name: Tamsulosin hydrochloride; Active government rights: No.

Rank: 46; Drug name: Fentanyl[A]; Active government rights: No.

Rank: 47; Drug name: Azithromycin dihydrate; Active government rights: No.

Rank: 48; Drug name: Risperidone; Active government rights: No.

Rank: 49; Drug name: Loratadine and pseudoephedrine sulfate; Active government rights: No.

Rank: 50; Drug name: Estrogens, conjugated and medroxyprogesterone acetate; Active government rights: No.

Rank: 51; Drug name: Tramadol hydrochloride; Active government rights: No.

Rank: 52; Drug name: Sumatriptan[A]; Active government rights: No.

Rank: 53; Drug name: Interferon beta-1a and albumin[D]; Active government rights: Unknown.

Rank: 54; Drug name: Somatropin recombinant; Active government rights: No.

Rank: 55; Drug name: Losartan potassium; Active government rights: No.

Rank: 56; Drug name: Sildenafil citrate; Active government rights: No.

Rank: 57; Drug name: Oxybutynin chloride; Active government rights: No.

Rank: 58; Drug name: Carvedilol; Active government rights: No.

Rank: 59; Drug name: Fenofibrate[E]; Active government rights: No.

Rank: 60; Drug name: Amlodipine besylate and benazepril hydrochloride; Active government rights: No.

Rank: 61; Drug name: Acetaminophen and hydrocodone bitartrate; Active government rights: No.

Rank: 62; Drug name: Topiramate; Active government rights: No.

Rank: 63; Drug name: Filgrastim[F]; Active government rights: Yes.

Rank: 64; Drug name: Metoprolol succinate; Active government rights: No.

Rank: 65; Drug name: Nifedipine; Active government rights: No.

Rank: 66; Drug name: Tamoxifen citrate; Active government rights: No.

Rank: 67; Drug name: Quetiapine fumarate; Active government rights: No.

Rank: 68; Drug name: Valsartan; Active government rights: No.

Rank: 69; Drug name: Budesonide; Active government rights: No.

Rank: 70; Drug name: Salmeterol xinafoate; Active government rights: No.

Rank: 71; Drug name: Latanoprost[G]; Active government rights: Yes.

Rank: 72; Drug name: Bicalutamide; Active government rights: No.

Rank: 73; Drug name: Clarithromycin; Active government rights: No.

Rank: 74; Drug name: Mometasone furoate; Active government rights: No.

Rank: 75; Drug name: Warfarin sodium; Active government rights: No.

Rank: 76; Drug name: Calcitonin, salmon; Active government rights: No.

Rank: 77; Drug name: Methylphenidate hydrochloride; Active government rights: No.

Rank: 78; Drug name: Finasteride; Active government rights: No.

Rank: 79; Drug name: Divalproex sodium; Active government rights: No.

Rank: 80; Drug name: Mesalamine; Active government rights: No.

Rank: 81; Drug name: Albuterol sulfate and ipratropium bromide; Active government rights: No.

Rank: 82; Drug name: Mirtazapine; Active government rights: No.

Rank: 83; Drug name: Amphetamine aspartate and amphetamine sulfate and dextroamphetamine saccharate and dextroamphetamine sulfate; Active government rights: No.

Rank: 84; Drug name: Ipratropium bromide; Active government rights: No.

Rank: 85; Drug name: Lorazepam; Active government rights: No.

Rank: 86; Drug name: Potassium chloride; Active government rights: No.

Rank: 87; Drug name: Hydrochlorothiazide and losartan potassium; Active government rights: No.

Rank: 88; Drug name: Estradiol[A]; Active government rights: No.

Rank: 89; Drug name: Triamcinolone[A]; Active government rights: No.

Rank: 90; Drug name: Verapamil hydrochloride; Active government rights: No.

Rank: 91; Drug name: Isotretinoin; Active government rights: No.

Rank: 92; Drug name: Enoxaparin sodium; Active government rights: No.

Rank: 93; Drug name: Buspirone hydrochloride; Active government rights: No.

Rank: 94; Drug name: Risedronate sodium; Active government rights: No.

Rank: 95; Drug name: Meloxicam; Active government rights: No.

Rank: 96; Drug name: Albuterol[A]; Active government rights: No.

Rank: 97; Drug name: Ethinyl estradiol and norgestimate; Active government rights: No.

Rank: 98; Drug name: Ranitidine hydrochloride; Active government rights: No.

Rank: 99; Drug name: Valacyclovir hydrochloride; Active government rights: No.

Rank: 100; Drug name: Amiodarone hydrochloride; Active government rights: No.

Sources: DOD (data), GAO (analysis).

Note: The ranking of the drugs is based on the dollar sales volumes for prescriptions filled through national mail order pharmacies and the retail pharmacy network. Dollar sales volumes are not provided here because, at the time of the data request, complete information regarding DOD's pharmaceutical-dispensing activities was not available. The table provides each drug's name on the basis of the active ingredients as they are listed in FDA's Electronic Orange Book.

[A] Variations of the drug's name appeared in the Orange Book, and we examined the patents underlying each relevant product.

[B] Relevant patent information was obtained from the Web site for the etanercept brand name product, Enbrel, http://www.enbrel.com/hcp/about_enbrel/indications.jsp, accessed on August 1, 2002.

[C] Patent and licensing information about epoetin alpha was obtained from NIH. Two brand name epoetin alpha products, Epogen and Procrit, appear to use federally sponsored technology.

[D] A patent search for this item was not completed because we did not find a related listing in the Orange Book or locate the product's patent information.

[E] DOD listed "fenofibrate, micronized," while the Orange Book listed only "fenofibrate." However, the Orange Book provided additional information specifying which fenofibrate products are micronized. Accordingly, we limited our work to such items.

[F] Patent and licensing information about filgrastim was obtained from NIH. A brand name filgrastim product, Neupogen, appears to use federally sponsored technology.

[G] Xalatan, a brand name latanoprost product, appears to use federally sponsored technology.

[End of table]

[End of section]

Appendix IV: Comments from the National Institutes of Health:

Note: GAO comments supplementing those in the report text appear at the end of this appendix.

Note: Page numbers in the draft report may differ from those in this report.

See comment 4.

See comment 3.

See comment 2.

See comment 1.

DEPARTMENT OF HEALTH & HUMAN SERVICES:

Public Health Service:

National Institutes of Health Bethesda, Maryland 20892:

APR 22 2003:

www.nih.gov:

Ms. Robin Nazzaro:

Director, Natural Resources and Environment:

U.S. General Accounting Office 441 G Street, N.W. Washington, D.C. 20548:

Dear Ms. Nazzaro:

Thank you for the opportunity to review and comment on the draft report entitled, Technology Transfer: Agencies' Rights in Federally Sponsored Biomedical Inventions (GAO-03-536). Enclosed are the comments of the National Institutes of Health. We offer several general and technical comments that we believe will enhance the clarity and accuracy of the document. As you are aware, we offered more extensive comments at the exit conference and are pleased that some of these are reflected in the draft report.

Sincerely,


Elias A. Zerhouni,
Director:

Signed by
Elias A. Zerhouni:

Enclosure:

National Institutes of Health Comments on the U.S. General Accounting Office Draft Report Entitled Technology Transfer: Agencies' Rights in Federally Sponsored Biomedical Inventions, GAO-03-536, April 2003:

General Comments:

Language throughout the draft report gives the impression that the government's right to use government licenses to federally funded

inventions is more limited than it actually is. For example, the
phrases "for the benefit of specific federal missions," and "where
there is a legitimate government need" are used often. It would be more
accurate to use statutory language when discussing this government
right. Therefore, we suggest that the report use language from 35
U.S.C. 202(c)(4) which states "the Federal agency shall have a
nonexclusive, nontransferrable, irrevocable, paid-up license to
practice or have practiced for or on behalf of the United States any
subject invention throughout the world.":

The draft report also states (see "Observations," pp. 13-14) that
government is not entitled to a discount when it purchases products
that use a federally funded technology. We believe that this is not a
completely accurate statement. The law specifies the government has a
royalty-free right to use this technology, and NIH patent licenses,
which transfer federally funded technologies, include language that
royalties are excluded from sales to the government since no royalty is
to be paid by government entities. The NIH enforces the requirement in
government licenses. As noted in the report, the issue revolves around
the ability to identify whether or not the final price to the
government includes in the calculation the reduction of the royalty.

Technical Comments:

Page 7, footnote 5, there is no place in the text associated with
footnote 5.

Page 7, second paragraph, 4th sentence, delete "generally.":

Page 9, delete the first paragraph concerning dominant and subservient
patents. It is not clear that this paragraph is supported by case law
as it relates to subject inventions [At least none that has been cited
by the GAO]. The paragraph implies that an owner of a valuable patent
developed entirely at private expense which dominated a subject
invention would have to license the patent to the government under the
same terms as the government's license in the subject invention if
necessary to practice the subject invention, i.e. "royalty free." If
true, this could have a chilling effect on participation of private
entities in government funding agreements and Cooperative Research and
Development Agreements.

The following are GAO's comments on the National Institutes of Health's
letter dated April 22, 2003.

GAO's Comments:

1. We agree with NIH that federal agencies have unrestricted rights to
use a federally funded invention for government purposes. It has,
indeed, a "nontransferable, irrevocable, paid-up license" to practice
the invention. Or it may authorize someone to practice the invention on
its behalf. However, these rights cannot be taken so as to undermine
the rights that the Bayh-Dole Act clearly intends to accord to
inventors. Specifically, the government's license permits it to
practice the invention to meet its needs, i.e., to meet needs that are
reasonably associated with the requirements of federal programs, not to
act outside of those constraints that normally distinguish public-from
private-sector activities.

2. We deleted the footnote.

3. We deleted "generally" from the sentence.

4. We disagree. Related issues have been discussed in several court
decisions. See, for example, AMP, Inc. v. United States, 389 F.2d 448,
454 (Ct. Cl. 1968), cert. denied, 391 U.S. 964 (1968). Regarding NIH's

concern that adherence to these cases might have a chilling effect on
the willingness of private entities to participate as funding
recipients, we point out that the parties can negotiate intellectual
property rights dealing with these issues on a case-by-case basis.
Moreover, the scope of any exception is limited as required to permit
use of the government's license in the subservient patent.


FOOTNOTES

[1] Technology transfer is a process through which research results,
including inventions, computer software, and technical information, are
provided to potential users in a manner that encourages and accelerates
their evaluation and use.

[2] See 35 U.S.C. § 202(c)(1)-(3). In addition, 35 U.S.C. § 203
protects the public interest by authorizing a federal agency to "march
in" and reassert control over a federally funded invention if, for
example, a patent owner fails to take steps to commercialize the
invention. If the government invokes its march-in rights, which is
believed never to have happened, it could license a third party to
commercialize the invention.

[3] 35 U.S.C. § 202(c)(4).

[4] See U.S. General Accounting Office, Technology Transfer: Reporting
Requirements for Federally Sponsored Inventions Need Revision, GAO/
RCED-99-242 (Washington, D.C.: Aug. 12, 1999).

[5] For example, HHS provides funding for the states' pediatric vaccine
program.

[6] See 35 U.S.C. § 202(c)(4).

[7] The patent application for the first invention is referred to as
the "parent" if a second application is filed on the basis of the same
disclosure and at least one person is named as the inventor on both
applications.

[8] The Veterans Health Care Act of 1992 (P.L. 102-585) established a
76-percent ceiling for Federal Supply Schedule prices.

GAO's Mission:

The General Accounting Office, the investigative arm of Congress,
exists to support Congress in meeting its constitutional
responsibilities and to help improve the performance and accountability
of the federal government for the American people. GAO examines the use
of public funds; evaluates federal programs and policies; and provides
analyses, recommendations, and other assistance to help Congress make
informed oversight, policy, and funding decisions. GAO's commitment to
good government is reflected in its core values of accountability,
integrity, and reliability.

Obtaining Copies of GAO Reports and Testimony:

The fastest and easiest way to obtain copies of GAO documents at no
cost is through the Internet. GAO's Web site ( www.gao.gov ) contains
abstracts and full-text files of current reports and testimony and an
expanding archive of older products. The Web site features a search
engine to help you locate documents using key words and phrases. You
can print these documents in their entirety, including charts and other
graphics.

Each day, GAO issues a list of newly released reports, testimony, and

correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to e-mail alerts" under the "Order GAO Products" heading.

Order by Mail or Phone:

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. General Accounting Office

441 G Street NW,

Room LM Washington,

D.C. 20548:

To order by Phone:

      Voice: (202) 512-6000:

      TDD: (202) 512-2537:

      Fax: (202) 512-6061:

To Report Fraud, Waste, and Abuse in Federal Programs:

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm E-mail: fraudnet@gao.gov

Automated answering system: (800) 424-5454 or (202) 512-7470:

Public Affairs:

Jeff Nelligan, managing director, NelliganJ@gao.gov (202) 512-4800 U.S. General Accounting Office, 441 G Street NW, Room 7149 Washington, D.C. 20548: