# Exhibit 1

Dockets.Justia.com

# STIFLING OR STIMULATING—THE ROLE OF GENE PATENTS IN RESEARCH AND GENETIC TESTING

# HEARING

BEFORE THE

## SUBCOMMITTEE ON COURTS, THE INTERNET, AND INTELLECTUAL PROPERTY

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

OCTOBER 30, 2007

## Serial No. 110–66

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

U.S. GOVERNMENT PRINTING OFFICE

38–639 PDF                    WASHINGTON : 2008

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON THE JUDICIARY

JOHN CONYERS, Jr., Michigan, *Chairman*

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SANCHEZ, California
STEVE COHEN, Tennessee
HANK JOHNSON, Georgia
BETTY SUTTON, Ohio
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

LAMAR SMITH, Texas
F. JAMES SENSENBRENNER, Jr., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

PERRY APELBAUM, *Staff Director and Chief Counsel*
JOSEPH GIBSON, *Minority Chief Counsel*

———

## SUBCOMMITTEE ON COURTS, THE INTERNET, AND INTELLECTUAL PROPERTY

HOWARD L. BERMAN, California, *Chairman*

JOHN CONYERS, Jr., Michigan
RICK BOUCHER, Virginia
ROBERT WEXLER, Florida
MELVIN L. WATT, North Carolina
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HANK JOHNSON, Georgia
BRAD SHERMAN, California
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ZOE LOFGREN, California
BETTY SUTTON, Ohio

HOWARD COBLE, North Carolina
TOM FEENEY, Florida
LAMAR SMITH, Texas
F. JAMES SENSENBRENNER, Jr., Wisconsin
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL ISSA, California
MIKE PENCE, Indiana

SHANNA WINTERS, *Chief Counsel*
BLAINE MERRITT, *Minority Counsel*

(II)

# CONTENTS

OCTOBER 30, 2007

Page

## OPENING STATEMENTS

The Honorable Howard L. Berman, a Representative in Congress from the State of California, and Chairman, Subcommittee on Courts, the Internet, and Intellectual Property ....................................................................... 1

The Honorable Howard Coble, a Representative in Congress from the State of North Carolina, and Ranking Member, Subcommittee on Courts, the Internet, and Intellectual Property ................................................... 4

## WITNESSES

Mr. Lawrence M. Sung, J.D., Ph.D., Law School Professor and Intellectual Property Law Program Director, University of Maryland, School of Law, Baltimore, MD
Oral Testimony ............................................................................................. 7
Prepared Statement ..................................................................................... 10

Mr. E. Jonathan Soderstrom, Managing Director, Office of Cooperative Research, Yale University, New Haven, CT
Oral Testimony ............................................................................................. 24
Prepared Statement ..................................................................................... 26

Dr. Marc Grodman, Chair of the Board and CEO, Bio-Reference Laboratories, Elmwood Park, NJ
Oral Testimony ............................................................................................. 34
Prepared Statement ..................................................................................... 37

Mr. Jeffrey Kushan, Partner, Sidley Austin, LLP, on behalf of Biotechnology Industry Organzation (BIO), Washington, DC
Oral Testimony ............................................................................................. 57
Prepared Statement ..................................................................................... 59

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Prepared Statement of the Honorable Howard L. Berman, a Representative in Congress from the State of California, and Chairman, Subcommittee on Courts, the Internet, and Intellectual Property ......................................... 3

Prepared Statement of the Honorable Howard Coble, a Representative in Congress from the State of North Carolina, and Ranking Member, Subcommittee on Courts, the Internet, and Intellectual Property ....................... 5

IV

## APPENDIX

Material Submitted for the Printed Hearing Record ........................................... 117

## OFFICIAL HEARING RECORD

MATERIAL SUBMITTED FOR THE HEARING RECORD BUT NOT REPRINTED

A publication of the National Research Council of the National Academies entitled "Reaping the Benefits of Genomic and Proteomic Research, Intellectual Property Rights, Innovation, and Public Health." This publication is available at the Subcommittee and can also be accessed at:

**http://www.nap.edu/catalog.php?record__id=11487#toc**

A report entitled "The Better World Report *Part One*, Building a Stronger Economy: Profiles of 25 Companies Rooted in Academic Research, 2007 Edition." This report is available at the Subcommittee and can also be accessed at:

**http://www.betterworldproject.net/documents/AUTMBWR1.pdf**

A report entitled "Technology Transfer Stories: 25 Innovations That Changed the World, The Better World Report, 2006 Edition." This report is available at the Subcommittee and can also be accessed at:

**http://www.betterworldproject.net/documents/AUTM__BWR.pdf**

# STIFLING OR STIMULATING—THE ROLE OF GENE PATENTS IN RESEARCH AND GENETIC TESTING

## TUESDAY, OCTOBER 30, 2007

House of Representatives,
Subcommittee on Courts, the Internet,
and Intellectual Property,
Committee on the Judiciary,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 2:14 p.m., in Room 2237, Rayburn House Office Building, the Honorable Howard L. Berman (Chairman of the Subcommittee) presiding.

Present: Representatives Berman, Watt, Lofgren, Coble, and Issa.

Staff present: Shanna Winters, Subcommittee Majority Chief Counsel; Eric Garduno, Majority Counsel; Blaine Merritt, Minority Counsel; and Rosalind Jackson, Professional Staff Member.

Mr. BERMAN. Good afternoon. The hearing of the Subcommittee on Courts, the Internet, and Intellectual Property will come to order.

I would like to begin by welcoming everyone to this hearing, "Stifling or Stimulating—The Role of Gene Patents in Research and Genetic Testing."

I noticed a couple of days ago that George Bush, when he was talking about President Putin and some of the problems in Russia, he said that in terms of whether or not it is possible to reprogram the kind of basic Russian DNA, which is used to centralized authority, that is hard to do, and so I would first like to know if there is a patent for an authoritarian gene, and how does it express itself, and can it be licensed? [Laughter.]

Scientific knowledge concerning genes has expanded considerably in the last half-century since James Watson and Francis Crick put forth their discovery of DNA.

We know now that genes are the blueprints of all living things. I am told that genes are chemical instructions stored in our cells that tell our bodies to grow bones, make blood, repair damaged skin, and perform tens of thousands of other functions.

Efforts to map the human genome, like the Human Genome Project headed by NIH, have allowed us to identify specific genes, determine their function, and harness their usefulness. As a result, we have been able to produce therapies to alleviate human suffering, such as insulin, develop tests to determine susceptibility to

diseases, like Alzheimer's and breast cancer, and create wholly new organisms, like cancer mice and pesticide-resistant plants.

Many attribute this success to the incentives provided by the patent system. Given the robust nature of the commercialization of biotechnology research, it is fair to say that patents have done their job in promoting new inventions in this field. However, there are those that have raised concerns about the impact of providing exclusivity for patents on genes.

For some, genes are thought of as products of nature and, thus, should not be patentable subject matter. However, the courts have long held that compositions of matter isolated and purified from their natural state are worthy of patent protection. This principle was made clearly applicable to living matter like genes in the Supreme Court's *Diamond v. Chakrabarty* decision.

For some, gene patents should require a more rigorous review. The USPTO revised their examination guidelines for gene patenting in 2001, which strengthened utility requirements so that a gene could no longer be patented based on uses like being good for landfill.

But while the 2001 guidelines tightened patentability requirements, some continue to argue that many gene patents are still issued for uses that are speculative and unproven.

If the quality of gene patents remain a problem, stricter utility standards requiring more concrete uses may be called for. However, any lingering quality issues surrounding how gene inventions are examined could very well be impacted by the recent *KSR v. Teleflex* decision.

I know at least one of our witnesses will be speaking to that issue.

Still, others fear that gene patents will be used to hinder research. They argue that if patent thickets were to form, it would become too costly or too troublesome for researchers to license the patented inventions they need, forcing them to abandon their research. There is anecdotal information that supports this notion that researchers have discontinued research pursuits because of the threat of lawsuits by gene patent holders. However, there is also data that suggests just the opposite, that gene patents have had little impact on basic research.

A recent survey by the National Academy of Sciences found that in biomedical research, "There is a lack of substantial evidence for a patent thicket or a patent blocking problem," primarily because researchers are not very concerned about patents being enforced against them. However, the report went on to say that this nonchalant attitude was based on the assumption by many researchers that they qualify for a robust research use exception, which many believe was eliminated by the 2002 *Madey v. Duke* decision.

Regardless, it might only take one major victory against a university to create a real and substantial chilling effect. As such, we may need to examine the effects or necessity of a clear research use exception.

Finally, for some, opposition to gene patents is a matter of principle. They point out that patents on genetic tests is harming patient access to and stunting improvement of these tests. It is reasoned that since most insurance providers do not provide coverage

for genetic tests, the patent markup can price tests out of reach for many patients.

In addition, some claim that gene patents have been asserted in order to prevent others from improving possibly inaccurate genetic tests and identifying whether these are even applicable to certain population subgroups.

While I firmly support a patent holder's right to charge what the market will bear for his invention, using a patent to block efforts that check the efficacy of such tests borders on the realm of patent misuse and may constitute anti-competitive practices.

Patents are meant to encourage technological progress. Thus, it is antithetical to the patent system for companies to use their patents to freeze a technology at a particular stage of development.

But is that what is happening? Are the practices of a few unfairly coloring all gene patents in a negative light? Are complaints related to gene patents based more on how they are being used instead of what is being patented?

We need to examine the role gene patents play in stimulating or stifling research in genetic testing. It is my hope that this hearing will help us answer these and many other underlying questions.

It is now my pleasure to recognize my friend and colleague, the distinguished Ranking minority Member of the Subcommittee, Howard Coble, for his opening statement.

[The prepared statement of Mr. Berman follows:]

PREPARED STATEMENT OF THE HONORABLE HOWARD L. BERMAN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA, AND CHAIRMAN, SUBCOMMITTEE ON COURTS, THE INTERNET, AND INTELLECTUAL PROPERTY

Scientific knowledge concerning genes has expanded considerably in the last half century since James Watson and Francis Crick put forth their discovery of DNA. We now know that genes are the blueprints of all living things. Efforts to map the human genome like the Human Genome Project headed by NIH has allowed us to identify specific genes, determine their function, and harness their usefulness. As a result we have been able to produce therapies to alleviate human suffering such as insulin, develop tests to determine susceptibility to diseases like Alzheimer's and breast cancer, and create wholly new organisms like "cancer mice" and pesticide resistant plants.

Many attribute this success to the incentives provided by the patent system. Given the robust nature of the commercialization of biotechnology research, it's fair to say that patents have done their job in promoting new inventions in this field. However, there are those that have raised concerns about the impact of providing exclusivity for patents on genes.

For some, genes are thought of as products of nature and thus should not be patentable subject matter. However, the courts have long held that compositions of matter isolated and purified from their natural state are worthy of patent protection. This principle was made clearly applicable to living matter like genes thanks to the Supreme Court's *Diamond v. Chakrabarty* decision.

For some, gene patents should require a more rigorous review. The USPTO revised their examination guidelines for gene patenting in 2001, which strengthened utility requirements so that a gene could no longer be patented based on uses like being "good for landfill." But, while the 2001 guidelines tightened patentability requirements, some continue to argue that many gene patents are still issued for uses that are speculative and unproven. If the quality of gene patents remains a problem, stricter utility standards requiring more concrete uses may be called for. However, any lingering quality issues surrounding how gene inventions are examined could very well be impacted by the recent *KSR v. Teleflex* decision.

Still others fear that gene patents will be used to hinder research. They argue that if patent thickets were to form, it could become too costly or too troublesome for researchers to license the patented inventions they need, forcing them to abandon their research. There is anecdotal information that supports this notion that researchers have discontinued research pursuits because of the threat of lawsuits by

gene patent holders. However, there is also data that suggests just the opposite; that gene patents have had little impact on basic research.

A recent survey by the National Academy of Sciences found that in biomedical research, there is a "lack of substantial evidence for a patent thicket or a patent blocking problem" primarily because researchers aren't very concerned about patents being enforced against them. However, the report went on to say that this nonchalant attitude was based on the assumption by many researchers that they qualify for a robust research use exception, which many believe was eliminated in the 2002 *Madey v. Duke* decision. Regardless, it might only take one major victory against a university to create a real and substantial chilling effect. As such, we may need to examine the effects or necessity of a clear research use exception.

Finally, for some, opposition to gene patents is a matter of principle. They point out that patents on genetic tests is harming patient access to, and stunting improvements of, these tests. First, it is reasoned that since most insurance providers do not provide coverage for genetic tests, the patent mark-up can price tests out of reach for many patients. In addition, some claim that gene patents have been asserted in order to prevent others from improving possibly inaccurate genetic tests and identifying whether the tests are even applicable to certain population subgroups. While I firmly support a patent holder's right to charge what the market will bare for his invention, using a patent to block efforts that check the efficacy of such tests borders on the realm of patent misuse and may constitute anti-competitive practices.

Patents are meant to encourage technical progress—thus, it is antithetical to the patent system for companies to use their patents to freeze a technology at a particular stage of development. But is that what is happening? Are the practices of a few unfairly coloring all gene patents in a negative light? Are complaints related to gene patents based more on how they are being used instead of what is being patented? We need to examine the role gene patents play in stimulating or stifling research and genetic testing. It is my hope that this hearing will help us answer these and many other underlying questions.

Mr. COBLE. Thank you, Mr. Chairman and ladies and gentlemen.

This is a good hearing topic, Mr. Chairman, in large part because the subject matter lends itself oftentimes to misrepresentation.

At the outset, it seems to me that an inventor whose application satisfies the requirements for gene patent is not trying to patent "life" or personal DNA chemistry in violation of the 13th amendment. The inventor's ultimate goal is to develop a protein-based drug, a diagnostic test, or a therapeutic modality that will improve public health, if not save lives.

I, therefore, hope the Subcommittee will collectively acknowledge after this hearing that gene patenting is a legitimate part of our patent system. It is a thriving component, it seems to me, of our knowledge-based economy. More importantly, gene patents ultimately contribute to the health and welfare of the American people and patients all over the world.

The National Institutes of Health is the world's largest agency for conducting basic medical and biological research with a budget in excess of $28 billion, but the pharmaceutical and biotech industries devote more than $50 billion annually to research. The process of identifying a DNA sequence through clinical testing and manufacturing of an FDA-approved drug may cost the patent holder in excess of a billion dollars, yet only a third of all drugs ever generate revenues sufficient to cover those costs, and the great majority, I am told, Mr. Chairman, of the biotech companies do not realize a profit.

Mr. Chairman, you did a very good, masterful job, I will say, in negotiating the recently passed Patent Reform Act of 2007, but one thing we learned while debating that legislation is that different

industries employ different business models. They use the patent system in various and sundry ways.

American biotech companies are more reliant on the Patent Act than any other industry. While a few biotech companies are large, most are smaller and lack the internal financing resources to subsidize their drug research and development. This is especially true of small start-up companies whose valuation is an exclusive function of their patent portfolios.

At our hearing today, the witnesses and the Subcommittee will explore some legitimate topics associated with gene patents. Are gene patents an impediment to university research? Do they inhibit competition and limit patient access to diagnostic testing? Should the Government exercise march-in rights to promote greater testing and research?

I look forward to the testimonies of our witnesses today on these and other issues.

And, in conclusion, Mr. Chairman, on March the 14 of 2000, about 4 months before you and I were involved in a Subcommittee on this very issue, at a hearing—gene patents, as you know, make inventions—I remember President Clinton and Prime Minster Blair issued a joint statement on the human genome. They said that all genes in the human body should be made freely available to scientists everywhere, and some interpreted that as an announcement of new Government policy that genes could not be patented.

Then the biotech industry, of course, experienced bad difficulty, losing several billion dollars and, the following day, the White House released another statement emphasizing that the Administration supported the patenting of genes.

I guess the moral of the story, Mr. Chairman, is to proceed cautiously and deliberately, and you have a good reputation of doing that, and I think I do, too.

This is a good topic for an oversight hearing, but I think we must exercise great care about legislating in this area, lest possibly important industry and compromised public health could result.

Thank you, Mr. Chairman.

[The prepared statement of Mr. Coble follows:]

Prepared Statement of the Honorable Howard Coble, a Representative in Congress from the State of North Carolina, and Ranking Member, Subcommittee on Courts, the Internet, and Intellectual Property

Thank you, Mr. Chairman.

This is a good hearing topic, in large part because the subject matter lends itself to misrepresentation. At the outset, let's be clear that an inventor whose application satisfies the requirements for a gene patent isn't trying to patent "life" or personal DNA chemistry in violation of the 13th Amendment. The inventor's ultimate goal is to develop a protein-based drug, a diagnostic test, or a therapeutic modality that will improve public health if not save lives.

I therefore hope the Subcommittee will collectively acknowledge after this hearing that gene patenting is a legitimate part of our patent system. It is a thriving component of our knowledge-based economy. More importantly, gene patents ultimately contribute to the health and welfare of the American people and patients all over the world.

The National Institutes of Health is the world's largest agency for conducting basic medical and biological research, with a budget in excess of $28 billion. But the pharmaceutical and biotech industries devote more than $50 billion annually to research. The process of identifying a DNA sequence through clinical testing and manufacturing of an FDA-approved drug may cost the patent holder north of one-

billion dollars. Yet only a third of all drugs ever generate revenue sufficient to cover their costs. And the great majority of biotech companies do not turn a profit.

Mr. Chairman, you did an outstanding job of negotiating House passage of the "Patent Reform Act of 2007." One thing we learned while debating the legislation is that different industries employ different business models that use the patent system in different ways. American biotech companies are more reliant on the Patent Act than any other industry. While a few biotech companies are large, most are much smaller and lack the internal financing resources to subsidize their drug research and development. This is especially true of small start-up companies, whose valuation is an exclusive function of their patent portfolios.

At our hearing today, the witnesses and the Subcommittee will explore some legitimate topics associated with gene patents. Are gene patents an impediment to university research? Do they inhibit competition and limit patient access to diagnostic testing? Should the government exercise "march-in" rights to promote greater testing and research? I look forward to the testimony of our witnesses today on these and other issues.

But I conclude with a cautionary tale. On March 14, 2000, about four months before I chaired a Subcommittee hearing on gene patents and genomic inventions, President Clinton and Prime Minister Blair issued a joint statement on the human genome. They said that all genes in the human body "should be made freely available to scientists everywhere," implying the announcement of a new government policy that genes could not be patented. The biotech industry promptly crashed, losing more than $40 billion in market capitalization. The following day the White House released another statement emphasizing that the Administration supported the patenting of genes.

The moral of the story, Mr. Chairman, is to proceed cautiously and deliberately. This is a good topic for an oversight hearing. But we must exercise great care about legislating in this area, lest we wreck an important industry and compromise public health.

That concludes my statement, Mr. Chairman.

Mr. BERMAN. Thank you, Mr. Coble.

I am wondering whether the asset value of the companies went back up by $2 billion on that next day when he said that because, if it had, I can say anything now and correct it tomorrow.

Mr. COBLE. And I am not sure I can answer that. [Laughter.]

Mr. BERMAN. I now will introduce a very distinguished panel of witnesses.

Lawrence Sung is Director of the Intellectual Property law program at the University of Maryland School of Law. He is a partner in the Washington, D.C., office of Dewey & LeBouef, where he specializes in biotechnology, medical device, and pharmaceutical patent litigation and counseling. Additionally, he serves as a consultant to the National Human Genome Research Institute and as Chair for Intellectual Property for the National Research Council. Professor Sung earned a Ph.D. in microbiology from the U.S. Department of Defense Uniformed Services University of the Health Sciences and a J.D. from American University's Washington College of Law.

John Soderstrom is the Managing Director of the Office of Cooperative Research at Yale University, where he is responsible for managing the university's intellectual property portfolio, executing commercialization strategies and developing spinoff ventures. His posture has allowed him to participate in the formation of more than 25 new start-up companies, many in the biotechnology sector. Prior to joining Yale, Dr. Soderstrom was the director of program development for Oak Ridge National Laboratory. Dr. Soderstrom is also President-Elect of the Association of University Technology Managers. Dr. Soderstrom received his Ph.D. from Northwestern University.

And I might point out we have had no less than the President of Yale University testifying on patent issues several times in the past few years.

Marc Grodman is founder of Bio-Reference Laboratories, the largest clinical laboratory operating in the Northeast. In addition to being a major regional laboratory, Bio-Reference Laboratories also provides national services in informatics and genomics. Dr. Grodman is also an Assistant Professor of clinical medicine at Columbia University's College of Physicians and Surgeons. Dr. Grodman received his B.A. from the University of Pennsylvania, his M.D. from Columbia University, and attended Harvard University's Kennedy School of Government.

Jeffrey Kushan is a Partner with Sidley & Austin, where he serves as Practice Group Chair for the firm's D.C. office. Mr. Kushan focuses his practice on Hatch-Waxman patent litigation, patent appeals and proceedings, patent portfolio reviews, and he represents clients, including trade associations, on domestic and international patent policy matters. He is testifying today on behalf of the Biotechnology Industry Organization. Before entering private practice, Mr. Kushan worked in Government as a patent examiner, in various policy advisory positions at the USPTO, and as an IP negotiator at the USTR. Mr. Kushan received his M.A. in chemistry from the University of North Carolina at Chapel Hill and his J.D. from George Washington University.

Gentlemen, it is really an honor to have you all here today. Your written statements will be made part of the record, in their entirety. I would ask you, if you would be willing to, to summarize your testimony in 5 minutes or less, and to stay within the time, there is a timing light at the table. When 1 minute remains, the light will switch from green to yellow, and then red when then 5 minutes are up.

We are glad to have you here.

Dr. Sung?

## TESTIMONY OF LAWRENCE M. SUNG, J.D., Ph.D., LAW SCHOOL PROFESSOR AND INTELLECTUAL PROPERTY LAW PROGRAM DIRECTOR, UNIVERSITY OF MARYLAND, SCHOOL OF LAW, BALTIMORE, MD

Mr. SUNG. My charge during our brief time is relatively modest. I am not here to represent an organization, nor am I here to press an agenda. Rather, I hope to help inform your deliberations on gene patenting with insights about the nature of patent protections for genomic inventions and also to describe some available options that might assist in effectuating the particular balance between patent exclusivity and public access you ultimately deem appropriate.

These may not be actual answers to the question of gene patenting, but then, as you know, what law professors do best is to answer a question by raising more questions.

This Subcommittee has had the benefit of hearings focusing on the state of the patent system and on the possibility of patent reform legislation. I will not revisit these general principles of the patent system, but instead address some of the distinctions of gene patenting, three in particular.

First, patenting genomic inventions is different because the underlying technology is different. Metaphorically speaking, in the physical sciences, if one dedicates her career to climbing the highest mountain, then on that day she can be confident that she has seen all there is to see. By contrast in the biological sciences, once you summit the highest mountain, only then do you see that there are other mountains you have never seen before. The science in this field is fluid, and this creates an inherent tension with the patent system which, like other systems of legal rights, depends upon static definition. Gene patents defy this type of containment.

Second, genes are simply something that we have a sense should be part of the public common. That the subject matter might fit within the legal standards of what is patentable does not necessarily change the fact that many are left feeling that something is just not right about treating genetic information as property.

Third, the temporal distortion that exists between the time one files a patent application and the time the courts adjudicate those patent rights seems even greater when dealing with gene patents. Sometimes decades separate these two events, and when courts make pronouncements today about what was a fledgling technology 20 years ago, that does not sit well with a public that sees foremost what is at stake today.

Now the state of gene patenting has seen significant evolution. When technology developed to allow rapid gene sequencing to occur, patent claims began being filed in hordes, what some called the patent gold rush, but, like most gold rushes, virtually all of the claims were speculative and the prospect of great wealth became illusory.

The Patent Office wisely issued a moratorium on examination until setting forth revised standards of utility in written description that could be applied more sensibly to patent claims to DNA fragments known as expressed sequence tags or ESTs. This era concluded with the 2005 Federal Circuit decision In re Fisher which clarified that DNA fragments without some demonstrated knowledge about its biological relevance were not patentable for failure to teach a specific substantial and credible utility.

This case arguably alleviates much of the wild concern over what many generically and inaccurately call gene patents. To be clear, gene patents still exist, but they are claims for DNA for which we have been taught both what it is and what it does, and this is somewhat more acceptable than the EST patent claims that the public first rallied against.

But the issue of gene patents and their effect on research and public access to genetic testing remains. For those of the mind that action is necessary, one option is the maintenance or the enhancement of the rigor with which the Patent Office examines gene patent applications. The evolving jurisprudence generally in the patent law doctrines of anticipation, inherency, and obviousness, including the Supreme Court's decision in *KSR v. Teleflex*, combined with the existing disclosure requirements of written description and enablement suggest that fewer gene patents will pass muster.

In addition, the Supreme Court decision in *Merck v. Integra* will likely lessen the ability of certain patents, including some gene patents to be enforced. The Supreme Court decision in *eBay v.*

*MercExchange* also implicates the restraint on the grounds of public interest in granting injunctive relief to gene patent plaintiffs even where infringement has occurred.

The Government's implementation of existing march-in rights for federally funded technology covered by gene patents would be another avenue to ensure public access.

For those that feel the status quo or the reinvigoration of these standards fall short, new legislation might be considered and these include three options. First is the creation of the heightened standard of inventorship that effectively precludes the mere elucidation of a natural property, such as the DNA sequence or a biological pathway. Second is compulsory licensing of gene patents or some form of mandatory patent pooling of gene patents. And, third, is an academic research use exemption from patent infringement.

In this last regard, my written submission for this hearing details a proposal of an elective right to use patented technology.

I appreciate your attention. In closing, I ask your indulgence to be mindful that in the brief time here, I have necessarily oversimplified many aspects of a complex set of considerations. As I caution in my written statement, generalization is problematic with regard to gene patents, and I hope you will seek further insights of others on the important specifics.

Thank you.

[The prepared statement of Mr. Sung follows:]

## Testimony Before the House Judiciary Subcommittee on Courts, the Internet, and Intellectual Property

30 October 2007 Hearing on
*Stifling or Stimulating –*
*The Role of Gene Patents in Research and Genetic Testing*

Statement of
Lawrence M. Sung[*]
*Law School Professor & Intellectual Property Law Program Director,*
*University of Maryland School of Law;*
*Partner, Dewey & LeBoeuf LLP*

---

[*] Correspondence addresses: University of Maryland School of Law, 500 West Baltimore Street, Baltimore, MD 21201-1786, 410.706.1052, lsung@law.umaryland.edu; Dewey & LeBoeuf LLP, 975 F Street, NW, Washington, DC 20004-1405, 202.862.1025, lsung@dl.com. B.A. Biology, University of Pennsylvania; Ph.D., Microbiology, U.S. Department of Defense – Uniformed Services University of the Health Sciences; J.D. cum laude, American University, Washington College of Law; former judicial clerk to the Honorable Raymond C. Clevenger, III, U.S. Court of Appeals for the Federal Circuit.

## Introduction

Chairman Berman, Ranking Member Coble, and Members of the Subcommittee, good afternoon. Thank you for this opportunity to appear before you to discuss the possible implications of patent protection for genomic inventions. I testify here on my own behalf, and my views are not necessarily those of any institution with which I am associated. While the other witnesses to this hearing are providing particular perspectives regarding the impact that gene patents might have on research and genetic testing, my testimony will focus on the nature of gene patents and the considerations surrounding the implementation of certain strategies, which have been proposed to balance, in varying degrees, the interests of commercial exclusivity with public access to genetic technology. To facilitate an understanding of the complexities involved, I would like to begin with an overview of gene patents.

## What Is A Gene Patent?

The term "gene patent" is not part of a nomenclature with a customary or universally accepted meaning. I have heard the use of this term generically to refer to patents as well as patent applications where all or just some of the claims pertain to subject matter ranging from a full-length deoxyribonucleic acid (DNA) sequence that encodes a complete protein to a DNA sequence that has unknown biologic significance. Because the same term, "gene patent," is often applied to very different things technically speaking, the legal governance of this technology is at sea without some measure of precision in the communication of what is being addressed. Indeed, a caution that reverberates throughout my testimony is the prudence to remain mindful that generalizations are problematic in this field.

Compounding the uncertainty that the science might carry is the vagary of our patent system that allows applicants to define their inventions in their own words, even where such definitions might otherwise contravene the customary meaning of such words to others skilled in the art. Accordingly, what one reads in a patent describing a "gene" may bear little resemblance to what a molecular geneticist would otherwise tell you a "gene" is as a matter of scientific truth. One can begin to appreciate the inherent difficulty in having confidence in a race where the starting line itself is debatable.

Without further technical elaboration, allow me for purposes of our brief time together to refer to a "gene" as a full-length DNA sequence that encodes a complete protein, and to any other DNA sequence with unknown or questionable biologic significance as a "genomic fragment," and in some cases, as an expressed sequence tag (ESTs) or single nucleotide polymorphisms (SNP). Accordingly, when I refer to a "gene patent," I will mean a patent that claims at least a DNA sequence that encodes a complete protein or a portion thereof. In this regard, traditional gene patents have been around for a relatively long time whereas patent applications claiming genomic

fragments of unknown or questionable biologic significance (such as ESTs and SNPs) have been the crux of more recent controversy.

Patenting DNA and Rising Concerns

Although DNA is naturally occurring as the biologic blueprint for living organisms, our patent system recognizes the subject matter as patentable where the claims set forth in a patent application properly distinguish the invention from the form of the genomic DNA found naturally. Because our patent system does not differentiate between the notions of invention and discovery, the elucidation of subject matter found in nature may nevertheless give rise to valid patent claims that relate to the natural product or process. Of course, beyond the qualification as statutory subject matter under 35 U.S.C. § 101, a genomic invention must satisfy the remaining conditions for patentability (utility, novelty and nonobviousness) under 35 U.S.C. §§ 101-103, and the patent application must satisfy the disclosure requirements under 35 U.S.C. § 112, to obtain a patent. These standards help ensure that the public receives a valuable benefit from the disclosure of an innovative technology in return for a grant of temporary exclusivity to the patentee. One inherent problem with making sense of the patent law vis-à-vis genomic inventions is the temporal distortion that occurs between the time patent claims are filed and the time the U.S. Patent & Trademark Office (PTO) and/or federal courts pass on the patentability or invalidity of those claims. Particularly with genomic inventions, a decade or more can separate these two events.

Although faced routinely with new technologies, our patent system has perhaps with no other class of inventions been so significantly challenged in dogma. In particular, a patent applicant must be able to teach the public about the invention by providing a reasonably clear answer to two fundamental questions: "What is it?" and "What does it do?" With regard to traditional gene patents, the response would include disclosure of the full-length DNA sequence that encodes a complete protein in conjunction with information about the protein and its potential beneficial uses. As a matter of scientific research, months, if not years, of characterization efforts might be entailed.

In more recent times, The Human Genome Project embodied breakthrough technology that made it possible for scientists to obtain vast numbers of genomic fragments by automated isolation and purification to facilitate chemical formula descriptions (high throughput polynucleotide sequencing) without learning anything about their origin, fit or function. The rub was that such an abstract process of invention hardly came with a complete answer to what the invention was, much less yielded any insight as to what the invention did. The dilemma of knowledge without wisdom came to the fore, and this change in the scientific paradigm relating to genomic discovery created significant problems for our patent system.

In the late 1990s, numerous patent applications were filed claiming thousands of genomic fragments with bare indications of what they were and even fainter disclosures of what they did. Moreover, these patent claims were of broad enough scope to capture as an infringer any user of a product derived from genomic material that included a patented DNA sequence. Such fears rekindled the public outcry over gene patenting generally and its potential chilling effect on research and development. But the Patent Gold Rush was on. Still, like most gold rushes, the dreams of riches from the ownership of genomic data alone began to fade almost as quickly as they arose. The PTO established an instant moratorium on the examination of EST and SNP claims.

The PTO struggled with attempts to reconcile the applicability of traditional, generic principles of patent law to this emerging technology. The PTO initially issued the 1999 Revised Interim Utility Examination Guidelines, only to withdraw them in the face of critical public comment. The reissue of the PTO prescriptions in this regard ultimately came in the form of the 2001 Utility Examination Guidelines. The operative framework for meeting the requirements of 35 U.S.C. § 101 now includes the mandate for a patent applicant to articulate a specific, substantial and credible utility.

## Stemming the Patenting of Genomic Fragments

In 2005, the U.S. Court of Appeals for the Federal Circuit closed this chapter in a long-awaited ending to the suspenseful story of whether gene patenting would include claims to genomic fragments of unknown biologic significance. In *In re Fisher*,[1] the Federal Circuit explained that a claimed invention must have a specific and substantial utility to satisfy 35 U.S.C. § 101, that an application must show that an invention is useful to the public as disclosed in its current form, not that it may prove useful at some future date after further research, and that an asserted use must show that that claimed invention has a significant and presently available benefit to the public. The Federal Circuit specified that an asserted use must also show that a claimed invention can be used to provide a well-defined and particular benefit to the public.

The Federal Circuit noted that as of the filing date of its patent application, Fisher admitted that the underlying genes had no known functions and that the claimed ESTs acted as no more than research intermediates that may help scientists to isolate the particular underlying protein-encoding genes and conduct further experimentation on those genes. Fisher compared the claimed ESTs to certain other patentable research tools, such as a microscope. The Federal Circuit explained, however, that although both a microscope and one of the claimed ESTs can be used to generate scientific data about a sample having unknown properties, Fisher's analogy was flawed because a microscope has the specific benefit of optically magnifying an object to immediately reveal its

---

[1] 421 F.3d 1365 (Fed. Cir. 2005).

structure. One of the claimed ESTs, by contrast, could only be used to detect the presence of genetic material having the same structure as the EST itself.

The Federal Circuit further explained that the claimed ESTs were unable to provide any information about the overall structure let alone the function of the underlying gene. To further the comparison, the Federal Circuit explained that while a microscope can offer an immediate, real world benefit in a variety of applications, the same cannot be said for the claimed ESTs. Fisher's asserted uses, therefore, did not meet the standard for a "substantial" utility under 35 U.S.C. § 101. According to the Federal Circuit, Fisher's asserted uses represented merely hypothetical possibilities, objectives which the claimed ESTs, or any EST for that matter, could possibly achieve, but none for which they have been used in the real world. The Federal Circuit further explained that Fisher's asserted uses were not sufficiently "specific" — that is, nothing about Fisher's alleged uses set the five claimed ESTs apart from the more than 32,000 ESTs disclosed in the patent application or indeed from any EST derived from any organism.*

In addressing the patentability of the EST claims in *Fisher*, the Federal Circuit reinforced the quid pro quo of a suitable primer on the claimed invention in exchange for the patent grant. In the words of the U.S. Supreme Court about the utility requirement, "[A] patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion." 

Stricter Patent Standards

Since the *Fisher* decision, the concerns over the implications for gene patents has largely returned to a focus on patents claiming DNA sequences that encode a complete protein or a portion thereof. In the meantime, the standards for patenting inventions generally arguably have become stricter in light of the evolving jurisprudence in the doctrines of inherent anticipation and obviousness.

To receive patent protection, the invention must be novel, i.e., not anticipated by the prior art under 35 U.S.C. § 102. An invention is anticipated if a single prior art reference expressly or inherently discloses each and every limitation of the claimed invention.⁶ Thus, a prior art reference without express reference to a claim limitation may nonetheless anticipate by inherency.⁸ Inherency is not necessarily coterminous

---

² *Brenner v. Manson*, 282 U.S. 519, 536 (1966).

³ *See Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991).

⁶ *See Titanium Metals Corp. v. Banner*, 778 F.2d 775 (Fed. Cir. 1985); *In re Omeprazole Patent Litig.*, 483 F.3d 1364 (Fed. Cir. 2007); *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 471 F.3d 1363 (Fed. Cir. 2006); *In re Crish*, 393 F.3d 1253, 1258-59 (Fed. Cir.

with knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art.[5] The new realization alone does not render that necessary prior art patentable.[6] This evolution of the doctrine of inherent anticipation may make it more difficult for applicants to obtain gene patents, particularly those claiming only certain fragments of a gene, which is otherwise disclosed in the prior art.

To receive patent protection, an invention must also be nonobvious at the time of the invention to one of ordinary skill in the relevant art under 35 U.S.C. § 103. In *KSR Int'l Co. v. Teleflex Inc.*,[7] the Supreme Court rejected a rigid application of the Federal Circuit's approach known as the teaching, suggestion, or motivation (TSM) test, under which a patent claim is only proved obvious if some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art.

The Court opined that inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. According to the Court, the obviousness analysis cannot be confined by an overemphasis on the importance of published articles and the explicit content of issued patents. The Court noted that granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility. The Court admonished that when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and

---

2004) (holding asserted claims covering a gene's nucleotide sequence anticipated where the gene, though not its particular sequence, was already known to the art); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349-50 (Fed. Cir. 2002) (ruling that an inventor's recognition of substances that render broccoli and cauliflower particularly healthy does not permit patent on identifying broccoli seeds or preparing broccoli as a food product).

[5] *See Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (rejecting the contention that inherent anticipation requires recognition in the prior art).

[6] *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001) (explaining that newly discovered results of known processes are not patentable because those results are inherent in the known processes); *Verdegaal Bros., Inc. v. Union Oil & Co. of Cal.*, 814 F.2d 628, 633 (Fed. Cir. 1987) (holding that the recognition of a new aspect of a known process is not a patentable invention of a novel process).

[7] 127 S. Ct. 1727 (2007).

common sense. This relaxation of the obviousness standard may also make it more difficult for applicants to obtain gene patents, particularly those claiming a novel combination or other use of known genes and/or gene fragments.

As a separate matter, a reinvigoration of the inventorship standards might serve to decrease the issuance of gene patents. The patent law jurisprudence uniformly recognizes the elements of conception and reduction to practice in defining invention. But the typical analysis is confined to questioning when these acts might have occurred for purposes of determining who is an inventor or who invented first. Little consideration is apparent on whether certain purported acts of invention actually meet these well accepted standards and otherwise constitute inventive acts.

One proposal might be to recast an inventive act as a governing threshold for patent protection, particularly as applied to genomic inventions. This standard does not incorporate the traditional considerations, such as novelty or nonobviousness, in assessing patent eligibility. Rather, like the requirement of originality in copyright law, this metric considers whether the claimed invention legitimately "owes its origin" to the named inventor, or for that matter, to anyone. This normative proposition contemplates a minimal showing of inventive activity embodied in the conception of an invention in order to qualify for patentability. But to the extent that the conception of the invention cannot fairly be ascribed to an individual, i.e., the named inventor or another, the claimed invention would be deemed to have resulted from a non-inventive act, and thus, be ineligible for patent protection.

## Facilitating Enhanced Public Access to Patented Technology

Various mechanisms exist to facilitate public access to patented technology generally. As applied particularly to gene patents, such mechanisms balance, in varying degrees, the interests of commercial exclusivity with public access to patented genetic technology.

*Injunctive Relief Restraint.* While our patent system does not provide for compulsory licensing *per se,* the denial of injunctive relief on the balance of the equities and/or the public interest factors of the traditional four-factor tests for determining whether to grant a preliminary or permanent injunction essentially amounts to a *de facto* ability of the infringer to continue to use the patented invention, albeit subject to a reasonable royalty. The decision in *eBay Inc. v. MercExchange, L.L.C.,*[8] where the Supreme Court vitiated the Federal Circuit presumptive grant of permanent injunctive relief to a prevailing patentee plaintiff in favor of the reliance on the traditional four-factor test, sustains the possibility of this approach to allow greater public access to patented genetic technology.

---

[8] 126 S. Ct. 1837 (2006).

_Patent Pools._ For a biotechnology company, there is arguably no greater asset than a proprietary position on genetic data that might become the platform for the development of commercially significant biological products. Besides its straightforward function as a direct template for such biologics, genomic data also has enormous potential as a basic research tool with many possible applications. The technical leap from knowledge of mere DNA sequence to such downstream applications, however, while perhaps grounded in accepted scientific methods, is certainly not trivial. Accordingly, the dependency of the biotechnology industry on patent exclusivity remains robust. Matching this are the continuing concerns over patent thickets and other obstacles to access and development.

As the biotechnology industry has matured, the embrace of cooperative market-based technology transfer strategies similar to those relied upon in other technology sectors is perhaps within reach. In 1998, I suggested that the interplay between historical experiences and future prospects in biotechnology made patent pooling arrangements a ripe consideration for the industry, and that the patent landscape should not be allowed to preclude the realization of financial rewards associated with the complex research efforts of biotechnology companies to understand and to harness the biological processes involved.[9]

At its core, biotechnology is the exploitation of nature's design, standing on the shoulders of the biological templates of DNA and ribonucleic acid (RNA). For biotechnology, genetic information represents an "industry standard" analogous to those described above in the electronics and telecommunications areas. Accordingly, the landscape of increasing patent protection to this genetic material favors the voluntary entry of biotechnology industry members into patent pooling arrangements.

Indeed, the vast amount of genetic information, and its significance as a fundamental research tool even absent functional knowledge, can give rise to an almost overwhelming number of patents, the true value of which may be unascertainable

---

[9] Lawrence M. Sung et al., _Greater Predictability May Result in Patent Pools As the Federal Circuit Refines Scope of Biotech Claims, Use of Collective Rights Becomes Likely_, Nat'l L.J. (Jun. 22, 1998), cited in USPTO White Paper, _Patent Pools: A Solution to the Problem of Access in Biotechnology Patents?_ (Dec. 5, 2000). In 2002, I testified, during part of the Joint U.S. Department of Justice and Federal Trade Commission hearings on Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy, that given the dynamics of biotechnology research and development, the reliance by the industry on cooperative market-based technology transfer strategies through patent pools or other collective rights organizations may be inevitable. Lawrence M. Sung, _Patent Pools and Cross-Licensing: When Do They Promote or Harm Competition?_ (Apr. 17, 2002).

without the cooperative efforts of other companies. In any event, the overall transactional costs associated with risk assessments based upon this relatively uninformed valuation of patent rights may alone outweigh any perceived benefit to the maintenance of an isolationist business strategy.

The establishment of a biotechnology patent pool will depend on the convergence of several factors. The first involves the determination of the patents necessary to undertake a particular research effort. Once the patent pool members set out research goals and define the technological aspects required to accomplish those goals, an independent licensing agent or patent pool administrator can assess which patents would be essential to achieve a freedom to operate in this regard. This assessment should involve the technical and legal expertise of qualified biotechnology patent attorneys.

A biotechnology patent pool can thus have a more horizontal scope relating broadly within a discipline, for example, encompassing genetic information likely associated with a particular biological function. Alternatively, a biotechnology patent pool can reflect a more vertical integration of scientific methods across various disciplines, for example, providing freedom to operate from genetic screening and lead identification to drug discovery. The determination of the appropriate scope of technology governed by the patent pool further allows the administrator to decide whether an invitation to patent pool membership should be extended to certain nonmembers owning essential patents.

During the patent pool's existence, a responsibility of the administrator will also be the strict regulation of the composition of the portfolio, which will likely change through the addition of newly issued, essential patents and the deletion of expired, nonessential, invalid or unenforceable patents. The administrator can further attend to the solicitation and engagement of nonmember licensees, the collection and distribution of royalty income, and the enforcement and termination of licenses.

The fundamental features of a patent pool include the integration of complementary technologies, the reduction of transaction costs, the clearance of blocking patent positions and the avoidance of costly infringement litigation. Its effectiveness springs principally from a consensus among the participants that individual patent rights will be made available to other members on fair, reasonable and nondiscriminatory terms. In any event, the ability to obtain a straightforward, reliable freedom to operate in an otherwise complex arena of intellectual property will be a dominant appeal of a biotechnology patent pool for prospective participants and nonmember licensees alike. The interest in the possibility of biotechnology patent pools

as mechanisms to balance the interests of commercial exclusivity with public access to patented genetic technology has resurged in recent years.[10]

March-In Rights. Under 35 U.S.C. § 203 (codifying a portion of the Bayh-Dole Act), the federal government retains "march-in rights" for government funded inventions owned by small businesses or nonprofit organizations. In situations of nonexploitation of the invention or public health threat, the funding agency may request the patentee or exclusive licensee to grant an appropriate license to another. If the request is refused, the funding agency may grant its own license, without restriction, including a license grant to a direct competitor. While the federal government historically has never exercised such rights, this entitlement has arguably greater implications for government funded genomic inventions, presumably because of the heightened relevance of the subject matter to potential public health and bioterrorism concerns.

Clinical Trial Exemption. At present, the only statutory exemption to patent infringement liability exists with 35 U.S.C. § 271(e)(1), which is limited to activity reasonably related to the preparation and submission of an application for federal regulatory approval. Such activity may include experimentation and other data gathering. In this regard, § 271(e)(1) can be fairly characterized as an experimental or research use defense applicable only in the specific context of regulatory compliance.

While § 271(e)(1) exempts from infringement such activity by the generic drug manufacturer that would otherwise infringe § 271(a), so long as that activity is reasonably related to the FDA application, § 271(e)(2) provides a cause of action for infringement based upon the filing of an application to the Food and Drug Administration (FDA) for market approval of a generic drug. The statutory scheme thus balances the interests of a patented, brand-name drug manufacturer in enforcing its patent rights and the interests of the public in the availability of a competitively priced generic version of the drug as soon as possible. Given the infringement exemption under § 271(e)(1), § 271(e)(2) essentially authorizes a declaratory judgment suit by a patentee against a prospective infringer.

In *Merck KGaA v. Integra Lifesciences I, Ltd.*,[11] the Supreme Court held that 35 U.S.C. § 271(e)(1) extends to all uses of patented inventions that are reasonably related

---

[10] *See, e.g.,* Board on Science, Technology, and Economic Policy, REAPING THE BENEFITS OF GENOMIC AND PROTEOMIC RESEARCH: INTELLECTUAL PROPERTY RIGHTS, INNOVATION AND PUBLIC HEALTH (Nat'l Academies Press 2006) ("Recommendation 11: NIH should undertake a study of potential university, government, and industry arrangements for the pooling and cross-licensing of genomic and proteomic patents, as well as research tools.").

[11] 545 U.S. 193 (2005).

to the development and submission of any information under the Federal Food, Drug, and Cosmetic Act (FDCA), including preclinical studies of patented compounds that are appropriate for submission to the FDA in the regulatory process. The Court clarified that the statute did not exclude certain information from the exemption on the basis of the phase of research in which it was developed or the particular submission in which it could be included. On remand,[12] the Federal Circuit further noted that the criterion of whether the experimental investigation of a patented compound is reasonably related to the development of information for submission to the FDA is established at the time of the experiment, and does not depend on the success or failure of the experimentation or actual submission of the experimental results. The Federal Circuit thus stated that studies of compounds that are not ultimately proposed for clinical trials are within the § 271(e)(1) FDA Exemption, when there was a reasonable basis for identifying the compounds as working through a particular biological process to produce a particular physiological effect. The Federal Circuit reasoned that the § 271(e)(1) safe harbor did not depend on a distinction between discovery and routine research, but on whether the threshold biological property and physiological effect had already been recognized as to the candidate drug.

Furthermore, the Supreme Court and Federal Circuit declined to address the potential implications for the rulings on the subject of research tools. Where a research tool has application only in the context of clinical trials, it becomes questionable how patent rights to such a research tool might be enforceable. But for other research tools, the Merck decision might have little bearing.

Research Use Exemption. Following the 2002 Federal Circuit decision in Madey v. Duke University,[13] the research community has been on notice that the patent laws apply to basic research activities, whether or not performed at universities or non-profit institutions, as they relate to infringement. Of course, the Federal Circuit has yet to abolish the common law exemption to patent infringement liability.[14] However, its decision in Madey leaves grave doubt that the common law exemption to patent infringement liability can act as a safe harbor for any academic research effort in this day and age. The relevant factors for such a determination arguably discount the nature

---

[12] 496 F.3d 1334 (Fed. Cir. 2007).

[13] 307 F.3d 1351 (Fed. Cir. 2002).

[14] See Whittemore v. Cutter, 29 F. Cas. 1120, 1121 (C.C.D. Mass. 1813) (No. 17,600) ("[I]t could never have been the intention of the legislature to punish a man, who constructed such a machine merely for philosophical experiments, or for the purpose of ascertaining the sufficiency of the machine to produce its described effects."); Poppenhusen v. Falke 19 F. Cas. 1048, 1049 (C.C.S.D.N.Y. 1861) (No. 11,279) ("[A]n experiment with a patented article for the sole purpose of gratifying a philosophical taste, or curiosity, or for mere amusement, is not an infringement of the rights of the patentee.").

of the defendant (whether academic, non-profit or not-for-profit in status) as well as the intent behind the conduct (non-pecuniary or non-commercial) as long as the act somehow can be related to a legitimate business purpose. Moreover, even where the experimental work can be shown to occur outside the umbrella of a research institution or other enterprise, the protection of the common law exemption to patent infringement liability likely will not extend to activity other than hobbyist tinkering or testing of a patented invention for verification and reproducibility.

The theoretical constructs behind § 271(e)(1) and other legislation, extant or proposed, to exempt certain activities from patent infringement liability all flow from specific policy considerations beyond the diverse objectives that are offset in a delicate interplay to promote the progress of the useful arts. The divergence, therefore, that rests with a proposal to establish a universal statutory research use exemption, without regard to technology, industry or regulatory concerns, is the need to reassess the very nature of the patent system.

The literature is rich with excellent considerations of this topic. Indeed, commentators, like Professors Janice Mueller, Katherine Strandburg, and Rochelle Dreyfuss, have set forth sound rationales for a research use exemption, whereas others like Professor Richard Epstein have advocated that compulsory licensing, experimental use defenses, condemnation proceedings, and such, which assertedly reflect *ad hoc* interventions, defy the reality that the extant system works acceptably.

Prior, more broad-based, approaches included aspects of compulsory licensing. In this vein, for example, Professor Mueller's proposed a standard reach-through royalty of 25% of pre-tax profits. Professor Strandburg further proposed a two-tiered compulsory licensing scheme for research tool patents. In this regard, research tool patents would be entitled to three to five years of default exclusivity, after which compulsory licensing could apply. This approach, according to Professor Strandburg, would encourage early commercialization and voluntary licensing. Such an outcome seems likely, particularly if voluntary licensing during the exclusivity period prescribes some benchmark for the royalty rate applied during the compulsory licensing period. Professor Dreyfuss raised detailed insights into a balancing of the benefits and harms between patentee and basic researchers in her proposal for special liability rules attached to research uses of patented technology. One suggestion was a statutory amendment to exempt basic research from patent infringement remedies, similar to 35 U.S.C. § 287(c)(2) for certain uses of patented surgical and medical methods. Professor Dreyfuss alternatively (and more favorably) advocated a waiver registry that enabled basic researchers to gain access to a patented technology by executing a written waiver that publicly dedicated any subject matter discovered or invented through the use of the patented technology. The dedication to the public under the Dreyfuss proposal would take the form of novelty-defeating publication, statutory invention registration

under 35 U.S.C. § 157, or the like. In this model, the research use of the patented technology subject to waiver could occur without authorization or compensation.

While such elegant solutions have been proposed, it appears that little support for any one proposal has manifested. Despite a clear mandate for change, advocates such as the National Academies have yet to articulate a position beyond recognizing a need for further study. While once regarded by many as a significant adjunct to sweeping reform of the U.S. patent system, no present legislative proposal embodies a research use exemption provision.

In a modest proposal to refocus the dialogue, I have suggested a legislative proposal to amend the U.S. patent laws to establish a basic research right to use patented technologies. The proposal draws from the present and proposed statutory framework governing prior user rights against patent infringement that may be found with 35 U.S.C. § 273, and the proposed amendments to that statute. The draft legislation would balance the interests of academic research freedom with patent exclusivity. While the proposal would hold the academic research community more accountable for their conduct, it would immunize academic researchers and their institutions from patent infringement liability and damages, and more importantly, would establish a right to use patented technology for basic research unfettered by threat of injunction. The draft legislation would accomplish this by precluding claims against academic researchers and their institutions for patent infringement, where such individuals and entities provide actual notice to the patent owner of the open and notorious use of the patented technology for basic research uses that become dedicated to the public, but by allowing claims against commercial entities that knowingly provide funding or materials, which facilitate the otherwise infringing activity. In so doing, the proposed statute would foster the increased awareness and respect of patent rights by the academic research community while alleviating the apprehension of patent infringement suit, by penalizing only commercial activity done under the guise of academic research.

35 U.S.C. § 274 Defense to infringement based on election of basic research right to use.

(a) DEFINITIONS. - For purposes of this section --

(1) the term "basic research use" means use of a device or method in the United States performed by a nonprofit research laboratory, or nonprofit entity such as a university, research center, or hospital, a use for which the public is the intended beneficiary, except that the use --

(A) may be asserted as a defense under this section only for continued use by and in the laboratory or nonprofit entity; and

(B) may not be asserted as a defense with respect to any subsequent commercialization or use outside such laboratory or nonprofit entity.

(b) DEFENSE TO INFRINGEMENT. --

(1) IN GENERAL. – It shall be a defense to an action for infringement under section 271 of this title with respect to any subject matter that would otherwise infringe one or more claims in the patent being asserted against a person, if such person had, acting in good faith, provided actual notice to the patent owner of the use of the patented device or method no later than six months after such use has commenced.

(2) LIMITATIONS AND QUALIFICATIONS OF DEFENSE. – The defense to infringement under this section is subject to the following:

(A) NOTICE CONTENT. – The actual notice must include a research plan that sets forth the use of the patented device or method; information regarding the identity of all persons engaged in the research plan and their affiliations, the nature and amount of funds used to support the activities performed under the research plan, and the identity of the funding sources.

(B) NOT A GENERAL LICENSE. – The defense asserted by a person under this section is not a general license under all claims of the patent at issue, but extends only to the specific subject matter claimed in the patent with respect to which the person can assert a defense under this chapter, except that the defense shall also extend to variations in the quantity or volume of use of the claimed subject matter, and to improvements in the claimed subject matter that do not infringe additional specifically claimed subject matter of the patent.

(3) BURDEN OF PROOF. – A person asserting the defense under this section shall have the burden of establishing the defense by clear and convincing evidence.

(4) PERSONAL DEFENSE. – The defense under this section may be asserted only by the person who performed the acts necessary to establish the defense and, except for any transfer to the patent owner, the right to assert the defense shall not be licensed or assigned or transferred to another person except as an ancillary and subordinate part of a good faith assignment or transfer for other reasons of the entire research program to which the defense relates.

(5) UNSUCCESSFUL ASSERTION OF DEFENSE. – If the defense under this section is pleaded by a person who is found to infringe the patent and who subsequently fails to demonstrate a reasonable basis for asserting the defense, the court shall find the case exceptional for the purpose of awarding attorney fees under section 285 of this title.

Conclusion

To the extent the balance between the interests of commercial exclusivity with public access to genetic technology is deemed suboptimal, and the legislature seeks to remedy the situation by statutory change, several mechanisms exist that may be adapted in an attempt to achieve such a purpose. However, the potential for unintended consequences in any change to the patent laws, which might have disparate impact upon various technologies and industries, strongly suggests that such action should be approached with careful deliberation. Thank you.

Mr. BERMAN. Thank you very much, Dr. Sung. Mr. Soderstrom?

## TESTIMONY OF E. JONATHAN SODERSTROM, MANAGING DIRECTOR, OFFICE OF COOPERATIVE RESEARCH, YALE UNIVERSITY, NEW HAVEN, CT

Mr. SODERSTROM. Thank you, Mr. Chairman, for the invitation to be here today.

As you indicated in your opening statement, some scholars have argued that patents and their enforcement may impose significant costs upon noncommercial biomedical research by creating an anticommons or a patent thicket that may make the acquisition of licenses and other rights too burdensome to permit the pursuit of these otherwise scientifically and socially worthwhile research. These concerns have grown since the *Madey v. Duke* decision that affirmed the affirmation of any research exemption shielding universities from patent infringement liability.

Without diminishing the importance of these potential concerns, it should be pointed out that the evidence offered to support these contentions is primarily anecdotal, and I need not remind you that the plural of anecdote is not data. Although a few isolated incidents have received significant attention, there is little systematic evidence that widespread assertion of patent rights on genes has been significantly hampered biomedical research.

Two recent surveys, as you pointed out, offer little empirical basis for claims that restricted access to intellectual property is currently impeding academic biomedical research. The authors, in fact, further note that patents are not typically used to restrict access to knowledge and tangible materials that biomedical scientists require.

The surveys further show that firms generally do not threaten infringement litigation against academic research institutions, a de facto research exemption, if you will, in part because such academic use may improve their invention or because they wish to maintain good will and ensure access to future academic inventions and also because the damages, as we all know, are likely to be very small.

These studies also confirm that university technology managers take a very nuanced approach to patenting and licensing seeking only enough intellectual property protection to facilitate the commercial development of an invention. Decisions to patent and strategies for commercializing the inventions depend on a determination of the level of protection necessary to induce an interested company into investing in the further development, testing, manufacturing, marketing, sales of a product embodying the technology.

But these results should not be surprising. The practice of university technology transfer managers reflect the salutary effects of the guidance that the National Institutes of Health has issued on patenting of research tools and genomic inventions as well as the formation of professional norms and standards of behavior encouraged by groups, such as the one that I help lead, the Association of University Technology Managers.

Universities share certain core values, and we seek to maintain to the fullest extent possible in all technology transfer agreements.

Chief among these values are the protection of academic freedom and the open pursuit of scientific inquiry. We seek balance between the business needs of our licensing partners and the shared value of our respective academic institutions.

Recently, a group of university research officers, licensing directors, and a representative from the Association of American Medical Colleges recognized the need to clearly articulate a set of principles that strike such an appropriate public policy balance.

The participating universities released a white paper in the public interest, nine points to consider in licensing university technology. These considerations were put forth in an aspirational or self-correcting sense to encourage the profession to set a high standard by creatively stretching the boundaries of conventional licensing practices and ensuring that licensing activities are in the public interest for society's benefits.

The nine points included: one, universities should reserve the right to practice licensed inventions and to allow other nonprofit and governmental organizations to do so; two, exclusive licenses should be structured in a manner that encourage technology development and use as broadly and as quickly as possible; three, that we should strive to minimize the licensing of "future improvements"; four, that universities should anticipate and help manage technology transfer-related conflicts of interest; five, ensure broad access to research tools; six, enforcement action should be carefully considered; seven, we should be mindful of export regulations; eight, we should be mindful of the implications of working with patent aggregators; and, nine, we should consider including provisions that address unmet needs, such as those of neglected patient populations or geographic areas, giving particular attention to improved therapeutics, diagnostics and agricultural technologies for the developing world.

Many of these points were already being practiced. In fact, the nine points have been endorsed by a growing number of academic institutions and professional organizations around the world. We applaud these participating universities' efforts to articulate these important principles and urge their adoption and application by the wider community of universities.

In the end, we hope to foster thoughtful approaches and creative solutions to complex problems that may arise when universities license technologies in the public interest and for society's benefit. We believe that patent policy, as well as practice, should be guided by the goal of promoting innovation and, in turn, improvements in human welfare.

That view drove Yale's interest in helping to draft the nine points guidelines, which recommended that universities endeavor to make genomic inventions that will serve primarily as research tools as broadly available as possible.

Yale has long taken a balanced approach to patenting, taking into account the nature of the invention, its relevance to research, and the extent to which patent protection would be necessary to give a commercial partner adequate incentive to develop the product completely. We have taken a similar approach to licensing, especially by insisting on the right to make the invention available to researchers at Yale and other academic institutions.

We do not think that gene patents are having a significant negative impact on academic research. There have been thoughtful analyses of problems that could arise, but the most comprehensive studies of this issue concluded that the patents are not slowing the pace of research.

Yale and other research universities have a major stake in ensuring access to research tools. We also recognize that circumstances may change as the field of genomics and proteomics continue to advance, and I am confident that the scientific community, working with the National Institutes of Health, the Association of Technology Managers, the Association of American Medical Colleges and others, will continue to monitor whether gene patents are interfering significantly with research.

My colleagues and I are grateful for the Subcommittee's interest in this topic.

Thank you.

[The prepared statement of Mr. Soderstrom follows:]

PREPARED STATEMENT OF E. JONATHAN SODERSTROM

Mr. Chairman, thank you for the opportunity to testify before your Subcommittee on the topic of whether gene patents are helping or hurting research in the life sciences.

My name is Jon Soderstrom. I am the Managing Director of the Office of Cooperative Research (OCR) at Yale University. The Office of Cooperative Research is the intellectual property management and licensing organization for Yale University. I also serve as the President-Elect for the Association of University Technology Managers known as AUTM. AUTM is a nonprofit organization created to function as a professional and educational society for academic technology transfer professionals involved with the management of intellectual property. AUTM was founded in 1974 as the Society of University Patent Administrators. That group laid the foundation for the association that exists today with more than 3,000 members strong representing over 1,500 institutions and companies across the globe.

SOURCES OF CONCERN

Scholars have recently argued that patents may impose significant costs upon noncommercial biomedical research. Heller and Eisenberg[1] suggest that the patenting of a broad range of the inputs that researchers need to do their work may give rise to an "anti-commons" or "patent thicket" that may make the acquisition of licenses and other rights too burdensome to permit the pursuit of what should otherwise be scientifically and socially worthwhile research. Merges and Nelson[2] and Scotchmer[3] highlight the related possibility that, in some fields of technology, the assertion of patents on only one or two key upstream, foundational discoveries may significantly restrict follow-on research. A further concern is that the prospect of realizing financial gain from upstream research may make researchers reluctant to share information or research materials with one another, thereby impeding the realization of research efficiencies and complementarities. Similarly, researchers may be trading away rights to conduct future research or to freely disseminate their discoveries in exchange for current access to research inputs or financial support.[4] Finally, prospective financial gains from the exploitation of intellectual property may induce researchers to choose research projects on the basis of commercial potential rather than scientific merit.

Another aspect of the debate about whether intellectual property fosters or hinders biomedical research relates to the 'research tools,' which are the ideas, data,

---

[1] Heller, M.A. and Eisenberg, R. S. 1998. "Can Patents Deter Innovation? The Anti-Commons in Biomedical Research." *Science*, Vol. 280. No. 5364, pp. 698–701
[2] Merges, R. P. and R. R. Nelson. 1990. "On the Complex Economics of Patent Scope. "Columbia Law Review 90:839–916
[3] Scotchmer, S. 1991. "Standing on the Shoulders of Giants: Cumulative Research and the Patent Law." *Journal of Economic Perspectives* 5:29–41.
[4] Cohen, W. M., R. Florida, and R. Goe. 1994. "University-Industry Research Centers in the United States."; Thursby, Jerry G. and Marie C. Thursby. 2003. "University Licensing and the Bayh-Dole Act." *Science* 301:1052.

materials or methods used to conduct research. Many such materials and methods are disclosed or claimed in DNA patents. Among DNA patents, there is particular concern about the subset of gene patents and their relevance to research tools because genes are not only inputs to developing genetic tests and therapeutic proteins, and thus directly relevant to medically important products and services, but also are crucially important tools for ongoing research. Concern over the impact of patenting and licensing on biomedical research has grown since the Court of Appeals for the Federal Circuit's 2002 *Madey v. Duke* decision, which visibly affirmed the absence of any research exemption shielding universities from patent infringement liability. Patent claims based on DNA sequences can be infringed by research activities that entail making or using the claimed sequence, not just by selling products or services.

Without diminishing the importance of these potential concerns, it should be pointed out that the evidence offered to support these contentions is primarily anecdotal. Although these isolated instances have received significant attention, there is no evidence that widespread assertion of patent rights on genes has significantly hampered biomedical research. Contrary to these prevailing beliefs, findings from a recent survey of 414 biomedical researchers in universities, government, and non-profit institutions offers little empirical basis for claims that restricted access to intellectual property is currently impeding academic biomedical research.[5] The authors noted that, although common, patents in this field are not typically used to restrict access to the knowledge and tangible materials that biomedical scientists require.

The authors cite a number of reasons, including the fact that firms generally do not threaten infringement litigation against academic research institutions (a *de facto* research exemption), in part because such academic use may improve their invention, because they wish to maintain good will and to ensure access to future academic inventions, and also because the damages are likely to be very small. According to the authors:

> "Our research thus suggests that 'law on the books' need not be the same as 'law in action' if the law on the books contravenes a community's norms and interests."

These findings are consistent with another recent major survey of 19 of the 30 US universities with the largest number of DNA patents. Their results showed that the licensing of DNA patents at US academic institutions has not led to the decline in academic cooperation and technology transfer that many observers have feared.[6] In fact, based on responses, the study demonstrated that in most cases the licensing behavior of universities allows for collaboration and sharing of DNA-based inventions among academic institutions.

The study investigated the patenting and licensing behavior for four main types of DNA-based inventions:

- DNA sequences that encode therapeutic proteins
- DNA sequences that are phenotypic markers only
- DNA sequences comprising genes encoding drug targets
- DNA discoveries or inventions representing research tools

The authors discovered that most universities base their decisions to patent and strategies for commercializing the invention on a determination of the level of protection necessary to induce an interested company into investing in the further development, testing, manufacture, marketing and sales of a product embodying the technology. Thus, in the case of a fully sequenced gene that encodes a therapeutic protein, where the utility and the development risks are both generally acknowledged to be high, survey respondents generally agreed that they would patent and license such inventions exclusively. However, in the case where the gene encoded is simply a target for drug discovery, few would consider even patenting such a discovery since researchers would be free to screen their compound libraries against the target while the patent application was pending and to use any resulting information without fear on infringement. In addition, it has become commonplace for universities, when licensing their inventions, to reserve the right for their own faculty, as well as researchers at other non-profit entities, to use the patented invention. The study confirmed that university technology managers take a nuanced ap-

[5] Walsh, J. P. Cho, C. Cohen, W. M. 2005. "View from the Bench: Patents and Material Transfers." *Science* 309: 2002–2003.

[6] Pressman, L. Burgess, R. Cook-Deegan, R. M. McCormack, S. J. Nami-Wolk, I. Soucy, M. & Walters, L. 2006. "The Licensing of DNA Patents by US Academic Institutions: An Empirical Survey." *Nature Biotechnology* 24: 31–39.

proach to patenting and licensing, seeking only enough intellectual property protection to facilitate the commercial development of the invention.

This market sensitivity is also reflected in data on patent trends. The number of DNA patents has shown a fairly dramatic and steady decline since their peak in 2001 (from about 4,500 to around 2,700 in 2005). Patent prosecution, maintenance and management costs that are typically between $20,000 and $30,000 per patent militate against patenting inventions that are unlikely to recover those costs and encourage considerable selectivity in which inventions are patented. As Pressman et al. point out, "these practices are designed pragmatically to accommodate both economic goals, such as revenue generation and new company formation, and social goals, such as ensuring utilization and availability of federally funded inventions."

### ESTABLISHING LICENSING PRINCIPLES TO PROMOTE ACCESS

These results are not surprising to persons currently involved in technology licensing activities as practiced at major research universities. To some extent the practices of university technology transfer managers reflect the salutary effects of guidance that the National Institutes of Health has issued on patenting of research tools and genomic inventions as well as the formation of professional norms and standards of behavior encouraged by groups such as the Association of University Technology Managers. Universities share certain core values that can and should be maintained to the fullest extent possible in all technology transfer agreements, chief among these are the protection of academic freedom and open pursuit of scientific inquiry. When crafting agreements with industry, a balance must be struck between the business needs of our licensing partners to generate returns on their investments and the shared values of our respective academic institutions.

Recognizing the need to clearly articulate a set of technology licensing principles that strikes the appropriate balance, a group of university research officers, licensing directors and a representative from the Association of American Medical Colleges met in July 2006 to brainstorm about critical societal, policy, legislative and other issues in university technology transfer.[7] Our aim was and is to encourage our colleagues in the academic technology transfer profession to analyze each licensing opportunity individually, but with certain core principles in mind.

The participating universities released a white paper, "In the Public Interest: Nine Points to Consider in Licensing University Technology."[8] The paper seeks to capture the shared perspectives of the participating university research officers and licensing directors on policy issues related to university technology transfer, in particular, with respect to ensuring that licensing activities are "in the public interest and for society's benefit." These considerations are put forth in an aspirational, rather than proscriptive, sense to encourage others in the profession to set a higher standard by stretching the boundaries of conventional licensing practices and sharing with the greater technology transfer community the insights that they gain in doing so.

The nine points identified in the white paper (see Appendix for the full elaboration of each point) included:

Point 1: **Universities should reserve the right to practice licensed inventions and to allow other non-profit and governmental organizations to do so**

Point 2: **Exclusive licenses should be structured in a manner that encourages technology development and use**

Point 3: **Strive to minimize the licensing of "future improvements"**

Point 4: **Universities should anticipate and help to manage technology transfer related conflicts of interest**

Point 5: **Ensure broad access to research tools**

Point 6: **Enforcement action should be carefully considered**

Point 7: **Be mindful of export regulations**

Point 8: **Be mindful of the implications of working with patent aggregators**

---

[7] The participating universities included: California Institute of Technology, Cornell University, Harvard University, Massachusetts Institute of Technology, Stanford University, University of California, University of Illinois, Chicago, University of Illinois, Urbana-Champaign, University of Washington, Wisconsin Alumni Research Foundation, Yale University and Association of American Medical Colleges (AAMC).

[8] "In the Public Interest: Nine Points to Consider in University Licensing," March 6, 2007. *http://www.autm.org/aboutTT/Points_to_Consider.pdf*

**Point 9: Consider including provisions that address unmet needs, such as those of neglected patient populations or geographic areas, giving particular attention to improved therapeutics, diagnostics and agricultural technologies for the developing world**

IN CONCLUSION

As technology transfer professionals, we recognize that many of these points are already being practiced. In fact, these points have been endorsed by a growing number of institutions and professional organizations around the world. We applaud the participating institutions' efforts to articulate these important principles and urge their adoption and application by the wider community of universities. As often is the case, guidance as to implementation of practices that will advance the mission of university technology transfer lags behind our collective awareness of both the needs that exist and our role in fostering an environment in which such needs can be met effectively. Given recent criticism from some sectors that question the motives and methods underlying university technology commercialization activities, however, it is especially important that the principles used to support our decision-making be recognized as serving the best interest of the public not just of individual universities. Beyond the simple economics of any agreement, it is our hope that our colleagues will give serious consideration to these additional points before finalizing the terms and conditions of any technology transfer agreement. In the end, we hope to foster thoughtful approaches and encourage creative solutions to complex problems that may arise when universities license technologies in the public interest and for society's benefit.

We believe that patent policy, as well as practice, should be guided by the goal of promoting innovation and, in turn, improvements in human welfare. That view drove Yale's interest in helping to draft the "Nine Points" guidelines, which recommend that universities refrain from patenting genomic inventions that will serve primarily as research tools. Yale has long taken a balanced approach to patenting, taking into account the nature of the invention, its relevance to research, and the extent to which patent protection would be necessary to give a commercial partner adequate incentive to develop the product completely. We have taken a similar approach to licensing, especially by insisting upon the right to make the invention available to researchers at Yale and other academic institutions.

We do not think that gene patents are having a significant negative impact on academic research. There have been thoughtful analyses of problems that could arise, and there have been anecdotal reports and two comprehensive studies of this issue, cited earlier in my testimony, that concluded that patents are not slowing the pace of research for several reasons. Universities take a nuanced approach to patenting and they are increasingly making specific provision for research uses of inventions in licenses. There is evidence that a "de facto research exemption" exists because companies rarely prosecute academic investigators for research uses that may be infringing.

Yale and other universities have a major stake in ensuring that access to research tools is not compromised (the "Nine Points" document is evidence of that); we also recognize that circumstances may change as the fields of genomics and proteomics continue to advance. I am confident that the scientific community, working with the National Institutes of Health, the Association of University Technology Managers, the Association of American Medical Colleges and others, we will continue to monitor whether gene patents are interfering significantly with research. My colleagues and I are grateful for the Subcommittee's interest in this topic.

——— APPENDIX———

**In the Public Interest:**
**Nine Points to Consider in Licensing University Technology**

**Point 1**

**Universities should reserve the right to practice licensed inventions and to allow other non-profit and governmental organizations to do so**

In the spirit of preserving the ability of all universities to perform research, ensuring that researchers are able to publish the results of their research in dissertations and peer-reviewed journals and that other scholars are able to verify published

results without concern for patents, universities should consider reserving rights in all fields of use, even if the invention is licensed exclusively to a commercial entity, for themselves and other non-profit and governmental organizations:

- to practice inventions and to use associated information and data for research and educational purposes, including research sponsored by commercial entities; and

- to transfer tangible research materials (e.g., biological materials and chemical compounds) and intangible materials (e.g., computer software, databases and know-how) to others in the non-profit and governmental sectors.

Clear articulation of the scope of reserved rights is critical.

## Point 2

### Exclusive licenses should be structured in a manner that encourages technology development and use

When significant investment of time and resources in a technology are needed in order to achieve its broad implementation, an exclusive license often is necessary and appropriate. However, it is important that technology transfer offices be aware of the potential impact that the exclusive license might have on further research, unanticipated uses, future commercialization efforts and markets. Universities need to be mindful of the impact of granting overly broad exclusive rights and should strive to grant just those rights necessary to encourage development of the technology.

Special consideration should be given to the impact of an exclusive license on uses of a technology that may not be appreciated at the time of initial licensing. A license grant that encompasses all fields of use for the life of the licensed patent(s) may have negative consequences if the subject technology is found to have unanticipated utility. This possibility is particularly troublesome if the licensee is not able or willing to develop the technology in fields outside of its core business. Universities are encouraged to use approaches that balance a licensee's legitimate commercial needs against the university's goal (based on its educational and charitable mission and the public interest) of ensuring broad practical application of the fruits of its research programs.

In situations where an exclusive license is warranted, it is important that licensees commit to diligently develop the technology to protect against a licensee that is unable or unwilling to move an innovation forward. In long-term exclusive licenses, diligent development should be well-defined and regularly monitored during the exclusive term of the agreement and should promote the development and broad dissemination of the licensed technology. Ideally, objective, time-limited performance milestones are set, with termination or non-exclusivity (subject to limited, but reasonable, cure provisions) as the penalty for breach of the diligence obligation.

Another means of ensuring diligent development, often used in conjunction with milestones, is to require exclusive licensees to grant sublicenses to third parties to address unmet market or public health needs ("mandatory sublicensing") and/or to diligently commercialize new applications of the licensed rights. Such a requirement could also be implemented through a reserved right of the licensor to grant direct licenses within the scope of the exclusive grant to third parties based on unmet need. In such situations, it is important to ensure that the parties have a common understanding of what constitutes a new application or unmet need for the purpose of implementing such a provision.

Absent the need for a significant investment—such as to optimize a technology for wide use—broad, non-exclusive licensing of tools such as genomic and proteomic inventions can help maximize the benefits derived from those technologies, in part by removing obstacles to further innovation. Unlike most research tools or manufacturing methods, diagnostic tests often must go through the regulatory approval process, and so may warrant exclusive licensing when the costs of test development, approval or diffusion require substantial investment of capital. Nevertheless, licensing of diagnostic tests based on broadly applicable genomics or proteomics methods should strive to preserve sufficient flexibility to permit testing for multiple indications (i.e., not an exclusive licensee's single disease of interest) perhaps through multiple field-restricted or non-exclusive licenses. Exclusive licensing of a single gene for a diagnostic may be counterproductive in a multi-gene pathology where only a panel of genes can yield an adequate diagnosis, unless the licensee has access to the other genes of the panel. Such licenses can also be limited in other ways. For example, a university might license a genomics method exclusively for a company to optimize and sell licensed products for diagnostic use. The drafting of the exclusive grant could make it clear that the license is exclusive for the sale, *but not use,*

of such products; in doing so, the university ensures that it is free to license non-exclusively to others the right (or may simply not assert its rights) to use the patented technology, which they may do either using products purchased from the exclusive licensee or those that they make in-house for their own use.

In general, when no alternative testing strategy is available for a given indication, consideration should be given to means of ensuring reasonable access for patients and shielding individual healthcare providers from the risk of suit for patent infringement. As with any medical technology, licenses should not hinder clinical research, professional education and training, use by public health authorities, independent validation of test results or quality verification and/or control.

### Point 3
### Strive to minimize the licensing of "future improvements"

Although licensees often seek guaranteed access to future improvements on licensed inventions, the obligation of such future inventions may effectively enslave a faculty member's research program to the company, thereby exerting a chilling effect on their ability to receive corporate and other research funding and to engage in productive collaborations with scientists employed by companies other than the licensee—perhaps even to collaborate with other academic scientists. In particular, if such future rights reach to inventions made elsewhere in the university, researchers who did not benefit from the licensing of the original invention may have their opportunities restricted as well, and may be disadvantaged economically relative to the original inventors if the licensing office has pre-committed their inventions to a licensee.

For these reasons, exclusive licensees should not automatically receive rights to "improvement" or "follow-on" inventions. Instead, as a matter of course, licensed rights should be limited to existing patent applications and patents, and only to those claims in any continuing patent applications that are (i) fully supported by information in an identified, existing patent application or patent and (ii) entitled to the priority date of that application or patent.

In the rare case where a licensee is granted rights to improvement patents, it is critical to limit the scope of the grant so that it does not impact uninvolved researchers and does not extend indefinitely into the future. It is important to further restrict the grant of improvements to inventions that are owned and controlled by the licensor institution—i.e., (i) not made by the inventor at another institution, should they move on or (ii) co-owned with, or controlled by, another party. One refinement to this strategy would be to limit the license to inventions that are dominated by the original licensed patents, as these could not be meaningfully licensed to a third party, at least within the first licensee's exclusive field. As was discussed earlier, appropriate field restrictions enable the licensing not only of the background technology, but also of improvements, to third parties for use outside the initial licensee's core business. In all cases, a license to improvements should be subject to appropriate diligent development requirements.

It should be recognized, however, that not all "improvements" have commercial potential (for example, they may not confer sufficient additional benefit over the existing technology to merit the expense of the development of new or modified products), in which case a licensee might not wish to develop them. In general, it may be best simply not to patent such improvements.

### Point 4
### Universities should anticipate and help to manage technology transfer related conflicts of interest

Technology transfer offices should be particularly conscious and sensitive about their roles in the identification, review and management of conflicts of interest, both at the investigator and institutional levels. Licensing to a start-up founded by faculty, student or other university inventors raises the potential for conflicts of interest; these conflicts should be properly reviewed and managed by academic and administrative officers and committees outside of the technology transfer office. A technology licensing professional ideally works in an open and collegial manner with those directly responsible for oversight of conflicts of interest so as to ensure that potential conflicts arising from licensing arrangements are reviewed and managed in a way that reflects well on their university and its community. Ideally, the university has an administrative channel and reporting point whereby potential conflicts can be non-punitively reported and discussed, and through which consistent decisions are made in a timely manner.

### Point 5
### Ensure broad access to research tools

Consistent with the NIH Guidelines on Research Tools, principles set forth by various charitable foundations that sponsor academic research programs and by the mission of the typical university to advance scientific research, universities are expected to make research tools as broadly available as possible. Such an approach is in keeping with the policies of numerous peer-reviewed scientific journals, on which the scientific enterprise depends as much as it does on the receipt of funding: in order to publish research results, scientists must agree to make unique resources (e.g., novel antibodies, cell lines, animal models, chemical compounds) available to others for verification of their published data and conclusions.

Through a blend of field-exclusive and non-exclusive licenses, research tools may be licensed appropriately, depending on the resources needed to develop each particular invention, the licensee's needs and the public good. As suggested with respect to genomics and proteomics method patents in Point 2 above, a university might license a research reagent, kit or device exclusively to a company to optimize and sell licensed products and services for research, diagnostic or other end uses. The drafting of such an exclusive grant should make clear that the license is exclusive for the sale, *but not use*, of such products and services; in doing so, the university ensures that it is free to license non-exclusively to others the right to use the patented technology, which they may do either using products purchased from the exclusive licensee or those that they make in-house for their own use.

### Point 6
### Enforcement action should be carefully considered

In considering enforcement of their intellectual property, it is important that universities be mindful of their primary mission to use patents to promote technology development for the benefit of society. All efforts should be made to reach a resolution that benefits both sides and promotes the continuing expansion and adoption of new technologies. Litigation is seldom the preferred option for resolving disputes.

However, after serious consideration, if a university still decides to initiate an infringement lawsuit, it should be with a clear, mission-oriented rationale for doing so—one that can be clearly articulated both to its internal constituencies and to the public. Ideally, the university's decision to litigate is based on factors that closely track the reasons for which universities obtain and license patents in the first place, as set out elsewhere in this paper. Examples might include:

- Contractual or ethical obligation to protect the rights of existing licensees to enjoy the benefits conferred by their licenses; and
- Blatant disregard on the part of the infringer for the university's legitimate rights in availing itself of patent protection, as evidenced by refusal on the part of the infringer to negotiate with or otherwise entertain a reasonable offer of license terms.

Under all circumstances, it reflects poorly on universities to be involved in "nuisance suits." Exclusive licensees should be encouraged to approach patent enforcement in a manner that is consistent with the philosophy described in this Point 6.

### Point 7
### Be mindful of export regulations

University technology transfer offices should have a heightened sensitivity about export laws and regulations and how these bodies of law could affect university licensing practices. Licensing "proprietary information" or "confidential information" can affect the "fundamental research exclusion" (enunciated by the various export regulations) enjoyed by most university research, so the use of appropriate language is particularly important. Diligence in ensuring that technology license transactions comply with federal export control laws helps to safeguard the continued ability of technology transfer offices to serve the public interest.

### Point 8
### Be mindful of the implications of working with patent aggregators

As is true of patents generally, the majority of university-owned patents are unlicensed. With increasing frequency, university technology transfer offices are approached by parties who wish to acquire rights in such 'overstock' in order to com-

mercialize it through further licenses. These patent aggregators typically work under one of two models: the 'added value' model and the so-called 'patent troll' model.

Under the added value model, the primary licensee assembles a portfolio of patents related to a particular technology. In doing so, they are able to offer secondary licensees a complete package that affords them freedom to operate under patents perhaps obtained from multiple sources. As universities do not normally have the resources to identify and in-license relevant patents of importance, they cannot offer others all of the rights that may control practice (and, consequently, commercialization) of university inventions. By consolidating rights in patents that cover foundational technologies and later improvements, patent aggregators serve an important translational function in the successful development of new technologies and so exert a positive force toward commercialization. For example, aggregation of patents by venture capital groups regularly results in the establishment of corporate entities that focus on the development of new technologies, including those that arise from university research programs. To ensure that the potential benefits of patent aggregation actually are realized, however, license agreements, both primary and secondary, should contain terms (for example, time-limited diligence requirements) that are consistent with the university's overarching goal of delivering useful products to the public.

In contrast to patent aggregators who add value through technology-appropriate bundling of intellectual property rights, there are also aggregators (the 'patent trolls') who acquire rights that cut broadly across one or more technological fields with no real intention of commercializing the technologies. In the extreme case, this kind of aggregator approaches companies with a large bundle of patent rights with the expectation that they license the entire package on the theory that any company that operates in the relevant field(s) must be infringing at least one of the hundreds, or even thousands, of included patents. Daunted by the prospect of committing the human and financial resources needed to perform due diligence sufficient to establish their freedom to operate under each of the bundled patents, many companies in this situation will conclude that they must pay for a license that they may not need. Unlike the original patent owner, who has created the technology and so is reasonably entitled to some economic benefit in recognition for its innovative contribution, the commercial licensee who advances the technology prior to sublicensing, or the added value aggregator who helps overcome legal barriers to product development, the kind of aggregator described in this paragraph typically extracts payments in the absence of any enhancement to the licensed technology.[9] Without delving more deeply into the very real issues of patent misuse and bad-faith dealing by such aggregators, suffice it to say that universities would better serve the public interest by ensuring appropriate use of their technology by requiring their licensees to operate under a business model that encourages commercialization and does not rely primarily on threats of infringement litigation to generate revenue.

## Point 9

**Consider including provisions that address unmet needs, such as those of neglected patient populations or geographic areas, giving particular attention to improved therapeutics, diagnostics and agricultural technologies for the developing world**

Universities have a social compact with society. As educational and research institutions, it is our responsibility to generate and transmit knowledge, both to our students and the wider society. We have a specific and central role in helping to advance knowledge in many fields and to manage the deployment of resulting innovations for the public benefit. In no field is the importance of doing so clearer than it is in medicine.

Around the world millions of people are suffering and dying from preventable or curable diseases. The failure to prevent or treat disease has many causes. We have a responsibility to try to alleviate it, including finding a way to share the fruits of

---

[9]A somewhat related issue is that of technology 'flipping', wherein a non-aggregator licensee of a university patent engages in sublicensing without having first advanced the technology, thereby increasing product development costs, potentially jeopardizing eventual product release and availability. This problem can be addressed most effectively by building positive incentives into the license agreement for the licensee to advance the licensed technology itself—e.g., design instrumentation, perform hit-to-lead optimization, file an IND. Such an incentive might be to decrease the percentage of sublicense revenues due to the university as the licensee meets specific milestones.

what we learn globally, at sustainable and affordable prices, for the benefit of the world's poor. There is an increased awareness that responsible licensing includes consideration of the needs of people in developing countries and members of other underserved populations.

The details involved in any agreement provisions attempting to address this issue are complex and will require expert planning and careful negotiation. The application will vary in different contexts. The principle, however, is simple. Universities should strive to construct licensing arrangements in ways that ensure that these underprivileged populations have low- or no-cost access to adequate quantities of these medical innovations.

We recognize that licensing initiatives cannot solve the problem by themselves. Licensing techniques alone, without significant added funding, can, at most, enhance access to medicines for which there is demand in wealthier countries. Diseases that afflict only the global poor have long suffered from lack of investment in research and development: the prospects of profit do not exist to draw commercial development, and public funding for diseases suffered by those who live far away from nations that can afford it is difficult to obtain and sustain. Through thoughtful management and licensing of intellectual property, however, drugs, therapies, and agricultural technologies developed at universities can at least help to alleviate suffering from disease or hunger in historically marginalized population groups.

Mr. BERMAN. Dr. Grodman?

## TESTIMONY OF MARC GRODMAN, CHAIR OF THE BOARD AND CEO, BIO-REFERENCE LABORATORIES, ELMWOOD PARK, NJ

Dr. GRODMAN. Mr. Chairman, Members of the Subcommittee, I want to thank you for the opportunity to testify on a critical issue of public health.

My name is Marc Grodman. I am a physician as well as founder and CEO of Bio-Reference Laboratories, a publicly traded company. We are the largest independent regional clinical laboratory in the Northeast, employing over 1,700 people with revenues this year that will exceed $250 million. In 2006, Bio-Reference Laboratories purchased Gene Dx, a laboratory in Gaithersburg, Maryland, that does primarily genetic testing. This is an important business opportunity.

Unfortunately, the ability of Gene Dx to offer potentially life-saving genetic tests have been severely restricted. Gene patent holders have granted exclusive licenses for the testing of genetic disorders, keeping competitors of Gene Dx out, and we think having an adverse effect on the public.

I am not here today to attack the patenting of genes. What I am here to say is that using gene patents for the exclusive licensing of genetic tests for conditions, such as cancer, neurological disease, certain kinds of heart disease, among others, should be severely restricted, if not barred.

A laboratory with an exclusive testing license does not have to compete. It results in substantive quality of the testing as well as excessive pricing, making the test unaffordable to many. It also stifles research innovation. Competition, on the other hand, is the most effective tool we have to address the needs of public health. Let me describe three examples that will explain what I mean.

The first example concerns one of our society's most dangerous killers, breast cancer, and the related breast cancer genes BRCA-1 and BRCA-2. The patent holder has granted an exclusive license to one company to do the diagnostic testing for these genes. Not surprisingly, over the course of time, quality issues arose.

Dr. Chung, from Columbia University, who has submitted testimony along with my testimony, cites in her testimony that for about 10 years the tests of breast cancer genes was not as comprehensive as it might have been, given that there were a number of subsequent mutations that were not found. Competition would never allow this situation to go on, and, in fact, this information is confirmed in the peer-reviewed article, which is also cited in Dr. Chung's testimony.

The second example involves long QT genes that can cause sudden death from heart arrhythmias. These genes were patented and an exclusive license was granted to a single laboratory. For 2 years, the exclusive licensed laboratory went into bankruptcy and no other laboratory could test for this gene.

During this hiatus, Abigail, a 10-year-old child with long QT syndrome, died.

It is not just one or two genes. Each of the genes may mean a different medicine may work. So you really have to do it and do it well, and in that period of time, this girl never had access to the test.

Dr. Chung also describes persistent problems with a test performed by this exclusive laboratory, including long delays in getting results, in determinant findings, high costs, and just the basic lack of improvement by making the test better.

We can make a better test, but under the existing system, we cannot.

The third example is raised by testimony that I submitted from Dr. Kathy Matthews, a child neurologist and pediatrician at the University of Iowa. Dr. Matthews describes serious quality issues that she has encountered with the exclusive licensing of laboratory tests for certain neurological disorders.

It is somewhat amazing that as time goes on and we learn more about the association of different medical conditions and genetic patterns that she is now at a point to where she is referring less.

These scenarios illustrate another problem, that the laboratory with the exclusive license has no incentive to conduct further research, and other laboratories, including academic laboratories, are prevented by the patent holder from doing research as well in many cases.

I believe that competition in diagnostic testing is critical to protecting the public health and, fortunately, is a remedy aside from legislative reform, and that is the Bayh-Dole Act of 1980. This is the act that allows universities to get paid patents on genes even though Federal funds help pay the research. The act, however, recognizes that the patent monopoly obtained through taxpayer funding could be misused.

It specifies specifically a remedy. When the public's health or safety needs are not being reasonably satisfied by the patent holder or its exclusive licensee, the Federal funding agency has the power to march in and provide licenses to other interested parties. Thus, under existing Bayh-Dole legislation, when there are legitimate health and quality complaints about genetic laboratory tests of an exclusive licensee, the NIH may give licenses to other laboratories willing and able to do the tests.

Opening up the licensing process to more than one diagnostic testing laboratory will have a desirable benefit of improvement quality, more research, lower price, and creating a competitive framework at a higher standard by which even the exclusive licensees have to be able to attain.

As a laboratory, we are not seeking any windfall. Under Bayh-Dole, any laboratory given a license through the march-in provisions can and should be charged a reasonable royalty to use the patent.

Even though the NIH has refused to march in in three instances in which it was asked to do so, those cases involved drugs and not gene diagnostic testing and involved issues of price, not efficacy. Therefore, Congress must compel the NIH to enforce the margin provisions of the Bayh-Dole Act.

In conclusion, if we or any company can be able to provide a faster, better, more thorough result, more complete, more efficient tests to the public, the ability to go in and obtain this on a nonexclusive license and then sweep the market will be in the public health's advantage.

Thank you very much.

[The prepared statement of Dr. Grodman follows:]

PREPARED STATEMENT OF MARC GRODMAN

Statement of Dr. Marc Grodman,
CEO of Bio-Reference Laboratories, Inc.

The House Judiciary Subcommittee on Courts, the Internet and Intellectual Property in Connection with its hearing on "Stifling or Stimulating - The Role of Gene Patents in Research and Genetic Testing"

October 30, 2007

Mr. Chairman, members of the subcommittee, I want to thank you for the opportunity of testifying on a critical issue public health. I also want to congratulate the subcommittee for its leadership in scheduling this hearing on the important topic of the impact of gene patenting n genetic testing.

My name is Marc Grodman. I am the founder and CEO of Bio-Reference Laboratories (BRLI), a publicly traded company with headquarters in Elmwood Park, New Jersey that is the largest independent regional clinical laboratory in the Northeast, as well as providing national service in certain specialized areas. For almost 25 I have also been an attending physician on the medical wards of Columbia University's College of Physicians and Surgeons' New York-Presbyterian Hospital.

BRLI is a full service clinical laboratory. This means that we analyze blood, urine and tissue samples for a whole host of conditions, including diabetes, HIV/AIDS and hepatitis, to name a few. We have specialty capabilities in the areas of oncology and genetics. We employ almost 1700 individuals and serve physicians across the country who send us the samples to test. Over the past twenty years, BRLI has grown substantially. This year its revenues will total more than a quarter of a billion dollars, up from a two hundred thousand dollars in 1987.

A few years ago, I was making rounds with the interns when a patient was presented whose heart muscle was defective. She had a condition known as hypertrophic cardiomyopathy. A significant number of people with this condition are susceptible to sudden death syndrome. I asked the medical student to tell me the options for treating this patient and discovered for the first time that we could diagnose the condition by using a genetic test. In the past, our ability to make an exact diagnosis was limited; using data from an EKG and evaluating the shape of the heart using an echocardiogram, we hoped to have clues to the severity of the condition. But, as I learned at that time, with proper genetic testing, a much more accurate diagnosis could be made and the risk of sudden death could be properly evaluated and even reduced. That impressed me.

At the outset, I want to make it clear that that I am not here to attack the entire U.S. patent system, or even the patenting of genes or gene sequences *per se*. I am also not here to challenge the rights of universities under the Bayh-Dole Act of 1980 ("Bayh-Dole") to profit from the commercialization of their discoveries. While historically, patents, which confer legal monopolies of limited duration, have benefited society in numerous ways, such as by increasing innovation, in the case of genetic diagnostic testing that is patent protected and exclusively licensed the public health has been adversely affected. What I am saying is that the exclusive licensing of genetic associations, meaning of specific gene sequences or mutations in relation to certain clinical conditions, should be barred.

I would like to focus my remarks on two points: (1) explaining how the grant of exclusive patent licenses for conducting genetic diagnostic tests runs contrary to the public health; and (2) proposing a practical and simple remedy for this problem, which involves the Bayh-Dole Act of 1980.

739526v1

I became personally familiar with the issues when in 2006, BRLI purchased GeneDx, a wonderful laboratory, not far from here in Gaithersburg, Maryland, that does DNA sequencing, analyzing each base pair of the chromosomes, to diagnosis rare genetic disorders. In addition to diagnosing genetic disease outright, GeneDx has the ability to test for human genes that are associated with certain diseases or that make a person highly susceptible to a certain disease. My company was excited by the opportunity to participate in the forefront of modern medicine and at the same time take advantage of an important business opportunity.

Unfortunately, however, the ability of GeneDx to offer these genetic tests has been severely restricted by gene patent holders or their exclusive licensees, such that GeneDx, as well as other clinical laboratories, may not provide tests without the threat of being sued for infringing gene-related patent.

How has this problem arisen?

The patent holder of a gene patent, usually a university where the original research was conducted, controls the commercial use of the gene. This means that a laboratory cannot analyze the gene for mutations in order to diagnose the presence of a disease or condition, such as breast cancer or muscular dystrophy, without permission of the patent holder. In cases where the university grants licenses to multiple laboratories to conduct the diagnostic tests, the public interest and technological advancement are generally promoted through the competitive process.

Indeed many institutions, including the National Institutes of Health (NIH), major universities, and the Association of University Technology Managers (AUTM) believe that the best practice is to limit strictly the grant of exclusive licenses to extraordinary circumstances.

More particularly, the NIH recommended policy is to restrict the licensing of genomic inventions to non-exclusive approaches "whenever possible." A non-exclusive licensing approach "whenever possible" favors and facilitates making broad enabling technologies and research uses of inventions widely available and accessible to the scientific community. See, "Best Practices for the Licensing of Genomic Inventions: Final Notice" (70 Fed. Reg. 18413, 18415, April 11, 2005), at http://www.ott.nih.gov/pdfs/70FR18413.pdf (last visited October 25, 2007).

Similarly, AUTM recently came out with their recommendation of a consensus recommendation by about a dozen major U.S. research universities entitled "In the Public Interest: Nine Points to Consider in Licensing University Technology." This policy, published on March 6, 2007 addresses the need for commercial arrangements to be cognizant of the public good. http://www.autm.net/ninepoints_endorsement.cfm, last visited October 26, 2007.

I have to confess to a strong underlying belief—competition in diagnostic testing is critical to protection the public health. Right now, except when blocked by exclusive licenses, clinical laboratories compete. We compete on service—getting back the results in a timely manner and in a way that contains clinically useful information to the physician and perhaps the patient. We compete on quality—we have to get the right result; if we do not, then we will suffer the consequences – the loss of business. We compete on price–we know if we are more efficient

739526v1

we can get more business. We need to compete fully and across the board on technology. We need, for example, to be able see if there is one area of the human genome that has been associated with one condition or disease might have new or further meaning when combined with another area of the human genome. This robust competition protects the public. When a gene is the exclusive province of a single laboratory because of an exclusive licensing agreement, that laboratory does not have to compete on any of these factors. The absence of competition leads to substandard quality of tests, inadequate marketing of or information about tests, as well as to excessive pricing, making the tests unaffordable and unavailable to thousands of individuals.

Let me give you several examples of the problems my laboratory has encountered in trying to do its business. In one case, shortly after we acquired GeneDx, one of our customers, a geneticist, asked for a diagnosis for a rare skin disorder. While we were in the process of sequencing the gene in order to make a diagnosis, we received a letter from another laboratory claiming that within the sequence we were analyzing was another sequence associated with hearing loss. We were told that this hearing loss area was patent protected and that we could not proceed further without infringing the patent. The laboratory would not accept a fee or royalty from us to conduct the genetic test, but said that the patient would have to submit DNA to them for testing; they would just re-do our existing work at full cost to the patient to confirm what we had already done.

We have experienced another notable example of the problem involving genes associated with Long QT Syndrome. Long QT Syndrome is a disorder of the heart's electrical system that is characterized by irregular heart rhythms and risk of sudden death. The discovery of these genes was partially funded by the NIH. Numerous U.S. patents were obtained on the genes and the patent holder (the University of Utah) granted an exclusive license to one laboratory to develop and offer the diagnostic test for the genes.

We have consulted with Dr. Wendy Chung, a highly respected physician and research scientist at Columbia University's New York-Presbyterian Hospital, who has informed us that there have been serious quality problems which continue, generally unresolved, in connection with the LQT Syndrome tests. A key problem relates to inaccurate or incomplete testing. Thus, tests done by the exclusively licensed clinical laboratory failed to detect mutations that were found in the same patients Dr. Chung's research laboratory. One such case involved a five year old child who was at very high risk of sudden cardiac death. An incorrect test could have had fatal consequences for the child. An incorrect diagnosis in the child would also have left over 20 other mutation carriers in her family at risk for sudden cardiac death. A system that allows only one laboratory to conduct a genetic test creates other problems as well. Dr. Chung has also informed us that the turn around time for the test is lengthy, and can take as long as six to eight weeks. Finally, the price of the test to the public is currently $5,400 even though a competitive laboratory could offer the test for about a quarter of the price. I am submitting as Appendix A to the subcommittee a written statement by Dr. Chung that describes in greater detail the problems with the Long QT syndrome test.

The University of Utah awarded an exclusive license to DNA Sciences for genetic testing in several genes associated with LQT. However, DNA Sciences never developed a genetic test

for this disorder. Meanwhile, GeneDx *did* develop testing and made it available to the public. DNA Sciences sued GeneDx for infringement, and would not issue GeneDx a sub-license to offer testing. DNASciences was sold to another company. GeneDx contacted the new company and requested a license. The new company refused. GeneDx asked simply to be allowed to offer the test only so long as the new company was getting their test ready, so that there would be testing available to the patients and their families in the interim. The new company refused. The new company was then purchased by yet another company. Thus there was a full 2-year period during which genetic testing was not available for this disorder which kills children and young adults. I am aware of at least one patient, Abigail, who during this time developed an arrythmia. If testing were available, the cause of Abigail's arrythmia would have been diagnosed and the correct therapy been instituted. However, Abigail died suddenly at age 10 from her undiagnosed LQT syndrome.

In sum, we have tried, with no success, to sublicense the Long QT genes from the laboratory with the exclusive patent rights so that we could offer the test to the public. I am convinced that if we had the rights to perform this test, we could do a better job and do it less expensively so that the test would be more widely available.

This problem extends to many other genetic diseases aside from LQT genes. One well-publicized example of this problem has to do with BRCA1/BRCA2, the genes whose mutation results in a predisposition to breast cancer, ovarian cancer and even prostate cancer. These genes were also discovered with the help of funding from the National Institutes of Health. There are multiple patents in this portfolio, including many owned or co-owned by the University of Utah. The University of Utah has granted an exclusive license to its owned or co-owned patents to one company to develop, use and commercialize the diagnostic tests for BRCA1 and BRCA2.

To begin with, there were several problems with the BRCA1 and BRCA2 tests, according to information we have received from Dr. Chung, which is contained in her statement to the subcommittee. For example, for many years, the testing procedures did not include genomic deletions and rearrangements. As a result, there were a number of mutations that were not detected by the test offered until 2006, meaning that the tests were not as comprehensive as they could have been if other companies and researchers had been permitted to create a better test. Furthermore, the laboratory's insistence on testing blood only has restricted the test unnecessarily in instances in which there is no blood but only other genetic material. The cost of the test, which is still high--approximately $3,000-- poses a problem for people who are uninsured or live in states in which Medicaid does not reimburse the cost.

In addition to BRCA1 and 2 and Long QT Syndrome genes, many providers have discontinued or have been prevented from providing genetic testing for other diseases. I am submitting as Appendix B to the subcommittee a statement provided to me by Dr. Katherine Matthews, a neurological pediatrician at the University of Iowa, describing the serious problems she has encountered previously with the exclusive licensing of gene patents in the area of neurological disorders. Many of these problems are similar to those described by Dr. Chung in her statement.

It is my strong belief that the exclusive licensing of genetic diagnostic patents is creating a serious public health problem. As the number of genes that are discovered to be associated in

739526v1

some manner to a certain disease keeps increasing, so will the problems. It is clear that while the function of many genes has already been discovered, many correlations between mutations in these genes and diseases still remain to be discovered. I expect that such discoveries will accelerate in the next few years, and that the number of established correlations will grow exponentially. And, since the numbers of discovered genetic correlations will grow, so will the numbers of patents and the number of exclusive licenses for diagnostic tests.

There is another significant problem caused by exclusive licenses; innovation is stifled. As Dr. Chung's statement demonstrates when an exclusive license is granted research on finding new genes which will enhance the clinical significance of the original discovery is brought to a halt.

I do not have a problem if the discoverers of such correlations obtain patent protection for the diagnostic applications of these correlations. I understand that the research enterprise needs financing and involves risks. Patent protection is a time proven method of trying to control such risks. In the case of genetic diagnostic correlations, however, it is my view that the risks are not as high nor the uncertainties as deep as is the case in the discovery of new drugs. I know that getting a new drug from discovery all the way through approval by the FDA may cost up to or more than $1 billion and involve a decade or more of work and uncertainty. Exclusive patent protection is critical in order to fund such endeavors.

In contrast, in the case of the discovery of genetic correlations to diagnosing disease or disease predisposition, the investment in time and money, the uncertainty, and the regulatory hurdles are not nearly as onerous as in the case of drugs. For example, a service laboratory like my company could enter the market quickly at only a small fraction of the cost of what would be needed in the pharmaceutical industry. Allowing companies like mine, that can put a diagnostic test on the market and provide competition to other laboratories in the same area, will be extremely beneficial to the public health.

I am therefore in favor of a regime where a company like mine can obtain a non-exclusive license from the holder of the patent or obtain a non-exclusive sublicense from the licensee of the patent. If I can demonstrate that my test would be better, faster, provide fewer false negatives or positives, fill a niche, cost less to the public or perhaps complement the test already offered by my competitor then the public will benefit greatly by my entry. I am not asking for a free ride; all I am asking for is the ability to compete fairly and benefit the public and my company.

In the area of genetic testing, exclusivity is a formula for mediocrity.

Fortunately, I believe that the Bayh-Dole Act of 1980 offers a ready solution to these problems that requires no legislation at all.

The Bayh-Dole Act was enacted more than twenty years ago to encourage the commercialization of patents obtained through federal funding by allowing the universities sponsoring the research to hold the patent. Nonetheless, Congress understood that this patent monopoly, based on taxpayer funding, could be misused--and Congress specified a remedy for

the misuse. Thus, the Act empowers the federal agency financing the research to "march in"--and provide licenses to other interested parties--when, for example, the "health or safety needs" of the American people are not being "reasonably satisfied" by the patent holder or its exclusive licensee.

The march-in rights are clearly spelled out in Bayh-Dole (35 U.S.C. § 203 (a)(2)):

> (a) With respect to any subject invention in which a small business firm or nonprofit organization [e.g. a university] has acquired title under this chapter, the Federal agency under whose funding agreement the subject invention was made [e.g. NIH] shall have the right, in accordance with such procedures as are provided in regulations promulgated hereunder, to require the contractor, an assignee, or exclusive licensee of a subject invention [e.g. in the case of the Long QT exclusive licensee] to grant a nonexclusive, partially exclusive, or exclusive license in any field of use to a responsible applicant or applicants, upon terms that are reasonable under the circumstances, and if the contractor, assignee, or exclusive licensee refuses such request, to grant such a license itself, if the Federal agency determines that such
>
> ∗∗∗
>
> (2) action is necessary to alleviate health or safety needs which are not reasonably satisfied by the contractor, assignee, or their licensees…

Bayh-Dole applies because most of the research leading to gene patents have been funded by the federal government.

I am aware that the NIH has never exercised its "march in" powers. I also know that it has denied three formal requests to "march in," although none of those instances involved diagnostic genetic tests.

In its opinions on two of those requests (Norvir™, manufactured by Abbott Laboratories, decided July 29, 2004; and Xalatan™, manufactured by Pfizer, decided September 17, 2004), the NIH indicated that the cases rested essentially on complaints about pricing alone, and asserted that "march in" rights were not designed for "controlling" drug prices. In addition, because in both instances the FDA had approved the drugs as safe and effective and no evidence had been presented by the requesters that march-in would alleviate health or safety needs not met by Abbott or Pfizer, the NIH declined to act. As I will demonstrate below the situation with genetic diagnostic tests is entirely different from that of these drugs.

The third denied request involved a 1997 petition from Baxter Labs that the NIH initiate march-in proceedings in a litigation between two competing products for separating stem cells. See, *Johns Hopkins University v Cellpro Inc.*, 152 F3d 1342( Fed. Cir., 1998). The NIH found

no health and safety needs at issue because the difference between the products was just one of "convenience of use." The NIH found that Baxter had taken appropriate steps to reasonably satisfy "health or safety needs," and did not initiate proceedings.

None of these cases, I believe, poses any obstacle to NIH's use of "march in" powers to ensure that the public's "health and safety needs" are met by diagnostic genetic laboratory tests. In fact, the exercise of march-in rights would be especially appropriate in cases involving diagnostic gene testing, wider availability and incidentally, lower cost to the public.

There is a fundamental difference between the situation of drug companies and diagnostic laboratories, as I have pointed out previously. Given the huge costs of drug development, breaking up exclusive patent rights for drugs could have serious consequences for the willingness of companies to undertake the needed research in the first place. Without solid patent protection, the companies could see no way to recoup their enormous investment. But in the area of gene patents for diagnostic tests, efforts to identify new genes and their correlation with disease would not seriously be discouraged by the absence of exclusive patent rights for several reasons. The costs of discovery are not comparable to those for drug development. Furthermore, because there are other ways of gaining royalties from the gene identification--for example development of drugs for the diseases themselves--the loss of some royalties from non exclusivity on lab tests is not likely to have a serious adverse impact on the incentives to identification.

Another major difference between drugs and genetic diagnostic tests is found in the very nature of the two technologies. In the case where a drug is patented by one pharmaceutical company, its competitors are not prevented from continuing their research into the same disease with the expectation that they can develop different drugs that will avoid the patent holder's patent. The disease itself is not patented, as it obviously cannot be since it is a natural phenomenon. Thus, there are a potentially unlimited number of drugs of different compositions and structures that might be tested and proposed for treating the same disease. In genetic diagnostics, in contrast, for a given disease such as Long QT Syndrome, we are dealing with one or at most a handful of genes and their correlations. Once these are in exclusive hands for the average life of a patent, say 18 years, neither I nor others can enter the field and use the patented genes to find other genes or improve the tests that correlate to the same disease. In fact, since my work is primarily commercial in nature, were my researchers to do commercially relevant discovery research with patented genes, I understand that such research would constitute patent infringement of the rights of the exclusive holder. See, *Roche Products Inc. v. Bolar Pharmaceutical Co. Inc.*, 733 F2d 858 ( Fed. Cir. 1984). The public does not benefit from such a situation.

In addition, breaking up exclusive licenses need not provide a windfall for my company or any other company. The Bayh-Dole section of the patent law contemplates expressly that the marching-in agency arrange that a license or sublicense be given to a responsible applicant "upon terms that are reasonable under the circumstances." See 35 U.S.C. 202(a). This clearly envisions the calculation of a reasonable royalty – not a royalty free license. There is plenty of precedent for reasonable royalties in other areas of the patent law, such as 35 U.S.C. 154 (a "reasonable royalty" to be charged to a party who has been on notice of pending patent claims

that later issue) and 25 U.S.C. 284 (after losing an infringement lawsuit the infringer has to pay damages no less that a "reasonable royalty"). The courts have developed a lengthy jurisprudence on what is a "reasonable royalty" for damages for patent infringement. See for example *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) (using 15 factors to determine a "reasonable royalty" such as the nature of the invention, other established royalties for the same patent, other comparable royalties, the custom of the industry, etc.).

Finally, calculating reasonable royalties is a well known exercise to patent-savvy universities and to the NIH's Office of Technology Transfer, both of which have licensed out their own extensive portfolios of patents in the last few decades.

Bayh-Dole vested the government with the responsibility of ensuring that government funded technology licenses protect the best interests of the public. In light of the foregoing, I believe that this committee should require that the that NIH enforce the "march in" provisions of Bayh-Dole in appropriate cases involving diagnostic genetic testing, including the ones outlined above. This is a feasible and indeed necessary way to ensure that the public's health and safety needs are met more widely with regard to DNA diagnostic and susceptibility testing. If the NIH is unwilling or unable to enforce the law as written, then Congress should review whether the power to enforce Bayh Dole should be placed in the hands of another federal agency. The NIH cannot be permitted to let Bayh Dole's march in provisions become dead letter law. The NIH must implement the law, not nullify it.

I have deliberately not discussed in detail other obvious remedies. The subcommittee is clearly aware that there are legislative solutions, such as the bill that was proposed by former Rep. Lynn Rivers. In my opinion, there is no need for a study to document further a problem that is already well known in the field of genetic diagnostic testing.

I have valued this opportunity to share my views on the serious public health consequences of exclusive patents for diagnostic gene testing. I most respectfully urge the subcommittee to adopt a remedy promptly to the problem I have described.

739526v1

45

**Appendix A**

Statement of Dr. Wendy Chung
Submitted in Connection with the Statement of Dr. Marc Grodman,
CEO of Bio-Reference Laboratories, Inc.

The House Judiciary Subcommittee on Courts, the Internet and Intellectual Property in
connection with a hearing on Stifling or Stimulating - The Role of Gene Patents in Research and
Genetic Testing

October 25, 2007

Mr. Chairman, Members of the Subcommittee,

Thank you very much for the opportunity to submit this statement which accompanies the Statement submitted by Dr. Marc Grodman, CEO of Bio-Reference Laboratories, Inc.

My name is Wendy Chung, MD, PhD. I am a clinical and molecular geneticist and am director of Clinical Genetics at Columbia University. I am director of the fellowship program in molecular genetics and cytogenetics at Columbia University and direct both a clinical and research molecular genetics laboratory. I am the Herbert Irving assistant professor of pediatrics and medicine at Columbia University. I have been conducting research in human genetics for the last 17 years in the areas of obesity, diabetes, breast cancer, pulmonary hypertension, inherited arrhythmias, congenital heart disease, and spinal muscular atrophy.

In recent years, there has been groundbreaking research in human genetics that has identified the genetic basis for over 2200 human diseases. Genes have been identified for nearly all types of human disease including susceptibility to breast cancer, colon cancer, Parkinson disease, Alzheimer's disease, stroke, coronary artery disease and myocardial infarction, arrhythmias, diabetes, and macular degeneration. These conditions are not rare diseases, but are common conditions from which the majority of Americans will suffer at some point in their lives. Importantly, for many of these conditions, there are effective preventive measures that can be taken if patients know they are at risk. Therefore, genetic testing for these conditions plays a crucial role in allowing patients to assess diseases for which they are at risk, quantify the level of risk, and determine the interventions that will be most effective given the molecular basis of their disease predisposition.

Clinical testing is now available for over 1180 of these genetic disorders, but in approximately 20% of these cases, only one laboratory is available to perform such testing, and genetic testing is often expensive ($1000-$5400) with long turn around times (approximately 2 months), and often ambiguous results. The provision of inexpensive, clinically useful genetic testing has been stifled in part based upon the issuance of patents for genes and provision of exclusive licenses that allow only a single laboratory to perform clinical genetic testing.

As significant as our previous advances in human genetics have been, within the last year alone, there has been an explosion in the identification of multiple genetic risk factors for many more diseases including inflammatory bowel disease, myocardial infarction, asthma, diabetes, and obesity. These advances were made using a genetic technique called genome wide association studies which will likely continue to identify many additional genetic risk factors for common diseases. To continue translating these genetic discoveries into improved health and quality of life, it is critical to ensure that affordable, interpretable clinical genetic tests will be available to all Americans.

A significant obstacle to providing this effective genetic testing to patients has been the issuance of patents on human genes and the issuance of exclusive licenses to use these genes for diagnostic purposes to a single laboratory. Neither one alone, but issuance of BOTH gene patents AND exclusive licenses in combination result in a monopoly in the provision of genetic

tests. It should be noted that the majority of genes for human diseases do not have both gene patents and exclusive licenses granted for genetic testing. However, there are a few notable examples for which this has occurred that have had detrimental results for the public good which we will discuss below.

Many of the genes for human diseases have been discovered in part or in whole in laboratories within universities and medical schools, funded in large part by the National Institutes of Health. Under this system, the patent holder controls the commercial use of the gene. In many cases where the university or medical school grants licenses to multiple companies, the public interest and technological advancement are promoted through the competitive marketplace. In those cases, however, where the patent holder on the gene grants an exclusive license to a single laboratory to develop and market diagnostic tests for that gene, the monopoly on the test generally leads to unfavorable consequences. The resulting monopoly in genetic diagnostic testing has many of the same effects as monopolies in other sectors. If there is only a single provider for a medical genetic testing, there is no competition or market force. This leads to substandard quality of the tests, inability for physicians to independently confirm a test result, lack of innovation and test improvement, slow turn around times for testing, and excessively high prices that often make these tests unavailable to many patients and unnecessarily increases the cost of health care provision by third party payers.

There are two especially noteworthy examples of this problem with gene patents and exclusive licenses.

The first example is for hereditary breast and ovarian cancer due to mutations in BRCA1 and BRCA2, the research on which was partially funded by the NIH. As the patent holder, the company refused to issue licenses to any other laboratories, commercial or academic, to provide a comprehensive diagnostic test for BRCA1 and BRCA2. That company had relied exclusively upon sequencing technology for 10 years to screen for mutations in these genes, a technology that is expensive and able to detect some but not all mutations in these genes. Large deletions, insertions, and re-arrangements in BRCA1/BRCA2 cannot be detected by this methodology and were known to be a cause of mutations (Walsh *et al. JAMA* 295: 1379, 2006). It was only after considerable pressure from the scientific community that the company added methods to detect these deletions, insertions, and re-arrangements in 2006, over 10 years after they first introduced clinical genetic testing, and barred anyone else from performing the tests. In a competitive marketplace, this delay never would have occurred.

Test result interpretation provided by the company has been problematic. As of 2005, approximately 1433 BRCA1/BRCA2 genetic tests had been reported out by the company to have "variants of unknown significance" which leaves the patient and the physician not knowing whether or not the patient is at increased risk for breast and/or ovarian cancer. Many patients not knowing how to interpret this information, yet fearing cancer in their future, have had prophylactic oophorectomies and mastectomies assuming that this test result means that they are at substantially increased risk for breast and/or ovarian cancer. Given that the vast majority of these variants of unknown significance are benign, many of these women who chose to have the prophylactic surgery were probably not at increased risk for one or both of these cancers. These variants of unknown significance are reported disproportionately in minority populations

3

(African Americans, Hispanics, and Asians) because we have less information about the normal genetic variation in minority populations who are less likely to participate in research studies unless diagnostic laboratories proactively gather this information. Rather than developing the necessary databases of normal genetic variants in multiple ethnic groups, scientifically analyzing the conservation of these nucleotide positions across other species, correlating these variants with the personal and family histories of the patients tested, and/or performing biological assays to functionally assess these variants, the company simply continues to report out ambiguous results because there is no incentive for them to improve the quality of the data interpretation since they face no competition in the market. Furthermore, until recently, all these data were held exclusively by the company so there was no ability for scientists to conduct these experiments themselves for the benefit of the public.

The company is willing to perform genetic testing only on blood samples and has not developed the ability to perform genetic testing on paraffin embedded tissue from previous cancer specimens although this testing is routinely performed in research laboratories. In many cases, the family member with either breast or ovarian cancer is deceased and the only source of genetic material for testing is a tumor sample that was previously removed. Testing an affected family member is necessary for accurate interpretation of a negative result in other unaffected family members. A negative genetic result in the daughter of a BRCA1 or BRCA2 mutation carrier reduces the daughter's risk of cancer to that of the general population while the cancer risk for a daughter with a negative genetic result of a mother who had early onset breast cancer but was negative for BRCA1 or BRCA2 remains substantially elevated over the general population. Again, without competition, the company has had no incentive to develop genetic testing from sources other than blood, cruelly leaving families at risk with no remedy.

The cost of BRCA1/BRCA2 testing has remained substantial, costing approximately $3000 from the time it was first offered 12 years ago. The cost could have been reduced by offering targeted rather than comprehensive testing for specific populations in which founder mutations account for a large fraction of all mutations. This has been offered for Ashkenazi Jews in the US, but for no other populations. For the first seven years, many insurance companies did not cover genetic testing for BRCA1/BRCA2 or required a lengthy preauthorization process that discouraged many patients from pursuing testing. Some of my patients died during that preauthorization process, and then the families were not able to get their affected family member tested to guide their future medical care. In addition, for the first eight years, the testing was not covered by Medicare, and for the first ten years and still in many states is not covered by Medicaid. This has created enormous disparities in access to the BRCA1/BRCA2 diagnostic tests due to the high cost which has continued to increase over the years to the current cost of $3200.

The second notable example has been for genetic testing for Long QT Syndrome which is associated with fatal arrhythmias of the heart and sudden death. These results can be prevented by avoiding triggers such as heart rates that are too fast or too slow or startling sounds during sleep, taking medication, and having a cardiac defibrillator implanted. Importantly, the therapy for each patient is based upon his or her molecular genetic defect. There are now 9 molecular subtypes of Long QT syndrome, and the triggers for arrhythmias and the most appropriate medical therapy depends upon which gene is mutated, a fact that can only be determined by genetic testing. A medication that is commonly used for Long QT syndrome, beta blockers,

which decrease the heart rate, are the first line drug for Long QT1 and Long QT2, but actually increase the risk of arrhythmias in Long QT3 which is more appropriately treated with medications such as mexiletine or flecainide.

The discovery of these genes for Long QT syndrome was partially funded by the National Institutes of Health. Patents were obtained on many of the first Long QT genes by the University of Utah, which granted an exclusive license to one laboratory to develop and provide a diagnostic test for the genes. DNA Sciences, the first commercial laboratory to offer testing, forced two other laboratories to cease and desist offering genetic testing for Long QT syndrome on the basis of their exclusive licenses. DNA Sciences subsequently went out of business, and for a period of time patients were unable to get any genetic testing for Long QT syndrome because the license holder was not performing testing. The licenses were subsequently purchased by Clinical Data Systems which is again the only laboratory licensed to offer genetic testing for Long QT syndrome. Many of the same problems that the medical community has experienced with BRCA1/BRCA2 testing have been repeated with Long QT syndrome testing because there is a monopoly on the testing. I describe them below.

Although the number of genes for Long QT syndrome has increased from 5 to 9 over the time that clinical testing has been made available, there has been no increase in the number of genes analyzed by the exclusively licensed laboratory, even though this would improve the testing sensitivity and would be clinically important.

Most concerning is that the company has rendered genetic testing results to me that have several times been inconsistent with independent genetic data obtained in my laboratory. For most patients there is no ability to independently confirm these results since there is no other clinical laboratory performing this testing., There are instances where I have independently performed genetic testing in my research laboratory and then sent samples to the company for independent confirmation prior to initiating medical therapy based upon their genetic test results and then found inconsistencies. One case would have had devastating effects for a 5 year old patient and her family since she carries two mutations (usually only one mutation is necessary for Long QT syndrome) and has a particularly malignant form of Long QT syndrome associated with nearly 100% mortality in childhood without intervention. Furthermore, because the mutation was inherited from both her mother and father, 20 other mutation carriers in her family are at risk for sudden cardiac death would have been missed had we not independently confirmed the correct result. In a competitive environment, where there is another laboratory offering this test, this situation would never exist. That company has also incorrectly reported genetic variants as disease associated because they have misinterpreted the scientific literature. There are many Long QT genetic variants that are associated with prolongation of the QT interval only upon exposure to certain medications that prolong the QT interval, but otherwise do not cause problems if patients do not take medications that prolong the QT interval. Patients carrying these variants should avoid such medications that prolong the QT interval, but do not have a high risk of sudden cardiac death if they do not take these medications. The company also reports some of these drug induced Long QT variants as independent Long QT mutations, leading many cardiologists to pursue overly aggressive intervention with medication and implantable defibrillators.

Similar to genetic testing for BRCA1/BRCA2, the company reports out "Class II variants of unknown significance" in approximately 5% of their test reports. These variants of unknown significance are reported disproportionately in minority populations (African Americans, Hispanics, and Asians) and is often extremely anxiety provoking and often leads to prophylactic implantation of a defibrillator. Rather than developing the necessary databases of normal genetic variants in multiple ethnic groups, scientifically analyzing the conservation of these nucleotide positions across other species, correlating these variants with the personal and family histories of the patients tested, and/or performing biological assays to functionally assess these variants, the company has not improved the test interpretation. Furthermore, the database of genetic variants is not publicly available, so there is no opportunity for scientists and physicians to attempt to interpret the genetic test results themselves beyond the information they have on their patient and the information in the scientific literature, leaving patients and physicians wondering if the patient really has Long QT syndrome or what treatment would be beneficial. Plainly, the exclusive license stifles scientific research and creates a barrier to medical progress.

The company is only willing to perform genetic testing on blood samples and has not developed the ability to perform genetic testing on paraffin embedded tissue tissues although this testing is routinely performed in research laboratories. Unfortunately, many of the cases that require testing are cases of sudden death, particularly sudden infant death syndrome (SIDS) in which the autopsy is normal. In such cases, usually the only tissue available for testing after the autopsy is paraffin embedded tissue. For families to obtain closure on the cause of death of their loved one and prevent similar deaths in other family members, it would be important to be able to perform genetic testing on fixed tissues.

The current cost of genetic testing for Long QT syndrome is $5,400 and is not routinely covered by most insurance companies without a lengthy preauthorization process that frequently takes 3-12 months to complete. Furthermore, testing is not covered at all by Medicare or Medicaid. The actual cost of the testing without the cost of the licensing fees could be 25% or less of the existing price and would be accessible to many more patients if it were correctly priced in a competitive market.

In summary, when genetic testing is performed by a single laboratory, the quality of the genetic testing and interpretation of results suffer, and the price of the testing remains artificially elevated to the detriment of patients who could take preventive measures to preserve their health if provided with accurate information to determine their risk of life threatening diseases.



University of Iowa Health Care

Roy J. and Lucille A.
Carver College of Medicine
Pediatric Neurology
200 Hawkins Dr. Rm. 2505 JCP
Iowa City, IA 52242-1083
319-356-1851 Tel
319-356-4855 Fax
www.uihealthcare.com

Appendix B

Statement of Dr. Katherine Mathews

Submitted in Connection with the Statement of Dr. Marc Grodman, CEO of Bio-reference Laboratories, Inc.

Before the House Judiciary Subcommittee on Courts, the Internet and Intellectual Property

"Stifling of Stimulating – The Role of Gene Patents in research and Genetic Testing"

Dated: October 26, 2007



University of Iowa Health Care

Roy J. and Lucille A.
Carver College of Medicine
Pediatric Neurology
2001 Hawkins Dr. Rm. 2585 JCP
Iowa City, IA 52242-1083
319-356-1851 Tel
319-356-4855 Fax
www.uihealthcare.com

Mr. Chairman, Members of the Subcommittee,

Thank you very much for the opportunity to submit this statement which accompanies the Statement submitted by Dr. Marc Grodman, CEO of Bio-reference Laboratories, Inc. My purpose in submitting testimony today is to provide first hand information about how the lack of competition among clinical laboratories offering specific genetic tests affects the quality of care that patients receive. I hope that my testimony will help in your consideration of questions concerning the role of gene patents in genetic testing.

I am a pediatric neurologist with expertise in neurogenetics and neuromuscular disease. In my clinical practice, genetic testing is often the most efficient, cost effective and/or accurate way to make a specific diagnosis. There is a choice of laboratories that offer the testing for some of these genetic tests. In this case, the University of Iowa Pathology Department has worked with clinicians such as me to choose the laboratories that provide the best service, most accurate and thoughtful results and are most cost effective. (This is also our approach to choosing reference laboratories for non-genetic diagnostic tests.) However, as you have heard, other genetic tests are available from a single commercial laboratory which has exclusive rights to the use of that gene in clinical testing. If a single laboratory has excessive costs, poor service or consistently inaccurate or incomplete results, I have few options. I can cease to offer the genetic test to my patients, or I can continue to accept suboptimal information for those patients who can afford the testing.

In my own case, after experiencing a consistent and unremitting pattern of laboratory and administrative errors that negatively impacted my care for patients, and after hours on the phone trying to correct or identify the basis of the problems, I notified one laboratory in writing in 2005 that I would no longer be sending them samples for one type of disease. Unfortunately, because the laboratory in question has exclusive rights to the testing for this disease and other diseases I deal with commonly, I have had to continue using them on occasion, and the problems have continued. In my management of a patient with one of these diseases, whenever I feel that not making a specific genetic diagnosis is a medically acceptable option, I explain to the patient that the only source of genetic testing has been unreliable and difficult to work with in my experience. Therefore I recommend that we forgo genetic testing at this time.

I will attempt to outline the problems that have led to this approach and present some typical examples.

## Case 1.

This case (and several others presented here) involves inherited peripheral neuropathy, or Charcot-Marie-Tooth disease. Neuropathies are caused by loss of function of the nerves going to the limbs and typically result in weakness of the ankles, lower legs and hands; absent reflexes; and decreased sensation in the feet and hands. There are many reasons a person might have neuropathy (such as diabetes). One subset of the neuropathies is inherited and there is an ever-increasing list of specific genes that are associated with inherited neuropathies. The inherited neuropathies as a group are called Charcot-Marie-Tooth disease, or CMT, and each genetic cause is given a specific number/letter designation, such as Charcot-Marie-Tooth type 1A, CMT1A. It is often helpful to make a specific genetic diagnosis to allow accurate genetic counseling to a family as the different subtypes are inherited differently (illustrated in Case 4 below). Arriving at a specific genetic diagnosis also prevents unnecessary, expensive and sometimes painful testing looking for other, non-genetic causes of neuropathy.

An adopted child was referred for increased falling and the physical findings indicated this was likely a neuropathy. She also had several other medical problems, making the diagnosis more complex. The most common reason for a child to have a neuropathy is that it is inherited (CMT as discussed above). I ordered genetic testing for CMT1A, the most common form of CMT. The test was called "not interpretable" and a second sample was requested. One month after the first sample, the second was sent. Five months after the original test and 4 months after the second, after several phone calls from the family asking about the results and numerous phone calls to the laboratory, the report was released. The diagnosis of CMT 1A was highly likely. This whole process was surprising, as genetic testing for this disease has been available for more than 10 years, many laboratories used to offer the testing (before the exclusivity restrictions were enforced), and interpretation of test results is usually extremely straightforward and available within 2 weeks (which is what the family had been told by me).

In phone calls with this lab, we were told that the reason for the difficulty with this case was that the laboratory had recently changed the way they performed the test, and were finding a small number of patients (such as this one) whose results they had not expected. The laboratory didn't have a back up approach in place to assist with interpretation (such as repeating the test, using the previous or one of several other possible technologies) and apparently had not tested this technique to identify such potential problems prior to implementing the change clinically. Furthermore, the several month delay before the lab director would complete the report suggests that the lab director lacked sufficient understanding of the genetics of this disease to interpret the results. Finally, the lab director did not appear to have contacted an expert in the field for assistance. This case left the family involved very unhappy, and gave me very little confidence in the laboratory.

### Case 2.

A 47 year old woman and her adult children were referred for genetic counseling. She has progressive ataxia (unsteady gait) resulting in significant disability, as do many of her family members. The clinical diagnosis is spinocerebellar ataxia (SCA) and there are more than 20 different genetic causes of SCA. The different genetic causes are clinically indistinguishable, so genetic testing is required for a specific diagnosis. This patient had genetic testing done by a previous neurologist. The report showed that most of the SCA genes were normal, and one (SCA8) was interpreted as "borderline". The report states that it could not be determined if this borderline result was associated with disease. However, the objective results (as opposed to the interpretation) of the genetic testing for this patient were also listed. The SCA8 result was 99; with normal being up to 50 in the literature, and up to 70 in this lab's own report. Clearly, 99 was in an abnormal range rather than a borderline range. There was no explanation for this discrepancy in the comments or interpretation of the report. This information is critical to provide accurate counseling to the children of the patient. Therefore, the neuromuscular nurse called the lab, where the director agreed that the interpretation did not make sense. The lab requested a second sample, which they will test at no charge to clarify the diagnosis. (Results are still pending.)

While the response to our concerns was very appropriate and helpful in this instance, errors in interpretation of this magnitude are outside of what is expected for a clinical laboratory. Most physicians only read the "Interpretation" section of a genetic test report. They rely on the expertise and knowledge of the laboratory director.

### Case 3.

This case was sent to me by a colleague at a different university. A great deal of detail was included in the summary and I was told that the entire situation is documented in the medical record. This case involves a disease called CADASIL that typically causes strokes and migraines in young adults. Brain MRI is quite abnormal in the disease, but the abnormality is not specific for CADASIL. This is an autosomal dominant disease, meaning that if a person is affected, their children have a 50% chance of having the same disease and other family members are affected. Genetic testing is the easiest and generally most accurate way to make the diagnosis. The disease is steadily progressive with recurrent strokes resulting in significant disability, dementia and in some cases, premature death. There is no specific treatment.

A middle aged man had some transient neurologic abnormalities, migraines and an abnormal MRI of the brain. Genetic testing for CADASIL was sent. The laboratory identified change in Notch 3, the CADASIL gene. The report stated that this was a known disease-associated mutation. The interpretation was confusing to my colleague because the DNA variant should not have led to a change in the protein. (Some amino acids can be coded several ways by the DNA, so a DNA change does not necessary cause a protein change, and without a protein change, disease is quite unlikely.) My colleague called the laboratory director to discuss this unusual situation. The lab director stood by the result and insisted this was CADASIL. Because of the suspicion that this was NOT in fact CADASIL, both of the gentleman's parents were tested (neither of whom had any symptoms relevant to CADASIL) and the mother had the same genetic variant. In her case, the same laboratory reported this as a "known polymorphism", meaning that it was a benign variant not associated with disease.

Ultimately a biopsy was performed to see if the man had other typical findings of CADASIL. None were found. Finally, the same laboratory was sent another sample from the patient. The lab identified the same variant that had been found previously and found in the patient's mother, and this time it was called a known polymorphism. The patient's ultimate diagnosis appears to be multiple sclerosis, treatment for which was delayed by one year due to this error. The bill to the family for all the genetic testing was approximately $10,000. The emotional cost was huge. There was no acknowledgement on the part of the laboratory that there had been an error, despite multiple phone calls regarding this case from the physician involved.

**Case 4.**
A 33 year old man was seen for clarification of his diagnosis and genetic counseling. He has Charcot Marie Tooth disease, but the type was unknown. He has a young son and wondered if the child could inherit his problems with weakness. His mother and several other relatives were similarly affected. Testing for CMT1A was normal. We then sent testing for CMTX. This is one form of CMT that is inherited in an X-linked fashion (carried on the X-chromosome). If this man has CMTX, then he could not pass it on to a son, since he would only give his son a Y chromosome. If this family has another form of CMT, the risk to his son would be 50%. This was an issue of grave concern for this man as he felt that his life had been significantly impacted by CMT. The CMTX report interpretation read: "This individual possesses a sequence alteration in the coding region of the Cx32 gene which cannot be interpreted as either disease associated or benign polymorphism, and therefore the result is indeterminate". The specific nucleotide change was also listed on the report. By reviewing the nature of the amino acid change, and databases listing the structure of this gene in many lower species, we were able to come to a conclusion that this change is highly likely to be disease causing. We confirmed this be discussion with a research expert in the field and have given appropriate counseling to the patient for CMTX.

Case 4 is one example of a case where the result is "indeterminate". Any time a mutation or alteration in a gene is identified, whether in a research laboratory or a clinical laboratory, the first question to be answered is whether it is simply part of the genetic variability that contributes to making us each an individual, or does it change the function of something essential, leading to disease. There are several approaches that can be taken to try to answer the question. The simplest is to look at the medical literature to see if the change has been reported in other people with the same disease or in the general population. If it is unreported, then one can examine additional information (computer database searches and basic biochemistry), as described in case 3, to make the best possible determination about whether or not the change is disease-related. In a research laboratory, several increasingly complex steps can be taken to clarify the nature of the genetic variation.

Clinicians rely on the genetic testing laboratory director to do the database searches and use their knowledge of biochemistry and physiology to examine the effects of the potential mutation and give the clinician the best possible guidance about whether it is disease-causing or benign. Clinicians generally have neither the time nor the expertise to do that level of analysis. This kind of support is generally viewed as part of the cost of the test (above and beyond the simple technical examination of the DNA). Most genetic testing laboratories in my experience offer this kind of service. If a laboratory fails to provide this service, I generally try to find an alternative laboratory to work with on future patients.

The problem of indeterminate test results is illustrated in Case 4, but I could have presented many more cases. Two similar cases from another institution were recently presented at the Symposium on Neurogenetics at the 2007 Child Neurology Society meeting and were contrasted with reports from a laboratory that provided detailed analysis of genetic variants.

In summary, the lack of choice in laboratories offering genetic testing, as a direct result of the patenting of genes and granting of exclusive contracts, is unusual in medicine and deleterious to patients and practitioners alike. It has led to my limiting my diagnostic testing in some cases, and accepting suboptimal test results in others. It has led to uncounted phone hours attempting to sort out errors and problems, without the simple recourse of choosing a different laboratory. It contributes to unnecessary health care expense. I feel that my ability to provide the best possible care to my patients is compromised by the current situation in genetic testing. Many of my colleagues in clinical genetics and neurology around the country share my concerns.

We are moving into an era when some treatments for genetic diseases will be based, at least in part, on the specific genetic mutation that caused the disease (example: PTC 124 is currently in trials for Duchenne muscular dystrophy and cystic fibrosis patients with point mutations and premature stops). If genetic testing becomes a prerequisite for best therapy, and each of these genetic tests is "owned" by a single, for-profit company without competition, I see no incentive to optimize service and accuracy, or to minimize costs to the patient, resulting in further escalation of health care costs and even greater clinical impact of errors in genetic testing.

Thank you very much for your attention to this issue.

Katherine D. Mathews, M.D.
Associate Professor, Departments of Pediatrics and Neurology
Division Director, Child Neurology
Director, MDA Clinic
Carver College of Medicine
Iowa City, Iowa 52242
319-356-2436 Telephone

Mr. BERMAN. I now change your name to Mr. Kushan.

## TESTIMONY OF JEFFREY KUSHAN, PARTNER, SIDLEY AUSTIN, LLP, ON BEHALF OF BIOTECHNOLOGY INDUSTRY ORGANZATION (BIO), WASHINGTON, DC

Mr. KUSHAN. Thank you, Mr. Chairman. Thank you, Mr. Chairman.

I am pleased to be here today to provide the views of the Biotechnology Industry Organization on the issue of gene patents. BIO is the principle trade association representing the biotechnology industry. There are more than 1,100 members of BIO. You can find them in every state of the union, and they presently employ more than 1.2 million people in the United States.

Biotechnology is still a young and growing industry. There are about 300 public companies in the biotech industry. At the end of 2005, their market cap was about $410 billion. The remainder of the companies in the biotechnology industry are private companies.

The typical biotech company is a small business with no products, no revenues and running itself on investor funding. Many of these companies are formed to take advantage of a significant scientific discovery or development. These companies focus on performing cutting-edge research aimed at discovering new products and services and bringing them to market. They follow a high-risk, high-reward business model. This model has been a signature of the industry since its inception.

Three fundamental requirements exist for biotech companies that are following this business model: first, scientific innovation; second, adequate funding; and, third, dependable intellectual protection.

I have chosen the word "dependable" in relation to intellectual property intentionally. When a biotech company develops an invention, they must make a judgment on whether the invention can be patented and whether these patent rights can be effectively used when and if they finally get a product to market. That judgment is based on existing legal standards and an assessment.

This certainty in the availability and use of patent rights in the future is critical given the uncertainty that exists on the scientific side of the business and whether they will ever reach the market with a product.

Today's discussions focus on gene patents. The word "gene patent," as some of the other panelists have already pointed out, is somewhat imprecise. What is at issue are patents that claim nucleic acids. Nucleic acid inventions are developed following extensive research and development. They rely on sophisticated research on genomic information. The research focuses on deciphering that genetic information and identifying a practical application for using the nucleic acid.

It is important to recognize this is not a debate about the quality of these patents. This is perhaps the one area of the Patent Office that is the most competent, the most high quality of all the areas. The PTF for more than 20 years has been doing extensive research on developing its own first-class examination group. You have more Ph.D.s in the biotech group than any other area, and they certainly know their stuff.

One of my other co-panelists had mentioned that the standards governing patent law in the biotech area have evolved significantly over the last 20 years. I think one thing we can assure you of is that when a patent issues in this sector, it is reflective of a significant advance, the company is deserving of the protection, and that will be used to develop products and bring them to market.

There are three points that I feel need to be addressed today.

First, the biotechnology industry is extremely competitive, and it is a lucrative business. You know, that dynamic is going to create conflicts no matter how you look at it. It is good for companies to have competition. It is also good for companies to be able to develop their own technology, protect it and rely on patents to do so.

You also have to appreciate that the competition is making the industry healthy and strong, and it is also delivering significant benefits for patients as products reach the market. Without that lucrative drive for the incentive for reward on innovation, you will not see the products coming to the market. You will not see the technology reaching the market and form valuable products and services.

It is also a fact that conflicts arise whenever you have a lucrative, competitive market. Patent conflicts also are common in this world, and the biotechnology industry accepts that as part of the equation of doing business in this environment.

Given the dependence on patent rights and the acceptance of the industry that there will be need to resolve disputes over property rights, we are very concerned that there might be some tinkering of the patent system that would alter the equation that so many companies have relied on before they made their investments.

The second point that was raised was the question of using the march-in rights under the Bayh-Dole Act. In the mid-1990's, there was some thought to using that authority in the Bayh-Dole Act to regulate pricing of pharmaceutical products. The only impact we could see from that is that the private companies ran away from the Federal funding because to attach a string like that upstream to invention of a product before you took the funding from the Government basically made that a nonstarter for the companies looking at that source of funding.

Third is to just touch on the research exemption. I think what we have seen—and Dr. Soderstrom had pointed this out—there are very few instances of patent owners suing universities for many of the reasons he has already pointed out. The *Madey v. Duke* was kind of a weird case involving a particularly unhappy patent owner with an employment dispute with Duke University, and I do not think it is a representative fact pattern that most companies who hold patents see when they are dealing with universities.

So I would just like to conclude in encouraging the Committee to look very carefully at the issue of gene patents and to also carefully consider what impact upstream, downstream that might have if you start to look at changing some of the parameters that companies have relied on before they made their investments in the sector.

Thank you.

[The prepared statement of Mr. Kushan follows:]



PREPARED STATEMENT OF

JEFFREY P. KUSHAN

ON BEHALF OF

THE
BIOTECHNOLOGY INDUSTRY ORGANIZATION

ON

"Stifling or Stimulating - The Role of Gene Patents in Research
and Genetic Testing"

Before the Committee on the Judiciary
Subcommittee on Courts, the Internet, and Intellectual
Property

OCTOBER 30, 2007

BIOTECHNOLOGY INDUSTRY
ORGANIZATION
1201 MARYLAND AVENUE SW, SUITE 900
WASHINGTON, D.C. 20024
(202) 962-9200
www.bio.org

## Overview

The Biotechnology Industry Organization (BIO) appreciates the opportunity to provide the views of its members on the role of DNA-based inventions in research and innovation. In general, BIO believes that the patent system has proven to be an effective stimulus for developing and bringing to market a wide range of innovations that have delivered innumerable benefits to patients and consumers.

The biotechnology industry today is a thriving, competitive, and dynamic industry. A significant reason for this is the availability of comprehensive and effective patent protection, including for inventions based on nucleic acids. Nucleic acid patents enable start up companies, universities, as well as established companies, to justify the significant investments – whether on the order of millions or hundreds of millions of dollars – that are necessary to discover, develop, bring to market and support products and services based on these nucleic acid inventions.

BIO does not believe issues exist that justify legislation to modify the patent system with regard to nucleic acid inventions. Like any other industry, commercial conflicts can arise regarding use of patented technology. The presence of occasional patent conflicts, or the need to resolve them (including through litigation), does not signal a need for legislative reform. Rather, it is a signal that there is a healthy degree of competition in this sector. And, the benefits delivered by the R&D investments of biotechnology companies far outweighs the incidental costs of resolving these patent disputes.

### Background on BIO and the Biotechnology Industry

BIO represents over 1,100 companies, universities and research institutions that use biotechnology to research and develop cutting edge healthcare, agricultural, industrial and environmental products and applications. As of December 31, 2005, there were over 1,400 biotechnology companies established and doing business in the United States, 329 of which were publicly held, having an aggregate market capitalization of over $410 billion. The biotechnology industry has mushroomed since 1992, with U.S. health-care biotech revenues increasing from $8 billion in 1992 to $50.7 billion in 2005. BIO members directly employ more than 1.2 million people, and biotechnology companies can be found in every state of the Union. More than 80 percent of BIO members are small businesses.

The biotechnology industry is one of the most research-intensive industries in the world. In 2005 alone, biotechnology companies spent nearly $20 billion in R&D. Since its inception, the biotechnology industry has raised more than $100 billion in private investment. These investments are paying off. There are more than 400 new drug products and vaccines on the market or in development. These products are now improving, and will continue to improve, the lives of millions of Americans, and offer hope for cures for a wide range of illnesses. Advances in agricultural biotechnology have already had a profound impact on the world's capacity to feed itself, dramatically improving yields of crops while decreasing dependence on chemical pesticides. Industrial biotechnology is affecting numerous sectors of the economy, and is presenting a realistic alternative through biofuel production.

The key to success of the biotechnology industry – across all its sectors – is a business model that is based on taking significant risks to develop products based on innovation. Specifically, the biotechnology business model is based on making significant investments (often hundreds of millions of dollars) in early stage research and development with the hope that some of these investments and efforts will yield a commercial product. This model has worked despite the fact that it is lengthy (often taking more than a decade) and that most biotechnology R&D investments and efforts do not result in a commercial product reaching the market. It is only by pushing boundaries of science and taking these risks that breakthrough inventions are discovered and converted into commercially viable products and services.

The biotechnology business model requires an environment that, as much as possible, eliminates unpredictability in the commercial sector. One important factor in this environment is the guarantee of patent exclusivity. Specifically, by ensuring that the products or services that may eventually be marketed can be protected from unauthorized copying and use, companies can justify taking risks and making significant R&D investments. Introducing unpredictability by changing the availability of patent rights, or the conditions in which patent rights can be asserted, will adversely affect business environment that is so crucial to supporting innovation in the biotechnology sector.

## Patents and the Biotechnology Industry

The biotechnology industry can attribute its current success to two seminal events in 1980; namely, the landmark Supreme Court decision of *Diamond v. Chakrabary*, 447 U.S. 303 (1980), in which the Supreme Court confirmed that key forms of biotechnology inventions including biological materials and living organisms can be patented; and by the passage of the Bayh-Dole Act, which allowed for the efficient transfer of patents on inventions arising from federally-funded research into the private sector.

Patents in the life sciences sector protect the type of products and processes that are integral to companies doing business in the biotech sector. By enabling these companies to prevent the unauthorized use of the patented technology, companies can justify pursuing their research and development efforts. Indeed, it is the guarantee of securing and using rights in the future that companies rely to justify making investments in R&D today.

To illustrate the role of patents in the typical biotechnology venture, consider the following example. A researcher, typically in a university laboratory, discovers a gene which is expressed only by a particular type of cancer cell. This discovery can result in a variety of distinct research and development initiatives – ranging from diagnostic tools for detecting the presence of the gene or its expression product in test samples taken from patients, to therapeutic agents that selectively kill cells that express the gene or inhibit the expression of the gene. As soon as practical after the discovery of the gene and its practical value, patent applications must be

filed. Filing the application early ensures that the researcher or its sponsor (a university or startup biotechnology company) can secure rights in the inventions that derive from the discovery, and permits the researcher to publish the results.

The patents based on this early application will be used to justify the investment of millions of dollars into development of these diagnostic and therapeutic agents. Translating this initial discovery into a tangible products can take more than a decade and hundreds of millions of dollars. The exclusivity that patents issued from this early application is what investors will rely upon to provide funding for development of products, and will be a key factor affecting the decision of a larger company to work with the startup company or university that owns the patent to do clinical development of products based on the discovery. Of course, the road to development from this point is long and torturous, has a significant likelihood of failure, and is fraught with other commercial setbacks. However, the faith that the discovery will help improve the lives of patients, and the confidence that patent rights will protect products that are developed, propel the transfer of technology and research and development work that follows.

**Patents in the Field of Genomics**

The topic of this hearing is "gene patents." Conceptually, this is a misnomer. Patents are not granted on "genes" per se, but on nucleic acid sequences that have a practical application. Genes as they exist in nature cannot be patented. Instead, patents can be secured for discrete nucleic acid sequences that are made after conducting research on genetic information.

- 6 -

Significant advances over the past two decades in research tools, such as the polymerase chain reaction (PCR), gene sequencing technology, and sophisticated computers and analytical tools, coupled with significant public and private investments, have produced a wealth of genomic information and tools for analyzing that information. By performing genomic research, scientists can discover and characterize genes and their functions, and then conduct research to decipher how to exploit the genomic information to produce useful products and services.

Two significant aims of genomic research have been to (i) identify sequences corresponding to proteins that regulate cellular activities, and (ii) to identify "abnormal" sequences and link these sequences to disease states. Once deduced, the "function" or "role" of a gene can provide the basis for developing a practical application of a nucleic acid sequence derived from that gene. This nucleic acid having a practical application – such as whether to enable commercial production of a desired protein the nucleic acid encodes or to provide the basis of a clinical diagnostic tool – is the threshold that must be achieved in order for a nucleic acid to have a practical application, and thus be "useful" in a patent sense. *See, In re Brana*, 51 F.3d 1560 (Fed. Cir. 1992).

A nucleic acid (i.e., a discrete nucleotide sequence), like any other type of chemical compound, is eligible to be patented if it is new, useful, and not obvious. A patent may be granted giving rights in the nucleic acid invention only if it is adequately described in a patent application. This public disclosure is the principle public benefit of the patent system – in exchange for disclosing their invention in a