UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

ASSOCIATION FOR MOLECULAR PATHOLOGY,
ET AL.,

                    Plaintiffs,                    09 Civ. 4515

      -against-                                    AMENDED
                                                   OPINION
UNITED STATES PATENT AND TRADEMARK
OFFICE, ET AL.,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiffs

          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
          125 Broad Street - 18th Floor
          New York, NY 10004
          By:  Christopher A. Hansen, Esq.
               Aden Fine, Esq.
               Lenora M. Lapidus, Esq.
               Sandra S. Park, Esq.

          PUBLIC PATENT FOUNDATION
          Benjamin N. Cardozo School of Law
          55 Fifth Ave., Suite 928
          New York, NY 10003
          By:  Daniel B. Ravicher, Esq.


          Attorney for Defendant USPTO

          PREET BHARARA
          United States Attorney for the
               Southern District of New York
          86 Chambers Street, 3rd Floor
          New York, NY  10007
          By:  Ross Morrison, Esq.

Attorneys for Defendants Myriad Genetics and
    Directors of the University of Utah
    Research Foundation


JONES DAY
22 East 41st Street
New York, NY  10017-6702
By:  Brian M. Poissant, Esq.
     Barry R. Satine, Esq.
     Laura A. Coruzzi, Esq.

# TABLE OF CONTENTS

I. PRIOR PROCEEDINGS ...................................... 5

II. THE PARTIES AND AMICI ................................. 6

III. THE FACTS .......................................... 25

  A.  The Development of Genetics as a Field of Knowledge. 25

  B.  Molecular Biology and Gene Sequencing............... 27

     1. DNA .............................................. 28

     2. Extracted and purified DNA ....................... 35

     3. RNA .............................................. 38

     4. cDNA ............................................. 41

     5. DNA sequencing ................................... 43

  C.  The Development of the Patents-in-Suit.............. 47

  D.  Application of the Patents-in-Suit.................. 54

     1. Myriad's *BRCA1/2* testing ......................... 56

     2. Funding for Myriad's *BRCA1/2* tests ............... 56

     3. Myriad's enforcement of the patents-in-suit ....... 60

  E.  Disputed Issues.................................... 63

     1. The impact of Myriad's patents on *BRCA1/2* testing . 64

     2. The impact of gene patents on the advancement of
       science and medical treatment ..................... 69

IV. THE PATENTS......................................... 80

  A. Summary of the Patents.............................. 80

  B. Construction of the Claims.......................... 86

     1.  Legal standard................................... 86

2. Resolution of the disputed claim terms ............ 91

   a. "DNA" and "isolated DNA".......................... 91

   b. "BRCA1" and "BRCA2".............................. 93

V. CONCLUSIONS OF LAW ................................... 95

A. The Summary Judgment Standard....................... 95

B. 35 U.S.C. § 101 and Its Scope....................... 97

C. The Composition Claims Are Invalid Under
   35 U.S.C. § 101.................................... 103

   1. Consideration of the merits of Plaintiffs'
      challenge is appropriate. ....................... 104

   2. Patentable subject matter must be "markedly
      different" from a product of nature ............. 108

   3. The claimed isolated DNA is not "markedly
      different" from native DNA ...................... 122

D. The Method Claims are Invalid Under
   35 U.S.C. § 101.................................... 136

   1. The claims for "analyzing" and "comparing" DNA
      sequences are invalid under § 101 ............... 138

   2. The claim for "comparing" the growth rate of
      cells is invalid under § 101. ................... 148

E. The Constitutional Claims Against the USPTO Are
   Dismissed......................................... 150

VIII.CONCLUSION ....................................... 153

**Sweet, D.J.**

Plaintiffs Association for Molecular Pathology,
et al. (collectively "Plaintiffs") have moved for summary
judgment pursuant to Rule 56, Fed. R. Civ. P., to declare
invalid fifteen claims (the "claims-in-suit") contained in
seven patents (the "patents-in-suit") relating to the human
BRCA1 and BRCA2 genes (Breast Cancer Susceptibility Genes 1
and 2) (collectively, "BRCA1/2") under each of (1) the
Patent Act, 35 U.S.C. § 101 (1952), (2) Article I, Section
8, Clause 8 of the United States Constitution, and (3) the
First and Fourteenth Amendments of the Constitution because
the patent claims cover products of nature, laws of nature
and/or natural phenomena, and abstract ideas or basic human
knowledge or thought.  The defendant United States Patent
and Trademark Office ("USPTO") issued the patents-in-suit
which are held by defendants Myriad Genetics and the
University of Utah Research Foundation ("UURF")
(collectively "Myriad" or the "Myriad Defendants").  Myriad
has cross-moved under Rule 56, Fed. R. Civ. P., for summary
judgment dismissing Plaintiffs' complaint, and the USPTO
has cross-moved under Rule 12(c), Fed. R. Civ. P., for
judgment on the pleadings.  Based upon the findings and
conclusions set forth below, the motion of Plaintiffs to

1

declare the claims-in-suit invalid is granted, the cross-motion of Myriad is denied, and the motion of the USPTO is granted.

As discussed infra in greater detail, the challenged patent claims are directed to (1) isolated DNA containing all or portions of the BRCA1 and BRCA2 gene sequence and (2) methods for "comparing" or "analyzing" BRCA1 and BRCA2 gene sequences to identify the presence of mutations correlating with a predisposition to breast or ovarian cancer.  Plaintiffs' challenge to the validity of these claims, and the arguments presented by the parties and amici, have presented a unique and challenging question:

> Are isolated human genes and the comparison
> of their sequences patentable?

Two complicated areas of science and law are involved: molecular biology and patent law.  The task is to seek the governing principles in each and to determine the essential elements of the claimed biological compositions and processes and their relationship to the laws of nature. The resolution of the issues presented to this Court deeply

2

concerns breast cancer patients, medical professionals,
researchers, caregivers, advocacy groups, existing gene
patent holders and their investors, and those seeking to
advance public health.

The claims-in-suit directed to "isolated DNA"
containing human *BRCA1/2* gene sequences reflect the USPTO's
practice of granting patents on DNA sequences so long as
those sequences are claimed in the form of "isolated DNA."
This practice is premised on the view that DNA should be
treated no differently from any other chemical compound,
and that its purification from the body, using well-known
techniques, renders it patentable by transforming it into
something distinctly different in character.  Many,
however, including scientists in the fields of molecular
biology and genomics, have considered this practice a
"lawyer's trick"[1] that circumvents the prohibitions on the
direct patenting of the DNA in our bodies but which, in
practice, reaches the same result.  The resolution of these
motions is based upon long recognized principles of
molecular biology and genetics: DNA represents the physical
embodiment of biological information, distinct in its

---

[1] See, e.g., John M. Conley & Roberte Markowski, Back to the Future:
Rethinking the Product of Nature Doctrine as a Barrier to Biotechnology
Patents, 85 J. Pat. & Trademark Off. Soc'y 301, 305 (2003).

3

essential characteristics from any other chemical found in

nature.  It is concluded that DNA's existence in an

"isolated" form alters neither this fundamental quality of

DNA as it exists in the body nor the information it

encodes.  Therefore, the patents at issue directed to

"isolated DNA" containing sequences found in nature are

unsustainable as a matter of law and are deemed

unpatentable subject matter under 35 U.S.C. § 101.


        Similarly, because the claimed comparisons of DNA

sequences are abstract mental processes, they also

constitute unpatentable subject matter under § 101.


        The facts relating to molecular biology are

fundamental to the patents at issue and to the conclusions

reached.  Consequently, in the findings which follow, the

discussion of molecular biology precedes the facts

concerning the development, application, and description of

the patents.  Following those facts are the conclusions

which compel the partial grant of summary judgment to the

Plaintiffs, the denial of Myriad's cross-motion, and the

grant of the USPTO's motion for judgment on the pleadings.

4

## I.   PRIOR PROCEEDINGS

The complaint in this action was filed on May 12, 2009, alleging violations of 35 U.S.C. § 101; Article I, Section 8, Clause 8 of the United States Constitution; and the First and Fourteenth Amendments to the Constitution.

Defendants moved to dismiss the complaint which motion was denied by the opinion of November 1, 2009.  See Assoc. for Molecular Pathology v. U.S. Patent and Trademark Office, 669 F. Supp. 2d 365 (S.D.N.Y. 2009).  Plaintiffs were found to have the necessary standing to assert their declaratory judgment claims against the Myriad Defendants and the USPTO, and specific personal jurisdiction was found to exist over the Directors of the UURF by virtue of acts performed in their official capacity that were directed to the state of New York.  It was also determined that this Court possessed the necessary subject matter jurisdiction to hear Plaintiffs' constitutional claims against the USPTO and that the complaint satisfied the pleading requirements set forth in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

Plaintiffs' motion for summary judgment and the cross-motions for summary judgment and judgment on the pleadings were heard and marked fully submitted on February 4, 2010.

## II. THE PARTIES AND AMICI

Plaintiff Association for Molecular Pathology ("AMP") is a not-for-profit scientific society dedicated to the advancement, practice, and science of clinical molecular laboratory medicine and translational research based on the applications of genomics and proteomics. AMP members participate in basic and translational research aimed at broadening the understanding of gene/protein structure and function, disease processes, and molecular diagnostics, and provide clinical medical services for patients, including diagnosis of breast cancer. Sobel Decl. ¶¶ 2, 4-5.[2]

Plaintiff the American College of Medical Genetics ("ACMG") is a private, non-profit voluntary organization of clinical and laboratory geneticists. The

---

[2] For purposes of this opinion, references to the parties' declarations will be in the format [Declarant name] Decl. ¶ [paragraph number].

6

Fellows of the ACMG are doctoral level medical geneticists and other physicians involved in the practice of medical genetics.  With more than 1300 members, the ACMG's mission is to improve health through the practice of medical genetics.  In order to fulfill this mission, the ACMG strives to define and promote excellence in medical genetics practice and the integration of translational research into practice; promote and provide medical genetics education; increase access to medical genetics services and integrate genetics into patient care; and advocate for and represent providers of medical genetics services and their patients.  Watson Decl. ¶¶ 2, 4-5.

Founded in 1922, plaintiff the American Society for Clinical Pathology ("ASCP") is the largest and oldest organization representing the medical specialty of pathology and laboratory medicine.  ASCP is a not-for-profit entity organized for scientific and educational purposes and dedicated to patient safety, public health, and the practice of pathology and laboratory medicine and has 130,000 members working as pathologists and laboratory professionals.  ASCP members design and interpret the tests that detect disease, predict outcome, and determine the appropriate therapy for the patient.  The ASCP is

7

recognized for its excellence in continuing professional
education, certification of laboratory professionals, and
advocacy.  Ball Decl. ¶¶ 2, 5.

    Plaintiff the College of American Pathologists
("CAP") is a national medical society representing more
than 17,000 pathologists who practice anatomic pathology
and laboratory medicine in laboratories worldwide.  The
College's Commission on Laboratory Accreditation is
responsible for accrediting more than 6,000 laboratories
domestically and abroad, and approximately 23,000
laboratories are enrolled in CAP's proficiency testing
programs.  It is the world's largest association composed
exclusively of board-certified pathologists and
pathologists in training worldwide and is widely considered
the leader in laboratory quality assurance.  CAP is an
advocate for high quality and cost-effective medical care.
Scott Decl. ¶¶ 2, 4-5.

    Plaintiff Haig Kazazian, M.D. ("Dr. Kazazian"),
is the Seymour Gray Professor of Molecular Medicine in
Genetics in the Department of Genetics at the University of
Pennsylvania School of Medicine.  He is a human genetics
researcher and the previous chair of the Department.  Dr.

8

Kazazian and plaintiff Arupa Ganguly, Ph.D. ("Dr. Ganguly"), designed tests to screen the BRCA1 and BRCA2 genes in their lab and provided screening to approximately 500 women per year starting in 1996.  Drs. Kazazian and Ganguly ceased their BRCA1/2 testing in response to cease-and-desist letters from Myriad relating to the patents-in-suit.  Kazazian Decl. ¶¶ 1-5.

Plaintiff Dr. Ganguly is an Associate Professor in the Department of Genetics at the Hospital of the University of Pennsylvania.  Dr. Ganguly's work previously included BRCA1/2 screening for both research and clinical purposes.  She ceased BRCA1/2 screening following her receipt of cease-and-desist letters from Myriad accusing her lab of violating the patents-in-suit.  Ganguly Decl. ¶¶ 1, 3-5.

Plaintiff Wendy Chung, M.D., Ph.D. ("Dr. Chung"), is an Associate Professor of Pediatrics and the Herbert Irving Professor of Pediatrics and Medicine in the Division of Molecular Genetics at Columbia University.  Dr. Chung is a human geneticist whose current research includes research on the BRCA1 and BRCA2 genes.  Because of the patents-in-suit, Dr. Chung currently cannot tell research subjects in

9

her studies the results of their *BRCA1/2* tests and cannot offer clinical *BRCA1/2* testing services.  Chung Decl. ¶¶ 1-9, 11-13, 16.

Plaintiff Harry Ostrer, M.D. ("Dr. Ostrer"), is a Professor of Pediatrics, Pathology and Medicine and Director of the Human Genetics Program in the Department of Pediatrics at New York University School of Medicine.  Dr. Ostrer's work has focused on understanding the genetic basis of development and disease, including disorders of sexual differentiation and genetic susceptibility to breast and prostate cancer and malignant melanoma. Dr. Ostrer is actively engaged in identifying genes that convey risk of breast cancer and that may mitigate the effects of mutations in the *BRCA1* and *BRCA2* genes.  Dr. Ostrer is also the Director of the Molecular Genetics Laboratory of NYU Medical Center, one of the largest academic genetic testing laboratories in the United States.  Because of the patents-in-suit, Dr. Ostrer currently cannot tell research subjects in his studies the results of their *BRCA1/2* tests and cannot offer clinical *BRCA1/2* testing services.  Ostrer Decl. ¶¶ 1-4.

Plaintiff David Ledbetter, Ph.D. ("Dr.

Ledbetter"), is a Professor of Human Genetics and Director
of the Division of Medical Genetics at the Emory University
School of Medicine.   Research in his laboratory focuses on
the molecular characterization of human developmental
disorders.   Dr. Ledbetter directs the Emory Genetics
Laboratory which provides testing services for individuals
with or at risk for genetic diseases.  Because of the
patents-in-suit, Dr. Ledbetter cannot offer comprehensive
*BRCA1/2* genetic testing to patients.   Ledbetter Decl. ¶¶ 1-
8, 16.

Plaintiff Stephen T. Warren, Ph.D. ("Dr.
Warren"), is the William Patterson Timmie Professor of
Human Genetics, Chairman of the Department of Human
Genetics, and Professor of Biochemistry and Professor of
Pediatrics at Emory University.  He is a past President of
the American Society of Human Genetics.  Dr. Warren
supervises genetic research at Emory and is responsible for
the laboratories at the Emory Genetics Laboratory.  These
laboratories would offer *BRCA1/2* genetic testing but for
the patents-in-suit.  Ledbetter Decl. ¶¶ 1, 16.

Plaintiff Ellen Matloff, M.S. ("Ms. Matloff"), is
Director of the Yale Cancer Genetic Counseling Program.

11

Ms. Matloff advises women on the desirability of obtaining
an analysis of their genes to determine if the women have
the genetic mutations that correlate with an increased risk
of breast and/or ovarian cancer.  If she determines that
such an analysis is warranted and the individual woman
concurs, Ms. Matloff arranges for the analysis and then
advises the woman of the significance of the results.  Ms.
Matloff would like to have the option to send patient
samples to laboratories other than Myriad Genetics for
*BRCA1/2* sequencing.  Matloff Decl. ¶¶ 1-4, 11.

Plaintiff Elsa W. Reich, M.S. ("Ms. Reich"), is a
Professor in the Department of Pediatrics at New York
University.  She is a genetic counselor.  She helps women
decide whether to be tested for mutations in the *BRCA1* and
*BRCA2* genes.  If they need testing, she sends samples to
Myriad and explains the results for the women.  Ms. Reich
would like to have the option to send patient samples to
laboratories other than Myriad for *BRCA1/2* sequencing.
Reich Decl. ¶¶ 1-3, 8.

Plaintiff Breast Cancer Action ("BCA") is a
national organization of approximately 30,000 members based
in San Francisco, California.  BCA is dedicated to

12

representing the voices of people affected by breast cancer
in order to inspire and compel the changes necessary to end
the breast cancer epidemic.  Its members include breast
cancer survivors, family members of people diagnosed with
breast cancer and other people affected by or concerned
about breast cancer.  BCA advocates for policy changes
directed at achieving prevention, finding better
treatments, and reducing the incidence of breast cancer,
provides information about breast cancer to anyone who
needs it via newsletters, web sites, e-mail and a toll-free
number, and organizes people to get involved in advocacy to
advance its policy goals.  Brenner Decl. ¶¶ 1-3.

          Plaintiff Boston Women's Health Book Collective,
doing business as Our Bodies Ourselves ("OBOS"), is a non-
profit, public interest women's health education, advocacy,
and consulting organization.  OBOS provides information
about health, sexuality and reproduction from a feminist
and consumer perspective.  OBOS advocates for women's
health and provides information to members of the public
about genetic analysis.  Norsigian Decl. ¶¶ 1-4.

          Plaintiff Lisbeth Ceriani ("Ms. Ceriani") is a
43-year-old single mother who was diagnosed with cancer in

13

both breasts in May 2008. Ms. Ceriani is insured through
MassHealth, a Medicaid insurance program for low-income
people. Her oncologist and genetic counselor recommended
that she obtain *BRCA1* and *BRCA2* genetic testing because she
may need to consider further surgery in order to reduce her
risk of ovarian cancer. However, Myriad will not accept
the MassHealth coverage, and Ms. Ceriani is unable to pay
the full cost out-of-pocket. Ceriani Decl. ¶¶ 1-6.

Plaintiff Runi Limary ("Ms. Limary") is a 32-
year-old Asian-American woman who was diagnosed with
aggressive breast cancer in 2005. Ms. Limary obtained
*BRCA1/2* testing through Myriad and received the following
result: "genetic variant of uncertain significance."
Because of Myriad's patents, she is unable to pursue
alternative testing options. Limary Decl. ¶¶ 1-5.

Plaintiff Genae Girard ("Ms. Girard") is a 39-
year-old woman who was diagnosed with breast cancer in
2006. Shortly after her diagnosis, she obtained *BRCA1/2*
genetic testing from Myriad and tested positive for a
deleterious mutation on the *BRCA2* gene. She sought a
second opinion of that test result but learned that Myriad
is the only laboratory in the country that can provide full

14

BRCA1/2 sequencing.   Girard Decl. ¶¶ 1-6.

Plaintiff Patrice Fortune ("Ms. Fortune") is a 48-year-old woman who was diagnosed with breast cancer in February 2009.  Ms. Fortune is insured through Medi-Cal. Her oncologist and genetic counselor recommended that she obtain BRCA1/2 genetic testing, including the supplemental testing that is offered by Myriad separate from its standard test, but told her that Myriad would not accept her insurance.  Ms. Fortune is unable to pay the full cost out-of-pocket.  Fortune Decl. ¶¶ 1-5.

Plaintiff Vicky Thomason ("Ms. Thomason") is a 52-year-old woman who was diagnosed with ovarian cancer in 2006.  She obtained BRCA1/2 genetic testing from Myriad in 2007 and was found to be negative for mutations covered by that test.  Her genetic counselor advised her about additional BRCA1/2 genetic testing offered by Myriad that looks for other large genetic rearrangements that are not included in Myriad's standard full sequencing test, but informed her that her insurance would not cover the full cost of that test.  Ms. Thomason is unable to afford the extra cost.   Thomason Decl. ¶¶ 1-8.

15

Plaintiff Kathleen Raker ("Ms. Raker") is a 41-year-old woman whose mother and maternal grandmother died from breast cancer. She obtained BRCA1/2 genetic testing from Myriad in 2007 and was found to be negative for mutations covered by that test. Her genetic counselor advised her about additional BRCA1/2 genetic testing offered by Myriad that looks for other large DNA rearrangements that are not included in Myriad's standard full sequencing test, but informed her that it was unclear whether her insurance would cover the full cost of that test. Ms. Raker is unable to afford the extra cost. Raker Decl. ¶¶ 1-9.

Defendant USPTO is an agency of the Commerce Department of the United States with its principal office in Alexandria, Virginia. USPTO Answer ¶ 27.

Defendant Myriad is a for-profit corporation incorporated in Delaware with its principal place of business in Salt Lake City, Utah. Myriad is the former co-owner of several of the patents-in-suit and the current exclusive licensee of the patents-in-suit. Myriad is the sole provider of full sequencing of BRCA1 and BRCA2 genes in the United States on a commercial basis. Myriad Answer

16

¶ 28.

The University of Utah Research Foundation, whose
directors are named as defendants in their official
capacity, is an owner or part-owner of each of the patents-
in-suit.  Myriad Answer ¶ 29.

Amici curiae American Medical Association,
American Society of Human Genetics, American College of
Obstetricians and Gynecologists, American College of
Embryology, and The Medical Society of the State of New
York are non-profit organizations representing physicians
and medical students throughout the United States,
including New York; professionals in the field of human
genetics, including researchers, clinicians, academicians,
ethicists, genetic counselors and nurses whose work involve
genetic testing; women's health care professionals; and
embryologists.  These amici contend that the patents-in-
suit are directed to unpatentable natural phenomena in
violation of Article I, Section 8, Clause 8 of the
Constitution, and 35 U.S.C. § 101, are unnecessary to
promote innovation in genetic research, and violate medical
and scientific ethics.

17

Amici curiae March of Dimes Foundation, Canavan
Foundation, Claire Altman Heine Foundation, Breast Cancer
Coalition, Massachusetts Breast Cancer Coalition, National
Organization for Rare Disorders, and National Tay-Sachs &
Allied Diseases Association are non-profit organizations
dedicated to advancing the treatment of a variety of
genetic diseases, including breast cancer, Tay-Sachs,
Spinal Muscular Dystrophy, Canavan disease, and other rare
genetic disorders.  These amici contend that Myriad's
patents represent patents on natural phenomena and laws of
nature, thereby restricting future research and scientific
progress.

Amici curiae National Women's Health Network,
Asian Communities for Reproductive Justice, Center for
Genetics and Society, Generations Ahead, and Pro-Choice
Alliance for Responsible Research are non-profit
organizations seeking to improve the health of women;
promote reproductive justice; encourage responsible use and
governance of genetic, reproductive and biomedical
technologies; promote policies on genetic technologies that
protect human rights; promote accountability, safety, and
social justice in biomedical research from a women's rights
perspective.  These amici contend that isolated DNA

18

constitutes an unpatentable product of nature whose patenting harms women by stifling innovation and interfering with patient access to medical testing and treatment.  These amici also contend that human genes and the information contained therein constitute part of the common heritage of humanity, and patenting human gene sequences is contrary to both international law and treatises as well as the public trust doctrine.

Amici curiae The International Center for Technology Assessment, Indigenous People Council on Biocolonialism, Greenpeace, Inc., and Council for Responsible Genetics are non-profit organizations dedicated to assisting the public and policy makers in understanding how technology affects society, protecting the cultural heritage and genetic materials of indigenous peoples; addressing global environmental problems; and protecting the public interest and fostering public debate about the social, ethical, and environmental implications of genetic technologies.  These amici contend that the patents-in-suit claim unpatentable products of nature and that gene patents have significant negative consequences, including privatization of genetic heritage in violation of fundamental precepts of common heritage, public domain, and

19

the public trust doctrine; creation of private rights of
unknown scope and significance; facilitate the exploitation
of indigenous peoples; and violation of patients' rights to
informed consent.

Amicus curiae Biotechnology Industry Organization
("BIO") is the country's largest biotechnology trade
association, representing over 1200 companies, academic
institutions, and biotechnology centers in all 50 states.
BIO members are involved in the research and development of
biotechnological healthcare, agricultural, environmental,
and industrial products.  BIO member companies range from
start-up businesses and university spin-offs to large
Fortune 500 corporations.  BIO contends that patents
directed to isolated DNA fall within the categories of
patent-eligible subject matter because they differ "in
kind" from naturally-occurring DNA.  The BIO also contends
that patents such as the ones in dispute here provide
incentives for investment in biotechnology that promotes
the advancement of science.

Amicus curiae Boston Patent Law Association
("BPLA") is a non-profit association of attorneys and other
intellectual property professionals.  BPLA's members serve

20

a broad range of clients who rely on the patent system, including independent investors, corporations, investors, and non-profit and academic institutions, such as universities and research hospitals. BPLA contends that patents, including patents on gene-related inventions, promote innovation by protecting investments in the innovation process. It further contends that the patents-in-suit satisfy the requirements of 35 U.S.C. § 101 as well as the Constitution.

Amicus curiae Genetic Alliance ("GA") is a not-for-profit, tax-exempt health advocacy organization founded in 1986 (as the Alliance for Genetic Support Groups). It brings together diverse stakeholders that create novel partnerships in advocacy. By integrating individual, family, and community perspectives to improve health systems, Genetic Alliance seeks to revolutionize access to information to enable translation of research into services and individualized decision-making. GA contends that the wholesale abolition of patents on isolated DNA molecules and isolated purified natural substances is legally untenable and undesirable as public policy, because it would diminish the promise of genetic research for patients and negatively affect other areas of medicine.

Amicus curiae Rosetta Genomics, Inc. is a wholly owned subsidiary of amicus curiae Rosetta Genomics, Ltd., a molecular diagnostics company that provides diagnostic tests for cancer and which owns several patents claiming isolated nucleic acid sequences. Amicus curiae George Mason University ("George Mason") is a public university located in Virginia. Research conducted at George Mason has been incorporated into patent applications covering cancer diagnostics. These amici contend that the question of patentability of human gene sequences is appropriately left to Congress; that the patents-in-suit promote, rather than hinder innovation; and that the challenged patents are lawful under 35 U.S.C. § 101 and the Constitution.

Amicus curiae BayBio is an independent, non-profit 501(c)(6) trade association serving the life sciences industry in Northern California, and represents more than 330 companies involved in the research and development of treatments, cures, and diagnostics. Amicus curiae Celera Corporation is a manufacturer of diagnostic products that include gene-based products used in genetic testing. Amicus curiae The Coalition for 21st Century Medicine represents some of the world's most innovative

diagnostic technology companies, clinical laboratories, researchers, physicians, venture capitalists, and patient advocacy groups that share a common mission to develop advanced diagnostics that improve the quality of healthcare for patients. Amicus curiae Genomic Health, Inc., is a life sciences company committed to improving the quality of cancer treatment decisions through genomics-based clinical laboratory services and currently offers the Oncotype DX breast cancer assay, which predicts the likelihood of the recurrence of specific types of breast cancer and whether a patient will benefit from certain treatment strategies. Amicus curiae Qiagen, N.V. is a leading provider of innovative sample and assay technologies and products which are considered standard for use in molecular diagnostics, applied testing, and academic and pharmaceutical research and development. Amicus curiae Target Discovery, Inc. discovers, validates, and utilizes protein isoforms to improve clinical diagnosis and management of disease. Amicus curiae XDx, Inc., is a molecular diagnostics company focused on the discovery, development and commercialization of non-invasive gene expression testing in the areas of transplant medicine and autoimmunity through the use of modern genomics and bioinformatics technology. These amici contend that patent exclusivity is required for the

23

development of personalized medicine and that the
challenged patents satisfy the requirements of 35 U.S.C. §
101 and the Constitution.  In addition, the amici contend
that the harm alleged by Plaintiffs can be redressed
through traditional judicial remedies and do not require a
finding that isolated DNA constitutes unpatentable subject
matter.

Amicus curiae Kenneth Chahine, Ph.D. ("Professor
Chahine"), is a Visiting Professor of Law at S.J. Quinney
College of Law at the University of Utah.  Professor
Chahine contends that the scope of the claims-in-suit are
sufficiently limited to avoid claiming products of nature
and that the claims directed to isolated DNA and diagnostic
process satisfy the requirements of patentable subject
matter under 35 U.S.C. § 101.

Amicus curiae Kevin E. Noonan, Ph.D. ("Dr.
Noonan"), is a patent attorney with McDonnell Boehnen
Hulbert & Berghoff LLP.  Dr. Noonan contends that isolated
human DNA constitutes patentable subject matter and that a
ban on patenting isolated human DNA would negatively affect
the development of human therapeutics, the development of
personalized medicine, and the scientific research in

24

general.

## III. THE FACTS

The facts as set forth in this section are taken
from the parties' respective statements and
counterstatements pursuant to Local Civil Rule 56.1 and the
affidavits submitted by the parties and amici and are not
in dispute except where noted.

### A. The Development of Genetics as a Field of Knowledge

The field of genetics - the science of heredity
and variation in living organisms - and the concept of
units of heredity that could be transmitted from one
generation to another originated in the 19th century from
experiments with pea plants conducted by Gregor Mendel.
Mendel showed that certain traits are passed on from parent
to offspring as discrete entities and do not appear blended
in the offspring.  He hypothesized that it was the plant's
genotype, or assortment of hereditary factors, that
determined the plant's phenotype, or appearance.  Mason
Decl. ¶ 8.  In 1909, this unit of inheritance was termed a
"gene."  Yet the gene remained an abstract concept until

25

1915, when it was shown that genes corresponded to physical spans of chromosomal material.  Mason Decl. ¶ 9.

In 1944, scientists determined that the chemical compound known as deoxyribonucleic acid, or DNA,[3] served as the carrier for genetic information by demonstrating that DNA extracted from one strain of bacteria and transferred to another strain could transfer certain characteristics found in the first strain.  Oswald Theodore Avery, et al., Studies on the Chemical Nature of the Substance Inducing Transformation of Pneumococcal Types: Induction of Transformation by a Desoxyribonucleic Acid Fraction Isolated from Pneumococcus Type III, 79 J. Exp. Med. 137-158 (1944).

On April 25, 1953, James Watson and Francis Crick published their determination of the famous double-helix structure of DNA in the journal *Nature*.  James D. Watson & Francis H.C. Crick, A Structure for Deoxyribose Nucleic Acid, 171 Nature 737-38 (1953).  Dr. Crick subsequently contributed to the decryption of the genetic code and proposed "the central dogma" of molecular biology: (1)

---

[3] Scientists had learned to extract DNA from the body by removing it from the rest of the cellular material since as early as 1869.  Ralf Dahm, Discovering DNA: Friedrich Miescher and the Early Years of Nucleic Acid Research, 122 Human Genetics 565-581, 567-68 (2008).

information is encoded in a segment of DNA, i.e., a gene;
(2) transmitted through a molecule called RNA; and then (3)
utilized to direct the creation of a protein, the building
block of the body.   Mason Decl. ¶ 10.

Our understanding of the DNA contained within our
cells has since grown at an exponential rate and has
included the landmark completion of the first full-length
sequence of a human genome, containing 25,000 genes, as a
result of the work performed by the Human Genome Project
from 1990 to 2003.   Sulston Decl. ¶¶ 11, 22.   Access to the
information encoded in our DNA has presented expansive new
possibilities for future biomedical research and the
development of novel diagnostic and therapeutic approaches.
How this genomic information is best harnessed for the
greater good presents difficult questions touching upon
innovation policy, social policy, medical ethics, economic
policy, and the ownership of what some view as our common
heritage.

## B.   Molecular Biology and Gene Sequencing

An understanding of the basics of molecular
biology is required to resolve the issues presented and to

27

provide the requisite insight into the fundamentals of the
genome, that is, the nature which is at the heard of the
dispute between the parties.  What follows represents the
standard undisputed knowledge of those in the field of
molecular biology as set forth in the parties' 56.1
Statements and expert declarations.  Citations are also
made to two established texts in the field: Bruce Alberts,
et al., *Molecular Biology of the Cell* (4th ed. 2002) ("*The
Cell*") and James Watson, et al., *Molecular Biology of the
Gene* (6th ed. 2008) ("*The Gene*").

### 1.  DNA

DNA is a chemical molecule composed of repeating
chemical units known as "nucleotides" or "bases."  DNA is
composed of four standard nucleotides: adenine, thymine,
cytosine, and guanine.  As shorthand, scientists denote
nucleotides by the first letter of the names of their
bases: "A" for adenine; "G" for guanine; "T" for thymine;
and "C" for cytosine.  These nucleotide units are composed
of several chemical elements, namely carbon, hydrogen,
oxygen, nitrogen, and phosphorus, and are linked together
by chemical bonds to form a strand, or polymer, of the DNA
molecule.  Kay Decl. ¶¶ 14, 125; Linck Decl. ¶ 70.

Although it can exist as a single strand of nucleotides, DNA typically exists as a "double helix"[4] consisting of two intertwined strands of DNA that are chemically bound to each other.  This structure is possible because of a property of DNA known as "base pair complementarity" or "base pairing," in which adenine on one strand of DNA always binds to thymine on the other strand of DNA, and guanine on one strand always bind to cytosine on the other strand.  Kay Decl. ¶ 129.  For example, if a portion of one strand of DNA has the nucleotide sequence ACTCGT, the corresponding section of DNA on the complementary strand will have the nucleotide sequence TGAGCA.

Genes are basic units of heredity found in all living organisms and are responsible for the inheritance of a discrete trait.  Sulston Decl. ¶ 11.  In molecular terms, a gene is composed of several, typically contiguous, segments of DNA.  Kay Decl. ¶ 142.  Each gene is typically thousands of nucleotides long and usually "encodes" one or more proteins, meaning it contains the information used by the body to produce those proteins.  Some of the segments of DNA within a gene, known as "exons" or "coding

---

[4] It was the description of this famous "double-helix" structure that earned Watson and Crick the Nobel Prize.

29

sequences," contain sequences necessary for the creation of
a protein, while other segments of DNA, known as "introns,"
are not necessary for the creation of a protein.[5]   See Mason
Decl. ¶ 11; Kay Decl. ¶ 151; Schlessinger Decl. ¶ 14.   DNA
encodes proteins by way of three nucleotide combinations,
termed "codons," that correspond to one of twenty amino
acids that constitute the building blocks of proteins.
Sulston Decl. ¶¶ 14-15.   For example, the codon adenine-
thymine-guanine (ATG) encodes the amino acid methionine.
Kay Decl. ¶ 158.    However, because there are only twenty
different amino acids but 64 possible codons that can be
derived from combinations of the four DNA nucleotides, most
amino acids are encoded by more than one DNA codon.   *The
Gene* at 37 & Table 2-3.

Together, the approximately 25,000 genes in the
human body make up the human genome.[6]   The genome, and the
genes within it, are contained within almost every cell in
the human body and define physical traits such as skin
tone, eye color, and sex, in addition to influencing the
development of conditions such as obesity, diabetes,

---

[5] Introns can contain regulatory sequences that affect the body's rate
of production of the protein encoded by a gene.   Kay Decl. ¶ 151.
[6] Genome is defined as "[t]he totality of genetic information belonging
to a cell or an organism; in particular, the DNA that carries this
information."   *The Cell* at G:15.

Alzheimer's disease, and bipolar disorder.   Mason Decl. ¶¶
4-5; Sulston Decl. ¶¶ 10-11.


        The linear order of DNA nucleotides that make up
a polynucleotide, such as a gene, is referred to as the
"nucleotide sequence," "DNA sequence," or "gene sequence."[7]
Kay Decl. ¶ 126; Schlessinger Decl. ¶ 19; Linck Decl. ¶ 45;
Sulston Decl. ¶ 16; Mason Decl. ¶ 13; Chung Decl. ¶ 10.
Gene sequences constitute biological information insofar as
they describe the structural and chemical properties of a
particular DNA molecule and serve as the cellular
"blueprint" for the production of proteins.   Sulston Decl.
¶ 16; Kay Decl. ¶ 126; Schlessinger Decl. ¶ 19; Linck Decl.
¶¶ 45, 46.   Genes and the information represented by human
gene sequences are products of nature universally present
in each individual, and the information content of a human
gene sequence is fixed.   While many inventive steps may be
necessary to allow scientists to extract and read a gene
sequence, it is undisputed that the ordering of the
nucleotides is determined by nature.   Sulston Decl. ¶ 10,
17; Ostrer Decl. ¶ 14; Chung Decl. ¶ 25; Ledbetter Decl. ¶
27; Leonard Decl. ¶ 15.

---

[7] By analogy, if a gene is the equivalent of a word, then the nucleotide
sequence is the equivalent of the word's spelling.

Scientists often use the term "wild-type" to refer to the "normal" human gene sequence, i.e. the sequence of a gene without any variations,[8] against which individuals' gene sequences are compared. Mason Decl. ¶ 17; Grody Decl. ¶ 46. Variations in the human genome are very common: aside from identical twins, the genomes of any two individuals are estimated to have one to five nucleotide differences for every 1000 nucleotides. Mason Decl. ¶ 14; Sulston Decl. ¶ 12.

Variations in the human genome, also known as "mutations," can occur at different scales. Small scale variations can be manifested as slight sequence differences between the same genes in different individuals. Thus, for example, if the wild-type sequence of a portion of a gene is represented by GACTCG, a variation of that sequence might omit the first C (resulting in GATCG) or contain an extra C at that point (resulting in GACCTCG) or reverse the order of two of the letters (e.g., GCATCG). Mason Decl. ¶ 16. Alternatively, there can be large scale variations,

---

[8] At the same time there is an increasing recognition that the notion of a single "normal" gene sequence may not be entirely accurate in light of the high frequency of variations in a gene's sequence between individuals. Mason Decl. ¶ 17. For purposes of this opinion, however, genes are treated as having a single "normal" DNA sequence.

32

such as the addition or deletion of substantial chromosomal
regions.  Thus, a particular gene may omit several hundred
letters at one point or may add several hundred letters
where they do not normally exist in the wild-type gene
sequence.  Even larger variations, known as structural
variants, also can occur, involving the deletion or
duplication of up to millions of nucleotides.  Extra copies
or missing copies of the genome that are larger than 1000
nucleotides are called "copy number variants" ("CNVs").
Mason Decl. ¶ 15, 18.

Some of these mutations have little or no effect
on the body's processes, while other mutations, including
those that appear to correlate with an increased risk of
particular diseases, do interfere with the body's
processes.[9]  There are also variants of uncertain
significance ("VUS"): variants whose effect on the body's
processes, if any, is currently unknown.  Mason Decl. ¶ 19;
Sulston Decl. ¶ 18; Kay Decl. ¶ 76.

DNA as it is found in the human body - "native

---

[9] The correlation between a particular mutation and disease
susceptibility is not self-evident from the mutation itself; rather,
extensive statistical analysis is required to identify which
alterations in the nucleotide sequence correlate with a particular
medical condition, a process which may take many years.  Kay Decl. ¶
190.

DNA" or "genomic DNA" - is packaged, along with proteins,
into complex structures known as chromosomes, which contain
the vast majority of the genes located in the cells of the
human body.  Kay Decl. ¶ 131; Schlessinger Decl. ¶ 12.
This mixture of DNA and proteins that makes up chromosomes
is also referred to as chromatin.  See The Gene at 135.
Genes are organized on forty-six chromosomes (twenty-three
of which are inherited from the mother, and twenty-three of
which are inherited from the father) which together
constitute the vast majority of the human genome.[10]  Mason
Decl. ¶ 5.  The proteins within the chromosomes are bound[11]
to the DNA molecules and modulate the structure and
function of the DNA molecules to which they are associated.
Kay Decl. ¶ 131; Schlessinger Decl. ¶ 12; The Cell at 198,
208, Fig. 4-24.  This interaction between chromosomal
proteins and native DNA is one method by which the body
establishes which genes are inactive, which genes are
active, and the level of activity.  Kay Decl. ¶ 132.  Some
DNA in the body also undergoes chemical modifications, such

---

[10] A very small fraction of human genes are located in a cellular
organelle known as the mitochondria.  Kay Decl. ¶ 144; Schlessinger
Decl. ¶ 23.  Neither party appears to believe that a discussion of
mitochondrial DNA bears much relevance to the legal issues presented.
[11] The ionic chemical bonds that exists between proteins and DNA
molecules differ from the covalent chemical bonds which hold DNA itself
together.  See The Cell at 198 (describing DNA in the cell as
"associated with proteins that fold and pack the fine DNA thread into a
more compact structure."); id. at 208 Fig. 4-24 (demonstrating
dissociation of histone proteins from DNA by high salt solution,
indicating lack of covalent bond between DNA and histones).

as methylation,[12] which can affect the level of activity of
a gene, but does not affect the nucleotide sequence of the
gene.  Kay Decl. ¶ 132; Mason Supp. Decl. ¶ 22.

### 2.    Extracted and purified DNA

Native DNA may be extracted from its cellular
environment, including the associated chromosomal proteins,
using any number of well-established laboratory techniques.
Grody Decl. ¶ 13; Leonard Decl. ¶ 33.  A particular segment
of DNA, such as a gene, contained in the extracted DNA may
then be excised from the genomic DNA in which it is
embedded to obtain the purified DNA of interest.  Kay Decl.
¶¶ 133, 137.  DNA molecules may also be chemically
synthesized in the laboratory.  Kay Decl. ¶¶ 17, 133, 137.

Although the parties use the term "isolated DNA"
to describe DNA that is separated from proteins and other
DNA sequences, the term "isolated DNA" possesses a specific
legal definition reflecting its use in the patents-in-suit.
To avoid any confusion for purposes of this fact
recitation, the term "extracted DNA" will be used to refer

---

[12] Methylation refers to the addition of a small chemical group composed
of one carbon atom and three hydrogen atoms ($CH_3$), known as a "methyl
group," to the nucleotides of a segment of DNA.  See *The Cell* at 430.

35

to DNA that has been removed from the cell and separated from other non-DNA materials in the cell (e.g., proteins); "purified DNA" will be used to refer to extracted DNA which has been further processed to separate the particular segment of DNA of interest from the other DNA in the genome; and "synthesized DNA" will be used to refer to DNA which has been synthesized in the laboratory.

As noted above, native DNA, unlike purified or synthesized DNA, is not typically found floating freely in cells of the body, but is packaged into chromosomes. Kay Decl. ¶¶ 131, 148. However, when DNA is copied, or replicated, in preparation for cell division, short segments of DNA are dissociated from the chromosomal proteins, although they are still contained within the cell. Similarly, when a particular portion of DNA is transcribed into RNA, segments of DNA exist dissociated from the proteins normally bound to it. Mason Supp. Decl. ¶ 23.

Purified or synthesized DNA may be used as tools for biotechnological applications for which native DNA cannot be used. Kay Decl. ¶¶ 134, 138; Schlessinger Decl. ¶ 27. For example, unlike native DNA, purified or

synthesized DNA may be used as a "probe,"[13] which is a
diagnostic tool that a molecular biologist uses to target
and bind to a particular segment of DNA, thus allowing the
target DNA sequence to be detectable using standard
laboratory machinery. Kay Decl. ¶ 135; Schlessinger Decl.
¶ 29. Purified or synthesized DNA can also be used as a
"primer"[14] to sequence a target DNA, a process used by
molecular biologists to determine the order of nucleotides
in a DNA molecule, or to perform polymerase chain reaction
("PCR") amplification, a process which utilizes target-DNA
specific primers to duplicate the quantity of target DNA
exponentially. Critchfield Decl. ¶ 40; Kay Decl. ¶ 184.

During this process, the DNA molecule being used
as a probe or a primer binds, or "hybridizes," to a
specific nucleotide sequence of a DNA target molecule, such
as the *BRCA1* or *BRCA2* gene. This sequence-specific binding
of two strands of DNA results from the same base-pairing
phenomenon which allows two complementary strands of DNA to
form the double helix structure. As a result, a strand of
isolated DNA being used as a primer with the sequence

---

[13] A probe is a DNA fragment that is usually between 100-1000
nucleotides long. Kay Decl. ¶ 135.
[14] A primer is a DNA fragment, usually between 15 and 30 nucleotides
long, that binds specifically to a target DNA sequence. Kay Decl. ¶
183.

ATGTCG, for example, will bind specifically to the portion

of the target DNA molecule containing the nucleotide

sequence TACAGC.  The hybridization of a primer or probe to

a DNA target, such as *BRCA1* or *BRCA2*, results in the

formation of a "hybridization product" that either acts as

a substrate for the enzymes used in the sequencing or

amplification reaction or permits the detection of the

target DNA.  See Kay Decl. ¶¶ 138, 183; Schlessinger Decl.

¶ 30; *The Gene* at 105-06; 113-15.


        The utility of purified *BRCA1/2* DNA molecules as

biotechnological tools therefore relies on their ability to

selectively bind to native or isolated *BRCA1/2* DNA

molecules, which ability is a function of the isolated

DNA's nucleotide sequence.  Kay Decl. ¶ 138.


        **3.    RNA**


        Ribonucleic acid ("RNA") is another nucleic acid

found in cells.  Like DNA, an RNA molecule is composed of a

combination of four different nucleotides, three of which

are the same bases incorporated into DNA: adenine,

cytosine, and guanine.  Unlike DNA, however, RNA utilizes

uracil as the fourth nucleotide base, rather than thymine.


                            38

In addition, the sugar-phosphate backbone in RNA is
chemically different from the sugar-phosphate backbone of
DNA.  Kay Decl. ¶ 170.

The creation of proteins, which do the work of
the body, comprises two steps: transcription and
translation.  Transcription is the process by which a
temporary copy of a particular DNA sequence, in the form of
an RNA molecule, is generated.  Mason Decl. ¶¶ 11-12; Kay
Decl. ¶¶ 149, 150.  During transcription, a discrete
segment of DNA unwinds itself inside the cell and the bases
of the DNA molecule act as "clamps" that hold the bases of
the newly forming RNA molecule in place while the chemical
bonds of its sugar-phosphate backbone are formed.  Kay
Decl. ¶ 150.  Each nucleotide in the DNA strand corresponds
to a nucleotide to be incorporated into the newly forming
RNA molecule: adenine on the DNA molecule binds to and
thereby acts as a clamp for RNA nucleotide uracil, thymine
for adenine, guanine for cytosine, and cytosine for
guanine.  Kay Decl. ¶ 150.  This newly generated RNA is
termed "pre-messenger RNA" or "pre-mRNA" and, like the DNA
from which it was generated, contains both introns and
exons.  In a process known as "splicing," the introns are
physically cut out of the pre-mRNA by the cell and the

39

remaining RNA segments containing the exons are rejoined,
or "ligated," together in consecutive order to form the
final "messenger RNA," or "mRNA." Mason Decl. ¶ 11; Kay
Decl. ¶ 151; Schlessinger Decl. ¶ 14.  Pre-mRNAs can also
undergo a process known as "alternative splicing," in which
different combinations of exons from the same pre-mRNA
molecule are ligated together to yield different final mRNA
products.[15]  Kay Decl. ¶ 152; Schlessinger Decl. ¶ 14.

During translation, an mRNA molecule serves as a
template for the assembly of a protein.  Kay Decl. ¶ 157.
In a process that parallels the transcription of DNA, the
mRNA bases, along with other proteins in the cell, serve as
clamps to hold the corresponding amino acids in place while
the chemical bonds between the individual amino acids are
formed.  Kay Decl. ¶ 157.  The three-nucleotide codons
originally found in DNA and copied into mRNA determine
which amino acids are incorporated into the protein and the
order in which they are incorporated.  Kay Decl. ¶ 157.

---

[15] For example, a pre-mRNA molecule containing exons ("E") numbered 1-6,
with introns ("I") between each exon whose structure is represented as
follows: E1+I1+E2+I2+E3+I3+E4+I4+E5+I5+E6.  After splicing, the introns
would be removed to form an mRNA composed only of exons:
E1+E2+E3+E4+E5+E6.  On the other hand, the same pre-mRNA molecule might
undergo alternative splicing to form final mRNAs with a variety of
different exon compositions: for example, E1+E2+E5; E1+E3+E6; and
E1+E4+E6.

### 4.   cDNA

Complementary DNA, or "cDNA," is a type of DNA molecule generated from mRNA during a process known as "reverse transcription" which is catalyzed by a protein known as "reverse transcriptase."  cDNA derives its name from the fact that it is "complementary" to the mRNA from which it is produced – that is, each base in the cDNA can bind to the corresponding base in the mRNA from which it is generated.  Kay Decl. ¶ 161.  Because it is derived from mRNA, a cDNA molecule represents an exact copy of one of the protein coding sequences encoded by the original genomic DNA.  Leonard Decl. ¶ 75.  In this respect, cDNA contains the identical protein coding informational content as the DNA in the body, even though differences exist in its physical form.  Mason Decl. ¶ 32.

During reverse transcription, each base of the mRNA serves as a clamp for its complementary nucleotide to be incorporated into the new cDNA molecule while the chemical bonds between the nucleotides of the cDNA strand are formed.  Much like transcription, uracil on the mRNA binds to and thereby acts as a clamp for the nucleotide adenine, adenine for thymine, guanine for cytosine, and

41

cytosine for guanine. Kay Decl. ¶ 165. The synthesis of
cDNA from very long mRNA molecules, such as *BRCA1* and
*BRCA2*, often does not result in a cDNA strand that is as
long as the mRNA chain. Kay Decl. ¶ 166.

cDNA is typically generated by scientists in a
laboratory. Kay Decl. ¶ 164, Linck Decl. ¶ 48. However,
naturally occurring cDNAs, known as "pseudogenes," exist in
the human genome and are structurally, functionally, and
chemically identical to cDNAs made in the laboratory.
Mason Supp. Decl. ¶¶ 18-21; Nussbaum Decl. ¶¶ 41-42.

cDNA possesses certain structural and functional
differences from native DNA. In contrast to most forms of
native DNA, cDNA does not contain non-coding intronic
sequences because it is derived from mRNA in which the
introns have been removed. As a result, the production of
proteins from cDNA does not require RNA splicing, in
contrast to the production of proteins from native DNA as
described above. Some cDNAs cannot be used to produce
proteins without the addition of certain regulatory
sequences, although other cDNAs possess some of the
necessary regulatory sequences. cDNAs also usually contain
nucleotides corresponding to the so-called "poly A tail"

42

sequence found in mRNA, which native DNA does not possess.

In addition, as mentioned above, native DNA is often

(although not always) chemically modified in the body,

e.g., by methylation, while cDNA generated in the

laboratory is not so modified.  Kay Decl. ¶¶ 168, 169;

Mason Supp. Decl. ¶¶ 18-22; Nussbaum Decl. ¶¶ 41-42.  cDNA

also differs from mRNA in that it is a more stable compound

and requires both transcription and translation to produce

protein, rather than simply translation, as is the case

with mRNA.  Kay Decl. ¶ 171.


Much like purified DNA, cDNA can be used as a

tool for biotechnological and diagnostic applications for

which native DNA cannot be used.  Kay Decl. ¶ 162.  In

addition, a scientist seeking to learn more about a protein

of interest may transfer a cDNA encoding the protein into a

recipient cell that does not normally express that protein.

If the cDNA is operatively linked to particular "promoter"

sequences that initiate transcription from the cDNA, the

recipient cell will then express the protein of interest.

Kay Decl. ¶ 163.


### 5.    DNA sequencing

DNA sequencing is the process by which one
"reads," or determines the ordering of the nucleotides
within a DNA molecule.  Sulston Decl. ¶ 20; Kay Decl. ¶
138.  In the context of a gene or a portion of the genome,
sequencing is designed to illuminate the information that
nature has dictated in that person's genome, and the
sequencing process, by design, does not alter the
information content of the native DNA sequence.  Sulston
Decl. ¶ 27; Mason Decl. ¶ 32.  In that respect, sequencing
is analogous to examining something through a microscope
insofar as it makes visible something that exists in nature
but is too small to be seen otherwise.  Mason Decl. ¶ 23.
Gene sequencing is used in diagnostic testing, such as
Myriad's tests, to determine whether a gene contains
mutations that have been associated with a particular
condition.  Sulston Decl. ¶ 24; Chung Decl. ¶ 10; Swisher
Decl. ¶¶ 23-26; Mason Decl. ¶ 21.  These mutations, along
with any association with a propensity to develop a
particular disease, are caused by nature.  Chung Decl. ¶
10; Mason Decl. ¶ 20; Sulston Decl. ¶¶ 19, 27; Ledbetter
Decl. ¶ 26.  Therefore, the significance of any person's
gene sequence, including its relationship to any disease,
is dictated by nature.  Mason Decl. ¶ 32.

44

Sequencing is often used to identify single nucleotide substitutions or the insertion or deletion of a small number of nucleotides in a gene. Swisher Decl. ¶ 23; Kay Decl. ¶ 180. However, even full sequencing of an entire gene can miss large genomic rearrangements in which whole sections of the gene have been deleted or moved to a different part of the genome. Other tests have been developed that better detect these large rearrangements. Swisher Decl. ¶ 24; Ledbetter Decl. ¶¶ 16-17.

Sequencing native DNA first requires that cells of a tissue sample[16] be broken open to permit extraction of the DNA contained within the cells. Sulston Decl. ¶ 25. The extracted DNA of the entire genome contains over three billion nucleotides, of which the gene of interest comprises a very small portion. Kay Decl. ¶ 178. *BRCA1/2* sequencing by Myriad follows the typical process for sequencing extracted genomic DNA, which begins with obtaining a sufficient quantity of the *BRCA1/2* genomic DNA to permit its sequencing. Critchfield Decl. ¶ 40.

Under the current state of the art, the only

---

[16] Various types of patient samples can be used, e.g., blood, tumor tissue, or non-tumor tissue. Kay Decl. ¶ 186.

practical way to obtain a sufficient amount of *BRCA1/2*
genomic DNA for mutation detection purposes is to PCR
amplify the genomic DNA in segments.  Critchfield Decl. ¶
40.  In order to design the necessary primers to PCR
amplify the correct region of the genome, at least a
portion of the sequence of the target DNA molecule must be
known.  Kay Decl. ¶ 184.  Typically, each exon of the
*BRCA1/2* genes, including a small adjacent portion of the
flanking introns, is separately amplified by PCR into one
or more amplified DNA fragments, also called "amplicons."
The *BRCA1* and *BRCA2* genes have a total of 48 coding exons
containing over 15,700 nucleotide base pairs.  More than 50
amplicons are typically produced as part of Myriad's
*BRCA1/2* testing.  Critchfield Decl. ¶ 40.


        Following PCR amplification of the target DNA, a
sequencing reaction is performed to determine the
nucleotide sequence of the amplicon.  Kay Decl. ¶ 183.  As
with PCR, at least some of the target sequence must be
known in order to design a primer specific to the target
DNA to be sequenced.  Kay Decl. ¶¶ 177, 179, 183.  For this
reason, primers that bind only to specific DNA sequences in
the *BRCA1* and *BRCA2* genes permit the analysis of a
patient's native DNA sequence to determine if the

46

nucleotide composition is the same or different from the
nucleotide composition of the normal *BRCA1* and *BRCA2* gene.
Kay Decl. ¶ 187.  Gene sequencing also sometimes utilizes
cDNA as the DNA template.  Leonard Decl. ¶ 75.

The techniques required for gene sequencing are
well-known and understood by scientists skilled in
molecular biology, and scientists and clinicians sequence
and analyze genes literally every day.  Chung Decl. ¶¶ 10-
11; Mason Decl. ¶ 22; Hegde Decl. ¶¶ 6-7.  However, because
sequencing requires knowledge of the sequence of a portion
of the target sequence, some ingenuity and effort is
required for the initial sequencing of a target DNA.  See
Kay Decl. ¶ 183; Klein Decl. ¶ 32-34.

## C.  The Development of the Patents-in-Suit

Breast cancer is the most frequently diagnosed
cancer worldwide and is the leading cause of cancer death
for women in Britain and the second leading cause of cancer
death for women in the United States.  Parthasarathy Decl.
¶ 8.[17]  Ovarian cancer is the eighth most common cancer in

---

[17] Dr. Parthasarathy has researched the development of genetic testing
for breast and ovarian cancer in the United States and Britain and has
interviewed over 100 individuals involved in the process, including

47

women and causes more deaths in the Western world than any
other gynecologic cancer.  Swisher Decl. ¶ 10.

Throughout the 1980s, organizations dedicated to
breast cancer awareness began efforts to increase public
and governmental awareness of the breast cancer epidemic.
In 1991, the U.S. Department of Defense created a research
program devoted to breast cancer research.  Over the years
this funding has grown from less than $90 million during
the fiscal year 1990 to more than $2.1 billion during the
fiscal year 2008.  Parthasarathy Decl. ¶ 10.

Throughout the 1980s, scientists from the United
States, England, France, Germany, Japan, and other
countries sought to be the first to identify DNA nucleotide
sequences associated with breast cancer.  Parthasarathy
Decl. ¶ 11.  In 1989, various European and American
research laboratories participated in the International
Breast Cancer Linkage Consortium (the "Consortium"), and in
1990, a group of researchers led by Mary-Claire King ("Dr.
King") at the University of California, Berkeley, published
a landmark paper demonstrating for the first time that a

---

research scientists, officials at research institutions, health care
professionals, patent office officials, bioethicists, and journalists.
Parthasarathy Decl. ¶ 6.

48

gene linked to breast cancer, whose sequence was unknown
but which was later designated Breast Cancer Susceptibility
Gene 1 (BRCA1), was located on a region of chromosome 17.
See Jeff M. Hall, et al., Linkage of Early-Onset Familial
Breast Cancer to Chromosome 17q21, 250 Science 1684-89
(1990); Parthasarathy Decl. ¶ 11.  Soon afterwards,
research intensified as teams around the world, including
groups led by Dr. King, Dr. Mark Skolnick ("Dr. Skolnick")
(co-founder of Myriad), and Dr. Michael Stratton ("Dr.
Stratton") (Institute for Cancer Research, London ("ICR")),
focused in on this region of the genome in an attempt to be
the first to determine the DNA sequence of BRCA1.
Parthasarathy Decl. ¶ 11.

        Dr. Skolnick, a 1968 economics graduate of the
University of California, Berkeley, had become interested
in the application of demography to the study of genetics
while doing research for his Ph.D. in genetics, which he
received from Stanford University in 1975.  While
reconstructing genealogies in Italy, he met three Mormons
who were microfilming parish records and from whom he
learned of the resources of the Utah Genealogical Society
in Salt Lake City.  Thereafter, in 1973, after an inquiry
from the organizers of a cancer center at the University of

Utah, Dr. Skolnick suggested linking the Utah Mormon
Genealogy with the Utah Cancer Registry. To further this
effort, a familial cancer screening clinic was established
and a program for mapping genes was developed. Skolnick
Decl. ¶¶ 7, 11, 12.

Following publication of the King group's study
relating to BRCA1 in the fall of 1990, Dr. Skolnick and his
collaborators concluded that additional resources would be
required to compete with the team of Dr. Francis Collins,
which had received a substantial grant from the National
Institutes of Health ("NIH"), Skolnick Decl. ¶¶ 13, 14, and
in 1991 Myriad was founded by Dr. Skolnick and a local
venture capital group interested in genetics. Myriad
received $5 million in funding in 1992, $8 million in 1993,
and $9 million in 1994. Skolnick Decl. ¶ 16.

Locating the BRCA1 gene relied on the use of
linkage analysis, in which correlations between the
occurrence of cancer and the inheritance of certain DNA
markers among family members were used to identify, or
"map," the physical location of, the BRCA1 gene within the
human genome. See '282 patent, col. 7:39-52. Once the
physical location had been narrowed down to a sufficiently

50

small region of the genome, Myriad was able to directly
analyze the sequence of the DNA in this region and identify
the nucleotides comprising the *BRCA1* gene.  See '282
patent, col. 7:53-8:7.  Successful linkage analysis
requires large and genetically informative families, or
kindreds, and detailed family information, such as detailed
genealogical records, are an important component to this
analysis.  Shattuck Decl. ¶¶ 10, 13; '282 patent, col.
8:16-29.


        In September 1994, the group at Myriad, along
with researchers from the National Institute for
Environmental Health Sciences ("NIEHS") (a subdivision of
the NIH), the University of Utah, McGill University, and
Eli Lilly and Company announced that they had sequenced the
*BRCA1* gene.  See Yoshio Miki, et al., A Strong Candidate
for the Breast and Ovarian Cancer Susceptibility Gene
*BRCA1*, 266 Science 66-71 (1994).  In addition to funding
the six NIEHS researchers who participated in the
identification of *BRCA1*, the NIH had also provided
approximately $2 million in funding to the University of
Utah.[18]  See id. at 71 n.52; Parthasarathy Decl. ¶ 18.

---

[18] According to the description of author associations, the first and
second authors of the paper were associated with the University of
Utah.

51

According to one analysis, the NIH contributed one-third of
the funding for the identification of *BRCA1*.  Parthasarathy
Decl. ¶ 18.

A dispute subsequently arose between Myriad and
the NIH over the NIEHS scientists' exclusion as co-
inventors on the *BRCA1* patents.  Parthasarathy Decl. ¶ 19.
The NIH maintained that its scientists had conducted some
of the most important work leading up to the sequencing of
the gene, including identifying the sequences of two of the
*BRCA1* gene fragments and assembling the complete *BRCA1*
sequence.  Id.  Myriad agreed to include the names of the
NIEHS researchers as inventors on its patent application
and pay inventors' royalties, although no payments appear
to have been made as of 2005.  Id.

Following the isolation of *BRCA1*, scientists
continued to search for a second gene also believed to be
linked with breast and ovarian cancer.[19]  Parthasarathy
Decl. ¶ 12.  Myriad collaborated with several research
groups, including scientists at the University of Laval in
Quebec, Canada, the Hospital for Sick Children in Toronto,

---

[19] The same positional cloning approach utilized to isolate the *BRCA1*
gene was relied on to isolate the *BRCA2* gene.  Tavtigian Decl. ¶ 4.

Canada, and the University of Pennsylvania in their search for this second gene. It also collaborated with a team of researchers led by Dr. Stratton at the ICR which, in November 1995, identified a mutation in breast cancer patients that appeared to be located in the as-yet unpublished *BRCA2* gene. Dr. Stratton ended the collaboration with Myriad upon learning of Myriad's plans to patent the *BRCA2* gene sequence. Sulston Decl. ¶ 30.

On December 21, 1995, Myriad filed for patents on the *BRCA2* gene in both the U.S. and Europe. Tavtigian Decl. ¶ 5. The next day, the Stratton group published its identification of the *BRCA2* gene in the journal *Nature*, and Myriad submitted the sequence of *BRCA2* to GenBank, an international depository of gene sequence information. Parthasarathy Decl. ¶ 12; Tavtigian Decl. ¶ 9; Richard Wooster, et al., Identification of the Breast Cancer Susceptibility Gene *BRCA2*, 378 Nature 789-92 (1995). Subsequent analysis of the *BRCA2* sequence from the Stratton group indicated that while they had correctly sequenced the primary portion of the *BRCA2* gene, their published sequence had errors in both ends of the *BRCA2* gene. Tavtigian Decl. ¶¶ 7-10. Nonetheless, the consensus among the scientific community is that the Stratton group, rather than Myriad,

was the first to sequence the *BRCA2* gene.    Parthasarathy
Decl. ¶ 13.


The isolation of the *BRCA1/2* genes required
considerable effort on the part of Myriad and its
collaborators as well as ingenuity in overcoming technical
obstacles associated with the isolation process.    However,
the process and techniques used were well understood,
widely used, and fairly uniform insofar as any scientist
engaged in the search for a gene would likely have utilized
a similar approach.    Parthasarathy Decl. ¶ 19; Tavtigian
Decl. ¶ 13.


**D.    Application of the Patents-in-Suit**


Mutations in the *BRCA1/2* genes correlate with an
increased risk of breast and ovarian cancer.    Women with
*BRCA1* and *BRCA2* mutations face up to an 85% cumulative risk
of breast cancer, as well as up to a 50% cumulative risk of
ovarian cancer.    Love Decl. ¶ 10; Parthasarathy Decl. ¶ 9.
In addition, among the 10-15% of ovarian cancer cases that
are inherited genetically, 80% of women diagnosed under the
age of 50 carry mutations in their *BRCA1* genes and 20%
carry mutations in their *BRCA2* genes.    The women with

54

inherited *BRCA1* mutations have a 40-52% cumulative risk of ovarian cancer by the time they reach 70 years old. For women with inherited *BRCA2* mutations, the risk is approximately 15-25%. Swisher Decl. ¶ 11. Male carriers of mutations are also at an increased risk for breast and prostate cancer. Love Decl. ¶ 10.

The existence of *BRCA1/2* mutations is therefore an important consideration in the provision of clinical care for breast and/or ovarian cancer. A patient will not only learn of her risk for hereditary breast and ovarian cancer, but also can gain information that may be useful in determining prevention and treatment options. This information is useful for women who are facing difficult decisions regarding whether or not to undergo prophylactic surgery, hormonal therapy, chemotherapy, and other measures. Swisher Decl. ¶ 12; Love Decl. ¶ 11. Testing results for the *BRCA1/2* genes can be an important factor in structuring an appropriate course of cancer treatment, since certain forms of chemotherapy can be more effective in treating cancers related to *BRCA1/2* mutations. Swisher Decl. ¶ 13; Love Decl. ¶ 18.

### 1.   Myriad's *BRCA1/2* testing

Myriad offers multiple forms of *BRCA1/2* testing
to the general public.  Its standard test, called
Comprehensive BRACAnalysis, originally only consisted of
the full sequencing of the *BRCA1/2* genes.  Swisher Decl. ¶¶
29-30; Reich Decl. ¶ 10; Parthasarathy Decl. ¶ 26;
Critchfield Decl. ¶ 49.  In 2002, Myriad supplemented its
full sequencing analysis with a large rearrangement panel
("LRP") for detecting five common large rearrangement
mutations which is now included in the Comprehensive
BRACAnalysis.  Critchfield Decl. ¶¶ 49, 51.  In 2006,
Myriad began offering a supplemental test to Comprehensive
BRACAnalysis called the BRACAnalysis Rearrangement Test
("BART"), which, according to Myriad, can detect virtually
all large rearrangement mutations in the *BRCA1* and *BRCA2*
genes.[20]  Swisher Decl. ¶¶ 29-30; Reich Decl. ¶ 10;
Parthasarathy Decl. ¶ 26; Critchfield Decl. ¶ 51.

### 2.   Funding for Myriad's *BRCA1/2* tests

The Myriad tests are available to clinicians and

---

[20] Myriad also offers other more limited forms of *BRCA1/2* genetic
testing.  Swisher Decl. ¶¶ 29-30; Reich Decl. ¶ 10; Parthasarathy Decl.
¶ 26

patients at a cost of over $3000 per test.  In 2008, the
total cost to Myriad of providing these tests was $32
million with resulting revenues of $222 million.  See
Myriad Genetics, Inc., Annual Report (Form 10-K), at 27
(Aug. 28, 2008).  In Ontario, where the regional public
healthcare plan is ignoring Myriad's patent, the testing
for breast cancer is performed for a third of Myriad's
cost.  See CBC News, Ontario to Offer New Genetic Test for
Breast, Ovarian Cancer (Jan. 8, 2003), available at
http://www.cbc.ca/health/story/2003/01/06/test_genetic03010
6.html.

          Plaintiffs have noted several instances where
women have been unable to obtain funding for all of
Myriad's testing services.  For example, Myriad refused to
process Ms. Ceriani's sample because it did not accept
coverage by Ms. Ceriani's insurance carrier.  Unable to pay
for Myriad's tests, and unable to find scholarship programs
to fund her testing, Ms. Ceriani has not been tested.
Ceriani Decl. ¶¶ 5-7.  Ms. Fortune's insurance carrier is
not accepted by Myriad, and Ms. Fortune is also unable to
pay the full out-of-pocket cost of Myriad's test.  Fortune
Decl. ¶ 5.

Myriad's BART test is not covered by a number of insurers, and unless a patient is one of a limited number of "high risk patients" who meet certain clinical criteria established by Myriad, a patient must pay an extra fee for BART testing. Swisher Decl. ¶¶ 29-30; Reich Decl. ¶ 10; Parthasarathy Decl. ¶ 26; Critchfield Decl. ¶ 52. As a result of the cost of BART testing, the test is unavailable to women who would otherwise choose to utilize the test. Swisher Decl. ¶¶ 30-31; Reich Decl. ¶ 10. For example, Ms. Raker is unable to afford the extra cost for BART testing and has not been tested for large genomic rearrangements, despite the advice of her genetic counselor. Raker Decl. ¶¶ 7-11. Similarly, Ms. Thomason has been unable afford the BART testing recommended by her genetic counselor. Thomason Decl. ¶¶ 6-9.

Myriad has pursued Medicaid coverage for years, but has been unable to secure "participating provider" status in 25 states which would allow it to offer testing to that state's Medicaid patients. Myriad also has a financial assistance program which provides free testing to low-income and uninsured patients who meet certain economic and clinical requirements. In addition, Myriad provides free testing to independent non-profit institutions. In

particular, Ms. Ceriani may be eligible to receive
BRACAnalysis testing at no charge through the non-profit
organization Cancer Resource Foundation, for which Myriad
has provided free testing since 2009.  Rusconi Decl. ¶¶ 4-
6; Critchfield Decl. ¶ 33; Ogaard Decl. ¶¶ 4-6.  Currently,
90% of the tests Myriad performs are covered by insurance
at over 90% of the test cost.  Critchfield Decl. ¶¶ 32, 33,
52, 53.

A number of researchers, clinicians, and
molecular pathologists have the personnel, equipment, and
expertise to sequence and analyze genes, including the
BRCA1 and BRCA2 genes, at a lower cost than Myriad's
testing.  Kazazian Decl. ¶¶ 8, 11; Matloff Decl. ¶ 12;
Ostrer Decl. ¶¶ 8-9; Ledbetter Decl. ¶¶ 16-18.  For
example, the BRCA1/2 testing previously conducted by the
Yale DNA Diagnostics Laboratory and the University of
Pennsylvania Genetic Diagnostic Laboratory ("GDL") cost
less than what Myriad charges, and testing by OncorMed, a
one-time competitor, was cheaper than Myriad's testing.
Matloff Decl. ¶ 7; Kazazian Decl. ¶ 8; Parthasarathy Decl.
¶ 24.  However, on a "cost per exon" basis, Myriad's
BRACAnalysis test costs less than testing for other genes
performed by the GDL at the University of Pennsylvania and

59

Drs. Ledbetter and Warren at Emory University.    See infra;
Critchfield Decl. ¶ 35.


### 3.    Myriad's enforcement of the patents-in-suit


During the mid-to-late-1990s, Drs. Kazazian and
Ganguly offered, for a fee, screening services for BRCA1
mutations through the GDL at the University of
Pennsylvania.    Kazazian Decl. ¶ 4; Ganguly Decl. ¶ 3.    The
screening methodology utilized by Drs. Kazazian and Ganguly
differed from the testing method used by Myriad, but
involved using isolated DNA encoding BRCA1 or BRCA2.
Kazazian Decl. ¶ 9; Parthasarathy Decl. ¶ 23.    At some
point during this period, Dr. Skolnick advised Dr. Kazazian
that Myriad planned to stop the BRCA1/2 testing being
conducted at the GDL.    Kazazian Decl. ¶ 6.    On May 29,
1998, Myriad offered Dr. Kazazian a collaborative license
in connection with the '473, '999, '001, '282, and '441
patents.    Ganguly Decl. Ex. 2.    However, the license
covered only single mutation tests and multiple mutation
panels of up to four mutations to allow for testing of
patients of Ashkenazi Jewish descent.    Ganguly Decl. ¶ 5.
Myriad subsequently sent cease and desist letters to Dr.

60

Kazazian and the University of Pennsylvania. On August 26, 1998, O'Melveny & Myers LLP gave notice to Dr. Kazazian of infringement in the absence of a license. Ganguly Decl. Ex. 3. Myriad subsequently sued the University of Pennsylvania in November 1998 for infringement of the patents-in-suit. See Myriad Genetics v. Univ. of Pennsylvania, 2:98-cv-00829 (D. Utah) (filed November 19, 1998). On June 10, 1999, Myriad's general counsel, Christopher Wright, sent a letter to the University of Pennsylvania seeking written assurances that Dr. Kazazian and the University of Pennsylvania had ceased BRCA1/2 clinical testing. Ganguly Decl. Ex. 4. This demand was repeated in a September 22, 1999 letter from Myriad to the University of Pennsylvania. Ganguly Decl. Ex. 6.

As a result of Myriad's efforts to enforce its patents against the University of Pennsylvania, the GDL no longer conducts BRCA1/2 screening for research or as part of its clinical practice. Kazazian Decl. ¶ 5; Ganguly Decl. ¶¶ 8-9; Parthasarathy Decl. ¶ 28. However, sometime between 1999 and 2000, Dr. Critchfield, on behalf of Myriad, informed Dr. Kazazian that he is free to conduct academic research on the BRCA1/2 genes, including

61

sequencing the genes and detecting mutations in the genes.
Critchfield Decl. ¶ 22.

In May 1998, Myriad offered Dr. Ostrer a license
agreement to conduct diagnostic *BRCA1/2* genetic testing.
The proposed license would permit Dr. Ostrer to conduct
single mutation tests and multiple mutation panels (up to
four mutations) for patients of Ashkenazi Jewish descent
only.  Dr. Ostrer declined the offer as too narrow to allow
him to perform any meaningful *BRCA1/2* testing.  Ostrer
Decl. ¶ 7.

On September 15, 1998, Myriad also notified Dr.
Barbara Weber ("Dr. Weber"), a principal investigator on
the Cancer Genetics Network Project ("CGNP") sponsored by
the National Cancer Institute ("NCI"), that Myriad's patent
position might impact research sponsored by NCI.  As a
result of that letter, the GDL at the University of
Pennsylvania ceased conducting *BRCA1/2* analysis for Dr.
Weber.  Ganguly Decl. ¶ 12, Ex. 7.  According to Myriad,
the GDL's involvement in CGNP was to provide DNA testing on
*BRCA1/2* genes for a fee, similar to the activity of any
commercial core lab.  Critchfield Decl. ¶ 21.  In September
1999, Myriad also requested that Georgetown University, one

62

of the other cancer centers participating in the CGNP, to
cease sending genetic samples to the GDL for *BRCA1/2*
analysis.  Ganguly Decl. ¶ 13.

    In December 2000, the director of the Yale DNA
Diagnostics Lab received a cease and desist letter
concerning *BRCA1/2* genetic testing being conducted by the
lab.  As a result of the letter, the lab ceased *BRCA1/2*
genetic testing.  Matloff Decl. ¶ 7.  In 2005, Dr. Matloff
sought permission from Myriad for the Yale DNA Diagnostics
Lab to conduct screening for mutations caused by large
rearrangements, which Myriad was not conducting at the
time.  Her request was denied.  Matloff Decl. ¶ 8.

    Myriad was also involved in a series of lawsuits
in the late 1990s against Oncormed, another company
undertaking *BRCA*-related testing, regarding patents that
covered various aspects of the *BRCA1* gene sequence.
Parthasarathy Decl. ¶ 27.  Myriad eventually purchased
Oncormed's patents and testing services in 1998.  Id.

### E.    Disputed Issues

63

## 1. The impact of Myriad's patents on BRCA1/2 testing

According to Plaintiffs, Myriad's patents and its position as the sole provider of BRCA1/2 testing has hindered the ability of patients to receive the highest-quality breast cancer genetic testing and has impeded the development of improvements to BRCA1/2 genetic testing. Plaintiffs first note deficiencies in the genetic testing services offered by Myriad, alleging that in the several years prior to the addition of the LRP, the testing done by Myriad did not reveal all known mutations in the BRCA1/2 genes or utilize known methodologies that would have revealed these additional mutations.[21] Chung Decl. ¶ 19; Matloff Decl. ¶ 8; Swisher Decl. ¶ 26; Ledbetter Decl. ¶ 16; Parthasarathy Decl. ¶ 29. As a result, Myriad's test may have reported false negative results during this period. Plaintiffs also cite a study published in 2006 in the Journal of the American Medical Association that concluded that 12% of those from high risk families with breast cancer and with negative test results from Myriad carried cancer-predisposing genomic deletions or duplications in one of those genes. Swisher Decl. ¶¶ 25-

---

[21] For example, the Myriad test received by Ms. Thomason, Ms. Raker, and Ms. Limary did not look for all known large rearrangements in the BRCA genes. Thomason Decl. ¶ 6; Raker Decl. ¶¶ 7-8; Limary Decl. ¶ 7.

26.  Plaintiffs also note that the sensitivity and
specificity of the BART test has not been validated by
comparing the results of BART testing with Multiplex
Ligation Dependent Probe Amplification ("MLPA") testing
commonly used by researchers.  Swisher Decl. ¶¶ 32, 33.

    According to Plaintiffs, other labs are in a
position to offer more comprehensive testing than Myriad's
standard testing services and would use newer testing
methods with improved testing quality and efficiency.
These labs would also include large rearrangement testing
after a negative test result is received from full
sequencing.  Ledbetter Decl. ¶¶ 17-18; Chung Decl. ¶ 18;
Ostrer Decl. ¶ 9.  In addition, labs would perform genetic
testing on tumor specimens preserved in paraffin from
deceased family members, which Myriad does not regularly
perform even though, according to Plaintiffs, such testing
can often provide valuable genetic information for living
relatives and is often necessary for accurate test
interpretation.  Chung Decl. ¶ 24.

    According to Myriad, however, its full
sequencing test has been recognized as the "gold standard"
for *BRCA1/2* mutation testing, and it continues to improve

65

its testing process.  Critchfield Decl. ¶ 37.  Myriad

contends that it researched and developed a commercially

viable high quality test for detecting large rearrangements

as soon as it and the research community recognized the

need for such testing, and continues work towards a test

capable of detecting all large rearrangement mutations,

including extremely rare ones.  Critchfield Decl. ¶¶ 49,

50.  According to Myriad, *BRCA1/2* studies conducted by

outside researchers confirmed that the BART test exhibited

superior performance over other methods for mutation

detection, including the MLPA kit often used by academic

researchers.[22]  Critchfield Decl. ¶ 51.


According to Plaintiffs, the lack of independent

*BRCA1/2* analysis also undermines the ability of the

scientific community to determine the meaning of VUS

results, which are reported disproportionately for members

of minority groups, and whose significance would be more

extensively analyzed by other labs.  Chung Decl. ¶ 20-21;

Ostrer Decl. ¶ 12; Matloff Decl. ¶ 9.  Myriad, however,

asserts that it has undertaken significant efforts to

determine the clinical importance of VUSs by establishing

---

[22] In addition, Myriad states that the MLPA kit is for research use
only, is not approved for clinical testing by the FDA, and is incapable
of detecting certain smaller rearrangements.  Critchfield Decl. ¶¶ 49,
50.

an in-house review committee for variant classification and

developing a systematic approach to providing clinical

interpretations for detected sequence variants based·on

generally accepted scientific data and analysis of its own

database.  In addition, clarification of any VUS previously

reported to a patient is immediately provided to the

patient and her doctor.  According to Myriad, the VUS

reporting rate has decreased markedly, with a 50% decrease

in major ethnic groups between 2002 and 2006, and a total

of 850 VUSs for about 21,000 patients have been clarified,

including 502 VUSs for 13,127 patients since the beginning

of 2008.  Myriad also asserts that it has made critical

data available to researchers to assist in the analysis of

VUSs and which have the potential of improving the

diagnostic testing for other genes.  Critchfield Decl. ¶¶

57-59.


            Plaintiffs contend that as a result of the

patents-in-suit, *BRCA1/2* genetic testing is one of the very

few tests performed as part of breast cancer care and

prevention for which a doctor or patient cannot get a

second confirmatory test done through another laboratory.

Love Decl. ¶ 12.  In particular, women who receive a

positive result cannot confirm the lab's findings or seek a

67

second opinion on the interpretation of those results.[23]
Ledbetter Decl. ¶ 23; Ostrer Decl. ¶ 11.  According to
Myriad, absent any doubts regarding the accuracy of the
original test, resequencing the patient's genes by another
laboratory would be an unnecessary waste of resources, and
Myriad has never prohibited a second interpretation of the
results of its diagnostic tests.  Critchfield Decl. ¶ 64;
Reilly Decl. ¶¶ 54, 55.  In addition, there are multiple
laboratories available to conduct confirmatory *BRCA1/2*
testing pursuant to patent licenses granted by Myriad,
including both the University of Chicago Genetic Services
Laboratories and Yale DNA Diagnostic Laboratories.
Critchfield Decl. ¶ 62.  That confirmatory testing,
however, is limited to the confirmation of certain,
specific positive test results; the remaining types of
positive test results as well as all negative test results
are excluded from such testing services.  Matloff Decl. ¶¶
9, 10.

           Whether the patents at issue impact the testing

---

[23] For example, Ms. Girard sought but was unable to obtain confirmatory
testing of her Myriad test results that indicated the presence of a
deleterious mutation in her *BRCA2* gene.  A second opinion would also be
important for her immediate family's screening options.  Girard Decl.
¶¶ 4-9.  Similarly, Ms. Ceriani and Ms. Fortune would both want a
second opinion concerning their *BRCA1/2* status before taking major
surgical steps.  Ceriani Decl. ¶¶ 9, 11; Fortune Decl. ¶ 7.

for *BRCA1/2* mutations favorably or unfavorably is an issue
of factual dispute not resolvable in the context of the
instant motions.

### 2.    The impact of gene patents on the advancement of science and medical treatment

There exists a deep disagreement between the
parties concerning the effects of gene patents on the
progression of scientific knowledge.

According to Plaintiffs, data sharing is the key
to the future of genetic discoveries and bioinformatics,
and gene patents impede research aimed at identifying the
role of genes in medical conditions.  Sulston Decl. ¶¶ 36,
38.  Plaintiffs assert that this understanding has wide
acceptance, noting that from the beginning of the Human
Genome project,[24] most scientists and even some private
companies recognized the importance of keeping the genome
freely available to all.  For example, in 1994, the
pharmaceutical company Merck funded a massive drive to
generate gene sequences and place them into public

---

[24] The Human Genome Project was an international project initiated in
1990 with the aim of sequencing an entire human genome and in which Sir
John Sulston, a Nobel laureate, actively participated.  Sulston Decl.
¶¶ 5, 22.

69

databases, thereby making them difficult to patent.
Sulston Decl. ¶¶ 22, 29.  In 1996, a group of 50 of the
most prominent geneticists who were involved with the
sequencing of the human genome adopted the Bermuda
principles which included the mandate that all "human
genome sequence information should be freely available and
in the public domain in order to encourage research and
development and to maximize its benefit to society."
Sulston Decl. ¶ 33.  The proliferation of intellectual
property rights directed to genetic material has also been
postulated to contribute to a phenomenon dubbed "the
tragedy of the anti-commons," in which numerous competing
patent rights held by independent parties prevents any one
party from engaging in productive innovation.  See, e.g.,
Michael A. Heller & Rebecca S. Eisenberg, Can Patents Deter
Innovation?  The Anticommons in Biomedical Research, 280
Science 698 (1998) (citing Michael A. Heller, The Tragedy
of the Anticommons: Property in the Transition from Marx to
Markets, 111 Harv. L. Rev. 621 (1998)).


     According to Dr. Fiona Murray ("Dr. Murray"), who
received a grant to research the impact of gene patenting
on scientific research and commercialization, 4382 of the
23,688 genes listed in the database of the National Center

for Biotechnology Information ("NCBI") - nearly 20% of
human genes - are explicitly claimed as United States
intellectual property.  Murray Decl. ¶ 6.  After devising a
study to gauge the impact of gene patenting on public
knowledge that utilized the time lag between publication of
papers on a gene sequence and the issuance of a patent
claiming that gene sequence, Dr. Murray concluded that the
Myriad patents have negatively impacted the public
knowledge of the *BRCA1* and *BRCA2* genes by 5-10%.  Murray
Decl. ¶¶ 7-15, 20.

    Plaintiffs have cited other studies to
demonstrate the chilling effect of gene patents on the
advancement of both genetic research and clinical testing.
A survey of laboratory directors in the United States
conducted by Dr. Mildred Cho (the "Cho study") found that
53% decided not to develop a new clinical test because of a
gene patent or license, and 67% believed that gene patents
decreased their ability to conduct research.  Cho Decl. ¶
10.  This correlated with a study conducted by the American
Society of Human Genetics that reported that 46% of
respondents felt that patents had delayed or limited their
research.  Cho Decl. ¶ 11.  The Cho study also revealed
that of those who stopped performing a clinical test

71

because of a gene patent or license, the largest number
stopped doing *BRCA1* and *BRCA2* testing (with the same number
having stopped Apolipoprotein E testing). Cho Decl. ¶ 16.
Specifically, the survey found that nine labs had ceased
performing *BRCA1/2* genetic testing as a result of the
patents-in-suit. In addition to labs that have ceased
performing *BRCA1/2* genetic testing, labs have avoided or
refrained from developing tests for *BRCA1* and *BRCA2* as a
result of the patents held by Myriad. Ostrer Decl. ¶ 6;
Ledbetter Decl. ¶¶ 14-16. Studies of other gene patents
have also revealed that labs frequently stop developing or
offering clinical tests for disease as a result of gene
patents. For example, a purportedly valid scientific
survey of labs in the United States found a 26% drop in the
number of labs performing testing for hemochromatosis as a
result of gene patents. Cho Decl. ¶¶ 18-20.


        Researchers, clinicians, and pathologists are
aware that Myriad has sent cease and desist letters in
connection with the patents-in-suit and that Myriad
prohibits clinical testing of the *BRCA1/2* genes. Kazazian
Decl. ¶¶ 5-11; Ganguly Decl. ¶¶ 4-14; Chung Decl. ¶ 15;
Hegde Decl. ¶ 10; Matloff Decl. ¶¶ 5-7; Ostrer Decl. ¶¶ 4-
7; Swisher Decl. ¶ 28; Hubbard Decl. ¶¶ 7-8; Kant Decl. ¶

4; Ledbetter Decl. ¶ 13; Reich Decl. ¶¶ 3, 5; Parthasarathy
Decl. ¶¶ 28-31.  Myriad also does not permit researchers to
tell patients involved in research the results of their
*BRCA1/2* testing, leading physicians involved in breast
cancer care and research unable to meet their ethical
obligations to provide genetic test results to research
subjects, when requested.  Ostrer Decl. ¶ 10; Chung Decl. ¶
13, 14.  In addition to the direct benefits to the patient
of knowing the results of their testing, such disclosure
would also provide valuable insights into patient behavior
that would enhance patient care.  Ostrer Decl. ¶ 10.  The
AMA has also expressed its belief that the "[t]he use of
patents . . . or other means to limit the availability of
medical procedures places significant limitation on the
dissemination of medical knowledge, and is therefore
unethical."  American Medical Association, Opinion 9.095 -
The Use of Patents and Other Means to Limit Availability of
Medical Procedures, (adopted June 1995), available at
http://www.ama-assn.org/ama/pub/physician-
resources/medical-ethics/code-medical-
ethics/opinion9095.shtml.  In addition, others have argued
that human genes are the common heritage of mankind whose
use should not be restricted by patent grants.  See, e.g.,
Pilar A. Ossorio, The Human Genome as Common Heritage:

Common Sense or Legal Nonsense?, 35 J.L. Med. & Ethics 425, 426 (2007); Melissa L. Sturges, Who Should Hold Property Rights to the Human Genome?  An Application of the Common Heritage of Humankind, 13 Am. U. Int'l L. Rev. 219, 245 (1997); Barbara Looney, Should Genes Be Patented?  The Gene Patenting Controversy: Ethical and Policy Foundations of an International Agreement, 26 Law & Pol'y Int'l Bus. 231 (1994); Hubert Curien, The Human Genome Project and Patents, 254 Science 1710, 1710-12 (1991).

According to Plaintiffs, Myriad has withheld critical data concerning genetic predisposition to breast cancer from the Breast Cancer Information Core ("BIC"), an international, open access online database that is a central repository for information about the BRCA1/2 genes and their genetic variants.  The BIC facilitates the identification of deleterious mutations (i.e. those associated with a higher risk of cancer), provides a mechanism to collect and distribute data about genetic variants, and plays an important role in helping to elucidate the significance of those variants through its collection of data.  Swisher Decl. ¶¶ 15, 17, 18; Chung Decl. ¶ 22; Ostrer Decl. ¶ 13.  Although the value of the BIC comes from the amount and quality of data provided by

the scientific community, Myriad, according to Plaintiffs,
has not contributed any data to BIC in the past two years.
Sulston Decl. ¶ 36; Swisher Decl. ¶¶ 19-21; Ostrer Decl. ¶¶
12-13; Chung Decl. ¶¶ 21-22; Ledbetter Decl. ¶ 20.

        Plaintiffs also assert that gene patents impede
the development of improved genetic testing.  For example,
as new sequencing technologies offer the possibility of
faster and less expensive sequencing of a patient's genes,
patents on one or more genes may impede scientists' ability
to develop a comprehensive test for complex diseases or
provide a person with an analysis of his or her entire
genome.  Sulston Decl. ¶ 38; Ledbetter Decl. ¶ 24.  In
addition, Plaintiffs assert that gene patents interfere
with the ability of physicians and researchers to
investigate complex diseases.  For example, *BRCA1/2* may be
associated with cancers other than breast and ovarian
cancer, but so long as the patents on these genes remain,
no one will be able to include these genes in tests for
other disease predispositions.  Ledbetter Decl. ¶¶ 24-25.
Gene patents similarly impede the development and
improvement of tests for diseases by geneticists.
Ledbetter Decl. ¶¶ 14-15.  Plaintiffs also assert that
allowing only a single lab to offer testing means that the

one lab dictates the standards for patient care in testing

for that disease; in contrast, patient care is promoted

when more than one lab offers a particular genetic test,

utilizing different methodologies, since this can ensure

the quality of the testing and accuracy of the test

results.  Chung Decl. ¶ 23; Ledbetter Decl. ¶ 23; Reich

Decl. ¶¶ 9, 11; Ostrer Decl. ¶ 11; Parthasarathy Decl. ¶

31.

Plaintiffs further assert that gene patents are

not necessary to create incentives for initial discoveries

or the development of commercial applications, including

diagnostic tests.  Cho Decl. ¶ 25; Leonard Decl. ¶¶ 20-21.

Patents have not been necessary for the rapid introduction

of genetic testing, as evidenced by genetic testing that

has been offered prior to the issuance of a patent.  Cho

Decl. ¶ 21.  In support of this assertion, Plaintiffs cite

a study of gene patents issued in the United States for

genetic diagnostics that showed that 67% of these patents

were issued for discoveries funded by the U.S. government.

Cho Decl. ¶ 22.  Similarly, another study showed that 63%

of patents on gene sequences resulted from federally

supported research.  Leonard Decl. ¶ 22.  As previously

noted, the NIH provided $2 million in research grants to

the University of Utah, or approximately one-third of the

total funding, for the identification of the *BRCA1*

sequence.  Parthasarathy Decl. ¶ 18.


        Myriad has contested these assertions and

disputes the idea that patenting of isolated human DNA

conflicts with the advancement of science.  According to

Myriad, the quid pro quo of the patent system is that

inventors, in exchange for a limited period of patent

exclusivity, must provide a sufficient description of the

patented invention so that others may improve upon it.

Reilly Decl. ¶ 24; Doll Decl. ¶ 44.  Furthermore, according

to Myriad, its policy and practice has been and still is to

allow scientists to conduct research studies on *BRCA1* and

*BRCA2* freely, the result of which has been the publication

of over 5,600 research papers on *BRCA1* and over 3,000

research papers on *BRCA2*, representing the work of over

18,000 scientists.  Critchfield Decl. ¶¶ 3, 13; Li Decl. ¶¶

3-6; Baer Decl. ¶¶ 3-6; Parvin Decl. ¶¶ 3-6; Sandbach Decl.

¶¶ 3-7.


        According to Myriad, patents on isolated DNA,

including the patents-in-suit, actually promote research

and advance clinical development to the benefit of

patients.  Reilly Decl. ¶¶ 38, 43; Critchfield Decl. ¶¶ 2-
18, 65, 68; Linck Decl. ¶¶ 27-28, 71, 73; Tavtigian Decl.
¶¶ 14-17; Doll Decl. ¶¶ 45-46; Schlessinger Decl. ¶¶ 31-32.
Myriad has contended that gene patents are essential for
obtaining capital investment in the development and
commercialization of technological breakthroughs.  Linck
Decl. ¶¶ 27, 28; Reilly Decl. ¶ 16; Doll Decl. ¶ 46.  In
support, Myriad has cited a survey published in 2009 by the
BIO of 150 biotechnology member companies in the
therapeutic and diagnostic healthcare industry stating that
the majority of companies (61%) generally in-licensed
projects that are in the pre-clinical or Phase I stage of
development, and thus still require substantial R&D
investment and commercialization risk by the licensee.  A
substantial majority (77%) of the respondents without
approved products indicated that they expect to spend 5-15
years and over $100 million developing a commercial
product.  Myriad asserts that these expenditures dwarf any
initial research funding by the federal government.  Reilly
Decl. ¶ 22.  In particular, Myriad notes that a significant
amount of private investment led to its identification of
the *BRCA1* and *BRCA2* sequences, with the expectation of
patent protection providing an incentive to fund the
research into the determination of the gene sequences.

Skolnick Decl. ¶¶ 14-16.  Therefore, Myriad asserts that absent the promise of a period of market exclusivity provided by patents and the infusion of venture and risk capital derived therefrom, companies such as Myriad that capitalize on innovation simply would not be created and their products would not be brought to market or the clinic.  Reilly Decl. ¶¶ 18, 34, 51, 52, 62; Critchfield Decl. ¶¶ 67, 68; Linck Decl. ¶ 73.

Myriad also notes that it has made over 20,000 submissions to the BIC database, making it the largest contributor to the database.  It has also published the largest clinical series of mutation risk in the *BRCA1/2* genes based on its testing data and has tabulated and posted the data on Myriad's website, where it is freely available to researchers throughout the world.  Critchfield Decl. ¶¶ 11, 12.

According to Myriad, the majority of academic researchers operating laboratories (as opposed to Clinical Laboratory Improvement Amendments ("CLIA")-certified laboratories) do not believe that they should share test results with subjects outside of the standard clinical setting.  Reilly Decl. ¶¶ 57-59.

79

As the declarations submitted by the parties make clear, there exists a sharp dispute concerning the impact of patents directed to isolated DNA on genetic research and consequently the health of society.  As with the dispute concerning the effect of the patents-in-suit on *BRCA1/2* genetic testing, the resolution of these disputes of fact and policy are not possible within the context of these motions.

## IV.  THE PATENTS

### A. Summary of the Patents

The subjects of this declaratory judgment action are fifteen claims contained in seven patents issued by the USPTO:[25] claims 1, 2, 5, 6, 7, and 20 of U.S. patent 5,747,282 (the "'282 patent"); claims 1, 6, and 7 of U.S. patent 5,837,492 (the "'492 patent"); claim 1 of U.S. patent 5,693,473 (the "'473 patent"); claim 1 of U.S. patent 5,709,999 (the "'999 patent"); claim 1 of U.S.

---

[25] The USPTO granted these patents pursuant to a formal written policy that permits the patenting of "isolated and purified" DNA encoding human genes and pursuant to a practice that permits such DNA patents and the patenting of correlations created by nature between natural elements of the body and a predisposition to disease. See Utility Examination Guidelines, 66 Fed. Reg. 1,093 (Jan. 5, 2001).

patent 5,710,001 (the "'001 patent"); claim 1 of U.S.

patent 5,753,441 (the "'441 patent"); and claims 1 and 2 of

U.S. patent 6,033,857 (the "'857 patent").[26]

The claims-in-suit may be divided into two types

of claims: composition claims and method, or process,

claims.   Independent claim 1 of the '282 patent is

representative of the group of composition claims and

claims:

> An isolated DNA coding for a BRCA1
> polypeptide, said polypeptide having
> the amino acid sequence set forth in
> SEQ ID NO:2.

This claim is therefore directed to an isolated DNA

molecule possessing a nucleotide sequence that translates

into the BRCA1 protein.   Because most amino acids can

result from the translation of more than one DNA codon,

multiple DNA sequences correspond to the nucleotide

sequence claimed by this claim.   Claim 2 of the '282 patent

is dependent on claim 1 but contains an additional

limitation that identifies the specific *BRCA1* nucleotide

---

[26] For purposes of understanding what the claim terms would have meant
to a person of ordinary skill in the art at the time of the application
for the patents, an application date of August 1994 is presumed for the
'282, '473, '999, '001, and '441 patents and December 1995 for the '492
and '857 patents.

sequence of the claimed DNA.[27]  Claims 5 and 6 of the '282

patent are directed to fragments as short as 15 nucleotides

of the DNA molecules claimed in claims 1 and 2 of the '282

patent.[28]  Finally, claim 7 of the '282 patent and claim 1

of the '473 patent are directed to isolated DNA possessing

one of the specified mutant *BRCA1* gene sequences.[29]

        Claims 1, 6, and 7 of the '492 patent are also

composition claims covering isolated DNA molecules

containing certain specified nucleotide sequences relating

to the *BRCA2* gene.  Claim 1 is directed to an isolated DNA

molecule encoding the BRCA2 protein.[30]  Like claim 1 of the

'282 patent, claim 1 of the '492 patent is directed to

multiple possible DNA sequences as a result of the

---

[27] Claim 2 of the '282 patent reads: "The isolated DNA of claim 1,
wherein said DNA has the nucleotide sequence set forth in SEQ ID NO:1.
[28] Claim 5 of the '282 patent claims: "An isolated DNA having at least
15 nucleotides of the DNA of claim 1."
Claim 6 of the '282 patent reads: "An isolated DNA having at least 15
nucleotides of the DNA of claim 2."
[29] Claim 7 of the '282 patent reads: "An isolated DNA selected from the
group consisting of: (a) a DNA having the nucleotide sequence set forth
in SEQ ID NO:1 having T at nucleotide position 4056; (b) a DNA having
the nucleotide sequence set forth in SEQ ID NO:1 having an extra C at
nucleotide position 5385; (c) a DNA having the nucleotide sequence set
forth in SEQ ID NO:1 having G at nucleotide position 5443; and (d) a
DNA having the nucleotide sequence set forth in SEQ ID NO:1 having 11
base pairs at nucleotide positions 189-199 deleted."
Claim 1 of the '473 patent reads: "An isolated DNA comprising an
altered BRCA1 DNA having at least one of the alterations set forth in
Tables 12A, 14, 18 or 19 with the proviso that the alteration is not a
deletion of four nucleotides corresponding to base numbers 4184-4187 in
SEQ. ID. NO:1."
[30] Claim 1 of the '492 patent reads: "An isolated DNA molecule coding
for a BRCA2 polypeptide, said DNA molecule comprising a nucleic acid
sequence encoding the amino acid sequence set forth in SEQ ID NO:2."

redundancy of the DNA codons.  Claim 6 of the '492 patent,

however, is considerably broader than claim 1 and is

directed to any DNA nucleotide encoding any mutant BRCA2

protein that is associated with a predisposition to breast

cancer.[31]  Claim 7 of the '492 patent depends on claim 6,

but is restricted to the mutated forms of the *BRCA2*

nucleotide sequence set forth in the specification.[32]  As a

result of the breadth of these composition claims, they

reach isolated *BRCA1/2* DNA obtained from any human being.

        Claim 1 of the '999 patent is representative of

the group of method claims.  It claims:

                A method for detecting a germline
                alteration in a BRCA1 gene, said
                alteration selected from a group
                consisting of the alterations set forth
                in Tables 12A, 14, 18, or 19 in a human
                which comprises analyzing a sequence of
                a BRCA1 gene or BRCA1 RNA from a human
                sample or analyzing a sequence of BRCA1
                cDNA made from mRNA from said human
                sample with the proviso that said
                germline alteration is not a deletion
                of 4 nucleotides corresponding to base
                numbers 4184-4187 of SEQ ID NO:1.

---

[31] Claim 6 of the '492 patent reads: "An isolated DNA molecule coding
for a mutated form of the BRCA2 polypeptide set forth in SEQ ID NO:2,
wherein said mutated form of the BRCA2 polypeptide is associated with
susceptibility to cancer."
[32] Claim 7 of the '492 patent reads: "The isolated DNA molecule of claim
6, wherein the DNA molecule comprises a mutated nucleotide sequence set
forth in SEQ ID cNO:1."

Thus, claim 1 of the '999 patent covers the process of
identifying the existence of certain specific mutations in
the *BRCA1* gene by "analyzing" the sequence of the *BRCA1*
DNA, RNA, or cDNA made from *BRCA1* RNA obtained from a human
sample.

Most of the remaining method claims-in-suit are
similarly structured and directed to the comparison of gene
sequences. Claim 1 of the '001 patent claims a method for
determining whether a human tumor sample contains a
mutation in the *BRCA1* gene by "comparing" the sequence of
the *BRCA1* gene from the tumor with the sequence of the
*BRCA1* gene from a non-tumor sample from the same person.[33]
Claim 1 of the '441 patent and claim 1 of the '857 are both
directed to the same process, differing only as to whether
the claimed method is directed to *BRCA1* ('441) or *BRCA2*
('857). Both of these independent claims are directed to
the process of determining whether an individual has

---

[33] Claim 1 of the '001 patent reads: "A method for screening a tumor
sample from a human subject for a somatic alteration in a BRCA1 gene in
said tumor which comprises gene comparing a first sequence selected
form [sic] the group consisting of a BRCA1 gene from said tumor sample,
BRCA1 RNA from said tumor sample and BRCA1 cDNA made from mRNA from
said tumor sample with a second sequence selected from the group
consisting of BRCA1 gene from a nontumor sample of said subject, BRCA1
RNA from said nontumor sample and BRCA1 cDNA made from mRNA from said
nontumor sample, wherein a difference in the sequence of the BRCA1
gene, BRCA1 RNA or BRCA1 cDNA from said tumor sample from the sequence
of the BRCA1 gene, BRCA1 RNA or BRCA1 cDNA from said nontumor sample
indicates a somatic alteration in the BRCA1 gene in said tumor sample."

inherited an altered *BRCA1* or *BRCA2* gene by "comparing" the individual's *BRCA1* or *BRCA2* gene sequence with the wild-type *BRCA1* or *BRCA2* gene sequence.[34]  Claim 2 of the '857 patent covers a method for determining whether an individual has a predisposition for breast cancer by "comparing" the individual's *BRCA2* gene sequence with the known wild-type *BRCA2* gene sequence.[35]

Finally, claim 20 of the '282 patent claims a method for determining the effectiveness of a potential cancer therapeutic comprising growing cells carrying an altered *BRCA1* gene known to cause cancer in the presence and absence of a potential cancer therapeutic, comparing the growth rates of the cells, and concluding that a slower

---

[34] Claim 1 of the '441 patent reads: "A method for screening germline of a human subject for an alteration of a BRCA1 gene which comprises comparing germline sequence of a BRCA1 gene or BRCA1 RNA from a tissue sample from said subject or a sequence of BRCA1 cDNA made from mRNA from said sample with germline sequences of wild-type BRCA1 gene, wild-type BRCA1 RNA or wild-type BRCA1 cDNA, wherein a difference in the sequence of the BRCA1 gene, BRCA1 RNA or BRCA1 cDNA of the subject from wild-type indicates an alteration in the BRCA1 gene in said subject." Claim 1 of the '857 patent claims: "A method for identifying a mutant BRCA2 nucleotide sequence in a suspected mutant BRCA2 allele which comprises comparing the nucleotide sequence of the suspected mutant BRCA2 allele with the wild-type BRCA2 nucleotide sequence, wherein a difference between the suspected mutant and the wild-type sequences identifies a mutant BRCA2 nucleotide sequence."

[35] Claim 2 of the '857 patent reads: "A method for diagnosing a predisposition for breast cancer in a human subject which comprises comparing the germline sequence of the BRCA2 gene or the sequence of its mRNA in a tissue sample from said subject with the germline sequence of the wild-type BRCA2 gene or the sequence of its mRNA, wherein an alteration in the germline sequence of the BRCA2 gene or the sequence of its mRNA of the subject indicates a predisposition to said cancer."

growth rate in the presence of the potential therapeutic
indicates that it is indeed a cancer therapeutic.[36]

## B.   Construction of the Claims[37]

### 1.   Legal standard

Before considering the patent-eligibility of a
patent claim, the disputed terms in the claims must be
construed in order ensure the scope of the claims is
accurately assessed.  See, e.g., Datamize, LLC v. Plumtree
Software, Inc., 417 F.3d 1342, 1354 (Fed. Cir. 2005) ("[A]
utility patent protects 'any new and useful process,
machine, manufacture, or composition of matter, or any new
or useful improvement thereof,' 35 U.S.C. § 101 (2000), the
scope of which is defined by the patent's written
claims.").  Courts are charged with interpreting disputed

---

[36] Claim 20 of the '282 patent reads: "A method for screening potential
cancer therapeutics which comprises: growing a transformed eukaryotic
host cell containing an altered BRCA1 gene causing cancer n the
presence of a compound suspected of being a cancer therapeutic, growing
said transformed eukaryotic host cell in the absence of said compound,
determining the rate of growth of said host cell in the presence of
said compound and the rate of growth of said host cell in the absence
of said compound and comparing the growth rate of said host cells,
wherein a slower rate of growth of said host cell in the presence of
said compound is indicative of a cancer therapeutic."
[37] In addition to the claim terms discussed below, the parties also
dispute the proper interpretation of the method claims - i.e., whether
they may be construed to encompass certain transformative steps.
Because this issue is broader in scope than simple claim term
definition, it is addressed infra in Section VII.D.

86

claim terms as a matter of law.  Markman v. Westview

Instruments, Inc., 517 U.S. 370, 384-85 (1996).

    In interpreting the meaning of claim terms,

"words of a claim are generally given their ordinary and

customary meaning" to a person of ordinary skill in the art

at the time of invention (i.e., the effective filing date

of the patent application).  Phillips v. AWH Corp., 415

F.3d 1303, 1312-13 (Fed. Cir. 2005) (internal citations and

quotation marks omitted).  "Importantly, the person of

ordinary skill in the art is deemed to read the claim term

not only in the context of the particular claim in which

the disputed term appears, but in the context of the entire

patent, including the specification."  Id. at 1313.  Thus,

the Federal Circuit has emphasized the importance of

"intrinsic" evidence in claim construction: the words of

the claim themselves, the written description in the

patent's specification, and, when necessary, the history of

the patent application's prosecution before the USPTO.  Id.

at 1314-17.

    The process of claim construction begins with the

language of the claims themselves.  The language of the

claim is what the patentee chose to use to "'particularly

87

point[] out and distinctly claim[] the subject matter which
the applicant regards as his invention.'" Id. at 1311-12
(quoting 35 U.S.C. § 112, ¶ 2).  Thus, "the claims
themselves provide substantial guidance as to the meaning
of particular claim terms." Id. at 1314.  In addition to
the particular claim being examined, the context provided
by other claims may be helpful as well.  "For example, the
presence of a dependent claim that adds a particular
limitation gives rise to a presumption that the limitation
in question is not present in the independent claim." Id.
at 1314-15.


               Claim language must also be read in the context
of the specification. Id. at 1315.  As the Federal Circuit
has made clear, "claims, of course, do not stand alone.
Rather, they are part of 'a fully integrated written
instrument,' consisting principally of a specification that
concludes with the claims." Id. (quoting Markman v.
Westview Instruments, Inc., 52 F.3d 967, 978 (Fed. Cir.
1995)).  "For that reason, claims 'must be read in view of
the specification, of which they are a part.'" Id.
(quoting Markman, 52 F.3d at 979).  The specification "is
always highly relevant to the claim construction analysis.
Usually it is dispositive; it is the single best guide to

the meaning of a disputed term." Id. (quoting Vitronics
Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir.
1996)).  Moreover, when the patentee "act[s] as his or her
own lexicographer" and includes an explicit definition of a
claim term in the specification, that definition is
dispositive over any ordinary meaning. Id. at 1319
(internal citation and quotation marks omitted); see also
Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335,
1344 (Fed. Cir. 1998).

　　　　　In relying on the specification to interpret
claim terms, the Federal Circuit has also "repeatedly
warned against confining the claims" to the embodiments
described in the specification. Phillips, 415 F.3d at
1323.  The mistake of "reading a limitation from the
written description into the claims" is "one of the
cardinal sins of patent law." Id. at 1320 (quoting SciMed
Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242
F.3d 1337, 1340 (Fed. Cir. 2001)).

　　　　　Courts may also utilize the prosecution history
which "consists of the complete record of the proceedings
before the PTO and includes the prior art cited during the
examination of the patent . . . .  [T]he prosecution

history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. at 1317 (internal citations omitted). However, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

Lastly, courts may rely on extrinsic evidence such as dictionaries, treatises, and expert testimony, which may serve to provide a source of "accepted meaning of terms used in various fields of science and technology," or by providing "background on the technology at issue." Id. at 1317-18. However, such "extrinsic" evidence is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." Id. at 1317 (internal citations and quotation marks omitted). The use of extrinsic evidence may not be used to contradict the meaning of the claim terms as evidenced by the intrinsic evidence. Id. at 1317-19; see also Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1302 (Fed. Cir. 2005).

## 2.    **Resolution of the disputed claim terms**

### a.    "DNA" and "isolated DNA"

The parties approach the terms "DNA" and
"isolated DNA" from opposing perspectives.[38]  Plaintiffs
contend that the term "DNA" means "a sequence of nucleic
acids, also referred to as nucleotides" and therefore
constitutes a "nucleotide sequence" or a "polynucleotide."
Pl. Br. at 10.[39]  Myriad disputes Plaintiffs' definition of
"DNA" insofar as Plaintiffs' definition suggests that the
term "DNA" refers merely to information, that is, "a
description of the linear order of nucleotide units that
make up the polynucleotide."  Myriad Br. at 15.  Myriad

---

[38] The degree to which the parties actually disagree on the meaning of
the discussed claim terms is unclear; however, to the extent some
disagreement has been noted by the parties, this section seeks to
resolve them.

[39] For purposes of this opinion, "Pl. Br." refers to Plaintiffs'
Memorandum of Law in Support of Motion for Summary Judgment; "Myriad
Br." refers to Myriad Defendants' Memorandum of Law (1) in Support of
Their Motion for Summary Judgment and (2) in Opposition to Plaintiffs'
Motion for Summary Judgment; "Pl. Reply" refers to the Memorandum of
Law (1) in Further Support of Plaintiffs' Motion for Summary Judgment
Against All Defendants and (2) in Opposition to the Myriad Defendants'
Motion for Summary Judgment and (3) in Opposition to Defendant United
States Patent and Trademark Office's Motion for Judgment on the
Pleadings; "Myriad Reply" refers to Myriad Defendants' Memorandum in
Reply to Plaintiffs' Opposition to Myriad Defendants' Motion for
Summary Judgment; and "USPTO Reply" refers to the Reply Memorandum of
Law in Further Support of Defendant United States Patent and Trademark
Office's Motion for Judgment on the Pleadings and in Opposition to
Plaintiffs' Motion for Summary Judgment.

instead argues that "DNA" refers to "a real and tangible
molecule, a chemical composition made up of
deoxyribonucleotides linked by a phosphodiester backbone."
Myriad Br. at 14.

As its name implies, DNA, or deoxyribonucleic
acid, is an acid - a tangible, chemical compound.  As
Myriad correctly notes, the specifications make clear that
"DNA," as used in the patents, refers to the physical
manifestation of the acid, one that may be "substantially
separated from other cellular components which naturally
accompany a gene."  '473 patent, col. 19:8-9; '282 patent,
col. 19:10-11; '492 patent, col. 17:64-65.  Despite the
description of the term "DNA" set forth in the briefs, this
understanding of the meaning of "DNA" is shared by both
Plaintiffs' and Myriad's declarants.  See Kay ¶ 125; Linck
¶ 45; Schlessinger ¶ 12; Grody ¶ 10; Leonard ¶ 30.

The term "isolated DNA" is defined by Plaintiffs
as "a fragment of DNA substantially separated from other
cellular components and other DNA." Pl. Br. at 10.  Myriad
disputes Plaintiffs' definition insofar as it implies that
fragments of DNA exist free-floating in the cell, separate
from other cellular components, such as proteins and the

other DNA in the chromosome.  Myriad Br. at 16.  The patent

specifications expressly define "isolated DNA" as a DNA

molecule "which is substantially separated from other

cellular components which naturally accompany a native

human sequence [such as] human genome sequences and

proteins" and "includes recombinant or cloned DNA isolates

and chemically synthesized analogs or analogs biologically

synthesized by heterologous systems."  '473 patent, col.

19:6-15; '282 patent, col. 19:8-18; '492 patent, col.

17:62-18:5.


        "Isolated DNA" is therefore construed to refer to

a segment of DNA nucleotides existing separate from other

cellular components normally associated with native DNA,

including proteins and other DNA sequences comprising the

remainder of the genome, and includes both DNA originating

from a cell as well as DNA synthesized through chemical or

heterologous biological means.


                b.    "BRCA1" and "BRCA2"


        Plaintiffs define the term "BRCA1" as "a

particular fragment of DNA found on chromosome 17 that

93

relates to a person's predisposition to develop breast and
ovarian cancer." Pl. Br. at 11. Similarly, Plaintiffs
define the term "BRCA2" as "a particular fragment of DNA
found on chromosome 13 that relate[s] to a person's
predisposition to develop breast and ovarian cancer." Pl.
Br. at 14. As with Plaintiffs' proposed definition of
"isolated DNA," Myriad argues that these definitions are
inconsistent with the patents' definition of "BRCA1" and
"BRCA2" as "cancer-predisposing gene[s], some alleles of
which cause susceptibility to breast and ovarian cancers"
because they suggest that the BRAC1 and BRCA2 genes are not
integrated into a chromosome, but are broken, detached, or
otherwise easily removed from their respective chromosomes.
Myriad Br. at 16.

        The specifications of the patents-in-suit define
the terms "BRCA1" and "BRCA2" as "a human breast cancer
predisposing gene . . . some alleles of which cause
susceptibility to cancer, in particular breast and ovarian
cancer." '282 patent, col. 4:33-36; see also '282 patent,
col. 1:22-23; '492 patent, col. 1:20-21, 4:28-29. Further,
neither party disputes that "genes" refer to segments of
DNA incorporated into chromosomes.

94

"BRCA1" is therefore construed to refer to a human gene, normally integrated into chromosome 17, some alleles of which cause susceptibility to breast and ovarian cancer.  Similarly, "BRCA2" is construed to refer to a human gene, normally integrated into chromosome 13, some alleles of which cause susceptibility to breast and ovarian cancer.

## V.   CONCLUSIONS OF LAW

### A.   The Summary Judgment Standard

Summary judgment is granted only where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).  The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (internal quotation marks omitted).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper." Gallo v. Prudential Residential
Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994)
(internal citations omitted).

## B.   35 U.S.C. § 101 and Its Scope

Section 101 of Title 35, United States Code,
provides:

> Whoever invents or discovers any new
> and useful process, machine,
> manufacture, or composition of matter,
> or any new and useful improvement
> thereof, may obtain a patent therefore,
> subject to the conditions and
> requirements of this title.

In interpreting this language, the Supreme Court
has observed that "Congress plainly contemplated that the
patent laws would be given wide scope." Diamond v.
Chakrabarty, 447 U.S. 303, 308 (1980); see also J.E.M. Ag
Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124,
131 (2001) ("[W]e are mindful that this Court has already
spoken clearly concerning the broad scope and applicability
of § 101.").

However, this broad reading of § 101 and statutory patent eligibility is not without limits. "The Supreme Court has recognized that scientific principles and laws of nature, even when for the first time discovered, have existed throughout time, define the relationship of man to his environment, and, as a consequence, ought not to be the subject of exclusive rights to any one person." In re Meyer, 688 F.2d 789, 795 (C.C.P.A. 1982) (citing Leroy v. Tatham, 55 U.S. 155, 175 (1852)). Specifically, the Supreme Court has recognized three categories of subject-matter that fall outside the scope of § 101: "The laws of nature, physical phenomena, and abstract ideas have been held not patentable." Chakrabarty, 447 U.S. at 309; see also Diamond v. Diehr, 450 U.S. 175, 185 (1981). "The rule that the discovery of a law of nature cannot be patented rests, not on the notion that natural phenomena are not processes, but rather on the more fundamental understanding that they are not the kind of 'discovery' that the statute was enacted to protect." Parker v. Flook, 437 U.S. 584, 593 (1978).

The exclusion of products of nature[40] as
patentable subject matter under § 101 also reflects the
Supreme Court's recognition that "[p]henomena of nature,
though just discovered, mental processes, and abstract
intellectual concepts are not patentable, as they are the
basic tools of scientific and technological work."
Gottschalk v. Benson, 409 U.S. 63, 67 (1972).  Thus, as
Justice Breyer has observed, "the reason for this exclusion
is that sometimes *too much* patent protection can impede
rather than 'promote the Progress of Science and useful
Arts,' the constitutional objective of patent and copyright
protection."  Lab. Corp. of Am. Holdings v. Metabolite
Labs., Inc., 548 U.S. 124, 126-27 (2006) (Breyer, J.,
dissenting) (quoting U.S. Const., Art. I, § 8, cl. 8.)
(emphasis in original).  For these reasons, "manifestations
of laws of nature [are] free to all men and reserved

---

[40] Myriad distinguishes between "laws of nature," "natural phenomena,"
and "abstract ideas," which it concedes are not patentable, and
"products of nature," for which it appears to argue no prohibition to
patentability exists.    Although the distinction between these two
categories is unclear, it is well established that "products of nature"
are not patentable.  See, e.g., Chakrabarty, 447 U.S. at 13 (stating
that relevant distinction for § 101 patentability is "between products
of nature, whether living or not, and human-made inventions"); Gen.
Elec. Co. v. De Forest Radio Co., 28 F.2d 641, 642 (3d Cir. 1928)
(noting that "a patent cannot be awarded for a discovery or for a
product of nature, or for a chemical element"); In re Marden, 47 F.2d
957, 957 (C.C.P.A. 1931) (concluding that "[u]ranium is a product of
nature, and the appellant is not entitled to a patent on the same, or
upon any of the inherent natural qualities of that metal"); In re
Marden, 47 F.2d 958, 959 (C.C.P.A. 1931) (stating that "pure vanadium
is not new in the inventive sense, and, it being a product of nature,
no one is entitled to a monopoly of the same").

exclusively to none."  Funk Bros. Seed Co. v. Kalo
Inoculant Co., 333 U.S. 127, 130 (1948).

          The inquiry into an invention's patent
eligibility is a fundamental one, and as such, "[t]he
obligation to determine what type of discovery is sought to
be patented must precede the determination of whether that
discovery is, in fact, new or obvious."  Flook, 437 U.S. at
593; see also In re Bilski, 545 F.3d 943, 950 (Fed. Cir.
2008) (en banc), cert. granted, 129 S. Ct. 2735 (2009)
("Whether a claim is drawn to patent-eligible subject
matter under § 101 is a threshold inquiry, and any claim of
an application failing the requirements of § 101 must be
rejected even if it meets all of the other legal
requirements of patentability." (citing In re Comiskey, 499
F.3d 1365, 1372 (Fed. Cir. 2007)); Prometheus Labs. v. Mayo
Collaborative Servs., 581 F.3d 1336, 1343 (Fed. Cir. 2009)
(noting that in determining patent eligibility, "it is
improper to consider whether a claimed element or step in a
process is novel or nonobvious, since such considerations
are separate requirements set forth in 35 U.S.C. §§ 102 and
103, respectively." (citing Bilski, 545 F.3d at 958)).
Consistent with this approach, the courts have rejected
patent claims even when the purported invention was highly

100

beneficial or novel, or the research and work that went
into identifying it was costly or time-consuming.  See,
e.g., Funk Bros., 333 U.S. at 130; Am. Fruit Growers, Inc.
v. Brodgex Co., 283 U.S. 1, 11-13 (1931); Gen. Elec. Co. v.
De Forest Radio Co., 28 F.2d 641, 642-43 (3d Cir. 1928).

        The distinction between the § 101 inquiry into
patentable subject matter and the other requirements for
patentability set forth in Title 35 is of particular
importance in evaluating the authorities cited by the
parties and the arguments presented.  The discussion of §
101 in In re Bergy, 596 F.2d 952 (C.C.P.A. 1979) by the
late Honorable Giles S. Rich, one of the authors of the
1952 Patent Act, is particularly informative in clarifying
the proper scope of a § 101 analysis.  There, Judge Rich
stated what considerations were salient - and importantly,
what considerations were not - in a § 101 analysis:

> Section 101 states three requirements: novelty,
> utility, and statutory subject matter.  The
> understanding that these three requirements are
> separate and distinct is long-standing and has
> been universally accepted. . . .  Thus, the
> questions of whether a particular invention is
> novel or useful are questions wholly apart from
> whether the invention falls into a category of
> statutory subject matter.  *Of the three
> requirements stated in § 101, only two, utility
> and statutory subject matter, are applied under §
> 101.*  As we shall show, in 1952 Congress voiced

> its intent to consider the novelty of an
> invention under § 102 where it is first made
> clear what the statute means by "new,"
> notwithstanding the fact that this requirement is
> first named in § 101.

Id. at 960-61 (emphasis added). Judge Rich further

cautioned that "statements in the older cases must be

handled with care lest the terms used in their reasoning

clash with the reformed terminology of the present statute;

lack of meticulous care may lead to distorted legal

conclusions." Id. at 959. The Supreme Court subsequently

affirmed this understanding of the § 101 analysis in Diehr,

noting that while it had been argued that "novelty is an

appropriate consideration under § 101," "[t]he question . .

. of whether a particular invention is novel is 'wholly

apart from whether from whether the invention falls into a

category of statutory subject matter.'"  450 U.S. at 189-90

(quoting Bergy, 596 F.2d at 961); see also Bilski, 545 F.3d

at 958 ("So here, it is irrelevant to the § 101 analysis

whether Applicants' claimed process is novel or non-

obvious.").

        Accordingly, in considering whether the patents-

in-suit comply with § 101, the proper analysis requires

determining (1) whether the claimed invention possesses

102

utility; and (2) whether the claimed invention constitutes

statutory subject matter, that is, whether it is a

"process, machine, manufacture, or composition of matter,

or any new and useful improvement thereof," 35 U.S.C. §

101, or whether the claimed invention instead falls within

the judicially created "products of nature" exception to

patentable subject matter, i.e., "laws of nature, natural

phenomenon, and abstract ideas," Chakrabarty, 447 U.S. at

309.   In contrast, the question of whether an invention is

"new" or "novel" over the prior art is a question addressed

by § 102 and falls outside of the scope of the present §

101 analysis.   Because it is undisputed that the claimed

compositions and methods possess utility, the sole task of

this Court is to resolve whether the claimed compositions

and methods constitute statutory subject matter or fall

within the judicially created products of nature exception

to patentable subject matter.

## C.   The Composition Claims Are Invalid Under 35 U.S.C. § 101

As noted, the issue presented by the instant

motions with respect to the composition claims is whether

or not claims directed to isolated DNA containing

naturally-occurring sequences fall within the products of

nature exception to § 101.  Based upon the reasons set forth below, it is concluded that the composition claims-in-suit are excepted.

### 1.   Consideration of the merits of Plaintiffs' challenge is appropriate.

Myriad offers several arguments for why this Court should not engage the substance of Plaintiffs' claims, but should instead dismiss them out of hand. Foremost among them is Myriad's assertion that Plaintiffs' claims should be dismissed in light of the "carefully considered policy of the USPTO," which is "entitled to great respect from the courts."  Myriad Br. at 26.  In so arguing, Myriad notes the presumption of validity afforded to patents, see 35 U.S.C. § 282, and the USPTO's prior consideration of the eligibility of gene-related patents, see Utility Examination Guidelines 66 Fed. Reg. 1092, 1092-99 (Jan. 5, 2001), as well as the Supreme Court's statements in J.E.M. Ag Supply, 534 U.S. 124.

The Federal Circuit has previously held that it owes no deference to USPTO legal determinations.  See, e.g., Arnold P'ship v. Dudas, 362 F.3d 1338, 1340 (Fed. Cir. 2004) ("This court reviews statutory interpretation,

104

the central issue in this case, without deference.").

While Congress has created a presumption of validity for

issued patents, approximately 40% of patents challenged in

the courts have been found invalid, demonstrating that this

presumption is far from absolute.  See Institute for

Intellectual Property & Information Law, University of

Houston Law Center, Patstats.org, Full Calendar Year 2008

Report,

http://www.patstats.org/2008_Full_Year_Posting.rev3.htm

(indicating that 40% of all validity determinations in

federal court in 2008 found the challenged patent invalid);

Paul F. Morgan & Bruce Stoner, Reexamination v. Litigation

– Making Intelligent Decisions in Challenging Patent

Validity, 86 J. Pat. & Trademark Off. Soc'y 441-461 (2004)

(citing USPTO statistics showing that 74% of patents

previously issued by the Patent Office and later challenged

through the reexamination process were either canceled or

changed by the USPTO).  Moreover, the lack of Congressional

action to specifically prohibit gene patents in response to

the USPTO's prior grant of such patents does not preclude

their review by the courts.  For example, in Bilski, 545

F.3d 943, the Federal Circuit set out a test for the

patentability of method claims that potentially will

invalidate thousands of patents on business method patents,

despite Congress' silence concerning the patentability of
such methods.  Finally, while the Supreme Court in J.E.M.
Ag Supply noted the USPTO's practice of issuing patents on
sexually reproducing plants in concluding that such plants
represented patentable subject matter under § 101, that
passing observation was neither dispositive nor central to
the Court's holding and does not establish a rule of
judicial deference to the USPTO's practices.  See J.E.M. Ag
Supply, 534 U.S. at 144-45.  Indeed, the judicial deference
urged by Myriad is difficult to reconcile with the courts'
consideration of the substantive issues presented in cases
such as Chakrabarty and indeed, J.E.M. Ag Supply itself.

        Moreover, in the absence of a § 101 challenge to
patent validity, the fact that courts have previously
upheld the validity of patents directed to biological
products in response to § 102 and/or § 103 challenges has
no bearing on the present inquiry.  See, e.g., In re Kubin,
561 F.3d 1351 (Fed. Cir. 2009) (considering obviousness of
claims); In re O'Farrell, 853 F.2d 894 (Fed. Cir. 1988)
(same).  The Patent Act sets out patent invalidity as an
issue to be raised by the parties, see 35 U.S.C. § 282, and
it would be erroneous to treat a case involving DNA-related
patents as holding that isolated human genes constitute

patentable subject matter under § 101.  Were that the case,

the Supreme Court could have proceeded with its

consideration of Metabolite Labs., after it granted

certiorari and the parties and amici had fully briefed the

issue of patentable subject matter eligibility, rather than

dismissing certiorari as improvidently granted based on the

parties' failure to raise the § 101 issue below.  548 U.S.

124.

Finally, Myriad's suggestion that invalidating

the patents-in-suit would constitute an unconstitutional

taking in violation of the Fifth Amendment of the

Constitution or a violation of the United States'

obligations under the Agreement on Trade-Related Aspects of

Intellectual Property Rights ("TRIPS") is unpersuasive.

Myriad's novel takings argument runs counter to a long

history of invalidation of patent claims by the courts and

is unsupported by legal precedent.  Similarly, Articles 8.1

and 27.3 of TRIPS permit governments to incorporate public

health concerns into their intellectual property laws and

to exclude from patentability diagnostic, therapeutic, or

surgical methods as well as particular inventions on the

grounds of public interest.  As a result, invalidation of

the patents-in-suit would constitute neither a

107

constitutional violation nor a conflict with the United
States' treaty obligations.

### 2. Patentable subject matter must be "markedly different" from a product of nature

Supreme Court precedent has established that
products of nature do not constitute patentable subject
matter absent a change that results in the creation of a
fundamentally new product. In American Fruit Growers, the
Supreme Court rejected patent claims covering fruit whose
skin had been treated with mold-resistant borax.
Acknowledging that the "complete article is not found in
nature," and "treatment, labor and manipulation" went into
producing the fruit, the Court nonetheless held that the
fruit did not become an "article of manufacture" unless it
"possesses a new or distinctive form, quality, or property"
compared to the naturally-occurring article.[41]  283 U.S. at
11.  The Court went on to observe:

---

[41] Myriad argues that American Fruit Growers was decided on novelty
grounds, rather than subject matter patentability.  See Myriad Br. at
26.  However, the Court's novelty discussion was restricted to its
analysis of the process claims. Am. Fruit Growers, 283 U.S. at 13-14
("If it be assumed that the process claims under consideration cover an
invention, we think this lacked novelty when application was made for
the patent August 13, 1923").  In contrast, its rejection of the
composition claims was based on an analysis of subject matter
patentability.  See id. at 11 ("Is an orange, the rind of which has
become impregnated with  borax, through immersion in a solution, and
thereby resistant to blue mold decay, a 'manufacture,' or manufactured
article, within the meaning of section 31, title 35, U.S. Code?").

108

> Manufacture implies a change, but every change is
> not manufacture, and yet every change in an
> article is the result of treatment, labor, and
> manipulation.  But something more is necessary .
> . . .  There must be transformation; a new and
> different article must emerge having a
> distinctive name, character, or use.

Id. at 12-13 (quoting Anheuser-Busch Brewing Ass'n v.
United States, 207 U.S. 556, 562 (1908)) (internal citation
and quotation marks omitted).

        Similarly, in Funk Brothers, the Supreme Court
considered whether a mixture of several naturally-occurring
species of bacteria was patentable.[42]   333 U.S. at 128-31.
Each species of bacteria in the mixture could extract
nitrogen from the air for plant usage.  While the patent
holder had created a mixture by selecting and testing for
strains of bacteria that did not mutually inhibit one
another, the Court concluded that the patent holder "did
not create a state of inhibition or of non-inhibition in
the bacteria.  Their qualities are the work of nature.
Those qualities are of course not patentable."  Id. at 130.

---

[42] Myriad suggests that the Supreme Court's holding in Funk Brothers was
premised on an obviousness determination, rather than patentable
subject matter.  Subsequent Supreme Court opinions, however, have
treated the holding in Funk Brothers as a statement of patentable
subject matter.  See Chakrabarty, 447 U.S. at 309-10; Flook, 437 U.S.
at 591-92; Benson, 409 U.S. at 67-68.

Most recently, the Supreme Court addressed the application of § 101 to product claims in Diamond v. Chakrabarty, 447 U.S. 303. In Chakrabarty, the Court considered whether a "live, human-made micro-organism is patentable subject matter under 35 U.S.C. § 101." Id. at 305. The microorganism in question was a bacterium that had been genetically engineered to break down multiple components of crude oil and possessed considerable utility in the treatment of oil spills. Id. In concluding that the man-made bacterial strain was patentable, the Court observed that the claim "is not to a hitherto unknown natural phenomenon, but to a nonnaturally occurring manufacture or composition of matter – a product of human ingenuity 'having a distinctive name, character [and] use.'" Id. at 309-10 (quoting Hartranft v. Wiegmann, 121 U.S. 609, 615 (1887)). The Court went on to contrast the Chakrabarty bacterium with the bacterial mixture at issue in Funk Brothers, stating that in Chakrabarty's case, "the patentee has produced a new bacterium with markedly different characteristics from any found in nature and one having the potential for significant utility. His discovery is not nature's handiwork, but his own . . . ."

Id. at 310.[43] This requirement that an invention possess "markedly different characteristics" for purposes of § 101 reflects the oft-repeated requirement that an invention have "a new or distinctive form, quality, or property" from a product of nature. Am. Fruit Growers, 283 U.S. at 11; In re Merz, 97 F.2d 599, 601 (C.C.P.A. 1935) ("[M]ere purification of known materials does not result in a patentable product," unless "the product obtained in such a case had properties and characteristics which were different in kind from those of the known product rather than in degree.").

Courts have also specifically held that "purification" of a natural compound, without more, is insufficient to render a product of nature patentable. In The American Wood-Paper Co. v. The Fibre Disintegrating Co., 90 U.S. (23 Wall.) 566 (1874), the Supreme Court held that refined cellulose, consisting of purified pulp derived from wood and vegetable, was unpatentable because it was "an extract obtained by the decomposition or disintegration

---

[43] Although Chakrabarty is often cited for the proposition that "anything under the sun that is made by man" is patentable, id. at 309, that phrase is a misleading quotation from the legislative history of the Patent Act of 1952. The full quote clearly acknowledges the statutory limitations to patentable subject matter: "A person may have 'invented' a machine or a manufacture, which may include anything under the sun made by man, but it is not necessarily patentable under section 101 unless the conditions of the title are fulfilled." H.R. Rep. No. 1923, 82d Cong., 2d Sess. 6 (1952).

111

of material substance." Id. at 593.  As the Court

observed:

> There are many things well known and valuable in
> medicine or in the arts which may be extracted
> from divers[e] substances.  But the extract is
> the same, no matter from what it has been taken.
> A process to obtain it from a subject from which
> it has never been taken may be the creature of
> invention, but the thing itself when obtained
> cannot be called a new manufacture.

Id. at 593-94.[44]  Similarly, in Cochrane v. Badische Anilin

& Soda Fabrik, 111 U.S. 293 (1884), the Court rejected a

patent on an artificial version of a natural red dye called

alizarine that was produced by manipulating another

compound through acid, heat, water or distillation.  See

generally, id.  Although the artificial version of the dye

was of a brighter hue than the naturally occurring dye, the

Court concluded that "[c]alling it artificial alizarine did

not make it a new composition of matter, and patentable as

such . . . ."  Id. at 311 (citing Am. Wood-Paper, 90 U.S.

(23 Wall.) at 593).


        In General Electric, 28 F.2d at 642, the Third

Circuit Court of Appeals considered the patentability of

---

[44] Given the posture of the challenge to the patent's validity, the
Court rested its holding on the fact that the patent in question was
invalid as non-novel.  Id.

purified tungsten, which possessed superior characteristics
and utility over its brittle, naturally-occurring form.
The court first noted that "[i]f it is a natural thing then
clearly, even if [the patentee] was the first to uncover it
and bring it into view, he cannot have a patent for it
because a patent cannot be awarded for a discovery or for a
product of nature, or for a chemical element." Id. The
court went on to state:

> Naturally we inquire who created pure tungsten.
> Coolidge? No. It existed in nature and
> doubtless has existed there for centuries. The
> fact that no one before Coolidge found it there
> does not negative its origin or existence.
>
> The second part of the claim reads: "Having
> ductility and high tensile strength." Did
> Coolidge give those qualities to "substantially
> pure tungsten"? We think not for it is now
> conceded that tungsten pure is ductile cold. If
> it possess that quality now it is certain that it
> possessed it always.

Id. at 643. The Court of Customs and Patent Appeals
("C.C.P.A."), the precursor to the Federal Circuit Court of
Appeals,[45] subsequently relied on General Electric in

---

[45] The decisions of the C.C.P.A. remain binding precedent in patent
cases.  See South Corp. v. United States, 690 F.2d 1368, 1370-71 (Fed.
Cir. 1982) (en banc) (adopting "[t]hat body of law represented by the
holdings of . . . the Court of Customs and Patent Appeals" as
"precedent" for the then-new Federal Circuit so as to "continu[e] the
stability in those areas of the law previously within the jurisdiction
of our predecessor courts").

113

rejecting patents claiming purified uranium and vanadium. See In re Marden, 47 F.2d 957, 957-58 (C.C.P.A. 1931) ("Marden I"); In re Marden, 47 F.2d 958, 1059 (C.C.P.A. 1931) ("Marden II") ("The quality of purity of vanadium or its ductility is a quality of a natural product and as such is not patentable."). Similarly, in Ex Parte Latimer, the Patent Commissioner refused to allow a patent on pine needle fibers that were better suited for textile production, even though it was necessary to remove the needle from its sheath and other resinous material. 1889 Dec. Comm'r Pat. 123, 125 (1889) ("Nature made them so and not the process by which they are taken from the leaf or needle.").

Myriad argues that purification of "'naturally occurring' compounds that 'do not exist in nature in pure form' renders such compounds patent-eligible." Myriad Br. at 21 (quoting In re Bergstrom, 427 F.2d 1394, 1401 (C.C.P.A. 1970)). However, Myriad cites no Supreme Court authority that would rebut the authorities presented by Plaintiffs, nor do the cited cases support Myriad's position.

Myriad has relied heavily on the holding of the
Honorable Learned Hand in Parke-Davis & Co. v. H.K. Mulford
Co., 189 F.2d 95 (S.D.N.Y. 1911).[46]  In Parke-Davis, Judge
Hand considered a challenge to the validity of a patent
claiming an adrenaline compound that had been isolated and
purified from animal suprarenal glands.  Id. at 97.  It had
been known that suprarenal glands in powdered form had
hemostatic, blood-pressure-raising and astringent

---

[46] The invocation of Judge Hand is frequently practiced in this Circuit.
See, e.g., United States v. Rigas, 583 F.3d 108, 121 n.3 (2d Cir. 2009)
(quoting Learned Hand for the proposition that appellate courts may not
find facts); United States v. Parker, 554 F.3d 230 (2d Cir. 2009)
(quoting Learned Hand for his formulation of the requirements of
conspiracy); In re City of New York, 522 F.3d 279, 284 (2d Cir. 2008)
(citing Learned Hand for his formulation of negligence); In re Hyman,
501 F.3d 61, 67 (2d Cir. 2007) (quoting at length Learned Hand's
inconclusive discussion of the meaning of the word "defalcation" in 11
U.S.C. § 523(a)(4)); United States v. Brand, 467 F.3d 179, 190 (2d Cir.
2006) (quoting Learned Hand's definition of inducement by the
government); In re Enron Corp., 419 F.3d 115, 123 (2d Cir. 2005)
(quoting Learned Hand's critique of statutes of limitations); Shannon
v. Jacobowitz, 394 F.3d 90, 95 (2d Cir. 2005) (quoting Learned Hand's
instruction that "[w]ords are not pebbles in alien juxtaposition . . .
."); Danahy v. Buscaglia, 134 F.3d 1185, 1189 (2d Cir. 1998) (quoting
Learned Hand on the rationale for qualified immunity).  See also,
Remarks of the Honorable John M. Walker, Jr. Upon Receiving the Learned
Hand Medal for Excellence in Federal Jurisprudence, 76 St. John's L.
Rev. 595, 596 (2002) ("Judge Hand is widely considered to have been one
of the four greatest judges of the first half of the twentieth
century."); James L. Oakes, Personal Reflections on Learned Hand and
the Second Circuit, 47 Stan. L. Rev. 387 (1995); Gerald Gunther,
Learned Hand: the Man and the Judge (1994); Kathryn Griffin, Judge
Learned Hand and the Role of the Federal Judiciary (1973); Marvin
Schick, Learned Hand's Court (1970); Marcia Nelson, ed., The Remarkable
Hands: An Affectionate Portrait (1983); Hershel Shanks, ed., The Art
and Craft of Judging: The Decisions of Judge Learned Hand (1968).
Although Judge Hand once turned his back on the author of this opinion
arguing before him on behalf of the Government, his opinion in Parke-
Davis deserves careful review but brings to mind that oft repeated
adage "Quote Learned, but follow Gus."  See Oakes, 47 Stan. L. Rev. at
389 n.175.  This author, confronted by genomics and molecular biology,
also emphatically empathizes with Judge Hand's complaint in Parke-Davis
about his lack of knowledge of the rudiments of chemistry.  See Parke-
Davis, 189 F. at 114.

properties, but could not be used for those purposes in gross form.  The isolated adrenaline, however, possessed the desired therapeutic properties and could be administered to humans.

Although Myriad argues that the holding in Parke-Davis establishes that the purification of a natural product necessarily renders it patentable, the opinion, read closely, fails to support such a conclusion.  The question before the court in Parke-Davis was one of novelty (a modern-day § 102 question), not of patentable subject matter (the § 101 question before this Court).  In framing the issue, Judge Hand observed that, "[the validity of the claims] is attacked, first, because they are anticipated in the art; and second, for a number of technical grounds which I shall take up in turn."  Id. at 101 (emphasis added).  He went on to conclude that the patented purified extract was not, in fact, different from the prior art "only for a degree of purity," but rather was a different chemical substance from that found in the prior art.  Id. at 103 (observing that "no one had ever isolated a substance [adrenaline] which was not in salt form" and that "the [claimed] base [form of adrenaline] was an original production of [the patentee's]").  Thus, Judge Hand held

116

that the purified adrenaline was not anticipated by the prior art, namely, the ground paradrenal gland that was known to possess certain beneficial properties. See Merck & Co. v. Olin Mathieson Chem. Corp., 253 F.2d 156, 162 (4th Cir. 1958) ("It was further held [in Parke-Davis] that the invention was not anticipated, though the principle was known to exist in the suprarenal glands.").

Only after concluding that the claimed purified adrenaline was novel over the prior art did Judge Hand offer, as dicta, the statement to which Myriad cites: "But, even if it were merely an extracted product without change, there is no rule that such products are not patentable." Id. at 103. While the accuracy of this statement at the time was written is dubious in light of American Wood-Paper (to which Judge Hand did not cite) it is certainly no longer good law in light of subsequent Supreme Court cases, which, as noted above, require that a claimed invention possess "markedly different characteristics" over products existing in nature in order for it to constitute patentable subject matter.[47] Chakrabarty, 447 U.S. at 310; see also Funk Bros., 333 U.S. at 130-32. By the same token, Judge

---

[47] Notwithstanding Judge Hand's reputation, see supra note 46, his opinion in Parke-Davis was one of a district court judge and does not supersede contrary statements of the law by the C.C.P.A. or the Supreme Court.

Hand's suggestion that a claimed invention was patentable
since it was a "new thing commercially and
therapeutically," Parke-Davis, 189 F.2d at 103, is firmly
contradicted by subsequent case law establishing that "it
is improper to consider whether a claimed element or step
in a process is novel or nonobvious, since such
considerations are separate requirements" when evaluating
whether a claim is patent-eligible subject matter.
Prometheus, 581 F.3d at 1343; see also Bergy, 596 F.2d at
960-61.  Such an approach would also be inconsistent with
the Supreme Court's rejection of the patentability of the
commercially useful mixture of bacteria in Funk Brothers,
the refined cellulose in American Wood-Paper, and the
electromagnetic communication devices in O'Reilly v. Morse,
56 U.S. (15 How.) 62 (1853).

          The distinction between considerations of novelty
and patentable subject matter similarly undermines Myriad's
reliance on Bergstrom and In re Kratz, 592 F.2d 1169
(C.C.P.A. 1979), both of which presented issues of novelty
and anticipation rather than the question of patentable
subject matter.  In Bergstrom, the C.C.P.A. considered an
appeal from a rejection by the Board of Patent and
Interferences ("BPAI") of a patent claiming the purified

prostaglandins PGE$_2$ and PGE$_3$ that had been extracted from
human or animal prostate glands.   427 F.2d at 1398.
Although the BPAI cited § 101 in its rejection, the
C.C.P.A. recognized the issue as a § 102 question of
novelty.  Id. at 1400 ("Tested by the conventional
evidentiary criteria or 'conditions for patentability'
relevant to the present factual situation which Congress
has expressed in the various provisions of 35 U.S.C. § 102,
appellants are undoubtedly correct, for the Patent Office
has not been able to . . . establish that the claimed
subject matter lacks 'novelty.'"); see also id. at 1401
("[T]he fundamental error in the board's position, as we
see it, is the analysis and answer it gave to the sole
issue it accurately posed - whether the claimed pure
materials are novel as compared with the less pure
materials of the reference." (internal citation and
quotation marks omitted)).  Indeed, the C.C.P.A. itself has
subsequently recognized that Bergstrom is properly viewed
as a case concerning novelty.  Bergy, 596 F.2d at 961 ("Our
research has disclosed only two instances in which
rejections for lack of novelty were made by the PTO under §
101 . . . .  In In re Bergstrom we in effect treated the
rejection as if it had been made under § 102, observing in
the process that 'The word "new" in § 101 is defined and to

be construed in accordance with the provisions of § 102.'"
(internal citation omitted)).

Kratz examined the rejection of a patent claiming
a substantially purified chemical compound naturally
occurring in strawberries, called 2-methyl-2-pentenoic acid
("2M2PA"). 592 F.2d at 1170. The patentee had appealed
from the BPAI's determination that the purified compound
was obvious over the prior art under § 103. See id.
Although there was some discussion about whether the
composition claimed was a naturally-occurring compound, the
C.C.P.A. did not view the question before it as a § 101
inquiry. Instead, the court treated the appeal as a
question of novelty and anticipation pursuant to § 102.[48]
See, e.g., id. at 1174 ("It should be clear that an
anticipation rejection in such a case is necessarily based
on a dual footing.").[49]

---

[48] The differences between the test applied in Kratz and the "markedly
different" requirement set forth in Chakrabarty and other Supreme Court
precedent further demonstrates that the Kratz court was engaged in a §
102 anticipation analysis and not a § 101 statutory subject matter
analysis. See id. at 1174 (requiring, for a finding of anticipation,
that "the natural composition must inherently contain the naturally
occurring compound" and that "the claim must be of sufficient breadth
to encompass both the known natural composition and the naturally
occurring compound.").
[49] Bergy, also cited by Myriad, considered the question of whether
microorganisms constituted patentable subject matter, an issue
subsequently addressed by the Supreme Court in Chakrabarty. It did not
address the patentability of purified natural products, and its
citation to Merck and Parke-Davis was only for the purpose of noting

Finally, Merck & Co., Inc. v. Olin Mathieson Chem. Corp., 253 F.2d 156, cited by Myriad, is entirely consistent with the principle set forth in Funk Brothers and American Fruit Growers that something derived from a product of nature must "possess a new or distinctive form, quality, or property" in order to become patentable subject matter.  Am. Fruit Growers, 283 U.S. at 11.  In Merck, the Fourth Circuit considered the validity of a patent claiming a Vitamin $B_{12}$ composition useful for treating pernicious anemia.  Id. at 157.  Although naturally occurring Vitamin $B_{12}$ produced in cows had known therapeutic properties and was commercially available, the court found the purified $B_{12}$ composition, which was obtained from a microorganism, patentable.  In upholding the validity of the patent, the court held:

> Every slight step in purification does not
> produce a new product.  What is gained may be the
> old product, but with a greater degree of purity.
> Alpha alumina purified is still alpha alumina, In
> re Ridgway, 76 F.2d 602, [] and ultramarine from
> which floatable impurities have been removed is
> still ultramarine, In re Merz, 97 F.2d 599 . . .
> .

---

that courts had upheld patents on pharmaceutical compounds such as
vitamin $B_{12}$ and adrenaline.  See Bergy, 596 F.2d at 974-75 & n.13.

Id. at 163.   Because the court concluded that the purified
$B_{12}$ was more than a "mere advance in the degree of purity of
a known product," it determined that the claimed invention
was entitled to patent protection.   Id. at 164.

In sum, the clear line of Supreme Court precedent
and accompanying lower court authorities, stretching from
American Wood-Paper through to Chakrabarty, establishes
that purification of a product of nature, without more,
cannot transform it into patentable subject matter.
Rather, the purified product must possess "markedly
different characteristics" in order to satisfy the
requirements of § 101.

### 3.   The claimed isolated DNA is not "markedly different" from native DNA

The question thus presented by Plaintiffs'
challenge to the composition claims is whether the isolated
DNA claimed by Myriad possesses "markedly different
characteristics" from a product of nature.[50]   Chakrabarty,
447 U.S. at 310.   In support of its position, Myriad cites

---

[50] The parties do not appear to dispute that isolated DNA claimed in the
patents-in-suit are "useful" for purposes of § 101.

several differences between the isolated DNA claimed in the patents and the native DNA found within human cells.   None, however, establish the subject matter patentability of isolated *BRCA1/2* DNA.

The central premise of Myriad's argument that the claimed DNA is "markedly different" from DNA found in nature is the assertion that "[i]solated DNA molecules should be treated no differently than other chemical compounds for patent eligibility," Myriad Br. at 26, and that the alleged "difference in the structural and functional properties of isolated DNA" render the claimed DNA patentable subject matter, Myriad Br. at 31.

Myriad's focus on the chemical nature of DNA, however, fails to acknowledge the unique characteristics of DNA that differentiate it from other chemical compounds. As Myriad's expert Dr. Joseph Straus observed: "Genes are of double nature: On the one hand, they are chemical substances or molecules.   On the other hand, they are physical carriers of information, i.e., where the actual biological function of this information is coding for proteins.   Thus, inherently genes are multifunctional." Straus Decl. ¶ 20; see also *The Cell* at 98, 104 ("Today the

123

idea that DNA carries genetic information in its long chain
of nucleotides is so fundamental to biological thought that
it is sometimes difficult to realize the enormous
intellectual gap that it filled. . . .  DNA is relatively
inert chemically."); Kevin Davies & Michael White,
*Breakthrough: The Race to Find the Breast Cancer Gene* 166
(1996) (noting that Myriad Genetics' April 1994 press
release described itself as a "genetic information
business").  This informational quality is unique among the
chemical compounds found in our bodies, and it would be
erroneous to view DNA as "no different[]" than other
chemicals previously the subject of patents.[51]


          Myriad's argument that all chemical compounds,
such as the adrenaline at issue in Parke-Davis, necessarily
conveys some information ignores the biological realities
of DNA in comparison to other chemical compounds in the
body.  The information encoded in DNA is not information

---

[51] Myriad and many of the amici suggest that the invalidation of the
patents-in-suit will result in the decimation of the biotechnology
industry.  See, e.g., Myriad Br. at 28-29 (suggesting that a finding
that DNA is unpatentable subject matter will invalidate patents to
important chemical compounds such as the anticancer drug Taxol
(paclitaxel) and leave "little to nothing" of the United States
biotechnology industry).  The conclusions reached in this opinion
concerning the subject matter patentability of isolated DNA, however,
are based on the unique properties of DNA that distinguish it from all
other chemicals and biological molecules found in nature.  As a result,
Myriad's predictions for the future of the U.S. biotechnology industry
are unfounded.

124

about its *own* molecular structure incidental to its
biological function, as is the case with adrenaline or
other chemicals found in the body.  Rather, the information
encoded by DNA reflects its primary biological function:
directing the synthesis of *other* molecules in the body –
namely, proteins, "biological molecules of enormous
importance" which "catalyze biochemical reactions" and
constitute the "major structural materials of the animal
body."  O'Farrell, 854 F.2d at 895-96.  DNA, and in
particular the ordering of its nucleotides, therefore
serves as the physical embodiment of laws of nature – those
that define the construction of the human body.  Any
"information" that may be embodied by adrenaline and
similar molecules serves no comparable function, and none
of the declarations submitted by Myriad support such a
conclusion.  Consequently, the use of simple analogies
comparing DNA with chemical compounds previously the
subject of patents cannot replace consideration of the
distinctive characteristics of DNA.

          In light of DNA's unique qualities as a physical
embodiment of information, none of the structural and
functional differences cited by Myriad between native
*BRCA1/2* DNA and the isolated *BRCA1/2* DNA claimed in the

125

patents-in-suit render the claimed DNA "markedly
different." This conclusion is driven by the overriding
importance of DNA's nucleotide sequence to both its natural
biological function as well as the utility associated with
DNA in its isolated form. The preservation of this
defining characteristic of DNA in its native and isolated
forms mandates the conclusion that the challenged
composition claims are directed to unpatentable products of
nature.

Myriad argues that the § 101 inquiry into the
subject matter patentability of isolated DNA should focus
exclusively on the differences alleged to exist between
native and isolated DNA, rather than considering the
similarities that exist between the two forms of DNA. See,
e.g., Myriad Reply at 8-9 ("[T]he observation that isolated
DNA and native DNA share this single property [i.e. the
same protein coding sequences] is irrelevant to the
critical issue of whether there are *differences* in their
properties. It is the *differences* that are legally
relevant to the novelty inquiry under Section 101, not the
properties held in common." (emphasis in original)); Myriad
Br. at 8. Setting aside the fact that considerations such
as novelty are irrelevant for § 101 purposes, see Bergy,

126

596 F.2d at 960-61, Myriad offers no authorities supporting

such an approach.  To the contrary, the Supreme Court has

held that "[i]n determining the eligibility of [a] claimed

process for patent protection under § 101, [the] claims

must be considered as a whole."  Diehr, 450 U.S. at 188.

Similarly, the Federal Circuit has expressly held that

"[i]n the final analysis under § 101, the claimed

invention, as a whole, must be evaluated for what it is."

In re Grams, 888 F.2d 835, 839 (Fed. Cir. 1989) (quoting In

re Abele, 684 F.2d 902, 907 (C.C.P.A. 1982)).


Were Myriad's approach the law, it is difficult

to discern how any invention could fail the test.  For

example, the bacterial mixture in Funk Brothers was

unquestionably different from any preexisting bacterial

mixture; yet the Supreme Court recognized that a patent

directed to the mixture, considered as a whole, did no more

than patent "the handiwork of nature."  333 U.S. at 131.

There will almost inevitably be some identifiable

differences between a claimed invention and a product of

nature; the appropriate § 101 inquiry is whether,

considering the claimed invention as a whole, it is

sufficiently distinct in its fundamental characteristics

from natural phenomena to possess the required "distinctive

name, character, [and] use." Chakrabarty, 447 U.S. at 309-
10.

     None of Myriad's arguments establish the
distinctive nature of the claimed DNA.  Myriad's argument
that association of chromosomal proteins with native DNA
establishes the existence of "structural differences"
between native and isolated DNA relies on an incorrect
comparison between isolated DNA and *chromatin*, which are
indeed different insofar as chromatin includes chromosomal
proteins normally associated with DNA.  The proper
comparison is between the claimed isolated DNA and the
corresponding native DNA, and the presence or absence of
chromosomal proteins merely constitutes a difference in
purity that cannot serve to establish subject matter
patentability.  See Gen. Elec., 28 F.2d at 642-43; Marden
I, 47 F.2d at 957-58; Marden II, 47 F.2d at 1059.

     Myriad also attempts to rely on its assertion
that native DNA contains intron sequences that are absent
in the claimed *BRCA1/2* DNA.  However, some of the claims,
such as claim 1 of the '282 patent, are directed broadly to
DNA "coding for a BRCA1 polypeptide."  Native *BRCA1* DNA, by
definition, encodes the BRCA1 protein; thus claim 1 of the

'282 patent would cover purified *BRCA1* DNA possessing the
exact same structure found in the human cell, introns and
all.[52]  See also '492 patent, claim 1 (similarly claiming
isolated DNA "coding for a BRCA2 polypeptide").  In
addition, several of the composition claims are directed to
isolated DNA containing as few as 15 nucleotides of the
*BRCA1* coding sequence, see, e.g., '282 patent, claims 5 &
6, and at least some of these short DNA sequences will be
found within a single exon of the native *BRCA1* gene
sequence.  See Adam Pavlicek, et al., Evolution of the
Tumor Suppressor *BRCA1* Locus in Primates: Implications for
Cancer Predisposition, 13 Human Molecular Genetics 2737,
2737 (2004) (noting *BRCA1* exons range from 37 to 3427
nucleotides in length).  Therefore, for these small DNA
fragments, the existence of introns in native *BRCA1* DNA is
completely irrelevant to the question of structural
differences when comparing these short DNA molecules with
native *BRCA1* DNA.

More generally, the fact that the *BRCA1/2* cDNA
molecules covered by the composition claims-in-suit contain
only the protein coding exons and not the introns found in

---

[52] To the extent a claim reads on unpatentable subject matter, the
entire claim must be deemed invalid.  See Titanium Metals Corp. of Am.
v. Banner, 778 F.2d 775, 782 (Fed. Cir. 1985).

native DNA does not render these cDNAs and their native

counterparts "markedly different." The splice variants

represented by these cDNAs are the result of the naturally-

occurring splicing of pre-mRNA into mature mRNA.

Therefore, not only are the coding sequences contained in

the claimed DNA identical to those found in native DNA, the

particular arrangement of those coding sequences is the

result of the natural phenomena of RNA splicing. Finally,

at least in the case of *BRCA1*, the claimed cDNA sequences

are actually found in the human genome in the form of a

naturally occurring pseudogene. See Mason Supp. Decl. ¶

18.[53]


Myriad's argument that the functional differences

between native and isolated DNA demonstrates that they are

"markedly different" relies on the fact that isolated DNA

may be used in applications for which native DNA is

unsuitable, namely, in "molecular diagnostic tests (e.g.,

as probes, primers, templates for sequencing reactions), in

---

[53] Native DNA is sometimes methylated, but that methylation is preserved when the DNA is extracted and purified. Nussbaum Decl. ¶ 20. Since the claimed "isolated DNA" includes DNA extracted and purified from the body, methylation of DNA in the body does not distinguish native DNA from the claimed DNA. In addition, DNA in the body also exists in a non-methylated state, just as the synthesized DNA claimed in the patents would not be methylated. More importantly, while methylation affects the transcription of a gene in the body, it does not have any impact on the genetic information contained within the DNA. Indeed, DNA is demethylated and remethylated as it passes from the germline of one generation to the next. Nussbaum Decl. ¶ 28.

biotechnological processes (e.g. production of pure *BRCA1*
and *BRCA2* protein), and even in medical treatments (e.g.
gene therapy)."  Myriad Reply at 9; see also Myriad Br. at
30-32.


Isolated DNA's utility as a primer or a molecular
probe (for example, for Southern blots) arises from its
ability to "target and interact with other DNA molecules,"
that is, the ability of a given DNA molecule to bind
exclusively to a specific DNA target sequence.  Myriad Br.
at 33; see Kay Decl. ¶ 138.  Thus, for example, a 24
nucleotide segment of isolated *BRCA1* DNA can be used as a
primer because it will bind only to its corresponding
location in the *BRCA1* gene.  However, the basis for this
utility is the fact that the isolated DNA possesses the
identical nucleotide sequence as the target DNA sequence,[54]
thus allowing target specific hybridization between the DNA
primer and the portion of the target DNA molecule
possessing the corresponding sequence.  Kay Decl. ¶¶ 135-
36, 138.  In contrast, another 24 nucleotide segment of DNA
possessing the same nucleotide composition but a different

---

[54] To be precise, the isolated single-stranded DNA molecule utilized as
a primer or probe has the identical sequence as the complementary DNA
strand to the DNA strand containing the target DNA sequence.  The
description in the text is meant to serve as a short-hand description
of this relationship.

131

nucleotide sequence would not have the same utility because it would be unable to hybridize to the proper location in the *BRCA1* gene.[55]   Indeed, Myriad implicitly acknowledges this fact when it states that the usefulness of isolated DNA molecules "is based on their ability to target and interact with other DNA molecules, which is a function of *their own individual structure and chemistry.*"   Myriad Br. at 33 (emphasis added).   Therefore, the cited utility of the isolated DNA as a primer or probe is primarily a function of the nucleotide sequence identity between native and isolated *BRCA1/2* DNA.

Similarly, the utility of isolated DNA as a sequencing target relies on the preservation of native DNA's nucleotide sequence.   Indeed, one need look no further than Myriad's BRACAnalysis testing, which relies on the sequencing of isolated DNA (i.e. the PCR amplified exons of *BRCA1/2*), to determine the sequence of the corresponding DNA coding sequences found in the cell.   The entire premise behind Myriad's genetic testing is that the claimed isolated DNA retains, in all relevant respects, the identical nucleotide sequence found in native DNA.   The use

---

[55] The same reasoning applies with respect to the use of isolated DNA as a probe.   See Kay Decl. ¶¶ 135-36.

of isolated *BRCA1/2* DNA in the production of BRCA1/2
proteins or in gene therapy also relies on the identity
between the native DNA sequences and the sequences
contained in the isolated DNA molecule.  Were the isolated
*BRCA1/2* sequences different in any significant way, the
entire point of their use - the production of BRCA1/2
proteins - would be undermined.

While the absence of proteins and other
nucleotide sequences is currently required for DNA to be
useful for the cited purposes, the purification of native
DNA does not alter its essential characteristic - its
nucleotide sequence - that is defined by nature and central
to both its biological function within the cell and its
utility as a research tool in the lab.  The requirement
that the DNA used be "isolated" is ultimately a
technological limitation to the use of DNA in this fashion,
and a time may come when the use of DNA for molecular and
diagnostic purposes may not require such purification.  The
nucleotide sequence, however, is the defining
characteristic of the isolated DNA that will always be
required to provide the sequence-specific targeting and
protein coding ability that allows isolated DNA to be used
for the various applications cited by Myriad.  For these

133

reasons, the use of isolated DNA for the various purposes
cited by Myriad does not establish the existence of
differences "in kind" between native and isolated DNA that
would establish the subject matter patentability of what is
otherwise a product of nature.  See Am. Fruit Growers, 283
U.S. at 11.

        Finally, the isolated BRCA1/2 DNA claimed in
Myriad's patents bears comparison to the bacterial mixture
in Funk Brothers.  In explaining why the claimed mixture of
bacteria did not constitute an invention, the Court
observed that the first part of the claimed invention was
the "[d]iscovery of the fact that certain strains of each
species of these bacteria can be mixed without harmful
effect to the properties of either" which was "a discovery
of their qualities of non-inhibition.  It is no more than
the discovery of some of the handiwork of nature and hence
is not patentable."  33 U.S. at 131.  The Court went on to
observe that the second part of the claimed invention was
"[t]he aggregation of select strains of the several species
into one product[, ] an application of that newly-
discovered natural principle.  But however ingenious the
discovery of that natural principle may have been, the

134

application of it is hardly more than an advance in the packaging of the inoculants." Id.

According to Myriad, the invention claimed in its patents required the identification of the specific segments of chromosomes 17 and 13 that correlated with breast and ovarian cancer (BRCA1 and BRCA2) followed by the isolation of these sequences away from other genomic DNA and cellular components. Myriad Reply at 6 ("By identifying these particular BRCA DNAs and isolating them away from other genomic DNA and other cellular components, the inventors created the claimed isolated BRCA DNA molecules."). Like the discovery of the mutual non-inhibition of the bacteria in Funk Brothers, discovery of this important correlation was a discovery of the handiwork of nature – the natural effect of certain mutations in a particular segment of the human genome. And like the aggregation of bacteria in Funk Brothers, the isolation of the BRCA1 and BRCA2 DNA, while requiring technical skill and considerable labor, was simply the application of techniques well-known to those skilled in the art. See Parthasarathy Decl. ¶ 19. The identification of the BRCA1 and BRCA2 gene sequences is unquestionably a valuable scientific achievement for which Myriad deserves

135

recognition, but that is not the same as concluding that it
is something for which they are entitled to a patent.  See
Funk Bros., 33 U.S. at 132 ("[O]nce nature's secret of the
non-inhibitive quality of certain strains of the [nitrogen-
fixing bacteria] was discovered, the state of the art made
the production of a mixed inoculant a simple step.  Even
though it may have been the product of skill, it certainly
was not the product of invention.").

Because the claimed isolated DNA is not markedly
different from native DNA as it exists in nature, it
constitutes unpatentable subject matter under 35 U.S.C. §
101.

### D.    The Method Claims are Invalid Under 35 U.S.C. § 101

"Phenomena of nature, though just discovered,
mental processes, and abstract intellectual concepts are
not patentable, as they are the basic tools of scientific
and technological work."  Benson, 409 U.S. at 67.  However,
"'an application of a law of nature or mathematical formula
to a known structure or process may well be deserving of
patent protection.'" Bilski, 545 F.3d at 953 (quoting
Diehr, 450 U.S. at 187).  In Bilski, the Federal Circuit

set forth "the definitive test to determine whether a process claim is tailored narrowly enough to encompass only a particular application of a fundamental principle rather than pre-empt the principle itself." Id. at 954. Under this "machine or transformation" test, "[a] claimed process is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." Id. In addition, "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope to impart patent-eligibility," and "the involvement of the machine or transformation in the claimed process must not merely be insignificant extra-solution activity." Id. at 961-62. In other words, the "transformation must be central to the purpose of the claimed process." Id. at 962. In particular, the Bilski court held that "adding a data-gathering step to an algorithm is insufficient to convert that algorithm into a patent-eligible process." Id. at 963 (citing Grams, 888 F.2d at 840; Meyer, 688 F.2d at 794). "A requirement simply that data inputs be gathered – without specifying how – is a meaningless limit on a claim to an algorithm because every algorithm inherently require the gathering of data inputs." Id. (citing Grams, 888 F.2d at 839-40).

137

"Further, the inherent step of gathering data can also
fairly be characterized as insignificant extra-solution
activity." Id. (citing Flook, 437 U.S. at 590).

### 1. The claims for "analyzing" and "comparing" DNA sequences are invalid under § 101

Claim 1 of the '999 patent is directed to the
process of "analyzing" a BRCA1 sequence and noting whether
or not the specified naturally-occurring mutations exist.
The claimed process is not limited to any particular method
of analysis and does not specify any further action beyond
the act of "analyzing."  Similarly, claim 1 of the '001,
'441, and '857 patents as well as claim 2 of the '857
patents are directed to "comparing" two gene sequences to
see if any differences exist and do not specify any
limitations on the method of comparison.

Myriad argues that these method claims should not
be viewed as mental processes because they incorporate a
transformation step and therefore satisfy the
"transformation" prong of the Bilski "machine or
transformation" test.  In support of its position, Myriad
relies primarily on the Federal Circuit's holding in

138

Prometheus, 581 F.3d 1336.  There, the Federal Circuit considered a patent containing claims directed to methods for calibrating the proper dosage of thiopurine drugs by measuring metabolites in subjects having gastrointestinal disorders.  Id. at 1343-50.  The patentees had discovered a correlation between metabolite levels in a patient's blood and the therapeutic efficacy of a dose of the drug.  Based on this correlation, the patentees claimed methods to optimize therapeutic efficiency while minimizing side effects by determining metabolite levels and identifying a need to adjust drug dosage upward or downward based on the levels.  Id. at 1339-40.  A representative claim asserted by the patentee in Prometheus claimed:

> A method of optimizing therapeutic efficacy for treatment of an immune-mediated gastrointestinal disorder, comprising:
>
> (a) administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder; and
>
> (b) determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder,
>
> wherein the level of 6-thioguanine less than about 230 pmol per $8x10^8$ red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject and

139

> wherein the level of 6-thioguanine greater than
> about 400 pmol per $8x10^8$ red blood cells
> indicates a need to decrease the amount of said
> drug subsequently administered to said subject.

Id. at 1340.

In concluding that the claimed methods satisfied
the requirements of § 101, the Federal Circuit held that
the relevant transformation for purposes of the "machine or
transformation" test was the transformation of the human
body as well as the chemical and physical changes of the
drug's metabolites. Id. at 1346 (stating that "claims to
methods of treatment," were "always transformative when a
defined group of drugs is administered to the body to
ameliorate the effects of an undesired condition").
Because the transformative steps were central to the
claimed treatment methods, they satisfied the "machine or
transformation" test. Id. at 1346-47.  The court went on
to hold that the "determining" step alone was
transformative and central to the claimed methods since
"determining the levels of [the metabolites] 6-TG or 6-MMP
in a subject necessarily involves a transformation, for
those levels cannot be determined by mere inspection." Id.
at 1347.

140

Myriad argues that just as the act of
"determining" metabolite levels in Prometheus was found to
involve the transformation of human blood, so too should
"analyzing" or "comparing" BRCA1/2 gene sequences be
construed to incorporate physically transformative steps
(i.e. the isolation and sequencing of DNA[56]) that would
satisfy the Bilski "machine or transformation" test.
Myriad further asserts that these transformations are
"central to the purpose of the claims," id. at 1347,
because "Myriad's method claims each require the
transformation of a tissue or blood sample in order to
isolate the patient's DNA."  Myriad Br. at 35.

The claims in Prometheus, however, are
distinguishable from the method claims in dispute here.  In
Prometheus, "determining metabolite levels in the clinical
samples taken from patients" was found to be transformative
because the act of "determining metabolite levels" was
itself construed to include the extraction and measurement
of metabolite concentrations, such as high pressure liquid
chromatography.    See Prometheus, 581 F.3d at 1347.  Indeed,

---

[56] The challenged method claims are also directed to analyzing and
comparing RNA and cDNA sequences, but for purposes of this opinion, the
discussion will be framed in terms of analyzing and comparing DNA
sequences.

neither party in Prometheus disputed that "determining"
metabolite levels in samples taken from patients was, in
and of itself, transformative.[57]  Id.

In contrast, the language of the method claims-
in-suit and the plain and ordinary meanings of the terms
"analyzing" or "comparing" establish that the method
claims-in-suit are directed only to the abstract mental
processes of "comparing" or "analyzing" gene sequences.
Although Myriad asserts that the challenged method claims
are directed to comparing DNA molecules rather than DNA
sequences, the language of the claims belies such an
interpretation.  While the purpose of the claimed method
is, for example, to "detect a germline alteration in a
BRCA1 gene," see '999 patent, col. 161:17-18, the method
actually claimed is "analyzing a sequence of a BRCA1 gene."
'999 patent, col. 161: 20-21 (emphasis added); see also
'001 patent, col. 144:2-17 ("A method . . . which comprises
gene comparing a first sequence selected from the group
consisting of a BRCA1 gene from said tumor sample . . .
with a second sequence selected from the group consisting
of BRCA1 gene from a nontumor sample . . . wherein a

---

[57] The issue with respect to the "determining" step was not whether it
was transformative, but whether that transformation was central to the
claimed invention.  Id.

142

difference in the sequence of the BRCA1 gene . . . indicates a somatic alteration in the BRCA1 gene."); '857 patent, col. 169:40-45 ("A method . . . which comprises comparing the nucleotide sequence of the suspected mutant BRCA2 allele with the wild-type BRCA2 nucleotide sequence . . . .").

Similarly, the inclusion of the phrases "from a human subject" or "from a nontumor sample" in the claims serve only to specify the identity of the DNA or RNA sequence to be "analyzed" or "compared," i.e., from a human sample as opposed to an animal sample or cell culture, and do not, as Myriad argues, establish that the claims should be read to include the physical transformations associated with obtaining DNA from those sources.[58]  In addition, the passages from the '999 specification cited by Myriad describing the process by which DNA sequences are obtained cannot serve to redefine the scope of the challenged claims

---

[58] Whether acts are "transformative" in the context of the "machine or transformation" test for process claims is distinct from the question of whether those acts would render the resulting product patentable subject matter.  See, e.g., Am. Wood-Paper, 90 U.S. (23 Wall.) at 593-94 (noting that a party may be entitled to a patent on a process for purifying a natural product but not the final product itself if the final product is not different "in kind" from the natural product); Merz, 97 F.2d at 601 (same).  Therefore the description of DNA purification and sequencing as "transformative acts" in the context of the challenged process claims is not inconsistent with the conclusion that the isolated DNAs claimed in the challenged patents constitute unpatentable subject matter.

143

without violating the prohibition against importing claim
limitations from the specification.  See Phillips, 415 F.3d
at 1320.

By the same token, the transformative steps
associated with isolating and sequencing DNA described in
the unchallenged dependent claims cannot be used to
establish that the challenged claims include transformative
events.  To do so would violate the doctrine of claim
differentiation, which presumes that "different words or
phrases used in separate claims . . . indicate that the
claims have different meanings and scope."  Karlin Tech.,
Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 972 (Fed.
Cir. 1999).  Because claim differentiation "prevents the
narrowing of broad claims by reading into them the
limitations of narrower claims," Clearstream Wastewater
Sys., Inc. v. Hydro-Action, Inc., 206 F.3d 1440, 1446 (Fed.
Cir. 2000), the dependent claims serve only to illustrate
the breadth of the challenged claims and reinforce the
conclusion that what is claimed are mental processes
independent of any physical transformations.  See Phillips,
415 F.3d at 1314-15 ("[T]he presence of a dependent claim
that adds a particular limitation gives rise to a

144

presumption that the limitation in question is not present
in the independent claim.").[59]

Myriad also argues that because isolating and
sequencing DNA are required for "analyzing" or "comparing"
DNA sequences, Prometheus allows those transformative acts
to be incorporated into the process claims for purposes of
the § 101 analysis.  See Myriad Reply at 12.  Myriad thus
seeks to rely on transformations not actually claimed by
the method claims-in-suit to satisfy the Bilski "machine or
transformation" test.  Neither Prometheus nor any other
authority supports such an expansive approach to the
application of this test.  Prometheus held only that the
term "determining," as used in the claims at issue,
referred to acts that included manipulations that satisfied
the "machine or transformation" test.  Id.  Nowhere did
Prometheus suggest that preparatory physical
transformations required for the performance of, but not
included in, claims directed to mental processes should be
incorporated into the claim for purposes of the § 101
analysis.  Not only would such an approach be inconsistent

---

[59] The patent examiner's reasons for allowance, cited by Myriad, are
precisely the legal conclusions concerning the patentability of the
claimed methods being challenged by Plaintiffs.  Moreover, the
examiner's reasons of allowance cannot serve to define the scope of
claim terms.  See ACCO Brands, Inc. v. Micro Sec. Devices, Inc., 346
F.3d 1075, 1079 (Fed. Cir. 2003).

145

with the prohibition on the importation of claim
limitations from the specification, it would effectively
vitiate the limitations to claiming mental processes
provided by the "machine or transformation" test since "to
use virtually any natural phenomenon for virtually any
useful purpose could well involve the use of empirical
information obtained through an unpatented means that might
have involved transforming matter." Metabolite Labs., 548
U.S. at 136 (Breyer, J., dissenting).  Therefore the
preparatory transformations relating to obtaining DNA
sequences cannot be relied on to satisfy the requirements
of § 101.


Even if the challenged method claims were read to
include the transformations associated with isolating and
sequencing human DNA, these transformations would
constitute no more than "data-gathering step[s]" that are
not "central to the purpose of the claimed process."
Bilski, 545 F.3d at 962-63.  In Grams, the Federal Circuit
considered a patent directed to a method of diagnosing an
abnormal condition in an individual.  The claimed method
consisted of two steps: (1) "performance of clinical
laboratory tests on an individual to obtain data for the
parameters," and (2) "analyz[ing] that data to ascertain

146

the existence and identity of an abnormality . . . ."  888

F.2d at 837.  Concluding that the essence of what was

claimed was the mathematical algorithm for analyzing the

clinical data, and that the sole physical process –

laboratory testing – was merely data-gathering to obtain

clinical data, the court held the patent invalid under §

101 for claiming a mathematic algorithm.  Id. at 840.


The method claims-in-suit present a closely

analogous situation.  The essence of what is claimed is the

identification of a predisposition to breast cancer based

on "analyzing" or "comparing" BRCA1/2 gene sequences.  See,

e.g., '857 patent, claim 2 ("A method for diagnosing a

predisposition for breast cancer in a human subject which

comprises comparing the [BRCA2 gene sequence] from said

subject with the [] sequence of the wild-type BRCA2 gene .

. . .").  As in Grams, isolation and sequencing of DNA from

a human sample, even if incorporated into the method

claims-in-suit, would represent nothing more than data-

gathering steps to obtain the DNA sequence information on

which to perform the claimed comparison or analysis.

Moreover, in the absence of a specified method for

isolating and sequencing DNA, "[a] requirement simply that

data inputs be gathered – without specifying how – is a

147

meaningless limit on a claim to an algorithm because every algorithm inherently requires the gathering of data inputs." Bilski, 545 F.3d at 963 (citing Grams, 888 F.2d at 839-40). Consequently, even if the method claims-in-suit were construed to include the physical transformations associated with isolating and sequencing DNA, they would still fail the "machine or transformation" test under § 101 for subject matter patentability.

### 2. The claim for "comparing" the growth rate of cells is invalid under § 101.

Claim 20 of the '282 patent is directed to "comparing" the growth rates of cells in the presence or absence of a potential cancer therapeutic. Specifically, the claim recites a method for identifying potential cancer therapeutics by utilizing cells into which an altered *BRCA1* gene known to cause cancer has been inserted. Thus modified to mimic cancerous cells in the body, these cells are then grown in either the presence or absence of a potential cancer therapeutic, and the growth rates of the cells are compared to determine the effect of the potential therapeutic.

Unlike the method claims directed to "analyzing"
or "comparing" DNA sequences, claim 20 arguably recites
certain transformative steps, such as the administration of
the test compound.[60]  However, the essence of the claim,
when considered in its entirety, is the act of comparing
cell growth rates and concluding that "a slower growth of
said host cell in the presence of said compound is
indicative of a cancer therapeutic."  '282 patent, col.
156:25-27.

This claimed "process" is, in fact, the
scientific method itself, and claim 20 seeks to patent a
basic scientific principle: that a slower rate of cell
growth in the presence of a compound indicates that the

---

[60] It is questionable whether the two transformations cited by Myriad
are relevant transformations for purposes of the § 101 inquiry.  Under
Prometheus, the administration of a test compound is transformative
only if it effects a change in cell growth.  See Prometheus, 581 F.3d
at 1346 (finding "administering" of a drug transformative since it
resulted in changes to both the patient and the drug metabolites).  If
the test compound had no effect on the cells, it is unclear whether
there would be any basis to view its administration as working a
"transformation" since there would be no transformation with respect to
the cells (i.e. there was no change in their growth rate) and there
would also presumably be no transformation with respect to the test
drug (i.e. it was not metabolized).

The other alleged "transformation" cited by Myriad is the insertion of
DNA into cells to create the "transformed eukaryotic cell" for
treatment with the test compound.  Kay Decl. ¶ 57.  Even more that its
expansive interpretation of the method claims for analyzing DNA
sequences for § 101 purposes, Myriad's attempt to rely on
transformations associated with the creation of a starting product for
its claimed process is unsupported by the law and demonstrates the
limitlessness of Myriad's interpretation of Prometheus and the "machine
or transformation" test.

compound may be a cancer therapeutic.  The recited
transformative steps, as in Grams, represent nothing more
than preparatory, data-gathering steps to obtain growth
rate information and do not render the claimed mental
process patentable under § 101.  See Grams, 888 F.2d at 840
("The presence of a physical step in the claim to derive
data for the algorithm will not render the claim
statutory").[61]

## E.   The Constitutional Claims Against the USPTO Are Dismissed

As determined above, the patents issued by the
USPTO are directed to a law of nature and were therefore
improperly granted.  The doctrine of constitutional
avoidance, which states that courts should not reach
unnecessary constitutional questions, thereby becomes
applicable.  See, e.g., Allstate Ins. Co. v. Serio, 261
F.3d 143, 149-50 (2d Cir. 2001) ("It is axiomatic that the
federal courts should, where possible, avoid reaching
constitutional questions.") (citing Spector Motor Serv.,
Inc. v. McLaughlin, 323 U.S. 101 (1944) ("If there is one
doctrine more deeply rooted than any other in the process

---

[61] Because Plaintiffs' motion for summary judgment with respect to its claims against Myriad is granted on the basis of 35 U.S.C. § 101, its Constitutional claims need not be addressed.

150

of constitutional adjudication, it is that we ought not to
pass on questions of constitutionality . . . unless such
adjudication is unavoidable")); see also Ashwander v. TVA,
297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f
a case can be decided on either of two grounds, one
involving a constitutional question, the other a question
of statutory construction or general law, the Court will
decide only the latter."). This doctrine bears on the
consideration of Plaintiffs' claims that the USPTO's policy
permitting the grant of the Myriad patents violates Article
I, Section 8, Clause 8 and the First Amendment of the
Constitution.

        The Plaintiffs have not addressed these
authorities and have contended that "the doctrine of
constitutional avoidance is inapplicable" because the
invalidation of Myriad's claims pursuant to 35 U.S.C. § 101
"will not necessarily invalidate the USPTO's policy [in
granting the patents]." Pl. Reply at 43. However, a
decision by the Federal Circuit or the Supreme Court
affirming the holding set forth above would apply to both
the issued patents as well as patent applications and would
be binding on all patent holders and applicants, as well as
the USPTO. See Koninklijke Philips Electronics N.V. v.

Cardiac Science, 590 F.3d 1326, 1337 (Fed. Cir. 2010) ("We remind the district court and the [USPTO] Board that they must follow judicial precedent. . . ."). Thus, to the extent the USPTO examination policies are inconsistent with a final, binding ruling, the USPTO would conform its examination policies to avoid issuing patents directed to isolated DNA or the comparison or analysis of DNA sequences. See USPTO Reply Memo, at 4.

With the holding that the patents are invalid, the Plaintiffs have received the relief sought in the Complaint and the doctrine of constitutional avoidance precludes this Court from reaching the constitutional claims against the USPTO. See Allstate Ins. Co. v. Serio, 261 F.3d 143, 149-50 (2d Cir. 2001); USPTO Br. at 4. Plaintiffs' claims for constitutional violations against the USPTO are therefore dismissed without prejudice.

## VIII.   CONCLUSION

For the reasons set forth above, Plaintiffs'
motion for summary judgment is granted in part, Myriad's
motion for summary judgment is denied, the USPTO's motion
for judgment on the pleadings is granted, and the claims-
in-suit are declared invalid pursuant to 35 U.S.C. § 101.

Submit judgment on notice.

It is so ordered.

**New York, N.Y.**
**April 2, 2010**

ROBERT W. SWEET
U.S.D.J.

153